## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03043-RM-STV

**SHELLEY LEVINE**;
**STEFANIE LEVINE**;
**HAYA LEVINE**, individually and as
personal representative of the Estate of Rabbi Kalman (Cary) Levine;
**ESTATE OF RABBI KALMAN (CARY) LEVINE**, by its personal representative, Haya
Levine;
**AHARON LEVINE**;
**CHANA LEVINE**;
**YEHUDA YISROEL LEVINE**;
**MICHAL LEVINE**, individually and as parent and natural guardian of minor H.Y.A.
**H.Y.A.**, minor, by her parent and natural guardian Michal Levine;
**BASSHEVA MIRIAM PELCOVICS**, individually and as parent and natural guardian of
minors L.Y.P., Y.M.P., N.B.P., and Y.C.P.;
**L.Y.P.**, minor, by her parent and natural guardian Bassheva Miriam Pelcovics;
**Y.M.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**N.B.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**Y.C.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**YITZCHOK MEIR LEVINE**;
**YERACHMIEL LEVINE**;
**MOSHE LEVINE**;
**AVRAHAM LEVINE**;
**DR. NORMAN HECHING**;
**CHAYA WERFEL**, as personal representative of the Estate of Joseph Werfel;
**THE ESTATE OF JOSEPH WERFEL**, by its personal representative, Chaya Werfel;
**AVRAHAM NEFOUSSI**;
**DAVID SAMUEL SALIS**, individually and as parent and natural guardian of minor E.Y.S.;
**DANA-LEE SALIS**, individually and as parent and natural guardian of minor E.Y.S.;
**E.Y.S.**, minor, by his parents and natural guardians David Samuel Salis and Dana-Lee Salis;
**AKIVA POLLACK**;
**RABBI SAUL GOLDSTEIN**, individually and as parent and natural guardian of minors E.G.,
A.D.G., N.G. and B.G.;
**MIRIAM GOLDSTEIN**, individually and as parent and natural guardian of minors E.G.,
A.D.G., N.G. and B.G.;
**SARAH RIVKA GOLDSTEIN**;
**MORDECHAI GOLDSTEIN**;
**BASYA YEHUDIS GOLDSTEIN**;
**E.G.** minor, by his parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;
**A.D.G.**, minor, by his parents and natural guardians Rabbi Saul Goldstein and Miriam

Goldstein;

**N.G.**, minor, by her parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;

**B.G.**, minor, by her parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;

**MALKA GOLDSTEIN**;

**MOSHE GEDALIAH GOLDSTEIN**;

**YAKOVA KUPINSKY**, individually, as parent and natural guardian of minors M.K., and Y.K., and as personal representative of the estate of Rabbi Aryeh Kupinsky;

**ESTATE OF RABBI ARYEH KUPINSKY**, by its personal representative, Yakova Kupinsky;

**YITZCHAK KUPINSKY**;

**DEVORAH KUPINSKY**;

**M.K.**, minor, by her parent and natural guardian Yakova Kupinsky;

**Y.K.**, minor, by his parent and natural guardian Yakova Kupinsky;

**ELIYAHU KUPINSKY**;

**BASHY MIRIAM TWERSKY**, individually and as personal representative of the Estate of Rabbi Moshe Twersky;

**MESHULEM TWERSKY**, individually, as parent and natural guardian of minors R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T., and as personal representative of the Estate of Rabbi Moshe Twersky;

**R.T.(1)**, minor, by her parent and natural guardian Meshulem Twersky;

**C.T.**, minor, by her parent and natural guardian Meshulem Twersky;

**E.T.(1)**, minor, by her parent and natural guardian Meshulem Twersky;

**Y.T.**, minor, by his parent and natural guardian Meshulem Twersky;

**M.T.**, minor, by his parent and natural guardian Meshulem Twersky;

**E.T.(2)**, minor, by her parent and natural guardian Meshulem Twersky;

**S.T.**, minor, by her parent and natural guardian Meshulem Twersky;

**ESTATE OF RABBI MOSHE TWERSKY**, by its personal representatives Bashy Miriam Twersky and Meshulem Twersky;

**REFAEL TWERSKY**, individually and as parent and natural guardian of minors A.T., I.T., and R.T.(2);

**A.T.**, minor, by his parent and natural guardian Refael Twersky;

**I.T.**, minor, by her parent and natural guardian Refael Twersky;

**R.T.(2)**, minor, by her parent and natural guardian Refael Twersky;

**RIVKA WALDER**, individually and as parent and natural guardian of minors Y.A.W., I.W. and Y.W.;

**Y.A.W.**, minor, by his parent and natural guardian Rivka Walder;

**I.W.**, minor, by her parent and natural guardian Rivka Walder;

**Y.W.**, minor, by his parent and natural guardian Rivka Walder;

**NECHAMA CHARLAP**, individually and as parent and natural guardian of minors I.C. and E.C.;

**I.C.**, minor, by her parent and natural guardian Nechama Charlap;

**E.C.**, minor, by his parent and natural guardian Nechama Charlap;

**AVRAHAM TWERSKY**;

**RINAL SAIF**, individually, as parent and natural guardian of minor, L.S., and as personal representative of the Estate of Zidan Saif;

2

**ESTATE OF ZIDAN SAIF**, by its personal representative, Rinal Saif;
**L.S.**, minor, by her parent and natural guardian, Rinal Saif;
**NUHAD SAIF**;
**JULIA SAIF**;
**BRIANA HAZEL GOLDBERG**, individually and as personal representative of the Estate of
Rabbi Abraham Samuel (Avraham) Goldberg;
**ESTATE OF RABBI ABRAHAM SAMUEL (AVRAHAM) GOLDBERG**, by its personal
representative, Briana Hazel Goldberg;
**DEBORAH (GOLDBERG) HAMMOND**;
**LIBBY GOLDBERG**;
**RIVKA (GOLDBERG) SIRELING**;
**HADASSA (GOLDBERG) TREUHAFT**;
**ADRIAN GOLDBERG**; and
**ELISHEVA GOLDBERG**

      Plaintiffs,

v.

**THE PALESTINE LIBERATION ORGANIZATION**;
**THE PALESTINIAN AUTHORITY** (a/k/a "The Palestinian Interim Self-Government
Authority" and/or "The Palestinian National Authority"); and
**RIYAD MANSOUR**, as the representative of The Palestine Liberation Organization
and The Palestinian Authority,

      Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, by counsel, bring this action against Defendants, and allege as follows:

## INTRODUCTION

1.      This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et
seq.*, and supplemental causes of action, seeking damages for international terrorism, wrongful
death, personal injury, and related harms, resulting from a terrorist shooting and stabbing attack
carried out on November 18, 2014, in a synagogue in Jerusalem, Israel (the "Terrorist Attack").

2.      This action is brought by the personal representatives of the estates of U.S. citizens Rabbi Kalman (Cary) Levine, Rabbi Aryeh Kupinsky and Rabbi Moshe Twersky, and of non-U.S. citizens Zidan Saif and Rabbi Abraham Goldberg, all of whom were murdered in the Terrorist Attack; by U.S. citizens Rabbi Saul Goldstein, Mordechai Goldstein, Dr. Norman Heching, the late Joseph Werfel (by the personal representative of his estate), Avraham Nefoussi and David Samuel Salis, all of whom were present at the scene of the Terrorist Attack and suffered serious physical, emotional, and/or other injuries therein or as a result thereof; and by the family members of the aforementioned decedents and plaintiffs, each of whom has suffered serious emotional or other injuries as a result of the Terrorist Attack.

3.      The Terrorist Attack was executed by a constituent faction of defendant The Palestine Liberation Organization ("PLO") known as the Popular Front for the Liberation of Palestine ("PFLP"). Defendant PLO and defendant Palestinian Authority ("PA") (collectively: "defendants"[1]) aided and abetted and conspired with the PFLP to carry out the Terrorist Attack, and took other actions that facilitated, enabled, and caused the Terrorist Attack.

## SUBJECT MATTER JURISDICTION

4.      This Court has original subject matter over plaintiffs' ATA claims pursuant to 18 U.S.C. §§ 2331, 2333, 2334, and 2338, and 28 U.S.C. § 1331.

---

[1] For the sake of simplicity the term "defendants" used in this First Amended Complaint refers *only* to defendants PLO and PA. By contrast, Riyad Mansour, who is named in this action as a representative member of the PLO and PA, is referred to herein by his full name or by "Mansour."

5.     This Court has supplemental subject matter jurisdiction over plaintiffs' non-federal claims pursuant to 28 U.S.C. § 1367, because the non-federal claims and the ATA claims derive from a common nucleus of operative fact.

## VENUE

6.     Venue is proper in this Court pursuant to 18 U.S.C. § 2334(a) because plaintiff Shelley Levine is domiciled and resides in Boulder, Colorado.

## PERSONAL JURISDICTION

7.     This Court has acquired personal jurisdiction over defendants PLO and PA pursuant to Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure because the PLO and PA have waived service of process in this action (DE 15) and 18 U.S.C. § 2334(a) is a federal statute that authorizes nationwide service of process in actions under the ATA.

8.     Additionally or alternatively, this Court has acquired personal jurisdiction over defendants PLO and PA pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, because the PLO and PA have waived service of process in this action (DE 15), they are not subject to jurisdiction in any individual state's courts of general jurisdiction, and exercising personal jurisdiction over the PLO and PA is consistent with the United States Constitution and laws.

9.     The PLO and PA cannot assert a Due Process challenge to the exercise of personal jurisdiction over them in this action because the PLO and the PA have no Due Process rights.

