**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:21-cv-03043-RM-STV

SHELLEY LEVINE, *et al.*,

               Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION
and THE PALESTINIAN AUTHORITY (a/k/a "The
Palestinian Interim Self-Government Authority" and/or
"The Palestinian National Authority"),

               Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
UNDER RULE 12(b)(2) AND RULE 12(b)(6)**

---

       Plaintiffs, Shelley Levine, et al. (collectively "Plaintiffs"), submit this Opposition to

Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and

Rule 12 (b)(6) as follows:

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.   Personal Jurisdiction ...................................................................................2

        a.   The PLO and PA Are Not "Persons" Under the
            Due Process Clause .........................................................................2

        b.   The PLO and PA Submitted to Jurisdiction
            Under the PSJVTA ..........................................................................9

            A.  The PLO and PA Submitted to Jurisdiction
                Under the PSJVTA .............................................................10

            B.  The PSJVTA Statutory Predicates ..............................................14

        c.   The Court Has Specific Jurisdiction
            Over the PLO and PA .....................................................................15

        d.   The Court Has Personal Jurisdiction
            Under Fed.R.Civ.P. 23.2 .................................................................23

            A.  The Court May Properly Assert Personal Jurisdiction
                Over The Defendants Because It Has Personal
                Jurisdiction Over Mansour.........................................................23

            B.  Rule 23.2 Applies Regardless Of Whether State Law
                Provides Unincorporated Associations With
                Capacity To Sue And Be Sued....................................................26

            C.  The FAC Properly Identifies The Two Unincorporated
                Associations As Classes...............................................................30

            D.  Mansour Will Fairly And Adequately Represent
                The Class.....................................................................................30

    II.  Plaintiffs' FAC Validly States All The Claims Asserted .........................34

        a.   Direct Primary ATA Liability..........................................................34

b.   Primary ATA Liability On The Basis of
Respondeat Superior ............................................................................42

c.   Secondary ATA Libility – Aiding and Abetting.................................46

d.   Secondary ATA Liability – Conspiracy ...........................................50

e.   The Nonfederal Claims Are Valuable................................................51

**Introduction**

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331, *et seq*., and supplemental causes of action, arising from a terrorist attack carried out on November 18, 2014, during morning prayers in a synagogue in Jerusalem, Israel ("Attack").

Congress enacted the ATA in response to the 1985 murder of Leon Klinghoffer by defendant, the Palestine Liberation Organization ("PLO"). Klinghoffer was an elderly, wheelchair-bound Jewish American who was shot in the head and tossed overboard in his wheelchair by PLO terrorists who had hijacked the Achille Lauro cruise ship. *Goldberg v. UBS*, 660 F. Supp. 2d 410, 421-22 (E.D.N.Y. 2009) (PLO's murder of Klinghoffer an "essential inspiration for the ATA."). Unfortunately, since Mr. Klinghoffer's murder, many more American citizens have been killed or injured by terrorist attacks carried out by or with the assistance of the PLO, and its governmental affiliate, defendant Palestinian Authority ("PA"). As a result, numerous ATA actions have been brought against the PLO and PA in our federal courts over the past two decades. *Cf. Sokolow v. PLO*, 2015 WL 10852003 (S.D.N.Y. Oct. 1, 2015), *vacated on other grounds*, 835 F.3d 317 (2d Cir. 2016) (entering judgment on jury trial verdict finding the PLO and PA liable under the ATA for six terrorist attacks in Jerusalem in which five Americans were murdered and many injured).

Defendants have moved to dismiss Plaintiffs' First Amended Complaint ("FAC") for lack of personal jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6). (DE 58).  For the reasons set forth below, the motion should be denied.

## ARGUMENT

### I.  PERSONAL JURISDICTION

Defendants' Rule 12(b)(2) motion should be denied because this Court has acquired personal jurisdiction over Defendants on multiple bases.

### a.  The PLO and PA Are Not "Persons" Under the Due Process Clause

Defendants concede that, because ATA § 2334(a) permits nationwide service of process, and because they have waived service, this Court may exercise personal jurisdiction over them under Fed. R. Civ. P. (4)(k), provided only that the exercise of jurisdiction is not barred by the Fifth Amendment's Due Process Clause. The Due Process Clause cannot possibly bar exercise of personal jurisdiction over these Defendants because it applies only to a "person," and neither the PA nor the PLO is a "person" within the meaning of the Clause.

There is no dispute "the PA is a non-sovereign governmental entity." FAC ¶ 119. "The PA was established by the 1993 Oslo Accords as the interim and non-sovereign government of parts of the West Bank and the Gaza Strip." *Waldman v. PLO*, 835 F.3d 317, 322 (2d Cir. 2016).[1] It is axiomatic due process clause provisions "protect natural persons and private corporations, not government, from arbitrary actions by the sovereign. The notion [a] political body created by the state enjoys protection, by virtue of the due process clause, from enforcement of the laws of its

---

[1] The PA's legal status and the scope of authority were analyzed in detail in *Knox v. PLO*, 306 F. Supp. 2d 424, 430-38 (S.D.N.Y. 2004) and *Ungar v. PA*, 315 F. Supp. 2d 164, 177-82 (D.R.I. 2004).

own or some other sovereign is not supported by either the case law or the language of the clause." *Creek v. Village of Westhaven*, 1987 WL 5429, at *7 (N.D. Ill. Jan. 15, 1987) (emphasis added).[2]

Courts have therefore consistently held governmental entities—domestic or foreign, sovereign or not—are not a "persons" within the meaning of the Due Process Clause. The Clause provides "[n]o *person* shall... be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. V (emphasis added); *Taha v. Bucks Cnty. Pennsylvania*, 172 F. Supp. 3d 867, 873 (E.D. Pa. 2016) ("[d]efendants have failed to cite any precedent to support the suggestion that, as government entities, they are entitled to due process." (emphasis added); *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ("word 'person' in the context of Due Process Clause [...] cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union."); *Oklahoma v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113-14 (10th Cir. 2006) ("Oklahoma concedes that, as a State, it is not protected by the Due Process Clause[.]"); *City of E. St. Louis v. Cir. Ct. for the Twentieth Jud. Cir., St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of [Due Process Clause]."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under Fifth Amendment's due process clause.").

Likewise, while the Supreme Court has never explicitly ruled whether foreign states are "persons" under the Due Process Clause, it has strongly hinted they are not. In *Republic of*

---

[2] *Cf. Associated Press v. Bd. of Pub. Educ.*, 246 Mont. 386, 390 (1991) ("The protections guaranteed by the constitutional right to due process were designed to protect people from governmental abuses. They were not designed to protect the government from the people.").

*Argentina v. Weltover*, the Supreme Court "assum[ed], without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," 504 U.S. 607, 619 (1992), but then cited *South Carolina v. Katzenbach.* "[T]he Court's implication was plain: If the 'States of the Union' have no rights under the Due Process Clause, why should foreign states?" *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 398–99 (2d Cir. 2009). Therefore, "[f]ollowing *Weltover*, the vast majority of federal courts to address this issue have determined that foreign states are not persons within the meaning of the Due Process Clause[.] The Court finds the underlying reasoning of the majority position persuasive and holds that foreign states are not 'persons' entitled to protection under the Due Process Clause." *DRFP v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 906-07 (S.D. Ohio 2013) (collecting cases).

Similarly, neither the Virgin Islands nor Puerto Rico are "persons" under the Due Process Clause. *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) (Virgin Islands "[g]overnment is not a person for purposes of due process."); *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urb. Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (Puerto Rican government instrumentalities are not "persons" under the Due Process Clause).

The Department of Justice ("DOJ"), too, has consistently taken the position governmental entities are not "persons" under the Due Process Clause. Thus, a Memorandum Opinion prepared by the DOJ Office of Legal Counsel opined "the rationale of *South Carolina v. Katzenbach*," where the Court held a state is not a person within the meaning of the Due Process Clause, is fully applicable to other "governmental bodies," even when they are not "states or instrumentalities of states." Office of Legal Counsel, *Mutual Consent Provisions in the Guam Commonwealth*

4

*Legislation: Memorandum Opinion for the Special Representative for Guam Commonwealth* (July 28, 1994) at 7 (emphasis added). Declaration of Asher Perlin ("Perlin"), **Ex. A**.

Similarly the DOJ has opined "the Supreme Court concluded that the Fifth Amendment's guarantee of due process applies only to persons and not to States. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). While *Katzenbach* was concerned with a State, its rationale suggests that a governmental body […] could not assert rights under the Due Process Clause." *Report by the President's Task Force on Puerto Rico's Status*, App. E (Dec. 2007) (Letter from Robert Raben, Assistant Attorney General, at 9 n.13) (emphasis added). Perlin, **Ex. B**.

The DOJ has acted on this position. In *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, No. 96-1304 (D.P.R. 1996), it successfully argued that, as "political entities," instrumentalities of the government of Puerto Rico are not "persons" within the meaning of the Due Process Clause. "<sup>United</sup> States' Motion for Partial Dismissal," at 24-25. Perlin, **Ex. C**. *Cf. Puerto Rico Pub. Hous. Admin.*, 59 F. Supp. 2d at 325 (agreeing with DOJ position).

Thus, as a governmental entity, the PA is not a "person" under the Due Process Clause.

Nor is the PLO a "person" under the Due Process Clause. The PLO is a foreign political entity founded in 1964. Its structure and operations are governed by the PLO's Basic Law, and it is controlled by a "Palestine National Council," consisting of several hundred members, and a smaller Executive Committee, which runs its day-to-day operations. (FAC ¶ 108). As its name reflects—Palestine Liberation Organization—the goal and raison d'être of the PLO is to "liberate" territories it views as "Palestine," located in Israel, the West Bank, and Gaza. (*Id*. at ¶ 114).

The DOJ correctly explains: "Foreign entities such as the PLO obviously do not have due process rights since they are not part of our constitutional scheme." *Palestine Info. Office v.*

*Schultz*, No. 87-5396 (D.C. Cir. 1988), Brief for the U.S., at 44 (emphasis added). Perlin **Ex. D**. Similarly, the DOJ has opined "[a]s <u>a foreign political entity, the PLO does not itself enjoy constitutional protection</u> […] It is clear, for example, that the PLO would not be recognized by American courts as a juridical entity capable of bringing a constitutional claim. Neither will the argument that the PLO is not a sovereign nation bring it within the constitutional fold." *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104 (1987) at 120 (citation omitted, emphasis added). Perlin **Ex. E**.

Moreover, in the most recent decision to examine the constitutional status of the PLO and PA, *Shatsky v. PLO*, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022), Judge Vyskocil found that, as Plaintiffs assert, these Defendants are not protected by the Due Process Clause:

> It is inconsistent with our constitutional system … to extend due process protections to foreign governments. Our system leaves it to the political branches to decide how to deal with foreign governments, including whether to protect them from suit in U.S. courts. The Due Process Clause of the Fifth Amendment provides that "no *person* shall be ... deprived of life, liberty or property without due process of law." <u>The PLO and PA are not persons for purposes of constitutional due process</u>. The Supreme Court long ago explained that the word "person" in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union. The Second Circuit then made the manifestly correct observation that it would make no sense to place foreign states in a more favored position than U.S. states. … This reasoning should apply to the PLO and PA. … The executive has, in the past, structured relations based on its explicit understanding that the PLO and PA are not entitled to constitutional protections of any kind. I think that understanding was correct.

*Shatsky*, 2022 WL 826409 at *5-6 (cleaned up) (emphasis added).