10.     As its name indicates ("Palestine Liberation Organization") the PLO is a foreign political entity. The Executive Branch has correctly stated that: "Foreign entities such as the PLO obviously do not have due process rights since they are not part of our constitutional scheme."

*Palestine Info. Office v. Schultz*, No. 87-5396 (D.C. Cir. Jan. 1988), Brief for the U.S., at 44. Similarly, the Executive Branch has accurately stated that "[a]s a foreign political entity, the PLO does not itself enjoy constitutional protection … It is clear, for example, that the PLO would not be recognized by American courts as a juridical entity capable of bringing a constitutional claim. Neither will the argument that the PLO is not a sovereign nation bring it within the constitutional fold." *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104 (1987) at 120 (citation omitted).

11.     Defendant PA is a foreign government. As such, it is not a "person" within the meaning of the Due Process Clause. The Judicial Branch has properly determined that the Due Process Clause protects only *people*, never governments.[2] The Executive Branch, too, has correctly taken the position that a government entity, including a non-sovereign government (such as defendant PA), is not a "person" under the Due Process Clause.[3]

12.     Alternatively, if the Court finds that the PLO and/or the PA are entitled to the protections of the Due Process Clause, it can and should exercise personal jurisdiction over them in this action on the bases set forth below.

---

[2] *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) (U.S. States); *U.S. v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1089-90 (6th Cir. 1990) (federal government); *Appling Cty. v. Mun. Elec. Auth.*, 621 F.2d 1301, 1308 (5th Cir. 1980) (county); *City of E. St. Louis v. Cir. Ct. for the Twentieth Jud. Cir., St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) (municipalities); *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (Puerto Rico); *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) (Virgin Islands); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) (foreign states).

[3] *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, No. 96-1304 (D.P.R. 1996), United States' Motion for Partial Dismissal, at 24-25.

A.     **Specific Jurisdiction**

13.     As set forth in detail below : (i) the Terrorist Attack was carried out pursuant to the defendants' long-standing policy and practice of using terrorism, and the threat of further terrorism, to obtain concessions from Israel; (ii) the defendants recognize that they cannot obtain concessions from Israel unless the United States and the American public use their influence and leverage with Israel to convince it to make concessions; and (iii) in order to cause the United States and the American public to exercise their influence over Israel to make such concessions, the defendants utilized a "double-pronged strategy": (a) the defendants employed terrorist violence to provoke the interest and concern of the United States and the American public about Middle East peace and security and (b) in parallel, defendants argued and advocated to the United States and the American public that in order to end the terrorist violence, the United States and the American public must persuade Israel to make the concessions sought by the defendants.

14.     Between 1994 and the date of the Terrorist Attack, the PLO and PA maintained and operated a joint office in Washington, D.C., staffed by senior officials and numerous employees of the PLO and PA. The activities of that office, and the fact that the office and its personnel were maintained by and operated on behalf of both the PLO and the PA, have been the subject of many federal court decisions, and the defendants are precluded from contesting those factual holdings.

15.     The primary activity of defendants' D.C. office and staff was to carry out advocacy, public relations and propaganda on behalf of defendants PLO and PA in the United States. During the years prior and leading up to the Terrorist Attack, defendants' D.C.-based officers and staff conducted and participated in thousands of media interviews, public lectures, conferences, symposia, academic events, meetings, and other events across the United States. They issued numerous

press releases and statements, and published materials on defendants' U.S.-based, English-language website. A central message and theme that defendants' D.C. office and staff communicated to the American public generally, to American opinion makers, and to American policy-makers, politicians and officials, in the course of these wide-ranging advocacy activities, was that the terrorist violence in Israel, the West Bank, and Gaza, would end only after Israel made the concessions that the defendants sought, and that the United States and the American public should use their leverage and influence with Israel to cause it to make those concessions.

16.    The Fifth Amendment's Due Process Clause permits the exercise of jurisdiction over a defendant for claims which "relate to" the defendant's contacts with the United States. Defendants' extensive advocacy activities in the United States in the years prior to the Terrorist Attack sufficiently "relate to" plaintiffs' claims, because those activities were an integral part of the defendants' "double-pronged strategy" (described above) of using terrorism to achieve their goals.

**B.    Consent Jurisdiction**

17.    Additionally or alternatively, this Court has personal jurisdiction over the PLO and PA in this action pursuant to the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 (codified at 18 U.S.C. § 2334(e)). Defendants PLO and PA have consented to personal jurisdiction in ATA actions such as this, pursuant to the provisions of the PSJVTA, because the PLO and PA have elected to engage in the activities described in 18 U.S.C. § 2334(e)(1) after the trigger dates specified in the PSJVTA.

18.    For decades, defendants PLO and PA have maintained a practice and program (known as "Pay-for-Slay") of paying benefits to the family members of suicide bombers and other terrorists killed while carrying out deadly terrorist attacks against Jewish and Israeli targets, and

to the family members of terrorists who were imprisoned after pleading guilty to or being tried and convicted of executing such attacks. Scores of U.S. citizens were murdered or injured in the terrorist attacks for which defendants make these Pay-for-Slay payments.[4] Defendants' Pay-for-Slay payments thus meet all the elements of the payments described in 18 U.S.C. § 2334(e)(1)(A).

19.     Congress has determined that "[t]he Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror." Taylor Force Act, Pub. L. No. 115-141, § 1002(1) (Findings) (22 U.S.C. § 2378c-1 note) (Mar. 23, 2018). Congress has also called on "the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations to stop payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism" and has conditioned aid to the defendants on the termination of these payments. *Id*. at § 1003(1), § 1004.

20.     But defendants PLO and PA have defied the United States, and have publicly stated that they continued to make these Pay-for-Slay payments after the trigger date provided in the PSJVTA (120 days after the enactment of the PSJVTA, *i.e.*, April 18, 2020), and will continue to do so forever. For example, on June 8, 2020, PA Prime Minister Mohammad Shtayyeh stated in a television interview that: "[W]e continued to pay the prisoners and the *shahids* [martyrs] in full …

---

[4] The identities of the many Americans killed and injured in terrorist attacks in Israel, the West Bank and Gaza, for which defendants make their Pay-for-Slay payments, the circumstances of those attacks and the identities of many of the terrorists involved are generally available on the dockets of federal courts that have heard civil actions under the ATA and the Foreign Sovereign Immunities Act arising from those attacks. *See e.g. Linde v. Arab Bank*, Civ. Nos. 04-2799, 04-5449, 05-365 (E.D.N.Y.); *Campuzano v. Islamic Republic of Iran*, Civ. Nos. 00-2328, 01-1655 (D.D.C.); *Sokolow v. PLO*, Civ. No. 04-397 (S.D.N.Y); *Henkin v. Islamic Republic of Iran*, Civ. Nos. 18-1273, 19-1184 (D.D.C.).

We will remain committed to this until Judgment Day, until we are victorious, until the bloodbath stops, and until the prisons are closed. This is one issue to which we remain committed."[5]

21.     Defendants PLO and PA have thus admitted that they made payments constituting consent to jurisdiction under 18 U.S.C. § 2334(e)(1)(A). Defendants have explicitly conceded this fact on the record in this action. *See* DE 30 at 7, n.5.

22.     Moreover, documents produced to the plaintiffs by defendants show that subsequent to April 18, 2020, defendants made over one thousand Pay-for-Slay payments, totaling millions of dollars, to over 100 terrorists involved (or to the family members of terrorists who were killed) in some 50 terrorist attacks in which American citizens were killed or injured.

23.     Furthermore, documents produced to the plaintiffs by defendants show that in the years since the Terrorist Attack from which this action arises, both prior and subsequent to April 18, 2020, defendants made monthly Pay-for-Slay payments to the families of the terrorist murderers who carried out the Terrorist Attack, Uday Abu Jamal and Ghassan Abu Jamal.

24.     Defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(i), because after the trigger date provided in the PSJVTA (15 days after the enactment of the PSJVTA, *i.e.*, January 4, 2020), the PLO and PA continued to maintain offices, headquarters, premises and other facilities in the United States, at a building owned by them at 115 East 65th Street in New York. Deposition transcripts and documents produced to the

---

[5] Palestinian Prime Minister Mohammad Shtayyeh: We Are Reconsidering Our 1993 Recognition of Israel; We Will Continue to Pay Salaries to Families of Prisoners and "Martyrs," https://www.memri.org/reports/palestinian-prime-minister-mohammad-shtayyeh-we-are-reconsidering-our-1993-recognition.

plaintiffs by defendants PLO and PA, and/or that are publicly available, show that that building is used, among other things, as a personal residence, and to conduct propaganda, social media, and other public relations activities that are unrelated to the official business of the United Nations.

25.     Deposition transcripts and documents produced to the plaintiffs by defendants PLO and PA, and/or that are publicly available, show that defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(iii), because after January 4, 2020, defendants and their employees and agents conducted activities on defendants' behalf while physically present in the United States, including extensive propaganda, public relations, lobbying, and social media activities that are unrelated to the official business of the United Nations.

26.     Defendant PA was created in 1994 pursuant to agreements between the PLO and the State of Israel known as the Oslo Accords. Pursuant to the Oslo Accords, which govern the PA's capacity and authority, the PA lacks legal capacity to conduct foreign relations. *Gilmore v. Palestinian Authority*, 422 F. Supp. 2d 96, 101 (D.D.C. 2006) (The Oslo Accords "clearly indicate that the PA lacks the capacity to conduct foreign relations."). The PA is not an invitee of the UN, is not an observer at the UN, and has no status whatsoever at the UN. Therefore, as a threshold matter of law and fact, the PA's conduct and activities in the United States after January 4, 2020, and the conduct and activities of the PA's employees and agents in the United States after that date, are not and cannot be related to the official business of the United Nations.