Despite this compelling analysis, Judge Vyskocil found she was bound by Second Circuit's decision in *Waldman*, 835 F.3d 317, holding the PLO and PA are entitled to due process protections. Defendants, predictably, ignore *Shatsky*, and urge the Court to follow *Waldman*, and the decision in *Livnat v. PA*, 851 F.3d 45 (D.C. Cir. 2017), which adopted *Waldman*.

*Waldman* and *Livnat* are unpersuasive. *Waldman*'s resolution of this issue is telegraphic: the court simply notes "sovereign states are not entitled to due process protection" and immediately concludes, with no analysis or discussion: "Because neither defendant is a state, the defendants have due process rights." *Waldman*, 835 F.3d at 329. But this is a logical fallacy. The fact sovereign states lack due process rights, does not mean that they are the <u>only</u> governmental entities that lack due process rights. To the contrary, as shown above, courts have found and the Executive Branch has opined, consistently, that governmental entities—including Puerto Rico and the Virgin Islands, which are neither sovereign nor creatures or subdivisions of the States of the Union—are not "persons" under the Due Process Clause.[3]

As for *Livnat*, that decision turns almost entirely on the *Livnat* plaintiffs' narrow argument that the D.C. Circuit could construe its prior ruling in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), which held foreign states have no Due Process rights, as including non-sovereign foreign entities as well. *Livnat*, 851 F.3d at 48 ("[A]ppellants … urge us to extend *Price* to the Palestinian Authority by holding that *Price* applies not just to sovereign

---

[3] *Waldman*'s shotgun disposition of this issue may come from the fact that, unlike Plaintiffs here, the *Waldman* plaintiffs "d[id] not cite any cases indicating [a] non-sovereign entity with governmental attributes lacks due process rights. All the cases cited by the plaintiffs stand for the proposition that sovereign governments lack due process rights." *Waldman*, at 329. Lacking a full briefing on this point, including the extensive authorities cited by Plaintiffs here, *Waldman* reached an incorrect conclusion.

foreign states, but to any foreign entity that 'functions as a government.'"). After analyzing *Price* and its progeny. *Livnat* concluded "*Price*'s holding applies to sovereigns alone." *Id*. at 52. While the D.C. Circuit is an authoritative arbiter of how to construe its <u>own</u> prior decisions, its finding that *Price* cannot be construed to encompass foreign non-sovereign governments sheds no light on the actual question of whether governmental entities have Due Process rights.

Indeed, the narrow focus in *Waldman* and *Livnat* on sovereignty is misplaced. The presence or absence of sovereignty is simply irrelevant to the question of whether a governmental entity is a "person" within the meaning of the Due Process Clause. The Virgin Islands are not sovereign, and neither is Puerto Rico. Nor do the States enjoy anything like the sovereignty of foreign state. Counties and cities are not sovereign. The false dichotomy of sovereignty-versus-personhood created by *Waldman* and *Livnat* lacks any conceptual or jurisprudential rationale, and appears (respectfully), to be result-oriented.[4] Sovereignty is not the flip-side of constitutional personhood; there is simply no inverse symmetry whatsoever between these two statuses.

Finally, as Judge Vyskocil explained, *Waldman* and *Livnat* are in error because they "paradoxically place[] the PLO and PA in a more favored position with respect to the safeguards of due process than both U.S. states and foreign sovereigns with whom the political branches have

---

[4] For example, in support of its finding that only <u>sovereign</u> states lack Due Process rights, *Livnat* cites to the unpublished ruling in *Toumazou v. Turkish Republic of Northern Cyprus*, No. 14-7170 (D.C. Cir. Jan. 15, 2016), regarding the Turkish Republic of Northern Cyprus ("TRNC"). *Livnat* notes that in *Toumazou* "we conducted the usual due-process inquiry," even though TRNC is a non-sovereign foreign government. (*Id*. at 52). That is not really accurate. The ruling <u>never addressed</u> whether the TRNC is covered by the Due Process Clause. Perlin, **Ex. F**. Moreover, in the district court and on appeal, the <u>plaintiffs</u> simply assumed that TRNC <u>does have</u> Due Process rights. Perlin **Ex. G-H**. Thus, the question of whether a non-sovereign government is a "person" for Due Process purposes was never raised, much less adjudicated, in *Toumazou*. *Livnat*'s reliance on a plainly inapposite case renders it even less persuasive.

8

established friendly relations," because "stretching the Due Process Clause to protect foreign governments would create serious separation-of-powers problems in our constitutional system," and because "Congress has repeatedly enacted legislation that leaves no doubt about its intention to define our jurisdiction to include ATA suits against the PLO and PA. Yet the courts have interceded to protect the PLO and PA from suit." *Shatsky*, 2022 WL 826409, at *6.

**b.  The PLO and PA Submitted to Jurisdiction Under the PSJVTA**

Alternatively, the Court has personal jurisdiction over Defendants under the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 (codified at 18 U.S.C. § 2334(e)).

The PSJVTA provides the PLO and PA submit to personal jurisdiction in ATA cases if they: (1) made payments after April 18, 2020, to persons who were convicted or pled guilty and were imprisoned for terrorism that harmed a U.S. national (or made payments to the families of persons killed in such attacks); (2) maintained "any office … in the United States" after January 4, 2020, except for one used exclusively for official UN business; or (3) engaged in "any activity while physically present in the United States" after January 4, 2020, not exempted by the PSJVTA.

Defendants admit to having triggered the "payment" prong of the PSJVTA. DE 58 at n.4; DE 30 at n.5. Moreover, documents produced by Defendants to Plaintiffs in this case include records showing Defendants have made jurisdiction-triggering "Pay-for-Slay" payments to the families of the individual perpetrators of the Attack in <u>this</u> case. FAC ¶ 23.[5]

---

[5] As discussed below, however, Defendants deny having triggered the U.S.-activities prong of the PSJVTA.

Defendants assert their statutory submission to jurisdiction under the PSJVTA is irrelevant, because the PSJVTA is unconstitutional. On January 6, 2022, a district judge in the Southern District of New York agreed the PSJVTA is unconstitutional. *Fuld v. PLO*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022). Two other judges in the same court quickly followed suit. *Sokolow v. PLO*, --- F.Supp.3d ----, 2022 WL 719261 (S.D.N.Y. Mar. 10, 2022); *Shatsky*, 2022 WL 826409.

*Fuld*, *Sokolow,* and *Shatsky* are all currently on appeal in the Second Circuit. Therefore, the status of the PSJVTA is to some degree in flux. If the Second Circuit finds the PSJVTA constitutional, Defendants will be collaterally estopped from pursuing their constitutional challenge to the PSJVTA in this court; and since Defendants admit to having fulfilled a statutory predicate for submission to jurisdiction under the PSJVTA, jurisdiction will then be established in this action. On the other hand, if the Second Circuit affirms the decisions finding the PSJVTA unconstitutional, the issue will remain wide open in this Court and this Circuit.[6]

Given this posture, Plaintiffs will first address the constitutional issue, and then briefly discuss the PSJVTA's factual predicates.

A. The PSJVTA Is Constitutional

The law of the land is that "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court, <u>whether voluntary or not</u>." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-05 (1982) (emphasis added). *Cf. V&A Collection, LLC v. Guzzini Properties Ltd.*, 46 F.4th ----, 2022 WL 3589143, at *3 (2d Cir. Aug. 23, 2022) ("[t]he

---

[6] Needless to say, if this Court finds that (as Plaintiffs assert) Defendants lack Due Process rights, or that it can exercise personal jurisdiction over Defendants under one or more of the other bases asserted in the FAC and discussed below, the constitutionality of the PSJVTA will become a moot issue.

actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not.") (quoting *Bauxites*).

*Fuld* and its progeny are founded on the premise—which is clearly erroneous in light of *Bauxites*' "voluntary or not" language—that a defendant's submission to personal jurisdiction must be "voluntary," in the sense that the defendant must agree, or must be deemed to have agreed, to the personal jurisdiction of the court. In other words, not only must the actions by which the defendant submits to jurisdiction be <u>volitional</u> (as opposed to coerced or oblivious), but the defendant must <u>willingly</u> submit to jurisdiction. In support of this mistaken premise, *Fuld* quotes language from *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880, (2011) to the purported effect that a finding of consent requires "'circumstances ... from which it is proper to infer an intention to benefit from and *thus an intention to submit to the laws of the forum*.'" *Fuld*, 578 F. Supp. 3d at 586 (quoting *McIntyre*) (emphasis added by *Fuld*).

Proceeding from its incorrect holding that submission to jurisdiction requires an inference (at least) that the defendant <u>willingly</u> agreed to jurisdiction, *Fuld* then goes on to hold that such an "inference is reasonable … only where the defendant's statements or conduct <u>actually signal approval or acceptance</u>." *Fuld* at 586 (emphasis added). Finally, applying its "actual approval" test, *Fuld* found that the PSJVTA does not permit an inference that the PLO and PA actually, i.e., willingly, approved or accepted the exercise of personal jurisdiction over them. *Id*. at 588. *Sokolow* and *Shatsky* simply echo *Fuld*'s reasoning and findings. *Sokolow* at *6; *Shatsky* at *5.

But the assumption of *Fuld* and its progeny is wrong. As *Bauxites* and subsequent cases (such as the fresh decision of the Second Circuit in *V&A Collection* cited above) teach, submission to jurisdiction may be "voluntary or not." The sentence fragment *Fuld* quoted from *McIntyre*,

which is the fulcrum on which *Fuld* and its progeny rest, was dicta and, moreover, that dicta is within Justice Kennedy's plurality opinion in *McIntyre* which is <u>not</u> the binding opinion of the Court. *Salt Lake City Corp. v. Sekisui SPR Americas, LLC*, 2018 WL 4688356, at *4 (D. Utah Sept. 28, 2018) (since *McIntyre* lacks a majority, pursuant to *Marks v. U.S.*, 430 U.S. 188 (1977), the opinion with the narrowest holding, which was Justice Breyer's concurrence, is the holding of *McIntyre*): *Ainsworth v. Cargotec USA*, 4443626, at *6 (S.D. Miss. Sept. 23, 2011) (binding holding in *McIntyre* is Justice Breyer's concurrence, not Justice Kennedy's plurality).

Thus, the rule stated in *Bauxites* that submission to jurisdiction may be "voluntary or not" was not disturbed or displaced by Justice Kennedy's non-binding plurality opinion in *McIntyre*, and therefore the legal premise underpinning *Fuld*, *Shatsky*, and *Sokolow* is erroneous.

For proof a defendant can unwillingly submit to personal jurisdiction, we need look no further than Rule 12(h)(1) of the Federal Rules of Civil Procedure—which provides a defendant waives a defense of lack of personal jurisdiction if she fails to assert it at the first opportunity.

Rule 12(h)(1) is an "automatic waiver provision." *Flory v. United States*, 79 F.3d 24, 25 (5th Cir. 1996). *Cf. White-Ruiz v. City of New York*, 1996 WL 744892, at *2 (S.D.N.Y. Dec. 31, 1996) ("Rule 12(h) provides for an automatic waiver."); *Mussat v. Enclarity*, 362 F. Supp. 3d 468, 476 (N.D. Ill. 2019) ("[T]he language of Rule 12(h) is unequivocal that waiver follows from the failure to join available motions as required by Rule 12(g)(2); it provides no discretion to excuse such waivers."); *Agbara v. Okoji*, 2021 WL 4940927, at *3 (D.D.C. Oct. 22, 2021) ("Rule 12(h) denies the court discretion to grant leave to amend in the case of the defenses such as lack of personal jurisdiction enumerated in Rule 12(b)(2) through Rule 12(b)(5).") (cleaned up).