**C.     Jurisdiction Pursuant to Rule 23.2 of the Federal Rules of Civil Procedure**

27.     Additionally or alternatively, this Court has personal jurisdiction over the PLO and PA pursuant to Rule 23.2 of the Federal Rules of Civil Procedure.

28.     The PLO and PA are both unincorporated associations. *Waldman v. PLO*, 835 F.3d 317, 332 (2d Cir. 2016) ("the PA is a non-sovereign government and the PLO is a foreign agent, and both are unincorporated associations.").

29.     The PLO and PA are judicially estopped from disputing that they are unincorporated associations, because they have successfully obtained dismissal of claims against them on the basis of the fact that they are unincorporated associations. *Shatsky v. PLO*, 2017 WL 2666111, at *10 (D.D.C. June 20, 2017) (agreeing that "the PLO and the PA are unincorporated associations" and granting motion by PLO and PA to dismiss non-federal claims against them for lack of capacity); *Sokolow v. PLO*, 60 F. Supp. 3d 509, 524 (S.D.N.Y. 2014) (same); *Parsons v. Palestinian Authority*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008) (same).

30.     Pursuant to Rule 23.2 of the Federal Rules of Civil Procedure, the PLO and the PA, as unincorporated associations, are each subject to suit "by naming certain members as representative parties." Fed. R. Civ. P. 23.2.

31.     Plaintiffs have named defendant Riyad Mansour ("Mansour") as a representative member of both the PLO and the PA. Riyad Mansour is a resident, domiciliary and citizen of the United States. He has resided and been domiciled in the United States for over 50 years, and has been a United States citizen for many decades. His home address is in Orlando, Florida (where he owns a private residence), but he often resides in defendants' building at 115 East 65th Street in New York. As a domiciliary of the United States, Mansour is subject to the general personal jurisdiction of this Court, pursuant to 18 U.S.C. § 2334(a).

32.     Pursuant to Rule 23.2, because this Court has jurisdiction over the representative member of the PLO and PA named in this action, Riyad Mansour, this Court also has personal jurisdiction over the PLO and PA.[6]

33.     Riyad Mansour is a senior member and officer of the PLO and PA, and he will fairly and adequately protect the interests of the PLO and PA and their members in this action.

34.     Mansour joined the PLO in 1983, and at that time began serving in a senior position ("Deputy Permanent Observer") at the PLO's UN Observer Mission. Mansour remained in that post until 1994. Since 2005 and until the present day, Riyad Mansour has served the PLO in the top position ("Permanent Observer") at the PLO's UN Mission.

35.     On September 5, 2005, defendant PA appointed Riyad Mansour to a very senior position (with the civil service rank of "ambassador") within the PA's Ministry of Foreign Affairs. Mansour holds and serves in that official rank and position in the PA until today.

36.     All of the elements of Rule 23.2 are therefore satisfied, and this Court has personal jurisdiction over defendants PLO and PA.

37.     Because defendants are subject to personal jurisdiction on plaintiffs' ATA claims, because the ATA authorizes nationwide personal jurisdiction and service of process, and because plaintiffs' ATA claims and non-federal claims derive from the same common nucleus of operative fact, this Court has pendent personal jurisdiction over defendants for plaintiffs' non-federal claims.

---

[6] "[A] a court has jurisdiction over an unincorporated association pursuant to Rule 23.2 Fed.R.Civ.P. on the basis of personal jurisdiction over the named class representatives." *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, 1204 (S.D.N.Y.), *aff'd*, 952 F.2d 393 (2d Cir. 1991). *Cf.* 7C C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure*: Civil 3d § 1861 (2021) (same).

## **THE PARTIES**

38.     Plaintiff Shelley Levine is and at all times was an American citizen, and the sister of American citizen Rabbi Kalman (Cary) Levine, who was murdered in the Terrorist Attack. Plaintiff Shelley Levine is domiciled and resides in Boulder, Colorado.

39.     Plaintiff Stefanie Levine is and at all times was an American citizen, and the sister of Rabbi Kalman (Cary) Levine.

40.     Plaintiff Haya Levine is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of Rabbi Kalman (Cary) Levine. Haya Levine brings this action individually and on behalf of the Estate of Rabbi Kalman (Cary) Levine.

41.     Plaintiff the Estate of Rabbi Kalman (Cary) Levine brings this action through its personal representative, plaintiff Haya Levine.

42.     Plaintiff Aharon Levine is and at all times was an American citizen and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

43.     Plaintiff Chana Levine is and at all times was an American citizen and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

44.     Plaintiff Yehuda Yisroel Levine is and at all times was an American citizen and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

45.     Plaintiff Michal Levine is and at all times was an American citizen, and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine. Michal Levine brings this action individually and as parent and natural guardian of her minor daughter plaintiff H.Y.A.

46.     Plaintiff H.Y.A., minor, is and at all times was an American citizen, and the granddaughter of Rabbi Kalman (Cary) Levine.

47.     Plaintiff Bassheva Miriam Pelcovics is and at all times was an American citizen, and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine. Bassheva Miriam Pelcovics brings this action individually and as parent and natural guardian of her minor children, plaintiffs L.Y.P., Y.M.P., N.B.P., and Y.C.P.

48.     Plaintiffs L.Y.P., Y.M.P., N.B.P., and Y.C.P. are and at all times were American citizens, and the grandchildren of Rabbi Kalman (Cary) Levine.

49.     Plaintiff Yitzchok Meir Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

50.     Plaintiff Yerachmiel Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

51.     Plaintiff Moshe Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

52.     Plaintiff Avraham Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

53.     Plaintiff Dr. Norman Heching was stabbed during the Terrorist Attack and is and at all times was an American citizen. Plaintiff the Estate of Joseph Wefel brings this action through its personal representative, plaintiff Chaya Werfel.

54.     Plaintiff Chaya Werfel is and at all relevant times was an American citizen. She brings this action as the widow, sole heir, and personal representative of the estate of decedent Joseph Werfel. Joseph Werfel was present at the scene of the Terrorist Attack and was at all times an American citizen.

55.     Plaintiff the Estate of Joseph Werfel brings this action through its personal representative, plaintiff Chaya Werfel.

56.     Plaintiff Avraham Nefoussi was present at the scene of the Terrorist Attack and is and at all times was an American citizen.

57.     Plaintiff David Samuel Salis was present at the scene of the Terrorist Attack and is and at all times was an American citizen. David Samuel Salis brings this action individually and as parent and natural guardian of his son, minor plaintiff E.Y.S.

58.     Plaintiff Dana-Lee Salis is and at all relevant times was the spouse of plaintiff David Samuel Salis. Dana-Lee Salis brings this action individually and as parent and natural guardian of her son, minor plaintiff E.Y.S.

59.     Plaintiff E.Y.S., minor, is and at all times was an American citizen, and the son of plaintiffs David Samuel Salis and Dana-Lee Salis.

60.     Plaintiff Akiva Pollack was present at the scene of the Terrorist Attack and is and at all times was an American citizen.

61.     Plaintiff Rabbi Saul Goldstein was stabbed during the Terrorist Attack and is and at all times was an American citizen. Rabbi Saul Goldstein brings this action individually and as parent and natural guardian of his minor children, plaintiffs E.G., A.D.G., N.G., and B.G.

62.     Plaintiff Miriam Goldstein is and at all relevant times was an American citizen, and the spouse of plaintiff Rabbi Saul Goldstein. Miriam Goldstein brings this action individually and as parent and natural guardian of her minor children, plaintiffs E.G., A.D.G., N.G., and B.G.

63.     Plaintiff Sarah Rivkah Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

64.     Plaintiff Mordechai Goldstein is and at all times was an American citizen, and the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein. Plaintiff Mordechai Goldstein was also present at the scene of the Terrorist Attack.

65.     Plaintiff Basya Yehudis Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

66.     Plaintiff E.G., minor, is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

67.     Plaintiff A.D.G., minor, is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

68.     Plaintiff N.G., minor, is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

69.     Plaintiff B.G., minor, is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

70.     Plaintiff Malka Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

71.     Plaintiff Moshe Gedaliah Goldstein is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

72.     Plaintiff Yakova Kupinsky is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of American citizen, Rabbi Aryeh Kupinsky, who was murdered in the Terrorist Attack, and the mother of minor plaintiffs M.K., and Y.K. Yakova Kupinsky brings this action individually, on behalf of the Estate of Rabbi Aryeh Kupinsky, and as parent and natural guardian of her minor children, M.K., and Y.K.

73.     Plaintiff the Estate of Rabbi Aryeh Kupinsky brings this action through its personal representative, plaintiff Yakova Kupinsky.

74.     Plaintiff Yitzchak Kupinsky is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

75.     Plaintiff Devorah Kupinsky is and at all times was an American citizen and the daughter of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

76.     Plaintiff M.K., minor, is and at all times was an American citizen and the daughter of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

77.     Plaintiff Y.K., minor, is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

78.     Plaintiff Eliyahu Kupinsky, is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

79.     Plaintiff Bashy Miriam Twersky is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of American citizen, Rabbi Moshe Twersky, who was murdered in the Terrorist Attack. Bashy Miriam Twersky brings this action individually and on behalf of the Estate of Rabbi Moshe Twersky.

80.     Plaintiff Meshulem Twersky is and at all relevant times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Together with his mother, plaintiff Bashy Miriam Twersky, he is personal representative of the Estate of Rabbi Moshe Twersky. Meshulem Twersky brings this action individually, on behalf of the Estate of Rabbi Moshe Twersky, and as parent and natural guardian of his minor children plaintiffs R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T.