Thus, Rule 12(h) operates automatically, and neither requires—nor allows—a court to examine the defendant's "willingness" to submit to jurisdiction. Indeed, courts enforce a Rule 12(h) waiver even when the defendant affirmatively negates her willingness to submit to jurisdiction by simultaneously purporting to reserve a personal jurisdiction defense. *Boston Telecomm. Grp., Inc. v. Deloitte Touche Tohmatsu*, 249 Fed.App'x 534, 536 (9th Cir. 2007) (defendant waived his right to assert the defense of personal jurisdiction where he did not raise it in his first motion to dismiss, even when he inserted a footnote in his brief stating that he "reserves his rights and objections to file a supplemental motion to dismiss" based on personal jurisdiction); *CGHH, LLC v. Cesta Punta Deportes, S.A. de C.V.*, 2006 WL 8430970, at *3 (N.D. Ga. Mar. 31, 2006) ("Defendants' motion to 'preserve' their Rule 12 defenses does nothing to dissuade this Court that the general principle of Rule 12(g) that those defenses not raised in a single, consolidated motion under Rule 12 are forever waived should not apply."); *Hunter v. Serv-Tech, Inc.*, 2009 WL 2858089, at *3 (E.D. La. Aug. 28, 2009) (cannot "reserve" 12(b)(2)-(5) defense).

If—as *Fuld* and its progeny would have it—courts were required to examine on a case-by-case basis whether a given defendant has willingly submitted to personal jurisdiction, the waiver provisions of Rule 12(h) would be unconstitutional. Those provisions are triggered automatically and peremptorily by the defendant's conduct, irrespective of whether the defendant intended to submit to personal jurisdiction. In fact, as shown above, those waiver provisions operate even when the defendant explicitly disavows any intention of submitting to jurisdiction. Yet, courts have rejected the argument that "Rule 12(h) only creates a 'rebuttable presumption' of waiver

13

because personal jurisdiction is a fundamental constitutional right that cannot be inadvertently waived." *WW, LLC v. Coffee Beanery, Ltd.*, 2012 WL 3728184, at *3 (D. Md. Aug. 27, 2012).[7]

Defendants do not explain, because they cannot, why the PSJVTA—enacted by the federal Congress with the aim of deterring terrorist attacks against American citizens—is unconstitutional, while the automatic waiver provision contained in Rule 12(h) (which is a mere rule of procedure aimed at simply boosting judicial efficiency) is constitutional.

Put differently, the PSJVTA is constitutional for the same reason Rule 12(h) is, namely: a defendant may <u>unwillingly</u> submit to jurisdiction by conduct, as long as it has fair warning. Here, Defendants admit they elected to make Pay-for-Slay payments they knew would constitute statutory submission to jurisdiction under the PSJVTA. The fact Defendants did so while simultaneously objecting to jurisdiction on constitutional grounds is no more legally effective than protests made by defendants who purported to negate the effect of Rule 12(h) by objecting while engaging in conduct constituting submission to jurisdiction under the Rule.

B.  <u>The PSJVTA Statutory Predicates</u>

As discussed above, Defendants have conceded they have made "at least one" payment triggering statutory submission to jurisdiction under the PSJVTA (DE 58 at n.4), and rested their challenge to personal jurisdiction under the PSJVTA solely on constitutional grounds. While Defendants claim they have not triggered submission to jurisdiction under the U.S.-activities prong

_____

[7] A court needs to engage in a particularized waiver analysis only when the defendant has *complied* with Rule 12(g) by timely asserting a personal jurisdiction defense, but *subsequently* behaves in a manner that may be deemed a submission to jurisdiction. "Rule 12(h)(1) 'sets only the outer limits of waiver; it does not preclude waiver by implication.'" *Tinley v. Poly-Triplex Techs., Inc.*, 2009 WL 812150, at *2 (D. Colo. Mar. 26, 2009) (quoting *Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, 203 F.3d 835 (10th Cir. 2000)) (emphasis added, brackets omitted).

of the PSJVTA (because their activities fall within the PSJVTA's exception relating to UN activities) they make this argument only in a footnote. *Id.* at n.7

The *Shatsky* plaintiffs took jurisdictional discovery from Defendants regarding the factual predicates of the PSJVTA, i.e., regarding Defendants' Pay-for-Slay payments and their U.S.-based activities. Earlier in this proceeding, the parties stipulated Defendants would produce to Plaintiffs the fruits of the *Shatsky* discovery, to eliminate or minimize any need for jurisdictional discovery here. Those materials were produced and they are extremely voluminous.

Given: (a) Defendants have conceded they made a statutorily qualifying payment under the PSJVTA; (b) Defendants have not pressed or developed their argument about their U.S.-activities, except for the place-holder footnote; (c) Defendants have not challenged Plaintiffs' factual allegations (FAC ¶¶ 22-25), which were based on the *Shatsky* production, regarding satisfaction of the predicates of the PSJVTA; and (d) Defendants have based their challenge to the PSJVTA entirely on constitutional grounds—Plaintiffs see no reason to burden the Court with the massive volume of underlying records from the *Shatsky* production, which are not now and likely never will be relevant or necessary to determining jurisdiction under the PSJVTA.

If Defendants try to shift positions, or the posture of the case unexpectedly changes such that these documents become relevant, or the Court so orders, Plaintiffs will of course submit them.

**c. <u>The Court Has Specific Personal Jurisdiction Over the PLO and PA</u>**

Additionally or alternatively, the Court has specific personal jurisdiction over Defendants PLO and PA in this action. Specific jurisdiction is available if (1) the defendant "purposefully avails itself of the privilege of conducting activities within the forum," and (2) the plaintiff's claims "<u>relate to</u> the defendant's contacts with the forum. Or put just a bit differently, there must be an

affiliation between the forum and the underlying controversy." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021) (cleaned up, emphasis added).

Significantly here, the Supreme Court clarified in *Ford* that the "relate to" test "does not require proof of causation between a plaintiff's suit and a defendant's activities." *Ditter v. Subaru Corp.*, 2022 WL 889102, at *2 (D. Colo. Mar. 25, 2022) (cleaned up, citing *Ford*). Therefore, because a causal connection is no longer required, a "plaintiff can meet the 'relate to' component by another kind of relationship, affiliation, or connection," between the defendant's forum contacts and plaintiffs' claim, such as "by showing that any of the defendant's contacts with the forum are relevant to the merits of plaintiff's claim." *Titan Feeding, LLC v. Corey Cattle Company, LLC*, 2022 WL 4182458, at *7 (D. Colo. Sept. 13, 2022) (cleaned up, emphasis added).

Plaintiffs' allegations easily provide a solid basis for the exercise of specific jurisdiction over Defendants in this case. The FAC alleges in detail: (1) Defendants seek to obtain territorial concessions from Israel (¶¶ 114-115, 121-122); (2) Defendants have for many decades had a policy and practice of using terrorism, and the threat of further terrorism, to obtain Israeli concessions, and the Attack here was carried out pursuant to that long-standing policy and practice (¶¶ 114-115, 121-122, 150-153, 173-175); (3) Defendants admit they cannot extract concessions from Israel on their own, and therefore need the U.S. public and government to use their sway with Israel to convince it make concessions (¶¶ 116-117, 123-124, 153); (4) to cause the U.S. public and government to influence Israel to make concessions, Defendants used a double-pronged strategy: (a) Defendants employed terrorism to provoke the interest and concern of the U.S. public and government about Middle East peace and (b) in parallel, Defendants maintained an office and staff in Washington, D.C., which for years promoted and reiterated to U.S. public and government the

argument that in order to end the violence, Americans must use their leverage with Israel to make concessions to Defendants (¶¶ 14-15, 116-117, 123-124; 150-153).[8]

Both prongs of the specific jurisdiction test are satisfied here. First, it is clear that by maintaining an actual office and a staff within the United States, Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum." *Ford*, at 1024.[9]

Second, Defendants' activities in the United States "relate to" Plaintiffs' claims. It is critical to bear in mind Defendants are not a gang of vandals or skinheads, nor are they the Mafia. They do not engage in or support "senseless" violence, nor do they use violence to enrich themselves. Defendants strategically use violence, and the threat of more violence, for a very specific, non-pecuniary and rational (though appalling) reason: to achieve their political goals. But Defendants themselves have made explicitly clear violence alone cannot move Israel to make concessions. FAC ¶¶ 116, 123 ("Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything […] Do you think we would be able to force Israel to do things that they don't want to do?"). Therefore, to achieve its purpose, the violence needed to be coupled with messaging—from Defendants' U.S.-based personnel and directed to the American public and government—that the violence will end only when Israel makes the concessions sought by Defendants. FAC ¶ 151 (Defendants' U.S. based officials wanted "Americans to understand" that "Palestinians are not looking to incite anything," but "incitement and violence are a

---

[8] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits*." Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (cleaned up). Defendants do not controvert these allegations at all, much less with affidavits. At this stage of the case, Plaintiffs "need only make a prima facie showing that jurisdiction exists," and that "burden is light." *Id*.

[9] Because the ATA permits nationwide service of process, the relevant "forum" for personal jurisdiction analysis is the United States as a whole. *Cohen v. Facebook*, 252 F. Supp. 3d 140, 153 (E.D.N.Y. 2017).

consequence of occupation. Once the occupation ends, so will all the negative behavior," and widely repeated this message to the American public for years before the Attack).

Thus, there was a direct, purposeful, and strategic relationship between Defendants' U.S.-based propaganda activities and their use of and provision of material support for terrorist violence. This Court should consider Defendants' entire course of conduct—all the components of their overall "business plan" (so to speak)—and should not artificially separate their use of violence to achieve political goals, from the political messaging, *conducted in the U.S.*, that Defendants employed as a necessary complement to their violence.

Additionally, in examining the "related to" element in this case, the ATA's definition of "international terrorism" must be considered. That is because the "relatedness" test is satisfied if "any of the defendant's contacts with the forum are <u>relevant to the merits of plaintiff's claim</u>." *Titan Feeding* 2022 WL 4182458, at *7 (emphasis added). *Cf. Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 759 (Fed. Cir. 2016) (determining "relatedness" for specific jurisdiction depends on "the nature of the claim asserted"); *In re Nexus 6P Prod. Liab. Litig.*, 2018 WL 827958, at *4 (N.D. Cal. Feb. 12, 2018) (Supreme Court emphasized specific jurisdiction requires a careful examination of the nature of the asserted claims); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) ("contours of plaintiffs' claims dictate what constitutes suit-related conduct."); *Havel v. Honda Motor Eur. Ltd.*, 2014 WL 4967229 at *10 (S.D. Tex. Sept. 30, 2014) ("connection between a defendant's suit-related conduct and the

forum state will clearly be strongest when that conduct forms <u>one of the elements of the intentional tort alleged</u>.") (emphasis added).[10]

The ATA creates a cause of action for Americans harmed "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Under the ATA's definition, "international terrorism" is limited to "activities that … appear to be intended— (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." § 2331(1)(B). Thus, the ATA does <u>not allow</u> suits for pointless violence; rather, *by definition*, the "activities" from which an ATA action arises must appear to have been intended to impact "a government" (any government(s)) and/or a "civilian population" (any civilian population(s)).

Plaintiffs' FAC explicitly alleges the elements of ATA § 2331(1)(B) are satisfied in this case because Defendants' conduct was intended to influence the United States government and the American public. FAC ¶¶ 183, 201. Thus, Defendants' U.S. based conduct—the influence campaign conducted by their D.C. office and personnel—<u>fulfills a statutory element of Plaintiffs' ATA claims</u>, and that conduct therefore clearly "relates to" Plaintiffs' claims here. *Titan Feeding* 2022 WL 4182458, at *7 ("relatedness" exists if "any of the defendant's contacts with the forum are relevant to the merits of plaintiff's claim."); *Havel*, 2014 WL 4967229, at *10 (relatedness "will clearly be strongest" when the defendant's in-forum conduct constitutes "one of the elements of the intentional tort alleged.")