81.     Plaintiffs R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

82.     Plaintiff the Estate of Rabbi Moshe Twersky brings this action through its personal representatives, plaintiffs Bashy Miriam Twersky and Meshulem Twersky.

83.     Plaintiff Refael Twersky is and at all times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Rafael Twersky brings this action individually and as parent and natural guardian of his minor children plaintiffs A.T., I.T., and R.T.(2).

84.     Plaintiffs A.T., I.T., and R.T.(2), minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

85.    Plaintiff Rivka Walder is and at all times was an American citizen, and the daughter of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Rivka Walder brings this action individually and as parent and natural guardian of her minor children plaintiffs Y.A.W., I.W., and Y.W.

86.    Plaintiffs Y.A.W., I.W., and Y.W., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

87.    Plaintiff Nechama Charlap is and at all times was an American citizen, and the daughter of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Nechama Charlap brings this action individually and as the parent and natural guardian of her minor children plaintiffs I.C. and E.C.

88.    Plaintiffs I.C. and E.C., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

89.    Plaintiff Avraham Twersky is and at all times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky.

90.    Plaintiff Rinal Saif, is the widow and personal representative of the estate of Zidan Saif, a policeman who was among the first to respond to emergency calls regarding the Terrorist Attack. Zidan Saif was mortally wounded and later died of his wounds. Rinal Saif is also the mother of minor plaintiff, L.S. Rinal Sarif brings this action individually and on behalf of the Estate of Zidan Saif, and as the parent and natural guardian of her minor child, L.S.

91.    Plaintiff the Estate of Zidan Saif brings this action through its personal representative, plaintiff, Rinal Saif.

92.    Plaintiff L.S. is the minor daughter of Zidan Saif.

20

93.     Plaintiff Nuhad Saif is the father of Zidan Saif.

94.     Plaintiff Julia Saif is the mother of Zidan Saif.

95.     Plaintiff Briana Hazel Goldberg is the widow and personal representative of the estate of Rabbi Avraham Shmuel (Abraham) Goldberg, who was murdered in the Terrorist Attack. Briana Goldberg brings this action individually and on behalf of the Estate of Rabbi Avraham Shmuel (Abraham) Goldberg.

96.     Plaintiff Estate of Rabbi Abraham Samuel (Avraham) Goldberg brings this action through its personal representative, plaintiff Briana Hazel Goldberg.

97.     Plaintiff Deborah (Goldberg) Hammond is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

98.     Plaintiff Libby Goldberg is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

99.     Plaintiff Rivka (Goldberg) Sireling is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

100.     Plaintiff Hadassa (Goldberg) Treuhaft is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

101.     Plaintiff Adrian Goldberg is the son of Rabbi Avraham Shmuel (Abraham) Goldberg.

102.     Plaintiff Elisheva Goldberg is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

103.     Defendant PLO is a person as defined in 18 U.S.C. § 2331. Defendant PLO aided and abetted, conspired to carry out, caused, and executed the Terrorist Attack.

104.     Defendant PA is a person as defined in 18 U.S.C. § 2331. Defendant PA aided and abetted, conspired to carry out, caused, and executed the Terrorist Attack.

105.     Defendant Riyad Mansour, a citizen and domiciliary of the United States, is a senior official and member of the PLO and the PA, and is named in this action as the representative member of the PLO and PA pursuant to Fed. R. Civ. P. 23.2.

## STATEMENT OF FACTS

**A.     Historical and Geographical Context**

106.     The establishment of the State of Israel was proclaimed on May 14, 1948, and President Harry S. Truman recognized the new nation just eleven minutes after its independence was declared. Hours later, the regular armies of Egypt, Jordan, Syria, Lebanon, and Iraq invaded the nascent country, in an effort to destroy Israel in its infancy. The invading armies were joined in this effort by thousands of local armed irregulars and guerillas. This fighting, known as Israel's War of Independence, lasted into 1949, when Israel and most of the invading countries signed armistice agreements. The conclusion of the War of Independence left the West Bank (including East Jerusalem) under Jordanian rule, and the Gaza Strip under Egyptian rule.

107.     Eighteen years later, in June 1967, full-scale armed conflict again erupted between Israel, Egypt, Jordan and Syria. During this conflict, generally known as the Six-Day War, Israel captured the West Bank (including East Jerusalem) from Jordan, and the Gaza Strip from Egypt.[7]

---

[7] During the Six-Day War Israel also captured the Sinai Peninsula from Egypt, and the Golan Heights from Syria. Sinai was returned to Egypt as part of the 1979 Camp David peace agreement between Israel and Egypt. Israel effectively annexed the Golan Heights in 1981.

B.      **The PLO and the PFLP**

108.    Defendant Palestine Liberation Organization ("PLO") was founded in 1964 (*i.e.*, long prior to Israel's capture of the West Bank and Gaza Strip). The structure and internal operations of the PLO are governed by the PLO's Basic Law. The two most important governing bodies in the PLO are the Palestine National Council ("PNC"), and the Executive Committee. The PNC has several hundred members, convenes in full infrequently, and is the highest decision-making body in the PLO. The PLO Executive Committee has fewer than 20 members, meets frequently, and controls the day-to-day operations of the PLO.

109.    The leader of the PLO is the Chairman of the PLO Executive Committee (also known as "Chairman of PLO"). Between 1969 and 2004 the Chairman of the PLO was the late Yasser Arafat. Since Arafat's death in 2004 the Chairman of the PLO has been Mahmoud Abbas.

110.    Since the late 1960's the PLO has been an "umbrella" organization composed of several constituent factions. Each of these factions has representatives in the PNC and on the PLO Executive Committee. The largest faction in the PLO has always been the "Fatah" faction, headed first by Yasser Arafat and then by Mahmoud Abbas. The Popular Front for the Liberation of Palestine ("PFLP") has always been the second largest faction in the PLO. The third-largest faction in the PLO is the Democratic Front for the Liberation of Palestine ("DFLP").

111.    The PLO's factions, including the PFLP, are not separately incorporated and do not have legal personalities separate from the PLO. The factions, including the PFLP, are merely subdivisions or departments of the PLO, and the members of the various factions are ipso facto members of the PLO. Thus, all members of the PFLP are members of the PLO.

112.   Under the PLO's rules of internal organizational governance, including the PLO's Basic Law, the internal by-laws of the PLC, and the PLO's Revolutionary Penal Code, the PLO has the right, the authority and the ability to control, to discipline, and to expel from the PLO, any of its factions and any members of its factions, including the PFLP and the members of the PFLP.

113.   The PLO's control over its factions is especially pronounced in respect to smaller factions such as the PFLP. That is because the largest faction, Fatah, has since the late 1960s been far larger and controlled far more seats in the PNC and in the PLO Executive Committee than all the other factions combined. Additionally, the head of Fatah (first Yasser Arafat and then Mahmoud Abbas), has since the late 1960s served as the Chairman of the PLO. Thus, for over 50 years, the Fatah-dominated PLO has had a broad array of overwhelming levers of control over its minority PFLP faction—among its other powers, the PLO had the ability to deprive the PFLP of organizational roles, positions, privileges, and benefits; the PLO had the ability to cut its financial and other material support (discussed below) to the PFLP; and the PLO had the ability to expel the PFLP, and/or its leaders and members, from the PLO.

114.   Since its founding in 1964, the supreme goal of the PLO (including its constituent factions) has been to end Israeli control over, and the presence of Jews in, territories which comprise the State of Israel, the West Bank (including Jerusalem) and the Gaza Strip. Since its founding, the PLO (including its constituent factions) has sought to achieve this goal by using and facilitating terrorist violence in an attempt to force and intimidate the government and citizens of Israel to cede physical and political control over areas held by Israel. The PLO (including its constituent factions) has at all times believed that by using and facilitating terrorism, it will weaken, undermine and demoralize Israel's government, population, institutions, and economy, and thereby coerce

Israel into capitulating to the PLO's territorial demands and achieve its goal of ending the Israeli and Jewish presence in areas governed by Israel.

115.    Thus, since its founding, in an effort to achieve its supreme goal of ending Israeli control over, and the presence of Jews in, these areas, the PLO has facilitated and carried out tens of thousands of terrorist attacks against Jewish and Israeli targets, resulting in the deaths of thousands of innocent civilians and the wounding of many thousands more. Hundreds of United States nationals have been killed or injured by terrorist attacks facilitated and carried out by the PLO and its constituent factions. In a determination made in 1987 that remains in force today, Congress found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad" and that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law." 22 U.S.C. § 5201. As the PLO's second-largest faction, the PFLP is one of the PLO's "constituent groups" referenced by Congress in § 5201. The PFLP has been continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001.

116.    Since the 1980s, however, the PLO has recognized that terrorism and the threat of terrorism cannot, standing alone, force Israel to capitulate to the PLO's demands. For example, a top U.S.-based representative of the PLO (and the PA), Maen Areikat, stated in an interview with Tablet magazine in 2010 that, "**Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything. … Do you think we would be able to force Israel to do things that they don't want to do?**" Since the 1980s the PLO has also recognized that the

United States, and the American public, have enormous influence and leverage with Israel, and have the ability to cause Israel to make the concessions and take the actions that the PLO seeks.

117.    Accordingly, the PLO (including its constituent factions) has for many decades used and facilitated terrorist violence to create an atmosphere of crisis and instability in the Middle East, in order to draw the United States and the American public into the Israeli-Palestinian conflict. The PLO has done so because it believes that the United States and the American public are interested in achieving calm and stability in the Middle East, and will therefore use their influence and leverage with Israel to convince Israel to make territorial concessions to the PLO, in order to end the terrorist violence generated by the PLO.