---

[10] However, the Supreme Court did "not limit 'suit-related conduct' to the *elements* of a tort." *Havel*, *id.* (emphasis in the original). Thus, while conduct that is an element of the cause of action is by definition "suit-related," the "relatedness" test is not <u>limited</u> to the actual elements of the cause of action.

Defendants do not contest the factual allegations underlying Plaintiffs' theory of specific jurisdiction. To the contrary, Defendants admit their Washington D.C. office had a multimillion dollar budget and engaged in extensive activities, including "promotion of 'the Palestinian cause in speeches and media.'" (DE 58 at 16-17, quoting factual findings in *Waldman*).[11] Rather, Defendants' sole challenge to Plaintiffs' specific jurisdiction argument is that the same argument was considered and rejected as a <u>matter of law</u> in *Waldman*, *Livnat*, *Klieman v. PA*, 923 F.3d 1115 (D.C. Cir. 2019) and *Shatsky v. PLO*, 955 F.3d 1016 (D.C. Cir. 2020) (DE 58 at 15-17).

But *Waldman*, *Livnat*, *Klieman,* and *Shatsky* cannot avail Defendants, because they rejected specific jurisdiction over Defendants on <u>legal</u> grounds later overruled by *Ford*. Under the traditional specific jurisdiction formula, a plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum" (*Ford* at 1025), which courts interpreted as demanding some causal connection. *Ford* effected a sea-change in specific jurisdiction, by clarifying under the "relate to" prong of the formula, specific jurisdiction may be established without a causal showing. *Ditter*, 2022 WL 889102, at *2 (D. Colo. Mar. 25, 2022) (after *Ford*, "relate to" test "does not require proof of causation between a plaintiff's suit and a defendant's activities" in the forum).[12]

*Waldman* is bad law post-*Ford* because it never even discusses the "relate to" prong of the specific jurisdiction formula (which requires no causal link), focuses exclusively on the "arises from" prong (which requires causation), and then emphasizes <u>no less than three times</u> it is rejecting

---

[11] Defendants dispute only "their alleged involvement in attacks" (DE 58 at 15), which of course is an ultimate merits issue for the jury. By contrast, Defendants do not dispute any of the FAC's factual allegations regarding the existence of their U.S.-based propaganda activities and the purpose served by those activities as a necessary element for achieving the goals of their overall terrorist program. Those undisputed allegations are therefore treated as true for the purposes of this motion. *Wenz*, 55 F.3d at 1505.

[12] Tellingly, Defendants fail to even mention *Ford* in their motion.

specific jurisdiction because "plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum." *Waldman*, 835 F.3d at 343. *Cf. id.* (finding twice more that plaintiffs' claims did not "arise from" Defendants' U.S. activities).

*Waldman* also rejected the plaintiffs' specific jurisdiction argument because they did not show Defendants' U.S.-based conduct itself was tortious. *Id.* at 342 ("connections the defendants do have with the United States—the Washington, D.C. and New York missions—revolve around lobbying activities that are not proscribed by the ATA."). But *Ford* itself shows that in a purposeful-availment case, the defendant's in-forum conduct need not be wrongful or tortious. In *Ford*, the defendant's in-forum activities involved innocent sales and advertising activities. *Id.* at 1027-28. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (upholding personal jurisdiction based on a course of non-tortious business dealings in the forum).

Moreover, irrespective of whether (standing alone) they were tortious or wrongful, Defendants' U.S. activities here <u>constitute and satisfy a defined statutory element</u> of Plaintiffs' ATA claim—i.e., § 2331(1)(B)—as discussed above.

*Livnat*, *Klieman*, and *Shatsky* are legally erroneous for similar reasons. In those cases, the D.C. Circuit found no jurisdiction because the plaintiffs did not show Defendants' U.S. contacts related to the <u>particular terror attacks</u> in which they were injured. *Livnat*, 851 F.3d at 57 (no specific jurisdiction because plaintiffs had not shown a link between Defendants' U.S.-related conduct and the particular attack); *Klieman*, 923 F.3d at 1124 (following *Livnat*, finding "Plaintiffs have not alleged tangible facts as to how *this* attack was intended (or even used ex post) to further defendants' political aims in the United States."); *Shatsky v. PLO*, 955 F.3d at 1037 (following

*Livnat* and *Klieman* and dismissing because there was no "evidence in the record connecting the Karnei Shomron bombing to the alleged public relations campaign.").[13]

After *Ford*, the holdings in *Livnat*, *Klieman*, and *Shatsky*—i.e., that an ATA plaintiff must show Defendants' U.S. activities are tied to the particular terrorist attack which injured her—are legally unsound. If we were to apply those holdings to the facts of *Ford*, the *Ford* plaintiffs would have had to show that Ford's in-forum activities (sales, advertising) related to the underlined particular vehicles harming the plaintiffs.  The Supreme Court has rejected any such requirement.

The constitutional rule established in *Ford*—that Due Process permits "relatedness" without causation—is not limited to a particular cause of action or set of circumstances. While *Ford* happened to involve a product liability suit, courts applying *Ford* have noted "the pitfalls of trying to compare the relatedness of contacts to a given forum in different tort claims for jurisdictional analysis," and cautioned against restricting the "relatedness" holding in *Ford* to the specific circumstances or causes of action in that case. *Bibbs v. Molson Coors Beverage Co. USA, LLC*, --- F.Supp.3d ----, 2022 WL 2900275, at *5, n.2 (N.D. Tex. July 22, 2022).[14]

---

[13] Notably, the decisions in *Waldman*, *Klieman* and *Shatsky* were given after discovery had been completed.

[14] The Court should disregard Defendants' footnote 8, claiming that exercise of jurisdiction "would violate fair play and substantial justice" under *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206 (10th Cir. 2000). "Arguments [of lack of "fair play and substantial justice"] raised in a perfunctory manner, such as in a footnote, are waived." *Titan Feeding*, at *8 (citation omitted). Defendants have not attempted to meet their burden "to show that the exercise of jurisdiction in the chosen forum will make litigation so gravely difficult and inconvenient that [they] unfairly [are] at a severe disadvantage in comparison to" Plaintiffs. *Peay*, at 1212 (cleaned up). Their claim that discovery will take place abroad supports jurisdiction, since *Peay*'s concern was that discovery will occur away from "defendant's residence or place of business." *Id*. Nor have Defendants tried to show, because they cannot, that any alleged burden on them outweighs the "federal interest in litigating the dispute in the chosen forum." *Id*. at 1213. The ATA "was not designed simply to afford *some* forum to victims of terrorism; it was designed to give them a forum in the courts of the United States…the ATA was designed to give American nationals broad remedies in a procedurally privileged U.S. forum." *Goldberg v. UBS* AG, 660 F. Supp. 2d 410, 421-22 (E.D.N.Y. 2009).

Accordingly, the Court has specific personal jurisdiction over the Defendants in this case.

**d.  The Court Has Personal Jurisdiction Under Fed. R. Civ. P. 23.2**

Alternatively, the Court has jurisdiction over Defendants under Fed. R. Civ. P. 23.2, which authorizes a "proceeding in the nature of a class action" against unincorporated associations.[15] FAC ¶ 11; C. Wright, A. Miller, M. Kane, 7C Fed. Prac. & Proc. Civ. § 1861 (3d ed.) (April 2022 update). Defendants assert "Rule 23.2 does not purport to create personal jurisdiction ... where otherwise lacking" (DE 58 at 19) and "if this Court cannot exercise personal jurisdiction over the PA and PLO consistent with due process ... Rule 23.2 does not change that result" (*id*. at 20). This assertion is at odds with decades of case law and leading commentators. Rule 23.2, like Rule 23 (class actions generally) allows a court to assert personal jurisdiction over a litigation class, including unincorporated associations, if the court has personal jurisdiction over the named class representative. This Court has general personal jurisdiction over Riyad Mansour, the named representative for the PLO and PA, as he is a domiciliary of the United States and service was effected at Mansour's home address in Florida. FAC ¶ 31; DE 55; 18 U.S.C. § 2334(a). Because the Court has jurisdiction over their representative, the Court may assert jurisdiction over the defendant unincorporated associations.

**A.  The Court may properly assert personal jurisdiction over the Defendants because it has personal jurisdiction over Mansour**.

Federal courts have long held a plaintiff may sue an unincorporated association using the form of a class action, even where personal or subject matter jurisdiction might be lacking if the

---

[15] Plaintiffs allege that "[t]he PLO and PA are both unincorporated associations." FAC ¶ 28. Defendants concede the point. DE 58 at 21.

plaintiff had sued the association as an entity or by naming each individual member. *Calagaz v. Calhoon*, 309 F.2d 248 (5th Cir. 1962); Wright & Miller § 1867. Wright & Miller explain unincorporated associations may be sued in different ways, and that a plaintiff's choice may determine the extent of a court's jurisdiction. *Id*. When the suit is brought as a class action, "service must be made only upon the named representatives <u>and the court may proceed on the basis of its personal jurisdiction over the named representatives</u>." *Id*. Thus, "treatment of unincorporated associations as classes provides substantial benefits from the perspective of personal jurisdiction, venue, and subject-matter jurisdiction." *Id*.; *Cf.* 5 Moore's Federal Practice - Civil § 23.2.02

Modern case law and the history of litigation involving unincorporated associations support this conclusion. Prior to the 1966 adoption of Rule 23.2, the Federal Rules of Civil Procedure allowed unincorporated associations to sue and be sued as litigation classes under the general language of Rule 23. *Cf. Calagaz* (finding plaintiff <u>and</u> defendant, both of which were unincorporated associations, to be properly designated as litigation classes under Rule 23(a); Wright & Miller § 1867; David Marcus, *The History of the Modern Class Action, Part I: Sturm Und Drang, 1953-1980*, 90 WASH. U. L. REV. 587, 600 (2013) (noting that the 1938 version of Rule 23 allowed "true" class actions, which included those involving unincorporated associations).

The *Calagaz* court held class treatment of unincorporated associations under Rule 23 did not address only the associations' legal capacity to sue or be sued. Rather, by regarding the suit as a class action, the court was able to assert diversity jurisdiction because the named class representatives did not share the same state citizenship as the plaintiff (even though other members of the association did). *Calagaz*, 309 F.2d at 252. Similarly, and critically here, *Calagaz* held

personal jurisdiction over the defendant <u>association</u> was established based upon the court's personal jurisdiction over the <u>named member/class representative</u>. *Id*. at 253.

In 1966, Rule 23.2 was enacted to continue the prior practice of allowing a class action mechanism to be used as to unincorporated associations while recognizing certain differences that made the stringencies of Rule 23 inapplicable to actions involving unincorporated associations. *Sembach v. McMahon Coll., Inc.*, 86 F.R.D. 188 (S.D. Tex. 1980); Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv. L. Rev. 356, 387 and notes 118-119 (1967). Thus, the Rule 23.2 class mechanism continues to provide litigants with many advantages of typical Rule 23 class actions. *Curley v. Brignoli, Curley & Roberts Assoc.*, 915 F.2d 81, 85 (2d Cir. 1990).