## C.    The Palestinian Authority

118.    Defendant Palestinian Authority ("PA") was established in 1994 pursuant to agreements between the PLO and the State of Israel known as the Oslo Accords.

119.     Pursuant to the Oslo Accords, the PA is a non-sovereign governmental entity, with a range of authority and powers over the territories and residents of the Palestinian cities and villages in the West Bank and the Gaza Strip. In 2007, the Hamas terrorist organization seized the Gaza Strip.

120.    Since its establishment, the PA has been both legally and practically subordinate to and controlled by the PLO. The President of the PA has always been the Chairman of the PLO; thus, between 1994 and 2004 the President of the PA was PLO Chairman Yasser Arafat, and since Arafat's death in 2004 the President of the PA has been PLO Chairman Mahmoud Abbas. Additionally, since its establishment, the PA's various governmental departments and agencies have been headed, staffed and controlled almost exclusively by PLO officials and operatives. Since the

PA was established, the PA and PLO have acted in complete unison and concert, and pursuant to shared policies and goals.

121.    Since its establishment, the PA's supreme goal (like the PLO) has been to end Israeli control over, and the presence of Jews in, territories in the State of Israel, the West Bank (including Jerusalem) and the Gaza Strip. Since its establishment the PA has worked hand-in-glove with the PLO (including its constituent factions) to achieve this goal by using and facilitating terrorist violence in an attempt to force and intimidate the government and citizens of Israel to cede physical and political control over areas held by Israel. The PA has at all times believed that by using and facilitating terrorism, it will weaken, undermine and demoralize Israel's government, population, institutions, and economy, and thereby coerce Israel into capitulating to the territorial demands of the PA and PLO, and thus achieve defendants' shared goal of ending the Israeli and Jewish presence in areas governed by Israel.

122.    Thus, since its establishment, in an effort to achieve defendants' shared goal of ending the Israeli and Jewish presence in areas governed by Israel, the PA has facilitated and carried out thousands of terrorist attacks against Jewish and Israeli targets, resulting in the deaths of thousands of innocent civilians and the wounding of many thousands more. Dozens of Americans have been killed or injured by terrorist attacks facilitated and carried out by the PA.

123.    Since its creation, however, the PA (like the PLO) has recognized that terrorism and the threat of terrorism cannot, standing alone, force Israel to capitulate to the demands of the PA and PLO. For example, a top U.S.-based representative of the PA (and the PLO), Maen Areikat, stated in an interview with Tablet magazine in 2010 that, "**Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything. ... Do you think we**

**would be able to force Israel to do things that they don't want to do?**" Since its creation, the PA has also recognized that the United States, and the American public, have enormous influence and leverage with Israel, and have the ability to cause Israel to make the concessions and take the actions that the PA and PLO seek.

124.    Accordingly, the PA (like the PLO) has since its creation used and facilitated terrorist violence to create an atmosphere of crisis and instability in the Middle East, in order to draw the United States and the American public into the Israeli-Palestinian conflict. The PA has done so because it also believes that the United States and the American public are interested in achieving calm and stability in the Middle East, and will therefore use their influence and leverage with Israel to convince Israel to make territorial concessions to the PA and PLO, in order to end the terrorist violence generated by the PA and PLO.

125.    Since its establishment the PA, too, has had the right, the authority and the ability to control the conduct of the PFLP. The PA was and is empowered under local law to take legal and regulatory measures, and/or to deploy its security and police forces, to limit or entirely prevent the existence and activities of organizations such as the PFLP within the territories it governs. Thus, since 1994, the PA had the authority and ability to ban the PFLP, to close its offices, and/or to otherwise limit its activities, in PA territory. Additionally, the PA has always had the ability to cut off the financial and other material support (discussed below) that it provides to the PFLP.

**D.    The Defendants' Provision of Material Support and Resources to the PFLP**

126.    As the second-largest faction in the PLO for over 50 years, the PFLP fully shares and supports the supreme goal of defendants PLO and PA to end Israeli control over, and the presence of Jews in, territories which comprise the State of Israel, the West Bank (including

Jerusalem) and the Gaza Strip, as well as the policy and practice of the PLO and the PA of using terrorist violence to achieve this goal by coercing Israel, directly and/or through American involvement, to cede territory.

127. Accordingly, during the 15 years prior to the Terrorist Attack, defendants PLO and PA provided the PFLP faction of the PLO with vital material support and resources (detailed below), for the specific purpose of enabling and assisting the PFLP to carry out terrorist attacks in furtherance of their shared supreme goal of eliminating Israeli control over, and the presence of Jews in, territories comprising the State of Israel, the West Bank (including Jerusalem) and Gaza.

128. **Cash Support**: Between 1999 and the date of the Terrorist Attack, the defendants provided the PFLP with direct monetary allocations totaling (at least) several million dollars every year. While the PFLP is the second-largest faction in the PLO, it is a relatively small group in the Palestinian arena (a fraction of the size, for example, of the PLO's Fatah faction, or of the Hamas organization), and the funding provided by the defendants in the amount of a few million dollars annually constituted an enormous sum for a faction of the PFLP's size.

129. Thus, during the 15 years prior to the Terrorist Attack, the defendants provided the PFLP with cash funding totaling in the tens of millions of dollars. These funds enabled the PFLP to build, maintain and expand its organizational scope and operational strength and capabilities.

130. **Geographic Base of Operations**: During the period between 2000 and the date of the Terrorist Attack, the PA exercised governmental powers pursuant to the Oslo Accords, including security and police powers, in all the Palestinian cities and nearly all of the Palestinian villages in the West Bank, which together cover about 39% of the West Bank territory and contained over 95% of the Palestinian population.

131.     During this period, the defendants permitted the PFLP to freely conduct activities and maintain offices and other facilities in the areas of the West Bank under PA control, and thereby provided the PFLP and its operatives a physical, geographic base of operations in which to organize, recruit, train and operate. This physical base of operations was absolutely vital to the PFLP, because the PFLP is strictly banned in Israel and in the areas of the West Bank governed by Israel. The only other areas in the region in which the PFLP is permitted to operate freely and aboveground are Syria, Lebanon and the Gaza Strip, but it is impossible for PFLP operatives in those areas to enter Israel to execute attacks against Jewish and Israeli targets.

132.     By providing the PFLP with this crucial physical base of operations in the West Bank during the 15 year period leading up to the Terrorist Attack, defendants enabled the PFLP to vastly expand its size, strength and operational capabilities, including its ability to plan and carry out deadly terrorist attacks in Israel, such as the Terrorist Attack.

133.     **Personnel**: During the 15 years preceding the Terrorist Attack, the defendants used the threat of violence to obtain the release of numerous PFLP operatives incarcerated in Israel for terrorist activities. Furthermore, during this period, as part of their "Pay-for-Slay" program the defendants paid "salaries" to hundreds of PFLP operatives in the West Bank and Gaza who had been incarcerated in the past by Israel for terrorist activities (including those terrorists whose release was arranged by the defendants and others). These payments were made solely due to the fact that the recipients had been incarcerated for terrorist crimes. The defendants' provision of unconditional financial support for these freed PFLP convicts (who were not required to perform any work in return), relieved these terrorists from the need to earn a living, and thereby enabled

and encouraged them to continue their PFLP activities as their full-time occupation. By making these payments the defendants provided the PFLP with a large number of leaders and operatives.

134.    Through these actions, the defendants provided the PFLP with a large pool of experienced and hardened terrorist leaders and operatives.

135.    **Communications and Broadcast Facilities**: Terrorist groups such as the PFLP require means of mass communication for many purposes, including: to recruit, indoctrinate and mobilize new and existing terrorist operatives, members and supporters; to spread their ideology and build public support for their activities and goals; and to raise funds and obtain other types of material support and resources.

136.    The defendants provided the PFLP with at least two crucial and highly effective means of mass communication during the years prior to the Terrorist Attack.

137.    PFLP Radio – Under the Oslo Accords, the defendants were given permission to control, govern and manage the use of various radio frequencies in the West Bank and Gaza Strip. The defendants abused and exploited their control over these radio frequencies to aid and assist the PFLP. Since 2006, the defendants have allowed the PFLP to operate and broadcast its own radio station, named "Voice of the People," on one of the frequencies under their control.

138.    The PFLP's radio station transmits and is received in the West Bank and Gaza Strip. Between 2006 and the date of the Terrorist Attack, the PFLP used its radio station, transmitting with the permission of the defendants on a frequency governed by the defendants, to broadcast programming which was intended to and did in fact build, expand and strengthen the PFLP's pool of human and material resources by recruiting new operatives, members, supporters and sympathizers for the PFLP, and thereby enhanced the PFLP's ability to carry out terrorist attacks.

139.   <u>PFLP Websites</u> – In 2000, in its capacity as the local government in the West Bank and Gaza Strip, defendant PA sought and obtained from the body that governs the internet, the Internet Corporation for Assigned Names and Number, (ICANN) its own "top-level domain" on the internet, which is designated as the **___.ps** domain.

140.   As the holders of the **___.ps** top-level domain, the defendants are empowered to permit and control the registration of all websites with an address within the **___.ps** domain.

141.   In 2005, defendants allowed the PFLP to register its official website, www.pflp.ps, within the **___.ps** top-level domain controlled by them, and defendants have allowed the PFLP to maintain and operate the www.pflp.ps website continuously until today.

142.   Additionally, in 2010, defendants allowed the PFLP to register a second official website, www.abuali.ps, within the **___.ps** top-level domain controlled by them, and defendants have allowed the PFLP to maintain and operate the www.abuali.ps site continuously until today.