These advantages include (a) expanding the number of districts where venue is proper; (b) empowering a plaintiff to name only those association members whose citizenship will not disturb diversity jurisdiction; and, as relevant here, (c) permitting a court to exercise personal jurisdiction over a class representative and thereby obtain jurisdiction over the unincorporated association, which might otherwise be beyond the court's jurisdiction. *Id*.; *see also*, Moore's § 23.2.04 (identifying venue, subject matter jurisdiction, and personal jurisdiction among procedural advantages of suing unincorporated associations under Rule 23.2); *Resolution Trust Corp. v. Deloitte & Touche*, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (personal jurisdiction over association based upon jurisdiction over representative member); *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, (S.D.N.Y. 1991) (same). Wright & Miller explicitly note suing an unincorporated association as a class may facilitate the court's exercise of personal jurisdiction over the association. "[W]hen the association is a defendant, plaintiff's ability to select the class

representatives enables plaintiff to choose adversaries, which is helpful for purposes of securing personal jurisdiction." Wright & Miller § 1867.

Rule 23.2 is entirely consistent with recent decisions that continue to hold personal jurisdiction over a Rule 23 class is perfected where the court has personal jurisdiction over the named class representatives. *Cf. Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445 (7th Cir. 2020) (class's affiliation with a forum depends only on the named class representatives); *Lyngaas v. Ag*, 992 F.3d 412, 433 (6th Cir. 2021) (in class actions, personal-jurisdiction analysis focuses on the named class representative); *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020); *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1227–28 (10th Cir. 2021) (citing *Mussat* and *Lyngaas* approvingly). Defendants do not cite a single case holding due process is violated by the class action principle that personal jurisdiction may be exercised as to a class based upon jurisdiction over named representatives. Instead, they argue a rule of civil procedure cannot override due process. (DE 58 at 20-21). This argument is off point because, for jurisdictional purposes, class actions are treated differently than other cases; the class's affiliation with the forum depends only on the named class representatives. *Mussat*, 953 F.3d at 445; *Lyngaas*, 992 F.3d 435.

### B. Rule 23.2 applies regardless of whether state law provides unincorporated associations with capacity to sue and be sued.

Defendants argue that Rule 23.2 merely affords unincorporated associations capacity to sue and be sued in diversity actions brought in federal courts in states that do not afford such associations with jural capacity. (DE 58 at 21-22, citing inter alia *Northbrook Excess & Surplus v. Med. Malpractice Joint Underwriting Ass'n of Massachusetts*, 900 F.2d 476 (1st Cir. 1990). Defendants assert that Rule 23.2 does not apply here because Colorado law provides unincorporated associations with capacity to be sued. Defendants cite in support of this

exceedingly narrow construction of the rule a handful of decisions that have been rejected based upon the plain language of Rule 23.2, the Advisory Committee Notes, the interplay between Federal Rules of Civil Procedure 23.2, 23, and 17, and the pre-Rule 23.2 history of using class actions to sue unincorporated associations. *Curley*, 915 F.2d at 86-87; *Kerney v. Fort Griffin Fandangle Ass'n, Inc.*, 624 F.2d 717 (5th Cir. 1980) ("Rule 23.2 clearly authorizes a class action against the members of an unincorporated association in Texas" though Texas law provided unincorporated associations with capacity); *Murray v. Sevier*, 156 F.R.D. 235, 240-41 (D. Kan. 1994); *Calagaz* (pre-Rule 23.2 decision holding Rule 17(b) is "no obstacle" to class actions based upon diversity). Both Wright & Miller and Moore's Federal Practice agree the expansive view of Rule 23.2 is the more reasonable interpretation. Wright & Miller § 1867; Moore's § 23.2.05[4].

By its terms, Rule 23.2 allows the class action form to be used in <u>any</u> actions involving unincorporated associations. The only limitation found in the Rule is that the class representative must fairly and adequately protect the interests of the association and its members. *Curley*, 915 F.2d at 86-87; *Northbrook*, 900 F.2d at 478. <u>Nowhere</u> does Rule 23.2 mention capacity or state law rules regarding unincorporated associations. In fact, questions of capacity generally, and that of unincorporated associations, specifically, are addressed in Fed. R. Civ. P. 17. If Defendants' narrow reading were correct, Rule 23.2 would have been included as a subparagraph within the capacity rule – Rule 17(b)(3)(A). *Curley*, at 87. As *Curley* noted, "[i]f the drafters of rule 23.2 intended to provide only a vehicle for capacity, it seems that they would have simply extended to the diversity realm rule 17(b)'s grant of association capacity in federal question cases," and "[i]f they intended the anomaly that the availability of class actions would turn on state capacity laws, the drafters could have so provided in the text of rule 23.2." *Id.*; *Cf.* Moore's, § 23.2.05[4].

Affording class treatment to unincorporated associations is consistent with class action jurisprudence generally. Wright & Miller § 1861.[16] Thus, in addition to preventing state capacity rules from providing unincorporated associations with an immunity shield, Rule 23.2 maintains other advantages afforded by class treatment. *Curley*, 915 F.2d at 87. As discussed above, these advantages include expanding venue options, personal jurisdiction, and diversity subject matter jurisdiction based upon the citizenship of the association's representative alone. *Id*. at 87; *Aetna Cas. & Sur. Co. v. Iso-Tex, Inc*., 75 F.3d 216, 218 (5th Cir. 1996). Recall Rule 23.2 was designed to continue the prior practice of allowing a class action to be used in actions involving unincorporated associations. *Sembach*, 86 F.R.D. 188. Thus, Professor Benjamin Kaplan, who served as the reporter to the Advisory Committee on Civil Rules, agrees that Rule 23.2 continues to provide the jurisdictional advantages that were available in unincorporated association class actions prior to the adoption of Rule 23.2. Kaplan, *Continuing Work of the Civil Committee, supra*, 81 Harv. L. Rev. at 387, n. 119. If the drafters had intended to break with the earlier practice by limiting the class action device to cases in states that do not afford capacity to unincorporated associations, they would have said so in the text of the Rule.

Defendants also argue it is inappropriate to sue an unincorporated association both as an entity and as a class. (DE 58 at 23, citing *Coniglio v. Highwood Servs., Inc.*, 60 F.R.D. 359

---

[16] The Defendants assert that Wright & Miller note a trend after the adoption of Rule 23.2, that the rule should be construed narrowly as a rule of capacity. Not so. Wright & Miller opine that state law should not interfere with the application of Rule 23.2. However, the commentary recognizes a trend to limit the applicability of Rule 23.2 in diversity cases where state law prohibits the use of class actions against unincorporated associations. Wright & Miller § 1861. The instant case is not premised upon diversity jurisdiction, and Colorado law does not bar class actions in suits involving unincorporated associations. *Cf. Murray*, 156 F.R.D. at 253 (Wright & Miller recognize trend restricting Rule 23.2 only in in cases where state law prohibits actions against the associative entity).

(W.D.N.Y. 1972)). But *Coniglio* did not hold, as Defendants maintain, that plaintiffs may not plead in the alternative claims against the association as an "entity" and as a class. It merely rejected the plaintiffs' attempt to name the defendant association itself as the representative of the association's members. "Nowhere is the association itself authorized as the proper representative of its members. *Coniglio*, at 364. Moreover, in *Coniglio*, the defendant association, as an entity, was already subject to the court's jurisdiction. *Id*. Similarly in *Patrician Towers Owners, Inc. v. Fairchild*, 513 F.2d 216 (4th Cir. 1975), also relied upon by Defendants, the association, as an entity, was before the court, and the association and its members were suing to enforce a single obligation to the association. *Id*. at 221. The court held the representative action could not be maintained when "joined voluntarily by the plaintiffs themselves" with an action by the plaintiffs' association. *Id*.

Here, by contrast, the PLO and PA are challenging the exercise of jurisdiction over them as non-class defendants, and if that challenge succeeds, Rule 23.2 will be Plaintiffs' only basis for jurisdiction. Therefore, this is precisely the type of case for which Rule 23.2 was intended, as it "provides litigants with important procedural advantages." *Curley*, 915 F. 2d at 87; Wright & Miller § 1867; Moore's § 23.2.02. Nothing prohibits Plaintiffs from alternatively pleading their claims against Defendants through the class action device of Rule 23.2. Indeed, in *Curley*, the Second Circuit *sue sponte* held that the plaintiffs could have brought their claim as a class action under Rule 23.2, and affirmed the judgment by converting the case (on appeal) into a Rule 23.2 class action. *Id*.; *cf*., *Murray*, 156 F.R.D. at 240 (court ordered plaintiff to plead his claim as a Rule 23.2 class action, holding, "[t]he court is exceedingly troubled that this action is not being plead under Rule 23.2 when that Rule seems tailor-made for this case.").

### C. The FAC properly identifies the two unincorporated associations as classes

Defendants baselessly argue Plaintiffs fail to allege a class under Rule 23.2. Plaintiffs allege both the PA and the PLO are unincorporated associations. FAC ¶¶ 28-29. And Plaintiffs named Riyad Mansour, a member of both the PA and the PLO, as class representative. That is sufficient under Rule 23.2. Moore's § 23.2.02 (Rule 23.2 enables a representative suit to be brought and enforced against the association itself). Plaintiffs need not allege any specific tortious conduct by Mansour because he is being sued as representative of the defendant classes—the associations, which are the tortfeasors. Thus, Defendants' claim "a complaint must explain what each defendant did to him or her[,]" (DE 58 at 25) fails.

Defendants also claim the FAC does not define class membership or an ascertainable class (DE 58 at 25-26), citing decisions addressing Rule 23 class actions. But Rule 23.2 does not incorporate Rule 23's requirements precisely because, by definition, the members of an unincorporated association constitute a class. A majority of authorities hold that the requirements of Rule 23 do <u>not</u> apply to Rule 23.2 actions. *Curley*, at 85-86; *Murray*, at 240-41; Wright § 1861.

### D. Mansour Will Fairly and Adequately Represent the Class.

1. <u>Defendants are estopped from disputing that Mansour is a member</u>

Defendants do not dispute Mansour is a member of the PLO, but assert he is not a member of the PA. DE 58 at 26. This claim is squarely refuted by Defendants' own representations and interrogatory answers in *Sokolow v. PLO*, 04-cv-397 (S.D.N.Y.). In *Sokolow*, Defendants moved to dismiss the plaintiffs' nonfederal claims on the grounds that, as unincorporated associations, they lacked the capacity to be sued under forum law. At a hearing on that motion, Judge Daniels stated Defendants' status as unincorporated associations had arisen in many ATA cases, and he

intended to resolve the question conclusively once and for all so that "every judge is not going to have to go through this depending on what's to the advantage or disadvantage of either party in terms of what they want to assert." Hearing Tr., Aug. 9, 2012 (Perlin, **Ex. I** at 3-4). In response, Defendants repeatedly stated for purposes of the Federal Rules of Civil Procedure generally, they should be considered unincorporated associations. *Id*. at 7, 12, 15, 64. Judge Daniels and the plaintiffs replied that to support their claim to be unincorporated associations, Defendants must identify their members. *Id*. at 10, 36.