143.   The www.pflp.ps site is the PFLP's general website, while www.abuali.ps is dedicated specifically to promoting the PFLP's violent terrorist activities.

144.   The acute danger of allowing foreign terrorists groups like the PFLP access to internet domains, as the defendants have done, is reflected in the fact that the United States Government has a policy and practice of regularly shutting down and seizing internet domains that belong to terrorist groups. After one such seizure last year, the Department of Justice explained that: "Seizures like these are critical to preventing designated entities and terrorist organizations from using

U.S. websites to recruit new members and promote their twisted world views … We will continue to fight terror groups and their propaganda no matter the domain."[8]

145.    Thus, while the United States is vigorously engaged in *seizing* terrorist internet domains within U.S. jurisdiction, because shutting down such domains is "critical" to preventing terrorist groups from using their sites "to recruit new members" and proselytize for terrorism, the defendants have done exactly the opposite: they have *granted* the PFLP its own internet domains.

146.    Since their creation and through the date of the Terrorist Attack, the PFLP domains provided by defendants, www.pflp.ps and www.abuali.ps, contained a vast range of sophisticated, well-written, graphically-esthetic content in multiple languages (Arabic, English, French, and Italian). The PFLP used these sites to recruit, indoctrinate and mobilize new and existing terrorist operatives, members and supporters; to spread its ideology and build public support for its activities and goals; and to raise funds and obtain other types of material support and resources.

E.    **The Defendants' Conspiracy with the PFLP**

147.    For decades, the PLO has been involved in the international political sphere, lobbying and interacting with national governments, international organizations and NGOs, the news

---

[8] "United States Seizes More Domain Names Used by Foreign Terrorist Organization," Oct. 21, 2020,    www.justice.gov/opa/pr/united-states-seizes-more-domain-names-used-foreign-terrorist-organization (viewed Nov. 11, 2021). *See also* "United States Seizes Domain Names Used by Foreign Terrorist Organization," Sept. 2, 2020, https://www.justice.gov/opa/pr/united-states-seizes-domain-names-used-foreign-terrorist-organization (viewed Nov. 11, 2021) ("Once again we see designated foreign terrorist organizations turning to the internet to push their message and recruit followers for their violent causes .. .We will continue to fight terror recruitment and propaganda efforts in the digital world, as we do elsewhere.")

media, and the general public. In order to maintain its ability to conduct such interactions without the taint of terrorists attacks executed under the name "PLO"—a taint that would make contacts with the PLO politically difficult, unpalatable, or impossible for many of the PLO's interlocutors— the PLO does not carry out its terrorist attacks under the name "PLO." Instead, the PLO's terrorist attacks were at all times executed by the PLO's constituent factions under the name of the respective PLO faction involved (*e.g.*, Fatah, PFLP, DFLP, etc.).

148.    Thus, notwithstanding the fact that the PLO's factions are integral parts of the PLO itself without separate legal identities, the fact that the leaders and terrorist operatives of the PLO's factions are all members of the PLO, and the fact that the PLO at all times approved of the attacks executed by its factions, by having its factions carry out attacks in their factional names and not in the name "PLO," the PLO was able to falsely seek to distance itself in the public eye from its own terrorism. This cynical "name game" has enabled the PLO to participate far more extensively in international politics than it otherwise could.

149.    Because the PLO and the PA have overlapping leaderships, the PA would be negatively impacted if the PLO carried out terrorist attacks under its own name. Thus, the fictitious "division of roles" between the PLO and its factions—pursuant to which the PLO's factions carry out terrorism under their factional names and the PLO participates in the international arena without the PLO name being directly linked to terrorism—has also benefited the PA since its creation.

150.    Since the early 1990s, this ersatz and purely nominal division of roles has allowed the defendants and the PFLP to advance their shared goal of eliminating the Israeli and Jewish presence in areas held by Israel using what is in essence a classic protection racket. Defendants have presented themselves to the world as seeking to achieve their territorial goals through

34

peaceful discussions, but at the same time they repeatedly warned Israel, and especially the United States and the American public, that unless Israel gives in to defendants' demands, the supposed "radicals"—*i.e.*, the PFLP and other PLO factions—will carry out further terrorist attacks.

151.    Thus, for example, in a 2010 interview with a U.S.-based English-language media outlet, the deputy head of the defendants' Washington, D.C. office, Amal Jadou, said that what she "**wants Americans to understand about Palestinians**" is that "**Palestinians are not looking to incite anything … but people need to understand that incitement and violence are a consequence of occupation. Once the occupation ends, so will all the negative behavior**." Defendants republished this statement about what they "want[] Americans to understand" on the U.S.-based, English-language website operated by their D.C. office. Defendants' U.S.-based office, officers and employees consistently reiterated this same message to the American public—*i.e.*, that defendants do not seek violence but the violence will end only when Israel gives the defendants what they want—throughout the decades prior to the Terrorist Attack, in the news media, in public lectures and meetings, in conferences, on their website, and in many other fora.

152.    In fact, of course, as in every protection scheme, the defendants and the PFLP work hand-in-glove, each playing their accepted roles. The PFLP is a full, willing participant in this conspiracy, executing terrorist attacks against Israeli and Jewish targets—using the material support and resources provided by the defendants for that purpose—and leaving to defendants the task of leveraging those attacks into political achievements.

153.    Each of the disparate roles of the participants in this terrorist conspiracy is critical to advancing the shared goal of ending Israeli rule and the Jewish presence in areas part of or governed by Israel. The role of the PFLP is critical because without the fact and the threat of

terrorist violence, the ability of defendants PLO and PA to achieve their territorial demands in the political arena and through public advocacy would be far weaker; yet if defendants carried out the violence under their own names they would be unable to operate effectively in the political arena or sway American public opinion. The role of the defendants is critical both: (i) because without accompanying political and public advocacy activities—especially those carried out in the United States and directed to the American public—terrorism alone would not result in Israeli concessions; and (ii) because the funding, physical base of operations, personnel, and communications and broadcast facilities provided by defendants to the PFLP enabled it to carry out terrorist attacks against Jewish targets in Israel and the West Bank.

## F.    PFLP Terror Activities Between 1999 and November 2014

154.    The financial support, geographical base of operations adjacent to Israel, personnel, and communications and broadcast facilities provided by the defendants to the PFLP between 1999 and the date of the Terrorist Attack enormously enhanced the PFLP's organizational and operational capabilities. This material support enabled the PFLP to recruit, build, maintain and deploy the human, material, and operational resources and infrastructure in the West Bank and Gaza that were needed and used by the PFLP to plan, organize and execute acts of terrorism against Jewish and Israeli targets in Israel, the West Bank and Gaza, including the Terrorist Attack.

155.    As a result and by means of the material support and assistance provided to the PFLP by defendants during this period, in fulfillment of the defendants' intent in providing that support and assistance to the PFLP, and further to the conspiracy between defendants and the PFLP described above, between 1999 and the date of the Terrorist Attack the PFLP carried out hundreds of terrorist attacks against Jewish and Israeli targets in Israel and the West Bank, in which scores

of Israeli and U.S. citizens were murdered and hundreds more wounded. The PFLP carried out these attacks pursuant to the policy and practice of defendants PLO and PA of using terrorist violence to end the Israeli and Jewish presence in territories that are part of or governed by Israel.

156.   During the 15 years of deadly PFLP terrorism preceding the Terrorist Attack, the defendants did not take any of the numerous measures available to them to prevent the PFLP from continuing to engage in terrorism; they did not terminate their provision of material support and resources to the PFLP, and they did not expel the PFLP from the PLO or otherwise sever their relationship with the PFLP. To the contrary, during this period the defendants continued to fund the PFLP, to grant it a physical base of operations contiguous to Israel, and to provide the other material support detailed above. Defendants allowed the PFLP to remain a respected faction within the PLO, and maintained their close relationship with the PFLP.

157.   The reason that defendants acted as described in the preceding paragraph is simple: defendants fully supported and approved of the PFLP's terrorist activities which, as discussed above, served the defendants' goals and purposes.

158.   Defendants' policy of approval and support for the PFLP's terrorist activities in the years leading up to the Terrorist Attack is exemplified in their response to an especially horrific attack executed by the PFLP in 2011. On March 11, 2011, PFLP terrorists entered the home of the Fogel family in the town of Itamar and murdered five family members in their beds. The victims were the parents, children aged 11 and 4, and a three-month-old infant. The infant was decapitated.

159.   On April 17, 2011, *i.e.*, less than 6 weeks after the massacre of the Fogel family, the Director-General of the PA's Ministry of Detainees (which administered defendants' Pay-for-Slay program), called for the release of the PFLP terrorists who murdered the Fogel family and

decapitated their baby, on the grounds that all Palestinians "**have the right to resist the occupation, and they have a duty to resist the occupation**."

160.     Moreover, in an affidavit executed by the defendants on April 13, 2021, in a suit brought by the Fogel family in an Israeli court, the defendants admitted that since 2011, they have been making monthly Pay-for-Slay payments to the families of each of the seven members of the PFLP cell convicted and imprisoned for their roles in the terrorist murders of the Fogels.

### G.     The Terrorist Attack

161.     The Jerusalem neighborhood of Har Nof is located on the southwestern edge of the city in an area that has been part of the modern State of Israel since Israel's independence in 1948.

162.     Har Nof's population of about 20,000 mostly Orthodox Jews is unique in that a very large percentage of the residents are American citizens.

163.     Har Nof is home to dozens of synagogues. The Congregation Bnei Torah synagogue (the "Synagogue") is one of the largest in the neighborhood.