Judge Daniels ordered Defendants to respond to discovery requests regarding their claim to be unincorporated associations. Among the materials produced were answers to interrogatories referencing exhibits that addressed the specific question of who comprised the membership of the PA and the PLO. (Perlin, **Ex. J**). Interrogatories 8 and 9 required Defendants to list the members of the PA and PLO. *Id*. at 8-9. Defendants responded their members included "certain elected, appointed, and employed officials" of the PA and PLO who were listed in documents referenced by Bates numbers. *Id*. at 8-10. The referenced documents were pages from the 2001 through 2011 editions of a privately-published governmental directory. *Id*. (Perlin, **Ex. K**). According to the documents cited in response to the interrogatories, the members of the PA and PLO are identical. Perlin, **Ex. J** (citing identical Bates stamped documents). Moreover, the membership of both unincorporated association defendants identified in the *Sokolow* interrogatory responses is much broader than the limited class of members Defendants describe in their Motion to Dismiss. DE 58 at 26 (purporting to limit membership of the PA to "the President, Council of Ministers, and Legislative Council."). Most importantly, the documents referred to in the *Sokolow* interrogatory

responses **identified Riyad Mansour, by name, as a member of both the PA and the PLO**. Perlin, Ex. K at 84, 111, 138, 189 (Bates 02:008812, 02:008839, 02:008866 and 02:008917).

Under the Federal Rules of Civil Procedure and the Federal Rules of Evidence interrogatory answers given in one action may be used in another. *Sclafani v. Air & Liquid Sys. Corp.*, 2013 WL 12119556, at *6, n.9 (C.D. Cal. Mar. 20, 2013) (citing 8B Wright, Miller & Marcus, § 2180 (3d ed. 2010)). Here, Defendants should be bound by their prior answers to interrogatories, which provided detailed definitions of their respective memberships and specifically identified Mansour as a member of both the PA and PLO. "[A] party opponent's answers to interrogatories are admissible as admissions." *Buckley v. Airshield Corp.*, 116 F. Supp. 2d 658, 669 (D. Md. 2000) *citing*, *Gridiron Steel Co. v. Jones & Laughlin Steel Corp.*, 361 F.2d 791, 794 (6th Cir. 1966). "Such admissions qualify as substantive evidence of the fact stated therein." *Id. citing* Fed. R. Evid. 801(d)(2).

Additionally, Defendants are judicially estopped from denying that Mansour is a member of the PA and PLO. Identifying their membership was critical to *Sokolow*'s acceptance of their claim that they were both unincorporated associations. And by establishing their status as unincorporated associations, Defendants prevailed on their motion to dismiss New York state law claims. *Sokolow v. PLO*, 60 F. Supp. 3d 509, 524 (S.D.N.Y. 2014). Thus, Defendants are estopped from now denying that Mansour is a member of the PA and PLO. *New Hampshire v. Maine*, 121 S. Ct. 1808, 1814-15 (2001); *Eastman v. Union Pac. R. Co.*, 493 F.3d 1151 (10th Cir. 2007).

Rule 23.2 imposes only one requirement for the class action to proceed: the class representative fairly and adequately represent the association and its members. *Curley*, at 85; *Murray*, at 240-41 (same); Wright & Miller, § 1861 (same). "The requirement of 'fair and adequate

representation' is satisfied when: (1) the named representatives have common interests with the other class members; and (2) the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Resolution Trust*, 822 F. Supp. at 1515 (D. Colo. 1993).

Here, the named class representative, Riyad Mansour, clearly has common interests with the class members and will protect the interests of the class through qualified counsel. Indeed, all the Defendants here are represented by the same law firm which has vigorously represented Defendants in numerous other terrorism lawsuits in the United States. *Cf. Resolution Trust*, at 1515 (adequate representation where litigation was handled by defendant association's national counsel and where class action briefing demonstrated that counsel would vigorously and competently protect the interests of the class members.).

Finally, Defendants offer only a *pro forma* argument that Mansour cannot be the class representative under Rule 23.2 because, they claim, "as an invitee to the United Nations" he enjoys immunity "under the UN Headquarters Agreement" for actions performed in the exercise of his functions as their representative to that body. DE 58 at 27.[17] This argument fails at the threshold for the PA, because the PA has no status at all at the UN (FAC ¶ 26), and thus Mansour can have no claim to any UN immunity as a member of the PA. More importantly, this argument is a colossal red herring: Mansour is not being sued for <u>any of his own actions</u>—much less actions at the UN. He is named in this action simply as a representative of the Defendants pursuant to Rule 23.2.

---

[17] Defendants have been claiming non-existent UN immunities in the federal courts for decades. Thus, in *Ungar v. PA*, Defendants argued that the Deputy Permanent Observer of the Permanent Observer Mission of Palestine to the United Nations "is immune from service pursuant to the Headquarters Agreement treaty between the U.N. and the United States." 153 F. Supp. 2d 76, 89 (D.R.I. 2001). The court rejected this claim because the Headquarters Agreement confers diplomatic immunity only on members of the United Nations. *Id.* citing *Klinghoffer,* 739 F.Supp. at 864; *aff'd,* 937 F.2d at 48.

4873-6555-8836, v. 1

Mansour is a citizen and long-time domiciliary of the United States. He is not present in the United States because of his positions in the PA and PLO; he is present here because he lives here.

For all the reasons above, Defendants' Rule 12(b)(2) motion should be denied.

## II.  PLAINTIFFS' FAC VALIDLY STATES ALL THE CLAIMS ASSERTED

Defendants' Rule 12(b)(6) motion should be denied. No court has ever dismissed an ATA action against the PLO or PA under Rule 12(b)(6). Nor has any court ever dismissed under Rule 12(b)(6) an ATA complaint presenting allegations like, or even approaching, those at issue here—*i.e.*, where, as here, defendants with a frank ideological and political agenda provided material support and resources <u>directly</u> to the designated Foreign Terrorist Organization ("FTO") that carried out the attack. The Rule 12(b)(6) dismissals which Defendants cite involved banks with no ideological or political goals, which provided services or assistance to entities alleged to be affiliated—somehow—with the terrorist group that actually carried out terrorist attacks at issue.

### a.  <u>Direct Primary ATA Liability</u>

Plaintiffs assert a claim against Defendants for primary liability under ATA § 2333(a), on the basis that Defendants' own actions constituted "international terrorism." FAC ¶¶ 179-99. The term "international terrorism" is defined in the ATA as "activities" that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1). Those "activities" must also "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished [or] the persons they appear intended to intimidate or coerce." *Id*. Finally, those "activities" must appear to be intend to influence a government or a population. *Id*.

Thus, to prevail on their direct primary liability claim, Plaintiffs need to show Defendants' conduct meets the definition of "international terrorism," and (2) that Plaintiffs were injured "by reason of" that conduct. Courts have construed the ATA's "by reason of" language as requiring proximate causation. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 226 (D.C. Cir. 2022).

The allegations here easily plead these elements. As discussed above (regarding specific jurisdiction) the FAC alleges Defendants' actions appeared to be and were intended to influence a government and population. And Defendants' activities obviously "transcended national boundaries." Regarding the remaining elements (dangerousness, criminality and proximate causation) the FAC alleges in extensive detail: (1) the PFLP is a designated FTO that over a period of decades carried out a huge number of deadly terrorist attacks (¶¶ 115, 154-160) ; (2) for 15 years prior to the Attack, the PLO and PA provided the PFLP with massive funding, along with a range of other material support and resources, including a geographic base of operations adjacent to Israel, direct financial support for PFLP terrorist operatives, a dedicated radio frequency for the PFLP's radio station, and internet access for the PFLP's websites (¶¶ 126-146) ; and (3) the material support and resources provided by Defendants greatly enhanced the PFLP's organizational and operational capabilities, and enabled the PFLP to recruit, build, maintain and deploy the human, material, and operational resources and infrastructure in the West Bank and Gaza that were needed and used by the PFLP to plan, organize and execute acts of terrorism against Jewish and Israeli targets in Israel, the West Bank and Gaza, including the Attack. (¶¶ 126-146, 153-155, 174).

These allegations satisfy the ATA's "dangerousness" element. "Giving money to Hamas, like giving a loaded gun to a child … is an 'act dangerous to human life.'" *Boim v. Holy Land*

*Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008). *Cf. Miller v. Arab Bank*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (providing material support to an FTO like the PFLP is "dangerous to human life" since those resources "increase [the PFLP's] ability to carry out attacks.").

Defendants' actions were also criminal (or would be criminal if performed in the United States) because the knowing provision of "material support or resources" to an FTO is a violation (inter alia) of 18 U.S.C. § 2339B. A violation of § 2339B "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Linde v. Arab Bank*, 882 F.3d 314, 329-30 (2d Cir. 2018). *Cf. Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 206 (2d Cir. 2014) ("[I]n order to establish entitlement to a civil remedy under 18 U.S.C. § 2333(a) predicated on a violation of § 2339B(a)(1), Plaintiffs were obliged to show that [the defendant] had actual knowledge that, or exhibited deliberate indifference to whether" it was providing "material support to a terrorist organization, irrespective of whether the support aided terrorist activities."). Plaintiffs' allegations easily meet this requirement; indeed, Plaintiffs allege far more: namely, that Defendants provided support to the PFLP with the goal of enabling and facilitating terrorist attacks. [18]

The term "material support or resources" includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services […] safehouses […] communications equipment, facilities […] personnel […] and transportation." 18 U.S.C. § 2339A(b)(1). The funding, radio frequency, and internet service that Defendants provided

---

[18] Defendants' conduct violated many other federal and state criminal laws, ranging from counter-terrorism provisions to garden-variety crimes such as reckless endangerment; however, because the ATA is satisfied by violation of any criminal provision, Plaintiffs address here only § 2339B.

the PFLP obviously all meet this definition. Likewise, Defendants' support payments to PFLP operatives who had been convicted of terrorist crimes and then released, which "provided the PFLP with a large pool of experienced and hardened terrorist leaders and operatives" (FAC ¶¶ 133-134), constitutes provision of "personnel" to the PFLP under § 2339B. *Sattar v. United States*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) (by opening a channel of communication between an FTO's imprisoned leader and his confederates on the outside, defendants provided "personnel" to the FTO within the meaning of § 2339B); *United States v. Kandic*, 2022 WL 1266431, (E.D.N.Y. Apr. 28, 2022) (arranging travel of ISIS recruits to ISIS-held areas constitutes provision of "personnel" under § 2339B). Defendants' provision of a geographical base of operations to the PFLP (FAC ¶¶ 130-132) also constituted provision of material support to the PFLP under § 2339A(b)(1). *Rux v. Republic of Sudan*, 461 F.3d 461, 470 (4th Cir. 2006) (Sudan provided "material support and resources" to Al-Qaeda, within the meaning of § 2339A(b)(1), by granting Al-Qaeda a "safe haven and a base of operations" on Sudanese territory "from which to conduct its terrorist operations."). *Cf. Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 177 (D.D.C. 2016) (same).

Finally, Plaintiffs sufficiently allege causation. "To plead proximate causation, plaintiffs must plausibly allege (1) that defendants' acts were a substantial factor in the sequence of events that led to their injuries and (2) that those injuries were reasonably foreseeable or anticipated as a natural consequence of defendants' conduct. Those requirements are met by allegations of some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. Proximate causation functions to eliminate the bizarre, by precluding liability based on an attenuated causal link more aptly described as mere fortuity." *Atchley*, at 226. Importantly, "Plaintiffs who bring an ATA action are not required to trace specific dollars to

specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because money is fungible." *Schansman v. Sberbank of Russia*, 565 F. Supp. 3d 405, 418-19 (S.D.N.Y. 2021) (cleaned up). Likewise, for primary ATA liability, "Plaintiffs are not required to establish 'but-for' causation in addition to proximate causation." *Kaplan v. Lebanese Canadian Bank*, 405 F. Supp. 3d 525, 532 n.3 (S.D.N.Y. 2019).