164.     At an unknown time prior to November 18, 2014, the PFLP decided to carry out a terrorist attack at the Synagogue.

165.     On November 18, 2014, at approximately 6:55 am, two operatives of the PFLP, Uday Abu Jamal and Ghassan Abu Jamal, burst into the Synagogue wielding a pistol, meat cleavers, and an axe, and began shooting and slashing their way through the sanctuary, which was packed with worshipers in the midst of their morning prayers.

166.     Rabbi Kalman (Cary) Levine had attended an earlier prayer service. He came to the Synagogue to discuss a point of Jewish law with the congregation's rabbi. While standing in the

hall outside of the prayer sanctuary, Rabbi Levine was brutally murdered by the PFLP terrorists as they entered the Synagogue.

167.    Rabbis Aryeh Kupinsky, Moshe Twersky, and Abraham Goldberg were among those praying in the Synagogue that morning, and were brutally murdered by the PFLP terrorists inside the prayer sanctuary.

168.    Police Sergeant Zidan Saif, a member of Israel's Druze religious community, was among the first security personnel to arrive at the scene of the massacre. Israel's Chief of Police stated that Sgt. Saif "ran into the heart of the murderous inferno, without fear, without concern" for his own well being. The police chief credited Sgt. Saif with stopping the rampage and saving the lives of others. Tragically, Zidan Saif was shot by one of the terrorists and mortally wounded. He was rushed to the hospital and died of his wounds during the night following the attack.

169.    Plaintiffs Dr. Norman Heching and Rabbi Saul Goldstein, who were also praying in the Synagogue that morning, were stabbed and seriously injured by the PFLP terrorists. Rabbi Goldstein's young son, plaintiff Mordechai Goldstein, was at morning prayers alongside his father, and witnessed the attack on his father and the other victims.

170.    The late Joseph Werfel and plaintiff David Samuel Salis were present in the Synagogue during the attack, and plaintiffs Avraham Nefoussi and Akiva Pollack, both emergency medical responders, voluntarily arrived at and entered the Synagogue to treat the victims, while the attack was still in progress.

171.    Police arrived at the scene a few minutes after 7 am, and shot and killed both terrorists as they exited the Synagogue and charged at police with their weapons.

172.     Immediately after the Terrorist Attack, Rabah Muhanna, a senior PFLP leader in Gaza and member of the PFLP's Political Bureau, and Marwan Abd al-Al, the head of the PFLP in Lebanon, both publicly confirmed that Uday and Ghassan Abu Jamal were PFLP operatives.

173.     The PFLP carried out the Terrorist Attack pursuant to and as implementation of the longstanding policy and practice of the defendants, detailed above, of using terrorism in an effort to achieve the supreme goal—shared by the defendants and the PFLP—of eliminating the Israeli and Jewish presence in areas that are part of or governed by Israel. Thus, in a November 19, 2014, interview with Palestine Today television, Kayed al-Ghoul, a Gaza-based senior PFLP leader and PFLP Political Bureau member, confirmed that the PFLP had executed the Terrorist Attack, and explained that the PFLP had done so to prove that the Palestinians "will defend their city with all they have, until Jerusalem will become Arab, until it will become Palestinian." Al-Ghoul added that, "the two martyrs' blood that was shed yesterday has reinforced Jerusalem's Arab identity, and has thwarted the attempts to Judaize [sic] Jerusalem." Similarly, in an interview with Al Jazeera television on November 20, 2014, Hani Thawabta, a member of the PFLP Central Com-mittee and a top PFLP leader in Gaza, explained that the Terrorist Attack "prove[s] that … we will continue to chase this enemy wherever it is until he leaves our land."

174.     The PFLP was enabled to and did in fact recruit, build, indoctrinate, maintain and deploy the human, material, and operational infrastructure needed and used to plan, organize and execute the Terrorist Attack, as the result of and utilizing the material support and resources pro-vided to the PFLP by defendants for the purpose of carrying out such attacks, detailed above.

175.     The Terrorist Attack constituted another in the long series of terrorist attacks carried out by the defendants and the PFLP, acting in concert and in pursuant of a common goal and plan,

since the 1990s. The PFLP thus carried out the Terrorist Attack as a co-conspirator and as an agent of the defendants.

176.    The defendants endorsed and ratified the PFLP's execution of the Terrorist Attack. For example, after the attack, the defendants publicly praised the PFLP operatives who carried it out, Uday and Ghassan Abu Jamal, as "martyrs" and termed the Terrorist Attack "heroic."

177.    Defendants further endorsed and ratified the Terrorist Attack by officially designating Uday and Ghassan Abu Jamal as "Martyrs" under defendants' Pay-for-Slay program, less than two months after the Terrorist Attack. Since that time, defendants have been making monthly Pay-for-Slay payments to the families of Uday and Ghassan Abu Jamal.

178.    Additionally, following the Terrorist Attack, the defendants continued to provide the PFLP with funding and the other material support detailed above, and allowed the PFLP to remain within the PLO. Indeed, defendants continued to treat the PFLP as a highly respected faction of the PLO. On December 6, 2014, less than three weeks after the Terrorist Attack, the PFLP marked the 47th anniversary of its founding with celebrations in different locales, with the enthusiastic participation of defendants. Participants in the main celebration in Ramallah included representatives of the PLO Executive Committee and the PA's security forces. Senior PLO official Mahmoud Al-Aloul fully endorsed the PFLP, proclaiming at the celebration that: "**The Popular Front for the Liberation of Palestine is a faction we take pride in, and is one of the pillars of the Palestinian political system. It has significantly and actively taken part in the national struggle, and has made immense efforts and enormous sacrifices – martyrs, prisoners, casualties and exiled people … The PFLP is a politically unique group. It has worked and made tireless efforts, doing all it could for the people and for the homeland.**"

**FIRST CAUSE OF ACTION**
**AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS\***
<u>**ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)**</u>
**(Direct Liability)**

179.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

180.    The actions of the defendants described herein constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

181.    As required by § 2331, the actions of the defendants described herein constituted a violation of numerous criminal laws of the United States and of the several States (or, if carried out in the United States, would constitute such violations), including without limitation the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material support or resources to terrorist organizations and/or for terrorist activities. The PFLP has been continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001, and the provision of funding, or other material support or resources, to an SDT, an FTO, or an SDGT, such as the PFLP, is a crime under numerous provisions of United States law, including the provisions of Chapter 113B of Title 18 of the United States Code.

---

\* The "American Plaintiffs" include all the plaintiffs herein, except for the family members and the personal representatives of the estates of Zidan Saif and Rabbi Abraham Goldberg.

182.    As required by § 2331, the actions of the defendants were dangerous to human life by their nature and as evidenced by their consequences. The PFLP faction of the PLO is a deadly, notoriously dangerous group, which has carried out hundreds of murderous terrorist attacks.

183.    As required by § 2331(1)(B) the actions of the defendants appeared to be, and were in fact, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that the defendants provided the PFLP with extensive material support and resources with the purpose of facilitating, enabling and causing the PFLP to carry out acts of terrorism against Jewish and Israeli targets in order to intimidate, influence and coerce the Israeli government and public, and to influence the United States government and the American public.

184.    As required by § 2331, the actions of the defendants transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

185.    The actions of defendants described herein therefore constitute "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

186.    The Terrorist Attack was carried out by reason and as a direct and proximate result of the defendants' acts of international terrorism.

187.    Decedent Rabbi Kalman (Cary) Levine was murdered in the Terrorist Attack. The murder of Rabbi Kalman (Cary) Levine caused decedent, his estate, and plaintiffs Shelley Levine, Stefanie Levine, Haya Levine, Aharon Levine, Chana Levine, Yehuda Yisroel Levine, Michal Levine, H.Y.A., Bassheva Miriam Pelcovics, L.Y.P., Y.M.P., N.B.P., Y.C.P., Yitzchok Meir Levine, Yerachmiel Levine, Moshe Levine and Avraham Levine, severe injury, including: pain and

suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

188.    Decedent Rabbi Aryeh Kupinsky was murdered in the Terrorist Attack. The murder of Rabbi Aryeh Kupinsky caused decedent, his estate, and plaintiffs Yakova Kupinsky, Yitzchak Kupinsky, Devorah Kupinsky, M.K.,Y.K. and Eliyahu Kupinsky, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium. The injuries to Rabbi Aryeh Kupinsky's wife and children were severely compounded by their own close proximity to the Terrorist Attack, hearing the shooting and police and ambulance sirens, and witnessing the police, military, and emergency medical response in the immediate aftermath of the Terrorist Attack, all while knowing that Rabbi Kupinsky was in the Synagogue.

189.    Decedent Rabbi Moshe Twersky was murdered in the Terrorist Attack. The murder of Rabbi Moshe Twersky caused decedent, his estate, and plaintiffs Bashy Miriam Twersky, Meshulem Twersky, R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), S.T., Refael Twersky, A.T., I.T., R.T.(2), Rivka Walder, Y.A.W., I.W., Y.W., Nechama Charlap, I.C., E.C., and Avraham Twersky, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

190.    Plaintiff Rabbi Saul Goldstein was present in the Synagogue and was stabbed repeatedly during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury (for both himself and his young son, plaintiff Mordechai Goldstein, who was also present), witnessed the terrorists murder and maim the other victims, among many other horrifying

sights, and suffered severe physical and other injuries as a result, including: stab wounds, disfig-urement, loss of physical and mental functions, and multiple surgeries; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

191.    Plaintiff Mordechai Goldstein was present in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury (for both himself and his father), and witnessed a terrorist repeatedly stab his father, plaintiff Rabbi Saul Goldstein, and murder and maim the other victims, among many other horrifying sights. Plaintiff Mordechai Goldstein suffered severe harm as a result of the Terrorist Attack, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium.