Plaintiffs detail how the funds and other forms of material support that the Defendants provided to the PFLP in the 15 years prior to the attack boosted the PFLP's capabilities and enabled it to deploy the human and material resources necessary to carry out terrorist Attacks. (FAC ¶¶ 126-146, 153-155, 174). These allegations are analogous to those found adequate in *Atchley* for pleading proximate causation. "Defendants' alleged support here was similarly a substantial factor in plaintiffs' injuries. They gave both cash and cash equivalents to the terrorist organization that harmed plaintiffs, which allowed that organization to grow." *Id*. at 227 (emphasis added).

Plaintiffs also meet the second element of proximate causation, *i.e.*, the Attack was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct. As *Atchley* held: "Providing fungible resources to a terrorist organization allows it to grow, recruit and pay members, and obtain weapons and other equipment. It was reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered." *Id*. Exactly so here, Defendants provision of a broad range of material resources to the PFLP "allow[ed] it to grow, recruit and pay members, and obtain weapons and other equipment," and it was thus "reasonably foreseeable that … fortifying [the PFLP] would lead to" terror attacks like that here. Moreover, as explained in the FAC, Defendants affirmatively desired such attacks.

Defendants present several meritless arguments in response to Plaintiffs' direct primary liability claim.

First, Defendants claim Plaintiffs' allegation that the Attack was carried out by the PFLP is "conclusory." That is absurd: Plaintiffs identify by name four senior PFLP leaders (of whom two are quoted verbatim) who confirmed the PFLP executed the Attack, and explained why the PFLP did so. FAC ¶¶ 172-173.

Second, Defendants repetitiously and baldly claim that Plaintiffs' allegations are "conclusory" and/or implausible. Yet (with the sole exception of the PFLP executing the Attack, just discussed), Defendants never identify any <u>specific</u> allegations they believe are conclusory or not plausible, much less explain <u>why</u> they purportedly are deficient. "Defendant fails to engage in a proper 12(b)(6) analysis. Specifically, Defendant fails to explain why Plaintiff's factual allegations in his complaint, accepted as true, fail to state a claim to relief that is plausible on its face. Defendant offers little in the way of a 12(b)(6) challenge beyond counsel's cursory factual assertions. Because it is Defendant's burden to show that dismissal is warranted, the Court will not sua sponte engage in this analysis with regard to Plaintiff's … claim." *Aicher v. Access Corr.*, 2017 WL 8944040, at *5–6 (D.N.M. Aug. 28, 2017), *report and recommendation adopted*, 2017 WL 4338552 (D.N.M. Sept. 28, 2017) (cleaned up, citing *Iqbal*). *Cf. Luna v. Bank of Am. NA*, 2015 WL 11120875, at *10 (N.D. Tex. Nov. 9, 2015), *report and recommendation adopted* 2016 WL 158128 (N.D. Tex. Jan. 12, 2016) ("Defendant fails to explain how Plaintiff's allegations in support of his claims […] fail to state a claim under 12(b)(6) […] Its conclusory statement, without any explanation or support, is simply not persuasive.").

Third, Defendants repetitively claim their provision of material support to the PFLP was "limited and generalized." This self-serving characterization has no support in the FAC, in any materials which may be considered on a Rule 12(b)(6) motion—or in any other source. To the contrary, the FAC makes clear Defendants' support for the PFLP was extensive (not limited), and diversified (not generalized). And some of the in-kind support (geographical base of operations, dedicated frequency for PFLP radio, etc.) was unique, invaluable, and irreplaceable. Defendants have simply conjured up this characterization out thin air. The Court should disregard it.[19]

Fourth, Defendants misrepresent Plaintiffs' allegations. The FAC alleges Defendants provide on-going financial support to PFLP operatives who were incarcerated for terrorist crimes and then released, thereby proving the PFLP with a pool of experienced terrorist personnel. Plaintiffs also allege Defendants provide the PFLP with a dedicated radio frequency on the bandwidth controlled by Defendants, and internet privileges on Defendants' top-level domain. Defendants misrepresent these allegations, and portray them as payments to incarcerated terrorists, and refusal to shut down (rather than affirmative provision of) the PFLP websites and radio.

Fifth, Defendants cite to a number of ATA decisions, but none of them is relevant to the facts, allegations, or posture of this case. Thus, *Shatsky v. PLO*, 2017 WL 2666111 (D.D.C. June 20, 2017) was a summary judgment decision, not a Rule 12(b)(6) decision, and was entered on a limited factual record after the court struck much of the plaintiffs' evidence. *Id.* at *3.[20] *Shatsky*

---

[19] The Court should also disregard Defendants' strange demand that the Court take judicial notice of an internet report about a current policy disagreement between them and the PFLP. (DE 58 n.28). The 2022 report is neither cognizable on a Rule 12(b)(6) motion nor relevant to events in 2014 and earlier.

[20] The D.C. Circuit later found that the *Shatsky* court lacked personal jurisdiction, and so vacated the decision and dismissed the case without prejudice. 955 F.3d 1016 (D.C. Cir. 2020).

found that Defendants' payment of rent for a single PFLP office was insufficient to establish proximate causation. Clearly, the facts of *Shatsky* are light-years from those here. Furthermore, *Shatsky* indicated the result would have been different if the plaintiffs had shown Defendants provided "millions of dollars" to the PFLP. *Id.* at *9. Plaintiffs have alleged in this case that Defendants provided the PFLP with millions of dollars annually, as well as many other types of material support. Thus, *Shatsky* supports Plaintiffs here, not Defendants.

Defendants also cite *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) and *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) but those cases are even further off base—they dealt with ATA suits against banks that provided banking services to Iran and Sudan which, in turn, were alleged to have funded the terrorist groups that harmed the plaintiffs. Unsurprisingly courts held such twice-removed theories of liability, which bear no resemblance to the facts here, are not viable. Defendants repeatedly quote *Rothstein* to the effect that governmental entities have "many legitimate agencies, operations, and programs to fund" (DE 58 at 29, 31, 35), but the court there was not discussing Iran's provision of support to terrorist groups, but rather the bank's provision of services to Iran, and was making the point that not every dollar that goes to Iran goes to terrorism. By contrast, Iran's provision of material support to terrorist groups has rendered it liable in U.S. federal courts many times, and no court has ever found it to be "legitimate." Thus, Defendants' provision of material support to the PFLP is analogous to Iran's provision of such support to Hizbollah, and not to the *Rothstein* defendant's provision of banking services to Iran.

Finally, Defendants argue because Plaintiffs are suing Iran and Syria under the Foreign Sovereign Immunity Act ("FSIA") for their roles in supporting the PFLP, their allegations against

Defendants are (somehow) defective. DE 58 at 32-33. This argument borders on the frivolous. ATA plaintiffs often bring parallel FSIA suits (usually in different courts, due to the venue rules for ATA and FSIA cases) and there is nothing contradictory or improper about doing so. Indeed, the identical argument has been rejected. *Kaplan*, 405 F. Supp. 3d at 533 n.4 (rejecting ATA defendant's claim that plaintiffs could not show that it was a proximate cause of their injuries because the court in plaintiffs' FSIA suit had found that "North Korea and Iran provided the weapons, training, logistical support, infrastructure, and financing, utilized by Hizbollah to commit the rocket attacks that caused Plaintiffs' injuries. Because it is common for injuries to have multiple proximate causes this argument is unavailing.") (cleaned up).

Therefore, Plaintiffs' direct primary liability claim should proceed.

### b. Primary ATA Liability On the Basis of Respondeat Superior

Plaintiffs assert Defendants are also primarily liable under the ATA under respondeat superior, because the Attack was an "act of international terrorism" under § 2333(a), and the PFLP—as an organization—executed the Attack as Defendants' agent. FAC ¶¶ 200-204.

The ATA allows imposition of liability on a defendant for the acts of its agents, pursuant to the doctrine of respondeat superior. "The ATA was 'intended to incorporate general principles of tort law,' of which respondeat superior is unquestionably one. *See Wultz*, 755 F.Supp.2d at 55; *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C.Cir. 2011) (Brown, J., concurring) ("Respondeat Superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the [ATA]. Thus, the [PA] is liable for the acts of its employees committed within the scope of their employment.") (citation omitted); *see also Gill*, 893 F.Supp.2d at 558 (finding that plaintiff was correct in contending that the ATA provides for

4873-6555-8836, v. 1

liability on a theory of respondeat superior); *Abecassis v. Wyatt*, 785 F.Supp.2d 614, 649–50 (S.D.Tex. 2011)." *Sokolow v. PLO*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014).[21]

*Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242 (10th Cir. 2020) clarified the elements of respondeat superior liability in tort where, as here, the agent is <u>not</u> the employee of the principal.[22] The Court of Appeals held that "not every agent is an employee," that the "minimal level of control required to establish an agency relationship stands in contrast to the much more significant and intrusive right of control that makes an agent an employee," that the "right to control need not be exercised for an agency relationship to exist," that the "principal's control may concern only the overall mission, not operational details," and that the right of control "need not be control over the manner and means of the agent's performance of work." *Id.* at 1252-55.

Plaintiffs' allegations easily meet these elements. The FAC alleges in detail that Defendants and the PFLP (which is the second-largest faction within the PLO) share the identical ideological goal of gaining control of territories governed by Israel, that Defendants and the PFLP have worked together for many decades to achieve this goal by employing terrorism and the threat of terrorism, and that for many decades Defendants have provided the PFLP with material resources to carry out terrorism, while Defendants carefully remain at arm's-length from the

---

[21] *Sokolow* was vacated for lack of personal jurisdiction, but the Supreme Court has directed the Second Circuit to reexamine that dismissal in light of the PSJVTA. If the Second Circuit vacates the jurisdictional dismissal, *Sokolow*'s respondeat superior ruling will collaterally estop Defendants from contesting the availability of respondeat superior liability under the ATA, because (tellingly) Defendants did <u>not</u> challenge the respondeat superior ruling on appeal. *See* Brief and Special Appendix for Defendants-Appellants, *Sokolow v. Palestine Liberation Organization*, 15-3135 (2d. Cir.), DE 87 at 6 (listing issues on appeal). In any event, though not technically <u>preclusive</u> against Defendants at this time, the *Sokolow* respondeat superior decision remains <u>persuasive</u> authority, as do the authorities cited therein.

[22] Though *Alfaro-Huitron* was a New Mexico case, the Tenth Circuit conducted its analysis under federal common law principles as reflected in the Restatement (which New Mexico follows). *Id.* at 1259, n.6

violence in order to effectively conduct public advocacy and thereby leverage the violence into political gains. *Id.* ¶¶ 108-153. Moreover, Defendants have both the practical ability and <u>the legal right</u> to control the conduct of the PFLP. *Id.* ¶¶ 112-113; 125. These allegations, which reflect an agency relationship between Defendants and the PFLP to carry out terrorist attacks, consistent with the principles outlined in *Alfaro-Huitron*, clearly support Plaintiffs' theory of respondeat superior liability. In fact, the PFLP confirmed that it executed the Attack to advance the goal of its agency relationship with Defendants, namely: wresting control of territories from Israel. FAC ¶ 173 (PFLP officials explain that "the two martyrs' blood that was shed yesterday has reinforced Jerusalem's Arab identity, and has thwarted the attempts to Judaize [sic] Jerusalem," and that the Attack "prove[s] that … we will continue to chase this enemy wherever it is until he leaves our land.").