192.    The injuries suffered by plaintiffs Rabbi Saul Goldstein and Mordechai Goldstein in the Terrorist Attack caused plaintiffs Miriam Goldstein, Sarah Rivkah Goldstein, Basya Yehudis Goldstein, E.G., A.D.G., N.G., B.G., Malka Goldstein, and Moshe Gedaliah Goldstein, severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

193.    Plaintiff Dr. Norman Heching was present in the Synagogue and was stabbed dur-ing the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: stab wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and

mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

194.    The late Joseph Werfel was present in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

195.    Plaintiff Avraham Nefoussi was present in front of and in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury. He witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

196.    Plaintiff David Samuel Salis was present in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed many horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

197.    Plaintiff David Samuel Salis' presence in the Synagogue during the Terrorist Attack, and the harm suffered by him as a result thereof, caused plaintiffs Dana-Lee Salis and E.Y.S. severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium. Plaintiffs Dana-Lee Salis and

E.Y.S.'s emotional injuries were severely compounded by their own close proximity to the Terrorist Attack, hearing the shooting and police and ambulance sirens, and witnessing the police, military, and emergency medical response in the immediate aftermath of the Terrorist Attack, all while knowing that their husband and father was in the Synagogue.

198.   Plaintiff Akiva Pollack was present in front of and in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury. He witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

199.   Defendants are therefore liable for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## SECOND CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
## <u>ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)</u>
### (Respondeat Superior Liability)

200.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

201.   The Terrorist Attack constituted a violation of the criminal laws of the United States, and was dangerous to human life. The Terrorist Attack appeared to be, and was in fact, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that the PFLP carried out the Terrorist Attack in order to intimidate, influence and coerce the Israeli government and public, and to influence the United

States government and the American public. The Terrorist Attack transcended national boundaries in terms of the means by which it was accomplished and the persons it appeared intended to intimidate or coerce. Therefore, the Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

202.    The PFLP carried out the Terrorist Attack as the agent of the defendants, pursuant to the official, long-established policy and practice of the defendants of using terrorism to achieve the supreme goal shared by the defendants and the PFLP, namely: to end the Israeli and Jewish presence in territories governed by Israel. The PFLP served as the defendants' agent for that purpose for many years prior to the Terrorist Attack, carrying out many such attacks on the defendants' behalf, and the Terrorist Attack was carried out further to that agency relationship.

203.    Therefore, in addition to their direct liability under § 2333(a), the defendants are also liable for the Terrorist Attack under § 2333(a) pursuant to principles of respondeat superior, because the Terrorist Attack was carried out by the PFLP as defendants' agent.

204.    Defendants are therefore liable for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## THIRD CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
## AIDING AND ABETTING PURSUANT TO 18 U.S.C. § 2333(d)

205.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

206.    The Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

207.    The PFLP faction of the PLO planned and committed the Terrorist Attack.

208.     The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it planned and committed the Terrorist Attack.

209.     The PFLP is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

210.     The defendants knowingly aided and abetted the PFLP to commit the Terrorist Attack, by providing substantial assistance to the PFLP. Specifically, the defendants provided the PFLP with the extensive material support and resources discussed above, for at least 15 years prior to the Terrorist Attack, which they knew and intended would enable, facilitate, support and assist the PFLP to carry out acts of terrorism such as the Terrorist Attack.

211.     Defendants are therefore liable under 18 U.S.C. § 2333(d), as aiders and abettors, for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## FOURTH CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
## CONSPIRACY PURSUANT TO 18 U.S.C. § 2333(d)

212.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

213.     The Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

214.     The PFLP faction of the PLO planned and committed the Terrorist Attack.

215.     The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it planned and committed the Terrorist Attack.

216.    The PFLP is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

217.    The defendants engaged in a long-term common scheme and conspiracy with the PFLP, and with each other, which lasted from the 1990s until the Terrorist Attack, the goal of which was using terrorist violence and the threat of terrorist violence to cause Israel to cede territories governed by it, and remove the Jewish residents therefrom. Pursuant to that common scheme and conspiracy, defendants provided the PFLP with extensive material support and resources in order to enable and support the PFLP's terrorist activities, and in tandem the defendants conducted political and public advocacy activities to achieve their territorial demands while warning their interlocutors that a failure to grant their demands would result in terrorist attacks by the PFLP. As part of that conspiracy, the defendants and the PFLP adopted a fictitious division of roles, in order to enable the defendants to falsely disassociate themselves in the public arena from terrorism that they themselves facilitated, encouraged and desired. The PFLP carried out the Terrorist Attack pursuant to and in furtherance of that common plan and conspiracy with the defendants.

218.    Defendants are therefore liable under 18 U.S.C. § 2333(d), as co-conspirators, for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## FIFTH CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY ALL PLAINTIFFS
## NEGLIGENCE
## (Under Israeli Law)

219.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

220.     Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968, (hereinafter "CWO"). The CWO provides that any person injured or harmed by the torts listed in the CWO is entitled to relief from the person liable or responsible for the tort.

221.     Section 35 of the Israeli CWO creates a tort of Negligence. CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

222.     CWO § 36 provides that the obligation stated in CWO § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

223.     Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

224.     Defendants committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

225.     Defendants acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, the defendants had an obligation not to act

as they did. Defendants were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the plaintiffs' and the decedents were likely to be injured by the defendants' acts and omissions described herein.

226.     Defendants' behavior therefore constitutes Negligence under the CWO, and as a result of the defendants' negligent behavior decedents Rabbi Kalman (Cary) Levine, Rabbi Aryeh Kupinsky and Rabbi Moshe Twersky were murdered in the Terrorist Attack and the American Plaintiffs suffered the damages described above.

227.     Additionally, as a result of the defendants' negligent behavior decedents Zidan Saif and Rabbi Abraham Goldberg were murdered in the Terrorist Attack.

228.     At the time of his death, decedent Zidan Saif was 30 years of age, enjoying good health, was industrious and in possession of all his faculties. The murder of Zidan Saif caused him, his estate, and plaintiffs Rinal Saif, Nuhad Saif, Julia Saif, and L.S., severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

229.     At the time of his death, decedent Rabbi Abraham Goldberg was 68 years of age, enjoying good health, was industrious and in possession of all his faculties. The murder of Rabbi Abraham Goldberg caused him, his estate, and plaintiffs Briana Hazel Goldberg, Deborah (Gold- berg) Hammond, Libby Goldberg, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Adrian Goldberg, and Elisheva Goldberg, severe injury, including pain and suffering, pecuniary loss and loss of income. From the beginning of the Terrorist Attack until his death, decedent Rabbi Avraham Goldberg suffered great conscious pain, shock, and physical and mental anguish.

230.    Defendants are therefore liable for the full amount of the plaintiffs' damages in such sums as may hereinafter be determined.

231.    Defendants' conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

## SIXTH CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY ALL PLAINTIFFS
## <u>VICARIOUS LIABILITY</u>
### (Under Israeli Law)

232.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

233.    Aiding and abetting principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

234.    Defendants knowingly and willingly provided the PFLP with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of terrorism, including the Terrorist Attack.

235.    As a result of the Terrorist Attack caused, resulting from, and facilitated by the defendants' provision of material support and resources to, and other acts of aiding and abetting, the PFLP, the decedents and the plaintiffs suffered the damages enumerated herein.

236.    Defendants are also liable to the plaintiffs under CWO § 12 because their Pay-for-Slay Payments to the families of Uday and Ghassan Abu Jamal, the PFLP terrorists who executed the Terrorist Attack, constitute ratification of the Terrorist Attack.

237.    Respondeat superior principles are recognized in Israeli law in § 14 of the CWO, which provides that a person who engages an agent who is not his employee, to perform an act or a category of acts, is liable for anything the agent does in carrying out that act or category of acts, and for the manner in which he carries them out.

238.    Defendants engaged the PFLP as their agent to carry out terrorist attacks in order to achieve the supreme goal shared by the defendants and the PFLP of ending the Israeli and Jewish presence in areas that are part of, or governed by, the State of Israel. The Terrorist Attack was carried out by the PFLP in fulfillment, and within the scope, of that agency relationship.

239.    Defendants are therefore liable for the full amount of the plaintiffs' damages in such sums as may hereinafter be determined.

240.    Defendants' conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**WHEREFORE**, the plaintiffs respectfully request judgment be entered in their favor, against defendants PLO and PA, jointly and severally, as to each of the causes of action enumerated above, as follows:

a.    For all compensatory damages in an amount to be determined at trial;

b.    For all awards, sums, and other relief available pursuant to 18 U.S.C. § 2333, or other applicable law, including but not limited to treble damages, costs, expenses, and attorneys' fees;

c.    For all recoverable pre-judgment and post-judgment interest;

d.    For punitive and/or exemplary damages; and

e.    Such further relief as the Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


DATED this 13th day of May, 2022


        *s/ Daniel K. Calisher*
Daniel K. Calisher
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, 6th Floor
Denver, Colorado 80209
Telephone: 303-333-9810
Email: calisher@fostergraham.com
*Attorneys for Plaintiffs*

        *s/ Jordan Factor*
Jordan Factor
Allen Vellon Wolf Helfrich & Factor, P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
Telephone: 303-534-4499
Email: jfactor@allen-vellone.com
*Attorneys for Plaintiffs*


        *s/ Asher Perlin*
Asher Perlin
Law Office of Asher Perlin
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: 786-233-7164
Email: asher@asherperlin.com
*Attorneys for Plaintiffs*