Defendants challenge Plaintiffs' respondeat superior claim by building and thrashing a strawman; Defendants argue that "a respondeat superior claim … would require Plaintiffs to plausibly plead that <u>the Attackers</u> were the Defendants' agents," and that "Plaintiffs have not alleged facts sufficient to raise a reasonable inference … that <u>an employment relationship existed</u>." (DE 58 at 38, emphasis added). But it is crystal-clear from the FAC that the PFLP itself—as an organization—is alleged to be Defendants' agent. FAC ¶¶ 200-204.[23] Defendants' claim about the purported failure of the FAC to adequately allege an agency relationship between Defendants and the two individual murderers are non sequiturs, irrelevant to the actual allegations of the FAC. And

---

[23] An agent need not be a natural person; an organization or entity can be an agent for respondeat superior purposes. *Cf. Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001) (finding Iran liable under respondeat superior for the terrorist actions of Hizbollah); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007) (member of global accounting firm, which was an umbrella organization for member firms, could be liable under respondeat superior for fraud committed by Italian member firm).

*Alfaro-Huitron* establishes that respondeat superior liability does not require any "employment relationship."[24] Thus, Defendants fail to address, much less demonstrate the insufficiency of, the <u>actual</u> allegations of Plaintiffs' respondeat superior theory, or the relevant law.

Defendants also claim respondeat superior liability is unavailable under the ATA. This assertion ignores *Sokolow* and the unanimous cases cited therein. In purported support of this claim Defendants cite a few cases but (here again) the cases do not say what Defendants claim they do. Defendants cite *Boim v. Am. Muslims for Palestine*, 9 F.4th 545 (7th Cir. 2021), but that case dealt only with veil-piercing and alter ego theories in post-judgment enforcement proceedings, and has literally nothing to do with respondeat superior.[25] Defendants also cite *Parsons v. PA*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010), but that case explicitly dealt with "a conspiracy claim," not respondeat superior. And on appeal, the only judge to reach the issue held that the ATA <u>allows</u> respondeat superior liability. *Parsons v. PA*, 651 F.3d 118, 148 (D.C.Cir. 2011) (Brown, J., concurring).

Defendants' citation to *Mohamad v. PA*, 566 U.S. 449 (2012) is even further afield. The question in *Mohamad* was whether the Torture Victim Protection Act ("TVPA"), whose plain text is expressly limited to claims against an "individual," could be construed to include claims against these Defendants by the family of a U.S. citizen tortured to death by PA personnel. The Supreme Court held that it could not "read 'individual' so unnaturally. The ordinary meaning of the word,

---

[24] In putative support of their assertion that respondeat superior requires an employer-employee relationship, Defendants cite *Am. Select Ins. Co. v. Johnson*, U.S. Dist. LEXIS 101446, (D. Colo. June 18, 2018). But Defendants are aware of the contrary decision in *Alfaro-Huitron*, since they cite that case for other purposes in their motion. (*Id*. at 38). Thus, their reliance on *Am. Select Ins. Co*, which they know to be unfounded under the later decision in *Alfaro-Huitron*, is not made in good faith.

[25] Defendants the term "vicarious liability" as a synonym for respondeat superior liability, but the two concepts are not co-extensive, and respondeat superior liability is available even where secondary liability (such as aiding and abetting) is not allowed. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d at 550-52.

fortified by its statutory context, persuades us that the Act authorizes suit against natural persons alone." *Id.* at 453-54. This holding is, obviously, irrelevant to the question of whether the ATA allows respondent superior liability.[26] Indeed, unlike the TVPA, the ATA nowhere limits or defines the types of defendants who may be held primarily liable under ATA. *Cf.* ATA § 2333(a) (limiting only the class of plaintiffs, not the class of defendants who may be held liable).

The fact Congress left the class of ATA defendants wide open and unlimited is further grounds in favor of allowing respondent superior liability under the ATA. Indeed, since the ATA allows suits against entity defendants, and since entities can act only through human agents,[27] barring respondeat superior liability in ATA cases would render the ATA a dead letter in actions against terror groups or other entities, and limit its application solely to defendants who are natural persons. Obviously, Congress intended no such thing; rather, by allowing suits against entity defendants under the ATA, Congress necessarily intended to allow respondeat superior liability.

Plaintiffs thus state a valid claim for primary liability on the basis of respondeat superior.

c. **Secondary ATA Liability – Aiding and Abetting**

Section 2333(d) of the ATA provides in relevant part that where, as here, a terrorist attack was committed by an FTO, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such

---

[26] In fact, the D.C. Circuit found that the *Mohamad* plaintiffs had waived any argument that the PA or PLO could be held liable under the TVPA pursuant to respondeat superior, but that such an argument would likely have failed, precisely because Congress had specifically *limited* the TVPA to defendants who (unlike the PA and PLO) are natural persons. *Mohamad v. Rajoub*, 634 F.3d 604, 608-09 (D.C. Cir. 2011), *aff'd* 566 U.S. 449 (2012). This decision, too, supports the conclusion that the ATA—which permits suits against any type of defendant—allows respondeat superior liability.

[27] "Corporations and other legal entities…are not living, breathing human beings and therefore can act only through their agents." *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009).

an act of international terrorism." § 2333(d)(2). The FAC alleges that Defendants are liable under § 2333(d)(2) because they aided and abetted the PFLP. FAC ¶¶ 205-211. In enacting ATA § 2333(d), "Congress expressly embraced the aiding-and-abetting analysis in *Halberstam v. Welch* [705 F.2d 472, 474 (D.C. Cir. 1983)] as providing the proper legal framework for how aiding-and-abetting liability should function under the Act." *Atchley*, 22 F.4th at 219 (cleaned up). *Halberstam* "sets out three elements of aiding-and-abetting liability: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id*. at 220.

Defendants assert the FAC fails to sufficiently allege Defendants were "generally aware of [their] role as part of an overall illegal or tortious activity," or that they "knowingly and substantially assist the principal violation." DE 58 at 40-43. This assertion is meritless. Under ATA 2333(d) "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk. There is no specific intent requirement. … And *Halberstam*'s use of 'generally' as a modifier for 'aware' imparts a connotation of something less than full, or fully focused, recognition. Thus, a defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Atchley* at 220 (cleaned up).

Plaintiffs allegations easily meet this standard. As detailed in the FAC, Defendants provided material support and resources to the PFLP—including financial support to convicted PFLP terrorists who had been released—for 15 years prior to the Attack, for the specific purpose

of enabling the PFLP to carry out acts of terrorism; thus, PFLP terrorist acts were not only <u>foreseeable</u> by Defendants, they were affirmatively <u>desired</u> by them. Moreover, throughout this period, the PFLP was carrying out huge numbers of deadly terrorist attacks. FAC ¶¶ 154-160. Following one of the most horrific of these attacks—in which PFLP operatives entered the home of Jewish family and murdered the parents, two children and a three-month-old infant (whom they decapitated), Defendants called for the release of the PFLP murderers on the grounds that all Palestinians "have the right to resist the occupation, and they have a duty to resist the occupation," and have been making Pay-for-Slay payments to the murderers' families. FAC ¶¶ 158-160. Defendants were thus well aware of their role in "of an overall illegal or tortious activity," and welcomed that role.

Defendants' challenge to the "knowing and substantial assistance" element fares no better. The "knowledge" element "requires that the defendant know that it is providing assistance—whether directly to the FTO or indirectly through an intermediary. If the defendant knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly" then the "knowledge" element is met. *Atchley* at 222 (cleaned up). Obviously, this element is satisfied here; Defendants provided material support directly to the PFLP with their eyes (and hands) wide open.

As for the final element, "substantial assistance," *Halberstam* "identifies six factors to weigh: (i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance. No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that,

on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism." *Atchley* at 221 (cleaned up).

All six of these factors strongly support Plaintiffs' claims: (i) The "nature of the act assisted dictates what aid might matter, i.e., be substantial." *Id*. (cleaned up). Here, since the acts assisted were terror attacks, Defendants' provision of millions of dollars annually to the PFLP was critical, because: "Financial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Id*. (cleaned up). Moreover, as explained in the FAC, each of the other types of material support was important to the PFLP's ability to operate adjacent to, and to carry out attacks in, Israel; to deploy personnel (who were being financially supported by Defendants); to recruit new members and supporters, and generally to maintain and grow the organization; (ii) For the same reasons, the amount and kind of assistance provided to the PFLP by Defendants was substantial. Notably, the assistance does not have to be "indispensable to the injurious acts," nor does the defendant need to be the sole source of assistance. *Id*. (cleaned up) (rejecting claim that parallel Iranian funding of the FTO negated ATA liability); (iii) The Defendants were not present in the synagogue, but they were just a few miles away, since Jerusalem is bordered by the West Bank, and is a 20 minute drive from Defendants' headquarters in Ramallah; (iv) Defendants have a very close relationship with the PFLP, which is a faction within the PLO itself; (v) The Defendants' state of mind was extremely culpable—Defendants provided material support to the PFLP to facilitate terrorism; (vi) The duration of the assistance was extremely long—between 1999 and 2014.

Accordingly, Plaintiffs have adequately pled aiding and abetting.

### d.  <u>Secondary ATA Liability – Conspiracy</u>

As noted above, § 2333(d) provides when a terrorist attack is committed by an FTO, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, <u>or who conspires</u> with the person who committed such an act of international terrorism." § 2333(d)(2) (emphasis added). The FAC alleges Defendants are liable under § 2333(d) because they conspired with the PFLP. *Id.* ¶¶ 212-218.

To date, few if any conspiracy claims under § 2333(d) have been found viable. There is a simple reason for that: the vast majority of ATA actions are brought against commercial actors (banks, internet companies), which <u>do not share any of the goals of the FTO</u>. Typically, these commercial defendants interact with FTOs out of greed (e.g., banks or other businesses) or out of inertia (e.g., internet companies which do not screen their users). This case is very different: here, Defendants are deeply driven by an ideology and political goals, which are shared by the PFLP. This case is a perfect fit for conspiracy liability.

To plead a civil conspiracy, the plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477. Plaintiffs' allegations squarely meet these requirements. The whole warp and woof of the FAC details the agreement between Defendants and the PFLP to use terrorism to advance their shared political goals. Clearly, this constitutes an agreement between two or more persons to participate in unlawful acts. Likewise, Plaintiffs were injured by the Attack, which was one of the many terror attacks carried out by the

50

PFLP over the years, further to the common scheme with Defendants. If these Plaintiffs cannot sue for conspiracy under ATA § 2333(d), it is difficult to imagine which plaintiffs could.

### e.  **The Nonfederal Claims Are Viable**

The FAC asserts claims for negligence and vicarious liability under Israel's Civil Wrongs Ordinance ("CWO"). There have been many terror attacks in Israel, where Americans widely visit, study and live. As a result, our federal courts have often had occasion to apply these selfsame CWO claims in ATA (and FSIA actions), and have even developed a body of case law in respect thereto. *Cf. Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 57-67, 80-81 (D.D.C. 2010) (ATA case); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1084 (N.D. Ill. 2014) (FSIA case).

Defendants' anemic assertions (DE 58 at 43-44) that Plaintiffs' claims are not viable under Israeli law is rebutted in the attached Declaration of Dr. Boaz Shnoor, an Israeli tort law professor.

**WHEREFORE**, Defendants' motion should be denied in its entirety.

Respectfully Submitted,

s/ Daniel K. Calisher
Daniel K. Calisher
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, 6th Floor
Denver, Colorado 80209
Telephone: 303-333-9810
Email: calisher@fostergraham.com
*Attorneys for Plaintiff*

s/ Jordan Factor
Jordan Factor
Allen Vellon Wolf Helfrich & Factor, P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
Telephone: 303-534-4499
Email: jfactor@allen-vellone.com
*Attorneys for Plaintiff*

s/ Asher Perlin
Asher Perlin, Esq.
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: 786-233-7164
Email: asher@asherperlin.com
*Attorneys for Plaintiff*

4873-6555-8836, v. 1