# EXHIBIT B

# Report By The President's Task Force On Puerto Rico's Status



D E C E M B E R   2 0 0 7

# REPORT BY THE PRESIDENT'S TASK FORCE ON PUERTO RICO'S STATUS



DECEMBER 2007

# REPORT BY THE PRESIDENT'S TASK FORCE ON PUERTO RICO'S STATUS

## *Table of Contents*

I. Members of the Task Force

II. Statement of Guiding Principles

III. Executive Orders

IV. Historical Overview

V. Legal Analysis of Options

VI. Recent Developments

VII. Task Force Recommendations

*Members of*
*The President's Task Force on Puerto Rico's Status*

**Maggie Grant, Co-Chair**
Deputy Assistant to the President for Intergovernmental Affairs
The White House

**Steven A. Engel, Co-Chair**
Deputy Assistant Attorney General in the Office of Legal Counsel
U.S. Department of Justice

**Annabelle Romero**
Deputy Assistant Secretary for Civil Rights
U.S. Department of Agriculture

**Mary Tinsley Raul**
Director of Intergovernmental Affairs
U.S. Department of Commerce

**Frank Jimenez**
General Counsel of the Navy
U.S. Department of Defense

**Margarita P. Pinkos**
Director of the Office of English Language Acquisition
U.S. Department of Education

**Theresa Speake**
Director, of the Office of Economic Impact and Diversity
U.S. Department of Energy

**Laura M. Caliguiri**
Director of Intergovernmental Affairs
U.S. Department of Health and Human Services

Anne Petera
Assistant Secretary for Intergovernmental Programs
U.S. Department of Homeland Security


Robert M. Couch
General Counsel
U.S. Department of Housing and Urban Development


Douglas W. Domenech
Deputy Chief of Staff
U.S. Department of the Interior


Leon R. Sequeira
Assistant Secretary for Policy
U.S. Department of Labor


Portia Palmer
Director of Intergovernmental Affairs
U.S. Department of State


Kerry O'Hare
Deputy Assistant Secretary for Governmental Affairs
U.S. Department of Transportation


Anna Escobedo Cabral
U.S. Treasurer
U.S. Department of the Treasury


William McLemore
Deputy Assistant Secretary for Intergovernmental Affairs
U.S. Department of Veterans Affairs

# Statement of Guiding Principles

The mission of the President's Task Force on Puerto Rico's Status ("Task Force") is to provide options for Puerto Rico's future status and relationship with the Government of the United States. The Task Force has approached this mission without prejudice towards a status option and has developed options that are compatible with the Constitution and basic laws and policies of the United States.

The Task Force has developed these options after listening to and considering the views of individuals, elected officials, and other representatives of the people of Puerto Rico to ensure that views and positions have been objectively considered irrespective of affiliation or ideology.

The Task Force published its first report in December 2005. This report builds on the prior report and carries out the Task Force's continuing mandate to report, no less than every two years, on progress made in the determination of Puerto Rico's ultimate status.

# EXECUTIVE ORDERS CONCERNING PUERTO RICO'S STATUS

President George H.W. Bush issued a Memorandum on November 30, 1992, to heads of Executive Departments and Agencies establishing the current administrative relationship between the Federal Government and the Commonwealth of Puerto Rico. This memorandum directs all Federal departments, agencies, and officials to treat Puerto Rico administratively as if it were a State insofar as doing so would not disrupt Federal programs or operations. President Bush's memorandum remains in effect until Federal legislation is enacted to alter the status of Puerto Rico in accordance with the freely expressed wishes of the people of Puerto Rico. (See Appendix A.)

On December 23, 2000, President William J. Clinton signed Executive Order 13183, which established the President's Task Force on Puerto Rico's Status and the rules for its membership. This Executive Order outlines the policy and functions of the Task Force in identifying the options for Puerto Rico's future status and the process for realizing an option. (See Appendix B.)

On April 30, 2001, President George W. Bush amended Executive Order 13183, extending the deadline for the Task Force to forward a report to the President until August 2001. (See Appendix C.)

President Bush signed an additional amendment to Executive Order 13183 on December 3, 2003, which established the Task Force co-chairs and instructed the Task Force to issue reports as needed, but no less than once every two years. (See Appendix D.)

# Historical Overview

The Commonwealth of Puerto Rico has a rich tradition and history. As United States citizens, the people of Puerto Rico have enhanced American society and culture. Among their many contributions, Puerto Ricans have been recognized for their service and sacrifice in the United States Armed Forces.

The 2005 Task Force Report described in detail the modern history of Puerto Rico and its relationship with the United States, and we summarize that history here. The relationship between the United States and Puerto Rico dates to 1898, when the island was ceded to the United States by Spain, pursuant to the Treaty of Paris, which formally ended the Spanish-American War. The United States governed the island through a U.S. military governor until 1900, when Congress passed the Foraker Act, which established a civilian government, including a non-voting Resident Commissioner in Congress. In 1917, Congress established the island as an "organized but unincorporated" territory and granted U.S. citizenship to the people of Puerto Rico.

In 1952, Congress passed Public Law 600, the Puerto Rican Federal Relations Act, which provided the people of Puerto Rico with self-government with respect to internal affairs and administration. Public Law 600 gave Puerto Rico the right to establish a government and a constitution for the internal administration of Puerto Rico "on matters of purely local concern." The people of Puerto Rico approved the Act and then approved a new constitution by referendum, which would establish the "Commonwealth of Puerto Rico." Congress then approved that constitution in 1952, subject to several conditions that Puerto Rico fulfilled through amendments in 1953.

Since the adoption of the commonwealth system, Puerto Rico has held four plebiscites to ascertain the views of its people as to the status question. In 1967, a majority chose to continue the existing commonwealth status, and, in 1991, a majority similarly rejected a call to review that status. In 1993, a plurality of 48.6% voted for the commonwealth status, while 46.3% favored statehood and 4.4% independence.

The people of Puerto Rico most recently voted on their status in 1998, through a plebiscite presenting them with four status options: territorial commonwealth, free association, statehood, or independence. The leadership for the Popular Democratic Party, while backing continued commonwealth status, campaigned in favor of "none of the above" because of disagree-

ment with the "territorial" definition of the commonwealth option. In the subsequent vote, a majority (50.3%) voted for "none of the above." In addition, 46.5% voted for statehood, 2.54% voted for independence, 0.29% voted for free association, and 0.06% voted for a territorial commonwealth.

# Legal Analysis of Options for Puerto Rico's Status

The 2005 Task Force Report explained that the U.S. Constitution allows for three options for the future status of Puerto Rico: continuing territorial status, statehood, and independence.  In so doing, the Task Force did not break new ground. The Department of Justice affirmed the Commonwealth's territorial status in 1959, shortly after the enactment of Public Law 600, and the Supreme Court has held the same.  *See, e.g., Harris v. Rosario*, 446 U.S. 651 (1980).  Since 1991, the Executive Branch, through the Department of Justice, has further emphasized that the Constitution contemplates only three options for Puerto Rico's future status. (See Appendices E and F.)

This section reiterates and summarizes the conclusions of the 2005 Task Force Report.

## 1.    Continuing Territorial Status

The existing form of government in Puerto Rico is often described as a "Commonwealth," and this term recognizes the significant powers of self-government Puerto Rico enjoys under current law.  As discussed above, Congress established this arrangement through the passage of Public Law 600 and through the subsequent approval of the constitution drafted and amended by the people of Puerto Rico.

The constitution of Puerto Rico establishes a republican, popularly elected government with significant authority over local affairs, and since 1953, the people of Puerto Rico have exercised significant powers of self-government.  As the Supreme Court has recognized, under the commonwealth system, Puerto Rico currently exercises "a measure of autonomy comparable to that possessed by the States."  *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 597 (1976).

When "Commonwealth" is used to describe the substantial political autonomy enjoyed by Puerto Rico, the term appropriately captures Puerto Rico's special relationship with the United States.  The commonwealth system does not, however, describe a *legal* status different from Puerto Rico's constitutional status as a "territory" subject to Congress's plenary authority under the Territory Clause "to dispose of and make all needful Rules and Regulations respecting the Territory ... belonging to the United States."  Congress may continue the current commonwealth system indefinitely, but it necessarily retains the constitutional authority to revise or revoke the powers of self-government currently exercised by the government of Puerto Rico.  Thus, while the commonwealth of Puerto Rico enjoys significant political autonomy, it is important to recognize that, as long as

Puerto Rico remains a territory, its system is subject to revision by Congress.

Both before and since the issuance of the 2005 Task Force Report, some have questioned whether Puerto Rico's status as a United States territory is consistent with statements that the United States made to the United Nations in 1953 following the adoption of Puerto Rico's constitution, in requesting that Puerto Rico be removed from the list of non-self-governing territories. In its official request to the United Nations, the United States stated that Congress had given Puerto Rico the freedom to conduct its own internal government subject only to compliance with federal law and the U.S. Constitution. The official request did not state that Congress could make no changes in Puerto Rico's status without its consent. It is true that, prior to the submission of this official request, the U.S. representative to the U.N. General Assembly indicated orally that common consent would be needed to make changes in the relationship between Puerto Rico and the United States. Notwithstanding this statement, however, the Department of Justice concluded in 1959 that Puerto Rico remained a territory, and as noted above, the Supreme Court, while recognizing that Puerto Rico exercises substantial political autonomy under the current commonwealth system, has held that Puerto Rico remains fully subject to congressional authority under the Territory Clause. *See Harris*, 446 U.S. at 651-52.

The 2005 Task Force Report also explained why existing constitutional principles foreclose the so-called "New Commonwealth" status, which would purport to adopt a covenant between Puerto Rico and the United States that could not be altered without the "mutual consent" of both entities. Although the Executive Branch had once taken a different view, the Task Force endorsed the constitutional understanding that the Executive Branch has maintained across Administrations since 1991.

The U.S. Constitution would not permit the "New Commonwealth" proposal because land under United States sovereignty must either be a State or a territory. As the Supreme Court stated over a hundred years ago, if land is "not included in any State," it "must necessarily be governed by or under the authority of Congress." *First Nat. Bank v. Yankton County*, 101 U.S. 129, 133 (1879). Thus, although Congress is free to allow a territory to exercise powers of self-government (as Congress has done with respect to Puerto Rico), it may not restrict the authority of a future Congress over that territory.

This limitation on the power of Congress reflects the general rule that one legislature cannot bind a subsequent one. Each Congress may repeal or amend laws that a previous Congress enacted, and Congress may pass laws inconsistent with treaties. By the same token, a future Congress must have the power to disavow commitments contained in a covenant between the Federal Government and one of its territories, regardless of the terms of that covenant.

Accordingly, the "New Commonwealth" proposal that some have proposed contemplates a political status for Puerto Rico that is not permitted by the United States

Constitution. As long as Puerto Rico remains a territory of the United States, Congress may not impair the constitutional authority of later Congresses to alter the political powers of the government of Puerto Rico by entering into a covenant or compact with Puerto Rico or its residents.

### 2. Statehood

A second option for the future status of Puerto Rico is statehood. If admitted as a State, Puerto Rico would stand on equal footing with the existing States in all respects.

At present, Puerto Rico is an "unincorporated" territory, subject only to the most fundamental provisions of the Constitution. One notable consequence of this status is that the Constitution's Tax Uniformity Clause is not applicable to Puerto Rico, allowing Congress to exempt the Puerto Rican people from most federal income tax laws and to provide them with other tax preferences not provided to residents of the States. These tax preferences would become impermissible under the Constitution if Puerto Rico were "incorporated" into the country as part of the process of being admitted as a State.

Statehood would, of course, confer upon Puerto Rico and its citizens certain political rights they do not currently possess. Puerto Rican citizens would be entitled to vote for President, and, as a State, Puerto Rico would elect two U.S. Senators and full voting Members in the U.S. House of Representatives. The number of Members in the House would be determined based on Puerto Rico's population at the next congressional reap-portionment, following the 2010 census. In the interim, Congress could temporarily increase membership of the House to allow Puerto Rico to elect one or more Members.

### 3. Independence

Another option for the future status of Puerto Rico is independence from the United States. Congress's power under the Constitution's Territory Clause includes the power to relinquish its sovereignty over a territory. *See* U.S. CONST., Art. IV, Cl. 2. Congress thus may determine whether and under what conditions a territory may receive independence and may regulate those conditions until the point of independence.

Independence would have significant legal consequences for Puerto Rico. As an independent nation, Puerto Rico would not be subject to the authority of the United States and would be free to direct its own relations with foreign nations. By the same token, Puerto Rico would not automatically be entitled to receive monetary support or military protection from the United States. Additionally, independence from the United States could affect the citizenship of Puerto Rico's residents. Individuals born in Puerto Rico are citizens of the United States by statute, 8 U.S.C. § 1402. The general rule is that citizenship follows sovereignty. So if Puerto Rico were to become an independent nation, Puerto Rico's residents could become citizens of the newly independent nation and cease to be citizens of the United States, unless a different rule were prescribed by legislation or treaty.

There are a variety of different paths that Puerto Rico could take to independence. For example, the Territory of the Philippines received its independence by the Philippine Independence Act of 1934. The Act authorized the Philippine government to draft a constitution for an interim Commonwealth, which upon approval by the people of the Philippines and the U.S. President initiated an interim Commonwealth. The Act provided that, after a transition period of ten years, the President, by proclamation, would withdraw and surrender United States jurisdiction and sovereignty and "recognize the independence of the Philippines as a separate and self-governing nation." In 1946, President Harry S Truman did proclaim independence, and the two nations entered into a Treaty of General Relations.

Another possible model of independence is that of the "freely associated states" of Micronesia, the Marshall Islands, and Palau. These states, which the United States had administered since World War II, became independent after Congress approved negotiated "compacts of free association" with the territories. The freely associated states retained close ties to the United States, however, and the United States continues to provide security, defense, and various other types of financial assistance and services. Citizens of the freely associated states may generally enter the United States as non-immigrants and may establish residence and work here.

Among the constitutionally available options, freely associated status may come closest to providing for the relationship that advocates for "New Commonwealth" appear to desire. But it would need to be made clear to the people of Puerto Rico that freely associated status is a form of independence from the United States and cannot be made immune from the possibility of unilateral termination by the United States.

# Recent Developments

Section 4 of Executive Order 13183 (as amended by Executive Order 13319) directs the Task Force to "report on its actions to the President … on progress made in the determination of Puerto Rico's ultimate status." Following the issuance of the 2005 Task Force Report, the former co-chair of the Task Force, Deputy Assistant Attorney General C. Kevin Marshall, testified before the House Committee on Natural Resources, its Subcommittee on Insular Affairs, and the Senate Committee on Energy and Natural Resources on the Task Force Report and proposed legislation. (See Appendix G.)

Since the issuance of the 2005 Report, Members of Congress have proposed several measures to address the future status of Puerto Rico. Each of these proposals seeks to allow the Puerto Rican people to express their will regarding the future status of the island, although they would do so in different ways. These proposals fall into three general categories:

- The first category of legislation would seek to ascertain the views of the Puerto Rican people through a plebiscite. Some of the proposed bills would sanction a plebiscite similar to the one recommended in the 2005 Task Force Report. Those bills include S. 2661 (sponsored by Senator Martinez) and H.R. 4687 (co-sponsored by Representatives Fortuño and Serrano), both of which were introduced in the 109th Congress. Other bills, such as S. 1936 (sponsored by Senator Salazar), would authorize a single plebiscite in which the Puerto Rican people would choose among four status options (continuing the current status, statehood, independence, and independence as a freely associated state).

- The second category, represented in H.R. 1230 (sponsored by Representative Velázquez), would support the convening of a constitutional convention in Puerto Rico, the purpose of which would be to develop a proposal for the future status of the island to be voted upon by the Puerto Rican people.

- A third category would combine elements of the first two categories. An example of such legislation is H.R. 900 (sponsored by Representative Serrano), which was passed by the House Natural Resources Committee on October 27, 2007. As amended, H.R. 900 would direct Puerto Rico to hold a plebiscite by December 31, 2009, in which voters would be asked to decide whether Puerto Rico should "consider a constitutionally viable permanent non-territorial status" or "continue to have its present form of territorial status and relationship with the United States." If voters favor the first option, the bill would recognize the right of the people of Puerto Rico either to conduct an additional plebiscite "to consider a self-determination option with the results presented to Congress" or to call a constitutional convention for the purpose of proposing a "self-determination option" to the Puerto Rican people.

# TASK FORCE RECOMMENDATIONS

As detailed earlier and in the 2005 Report, the Task Force concludes that there are only three options available under the U.S. Constitution for the future status of Puerto Rico:

- Continue as a territory. The current status of Puerto Rico as a commonwealth may continue indefinitely but remains subject to future modification by Congress.

- Statehood. Under this option, Puerto Rico would become the 51st State with standing equal to the other 50 States.

- Independence. Under this option, Puerto Rico would become a sovereign nation, independent from the United States.

The democratic will of the Puerto Rican people is paramount for determining the future status of the territory. To this end, the 2005 Task Force Report recommended a two-stage plebiscite to determine whether the Puerto Rican people wish to retain the status quo, and if not, which of the two available options they prefer. The Task Force concluded that such a process would be the best way to ascertain the popular will in a way that provides clear guidance for future action by Congress.

The Task Force acknowledges the pending legislative measures that would provide similar or alternative procedures through which the people of Puerto Rico might express their will regarding the future status of the island. The Task Force continues to believe that the two-stage plebiscite would provide clearer guidance for Congress than other procedures in which it is possible that none of the available options would win a majority of votes. At the same time, there are other ways to proceed, and the Task Force's recommendations do not preclude alternative action by Puerto Rico itself to express its views to Congress.

The following are the recommendations of the Task Force:

1. The Task Force reiterates its prior recommendation that Congress provide for a Federally sanctioned plebiscite as soon as practicable in which the people of Puerto Rico will be asked to state whether they wish to maintain the current territorial status or to pursue a constitutionally viable path toward a permanent non-territorial status. Congress should provide for this plebiscite to occur on a date certain.

2. The Task Force reiterates its prior recommendation that if the people of Puerto Rico elect to pursue a permanent non-territorial status, Congress should provide for an additional plebiscite to allow the people of Puerto Rico to choose between one of the permanent non-territorial options permitted by the Constitution: statehood or independence. Once the

people of Puerto Rico have selected one of the two options, we would encourage Congress to begin a process of transition consistent with that option.

3. If the people elect to maintain Puerto Rico's current status, the Task Force recommends, consistent with the 1992 memorandum of President George H.W. Bush, that a plebiscite occur periodically as long as that status continues, to keep Congress informed of the people's wishes.

# APPENDIX A

Federal Register
Vol. 57, No. 232

Wednesday, December 2, 1992

# Presidential Documents

---

Title 3—

**The President**

Memorandum of November 30, 1992

## Memorandum for the Heads of Executive Departments and Agencies

Puerto Rico is a self-governing territory of the United States whose residents have been United States citizens since 1917 and have fought valorously in five wars in the defense of our Nation and the liberty of others.

On July 25, 1952, as a consequence of steps taken by both the United States Government and the people of Puerto Rico voting in a referendum, a new constitution was promulgated establishing the Commonwealth of Puerto Rico. The Commonwealth structure provides for self-government in respect of internal affairs and administration, subject to relevant portions of the Constitution and the laws of the United States. As long as Puerto Rico is a territory, however, the will of its people regarding their political status should be ascertained periodically by means of a general right of referendum or specific referenda sponsored either by the United States Government or the Legislature of Puerto Rico.

Because Puerto Rico's degree of constitutional self-government, population, and size set it apart from other areas also subject to Federal jurisdiction under Article IV, section 3, clause 2 of the Constitution, I hereby direct all Federal departments, agencies, and officials, to the extent consistent with the Constitution and the laws of the United States, henceforward to treat Puerto Rico administratively as if it were a State, except insofar as doing so with respect to an existing Federal program or activity would increase or decrease Federal receipts or expenditures, or would seriously disrupt the operation of such program or activity. With respect to a Federal program or activity for which no fiscal baseline has been established, this memorandum shall not be construed to require that such program or activity be conducted in a way that increases or decreases Federal receipts or expenditures relative to the level that would obtain if Puerto Rico were treated other than as a State.

If any matters arise involving the fundamentals of Puerto Rico's status, they shall be referred to the Office of the President.

This guidance shall remain in effect until Federal legislation is enacted altering the current status of Puerto Rico in accordance with the freely expressed wishes of the people of Puerto Rico.

The memorandum for the heads of executive departments and agencies on this subject, issued July 25, 1961, is hereby rescinded.

This memorandum shall be published in the **Federal Register**.

*[signature: George Bush]*

THE WHITE HOUSE,
*Washington, November 30, 1992.*

[FR Doc. 92–29441
Filed 12–1–92; 11:27 am]
Billing code 3195–01–M

# APPENDIX B

# Presidential Documents

Executive Order 13183 of December 23, 2000

## Establishment of the President's Task Force on Puerto Rico's Status

By the authority vested in me as President by the Constitution and the laws of the United States of America, including Public Law 106-346, it is hereby ordered as follows:

**Section 1.** *Policy.* It is the policy of the executive branch of the Government of the United States of America to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process for realizing an option. Further, it is our policy to consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status; to discuss such proposals with representatives of the people of Puerto Rico and the Congress; to work with leaders of the Commonwealth and the Congress to clarify the options to enable Puerto Ricans to determine their preference among options for the islands' future status that are not incompatible with the Constitution and basic laws and policies of the United States; and to implement such an option if chosen by a majority, including helping Puerto Ricans obtain a governing arrangement under which they would vote for national government officials, if they choose such a status.

**Sec. 2.** *The President's Task Force on Puerto Rico's Status.* There is established a task force to be known as "The President's Task Force on Puerto Rico's Status" (Task Force). It shall be composed of designees of each member of the President's Cabinet and the Co-Chairs of the President's Interagency Group on Puerto Rico (Interagency Group). The Task Force shall be co-chaired by the Attorney General's designee and a Co-Chair of the Interagency Group.

**Sec. 3.** *Functions.* The Task Force shall seek to implement the policy set forth in section 1 of this order. It shall ensure official attention to and facilitate action on matters related to proposals for Puerto Rico's status and the process by which an option can be realized. It shall provide advice and recommendations on such matters to the President and the Congress. It shall also provide advice and recommendations to assist the Executive Office of the President in fulfilling its responsibilities under Public Law 106-346 to transfer funding to the Elections Commission of the Commonwealth of Puerto Rico for public education on and a public choice among options for Puerto Rico's future status that are not incompatible with the Constitution and the basic laws and policies of the United States.

**Sec. 4.** *Report.* The Task Force shall report on its actions to the President not later than May 1, 2001, and thereafter as needed but not less than

annually on progress made in the determination of Puerto Rico's ultimate status.

THE WHITE HOUSE,
*December 23, 2000.*

[FR Doc. 00–33451
Filed 12–28–00; 8:45 am]
Billing code 3195–01–P

# APPENDIX C

Federal Register / Vol. 66, No. 85 / Wednesday, May 2, 2001 / Presidential Documents

**22105**

# Presidential Documents

Executive Order 13209 of April 30, 2001

## Amendment to Executive Order 13183, Establishment of the President's Task Force on Puerto Rico's Statis

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to extend by 3 months the time in which the President's Task Force on Puerto Rico's Status is to report to the President as directed in Executive Order 13183 of December 23, 2000, it is hereby ordered that section 4 of Executive Order 13183 is amended by deleting "May 1, 2001" and inserting in lieu thereof "August 1, 2001".

THE WHITE HOUSE,
*April 30, 2001.*

[FR Doc. 01–11210
Filed 5–1–01; 9:07 am]
Billing code 3195–01–P

# APPENDIX D

**68233**

Federal Register

Vol. 68, No. 235

Monday, December 8, 2003

# Presidential Documents

Title 3—

The President

Executive Order 13319 of December 3, 2003

## Amendment to Executive Order 13183, Establishment of the President's Task Force on Puerto Rico's Status

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered that Executive Order 13183 of December 23, 2000, as amended, is further amended as follows:

(1) Section 2 is amended by deleting the second and third sentences, and inserting in lieu thereof the following: ''It shall be composed of designees of each member of the President's Cabinet and the Deputy Assistant to the President and Director for Intergovernmental Affairs. The Task Force shall be co-chaired by the Attorney General's designee and the Deputy Assistant to the President and Director for Intergovernmental Affairs.''

(2) By deleting section 4, and inserting in lieu thereof the following: ''**Sec. 4.** *Report.* The Task Force shall report on its actions to the President as needed, but no less frequently than once every 2 years, on progress made in the determination of Puerto Rico's ultimate status.''

THE WHITE HOUSE,
*December 3, 2003.*

[FR Doc. 03–30513

Filed 12–5–03; 8:45 am]

Billing code 3195–01–P

# APPENDIX E



**U.S. Department of Justice**

Office of Legislative Affairs

---

*Washington, D.C. 20530*

January 18, 2001

The Honorable Frank H. Murkowski
Chairman, Committee on Energy and Natural Resources
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

This is in response to your letter to President Clinton requesting that the Administration provide an analysis of the status options for Puerto Rico favored by the three principle political parties in Puerto Rico. This letter provides comments on two proposals that were voted on in the December 1998 political status plebiscite in Puerto Rico, as well as a third proposal outlined by the Popular Democratic Party in its 2000 platform. The first proposal, for Statehood, is outlined in option number 3 in Puerto Rico's recent *Petition to the Government of the United States.* The second proposal, for Independence, is outlined in option number 4 of that petition. The third proposal, the "New Commonwealth" option, is described in the Popular Democratic Party platform documents. Given the complexity and number of proposals on which our comments have been sought, we address only a limited number of issues raised by the proposals, most of them constitutional in nature.

**1.     Statehood**

The Statehood option[1] provides that Puerto Rico would become "a sovereign state, with rights, responsibilities and benefits completely equivalent to those enjoyed by the rest of the

---

[1]  The Statehood proposal contemplates a petition to Congress asking it to provide for the following:

> The admission of Puerto Rico into the Union of the United States of America as a sovereign state, with rights, responsibilities and benefits completely equal to those enjoyed by the rest of the states. Retaining, furthermore, the sovereignty of Puerto Rico in those matters which are not delegated by the Constitution of the United States to the Federal Government. The right to the presidential vote and equal representation in the Senate and proportional representation in the House of Representatives, without impairment to the representation of the rest of the states. Also maintaining the present Constitution of Puerto Rico and the same Commonwealth laws; and with permanent United States citizenship guaranteed by the Constitution of the United States of America. The provisions of the Federal law on the use of the English language in the agencies and courts of the Federal Government in the fifty states of the Union shall apply equally in the State of Puerto Rico, as at present.

states."  The principle that a new State stands on "equal footing with the original States in all respects whatsoever" has been recognized since the first days of the republic.  *Coyle v. Smith*, 221 U.S. 559, 567 (1911) (quoting 1796 declaration upon the admission of Tennessee).  Supreme Court caselaw makes clear that, as a State, Puerto Rico would be "equal in power, dignity, and authority" to the other States.  *Id.*  This shift in status to statehood would also have tax consequences not fully articulated in the statehood proposal itself.  Currently, as an unincorporated territory, Puerto Rico is not subject to the Tax Uniformity Clause, which requires that "all Duties, Imposts, and Excises" imposed by Congress "shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1; *see Downes v. Bidwell*, 182 U.S. 244 (1901).  As a result, it can be and is exempted from some federal tax laws (including most federal income tax laws), and it has other tax preferences not applicable to the States, although it also does not receive certain benefits such as the earned income tax credit.  *See* 48 U.S.C. § 734 (1994) (providing that, with certain exceptions, "the internal revenue laws" shall not apply in Puerto Rico); 26 U.S.C. § 32 (earned income tax credit).  Were Puerto Rico to become a State, however, it would be covered by the Tax Uniformity Clause and many, if not all, of these different tax treatments could not constitutionally be preserved on a permanent basis.  *See Political Status of Puerto Rico: Hearings on S. 244 Before the Senate Comm. on Energy and Natural Resources*, 102d Cong. 189-90 (1991) (testimony of Attorney General Richard Thornburgh) ("Thornburgh Testimony") (reaching this conclusion, but also noting that the Tax Uniformity Clause permits the use of narrowly tailored transition provisions under which Puerto Rico's tax status need not be altered immediately once the decision were made to bring it into the Union as a State).

In addition, the statement in the Statehood option that admitting Puerto Rico as a State would not result in the "impairment of the representation of the rest of the states" may be inaccurate.  If Puerto Rico gains representatives in Congress, it will affect the representation of the rest of the States in both the Senate and the House.  In the Senate, because granting Puerto Rico two senators will increase the total membership of the Senate, the representation of the other States in the Senate will decline as a proportion of the whole, arguably "impair[ing]" their representation.  Similarly, if the total number of representatives in the House of Representatives were to be increased beyond its current number of 435 with the addition of representatives from Puerto Rico, then the representation of current States as a proportion of the whole would decline, again arguably "impair[ing]" their representation.  If, on the other hand, the total number of representatives were to remain fixed at 435, then the fact that Puerto Rico had achieved representation would necessarily mean that at least one State would have fewer representatives.  The representation of that State (or States) would arguably be "impair[ed]" in two ways: its number of representatives in the House would decline, and (like all the other States) its representation would decline as a proportion of the whole.[2]

---

[2]  In the past, Congress permanently increased the number of representatives in the House when new States were admitted.  Most recently, however, when Hawaii and Alaska were admitted in 1959, the number of Members of Congress was temporarily increased (from 435 to a total of 437) by the addition of a representative from each of these States; following the 1960 census, however, the number of representatives returned to 435, and the House was reapportioned.  *See* Comptroller General, *Puerto Rico's Political Future: A Divisive Issue with Many Dimensions* 103 (1981).

2

Moreover, the clause "maintaining the present Constitution of Puerto Rico and the same Commonwealth laws" contained in the Statehood option could be read as stating that the admission of Puerto Rico as a State would have no effect on the constitution and laws of Puerto Rico. Such a statement might not be entirely correct. Currently, not all provisions of the United States Constitution are fully applicable to Puerto Rico. *See Balzac v. Porto Rico*, 258 U.S. 298, 304-314 (1922) (Sixth Amendment right to jury trial not applicable in Puerto Rico); *Downes*, 182 U.S. at 291 (White, J., concurring in the judgment) (explaining that only constitutional provisions that are "of so fundamental a nature that they cannot be transgressed" apply to unincorporated territories such as Puerto Rico). If Puerto Rico were to become a State, however, it would then be subject to the entire Constitution. In that event, some aspects of Puerto Rico's constitution and laws might be preempted by the Constitution pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2. Similarly, the admission of Puerto Rico as a State might extend to Puerto Rico some federal statutes that may be deemed not to apply to Puerto Rico at present because they are written to apply only in the several States. If so, then under the Supremacy Clause those statutes would also preempt aspects of Puerto Rican law with which they conflict (although it should be noted that Congress currently has power to preempt laws of Puerto Rico).

## 2.   Independence

The Independence proposal contains certain provisions regarding citizenship. Specifically, it states:

> The residents of Puerto Rico shall owe allegiance to, and shall have the citizenship and nationality of, the Republic of Puerto Rico. Having been born in Puerto Rico or having relatives with statutory United States citizenship by birth shall no longer be grounds for United States citizenship; except for those persons who already had the United States citizenship, who shall have the statutory right to keep that citizenship for the rest of their lives, by right or by choice, as provided by the laws of the Congress of the United States.

This proposal could be read as having two possible meanings: it could mean that persons already holding United States citizenship based on their birth in Puerto Rico or on the birth of their relatives have a right to that citizenship and that Congress must legislate in a way that makes provision for that right; or, it could mean that Congress has discretion to decide whether persons who have United States citizenship by virtue of their birth in Puerto Rico (or by virtue of having United States citizen relatives) will retain that citizenship once Puerto Rico becomes independent.[3] At least the second reading raises the question whether statutory United States citizens residing in Puerto Rico at the time of independence would have a constitutionally

---

[3] We do not read the proposal to affect existing statutory provisions regarding U.S. citizenship for persons born outside the United States to a U.S. citizen parent or parents. *See* 8 U.S.C. §§ 1401, 1409.

protected right to retain that citizenship should Congress seek to terminate it.[4]

Although the proposal speaks of a "statutory right" to retain citizenship,[5] there is at least an argument that individuals possessing United States citizenship would have a constitutional right to retain that citizenship, even if they continue to reside in Puerto Rico after independence. *See Afroyim v. Rusk*, 387 U.S. 253, 257 (1967) (rejecting the position that Congress has a "general power . . . to take away an American citizen's citizenship without his assent"). On the other hand, there is also case law dating from the early republic supporting the proposition that nationality follows sovereignty. *See American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828) (Marshall, C.J.) (upon the cession of a territory the relations of its inhabitants "with their former sovereign are dissolved, and new relations are created between them, and the government which has acquired their territory. The same Act which transfers their country, transfers the allegiance of those who remain in it."); *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 162 (1892) ("Manifestly the nationality of the inhabitants of territory acquired by . . . cession becomes that of the government under whose dominion they pass, subject to the right of election on their part to retain their former nationality by removal, or otherwise, as may be provided."); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 902 (2d Cir. 1943) (describing *Canter* as recognizing a "generally accepted principle of international law" that "[i]f the inhabitants [of a newly independent nation] remain within the territory [of the new nation] their allegiance is transferred to the new sovereign."). *See also Restatement (Third) of The Law of Foreign Relations* § 208 (1987) (observing that "[n]ormally, the transfer of territory from one state to another results in a corresponding change in nationality for the inhabitants of that territory" and that, in some cases of territory transfer, inhabitants can choose between retaining their former nationality and acquiring that of the new state). In view of the tension between *Afroyim* and cases such as *Canter*, it is unclear whether the Independence proposal's possible provision for congressional revocation of United States citizenship passes constitutional muster. *See* Treanor Testimony at 19 (reserving the constitutional issue of whether, upon independence, it would be permissible to terminate non-consensually the United States citizenship of residents of Puerto

---

[4] If such persons do have a constitutionally protected right to retain their United States citizenship even as they acquire Puerto Rican citizenship, then Puerto Rican independence could result in a significant number of people acquiring dual citizenship. While this letter does not address the policy implications of such dual citizenship, we do not think it would run afoul of any constitutional stricture.

[5] It is the Department's position that the source of the citizenship of those born in Puerto Rico is not the Fourteenth Amendment, but federal statute, specifically 8 U.S.C. § 1402 (1994). *See* Statement of William M. Treanor, Deputy Assistant Attorney General, Office of Legal Counsel, Before the House Comm. on Resources, 106th Cong. 18 (Oct. 4, 2000) ("Treanor Testimony"); *Puerto Rico: Hearings on H.R. 856 and S. 472 Before the Senate Comm. on Energy and Natural Resources,* 105th Cong. 148 (1998) (statement of Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice). That point is separate, however, from the question whether the Constitution protects that citizenship once it is statutorily conferred, and, if so, to the same extent as it protects "Fourteenth Amendment citizenship."

Rico).[6]

The Independence proposal also provides that "Puerto Rico and the United States shall develop cooperation treaties, including economic and programmatic assistance for a reasonable period, free commerce and transit, and military force status." Viewing this language as part of a ballot option for the people of Puerto Rico, we understand it as a possible proposal to be made by Puerto Rico to Congress. We do not, therefore, read the use of the word "shall" to impose on the United States any obligation to enter into certain treaties with an independent Puerto Rico. Moreover, if the proposal did purport to impose such an obligation, we would construe its language as precatory, not binding, in order to preserve the sovereign prerogatives of the United States. We discuss this point in greater detail *infra* at 7-9.

## 3.    New Commonwealth[7]

The New Commonwealth proposal describes Puerto Rico as "an autonomous political body, that is neither colonial nor territorial, in permanent union with the United States under a covenant that cannot be invalidated or altered unilaterally." Our analysis of this proposal is based on two general premises, which we will outline before proceeding to address specific aspects of the proposal.

The first premise is that the Constitution recognizes only a limited number of options for governance of an area. Puerto Rico could constitutionally become a sovereign Nation, or it could remain subject to United States sovereignty. It can do the latter in only two ways: it can be admitted into the Union as a State, U.S. Const. art. IV, § 3, cl. 1, or it can remain subject to the authority of Congress under the Territory Clause, U.S. Const. art. IV, § 3, cl. 2. *See National Bank v. County of Yankton*, 101 U.S. 129, 133 (1879) ("All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress."). The terms of the Constitution do not contemplate an option other than sovereign independence, statehood, or territorial status.

Although Puerto Rico currently possesses significant autonomy and powers of self-government in local matters pursuant to the Puerto Rican Federal Relations Act, Pub. L. No. 81-600, 64 Stat. 319 (1950) (codified at 48 U.S.C. §§ 731b-731e (1994)) ("Public Law 600"), that statute did not take Puerto Rico outside the ambit of the Territory Clause. In *Harris v. Rosario*,

---

[6]  It should be noted that in 1991 the Department of Justice did not treat this question as unsettled. *See* Thornburgh Testimony at 206-07 (suggesting that should Puerto Rico become independent, its residents "should be required to elect between retaining United States citizenship (and ultimately taking up residence within the United States . . . )," and citizenship in the new republic of Puerto Rico.).

[7]  Our comments on the New Commonwealth proposal are based in part on, and are intended to be consistent with, the October 4, 2000 testimony of Deputy Assistant Attorney General William M. Treanor before the House Committee on Resources. *See* Treanor Testimony, *supra* at n.5.

446 U.S. 651 (1980) (per curiam), for example, the Court sustained a level of assistance for Puerto Rico under the Aid to Families with Dependent Children program lower than that which States received, and explained that "Congress, which is empowered under the Territory Clause of the Constitution to 'make all needful Rules and Regulations respecting the Territory . . . belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its actions." *Id.* at 651-52 (internal citation omitted). *See also Califano v. Torres,* 435 U.S. 1, 3 n.4 (1978) (per curiam) ("Congress has the power to treat Puerto Rico differently, and . . . every federal program does not have to be extended to it."). The Department of Justice has long taken the same view,[8] and the weight of appellate case law provides further support for it. *See, e.g., Mercado v. Commonwealth of Puerto Rico,* 214 F.3d 34, 44 (1st Cir. 2000) ("[U]nder the Territorial Clause, Congress may legislate for Puerto Rico differently than for the states."); *Davila-Perez v. Lockheed Martin Corp.,* 202 F.3d 464, 468 (1st Cir. 2000) (affirming that Puerto Rico "is still subject to the plenary powers of Congress under the territorial clause."); *United States v. Sanchez,* 992 F.2d 1143, 1152-53 (11th Cir. 1993) ("'Congress continues to be the ultimate source of power [over Puerto Rico] pursuant to the Territory Clause of the Constitution.'") (quoting *United States v. Andino,* 831 F.2d 1164, 1176 (1st Cir. 1987) (Torruella, J., concurring), *cert. denied,* 486 U.S. 1034 (1988)), *cert. denied,* 510 U.S. 1110 (1994).[9]

---

[8]   This position has been expressed in briefs filed in federal court by past Solicitors General. *See, e.g.,* Jurisdictional Statement of the United States at 10-11, *Harris v. Rosario,* 446 U.S. 651 (1980) (No. 79-1294). It has also been taken in memoranda and opinions issued by the Office of Legal Counsel. *See, e.g.,* Memoranda for Linda Cinciotta, Director, Office of Attorney Personnel Management, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re. Interpretation of the Term "Territory" in the Department of Justice Appropriations Act* (July 31, 1997); Memorandum for Lawrence E. Walsh, Deputy Attorney General, from Paul A. Sweeney, Acting Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 5926, 86th Cong., 1st Sess., a bill "To provide for amendments to the compact between the people of Puerto Rico and the United States"* (June 5, 1959). In a 1963 opinion, the Office of Legal Counsel treated the legal consequences of Public Law 600 as an open question and did not resolve it. *See Memorandum Re: Power of the United States to Conclude with the Commonwealth of Puerto Rico a Compact Which Could Be Modified Only by Mutual Consent* (July 23, 1963).

[9]   We acknowledge, however, that the First Circuit has not always spoken with a single voice on this question. *See, e.g., United States v. Andino,* 831 F.2d 1164 (1st Cir. 1987) (prevailing opinion), *cert. denied,* 486 U.S. 1034 (1988); *United States v. Quinones,* 758 F.2d 40, 42 (1st Cir. 1985) ("[I]n 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution."); *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A.,* 649 F.2d 36, 41 (1st Cir. 1981) (Breyer, J.) (stating that following the passage of Public Law 600, "Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth."); *Figueroa v. People of Puerto Rico,* 232 F.2d 615, 620 (1st Cir. 1956) (Magruder, J.) (maintaining that to say that Public Law 600 was "just another Organic Act" for Puerto Rico would be to say that Congress had perpetrated a "monumental hoax" on the Puerto Rican people). Notwithstanding these inconsistencies, we believe the more recent First Circuit and other appellate decisions correctly state the law and properly recognize that the Supreme Court's decision in *Harris* is controlling.

We also acknowledge that the Federal Circuit's opinion in *Romero v. United States,* 38 F.3d 1204 (Fed. Cir. 1994), found that, for purposes of 5 U.S.C. § 5517, Puerto Rico is not a "State," "territory," or "possession." We read that opinion as addressing questions regarding the terms of that particular statute alone.

The second premise is that, as a matter of domestic constitutional law, the United States cannot irrevocably surrender an essential attribute of its sovereignty. *See United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996) (The United States "may not contract away 'an essential attribute of its sovereignty.'") (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977)); *Burnet v. Brooks*, 288 U.S. 378, 396 (1933) ("As a nation with all the attributes of sovereignty, the United States is vested with all the powers of government necessary to maintain an effective control of international relations."). This premise is reflected in the rule that, in general, one Congress cannot irrevocably bind subsequent Congresses. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (Marshall, C.J.) (noting that legislative acts are "alterable when the legislature shall please to alter [them]."); *see also Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810) (Marshall, C.J.) (recognizing the general rule that "one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature," while holding that vested rights are protected against subsequent congressional enactments). Moreover, as the Supreme Court has recognized, treaties and other covenants to which the United States is party stand, for constitutional purposes, on the same footing as federal legislation. *See Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam) ("We have held 'that an Act of Congress . . . is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'") (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)). Thus, to the extent a covenant to which the United States is party stands on no stronger footing than an Act of Congress, it is, for purposes of federal constitutional law, subject to unilateral alteration or revocation by subsequent Acts of Congress. As the Court explained in *Whitney v. Robertson*, 124 U.S. 190, 194 (1888):

> When the stipulations [of a treaty] are not self-executing they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by Congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions, so far as they bind the United States, or supersede them altogether.

This second premise applies to the exercise of presidential powers as well as to the exercise of congressional powers. Thus, a compact could not constitutionally limit the President's power to terminate treaties by requiring that he not exercise that power in the context of that compact without first obtaining the consent of the other signatories to the compact. *Cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (President has "plenary and exclusive power . . . as the sole organ of the federal government in the field of international relations"); *Goldwater v. Carter*, 617 F.2d 697, 703–09 (D.C. Cir.) (en banc), *rev'd on other grounds*, 444 U.S. 996 (1979) (finding that the President has constitutional authority to terminate a treaty); *Goldwater*, 444 U.S. at 1007 (Brennan, J., dissenting) (President's power to recognize the People's Republic of China entailed power to abrogate existing defense treaty with Taiwan).

7

With these two premises established, we turn now to analyzing the New Commonwealth proposal. The threshold point to consider is what type of status the proposal contemplates for Puerto Rico. Parts of the New Commonwealth proposal appear to contemplate Puerto Rico's becoming an independent Nation,[10] while others contemplate Puerto Rico's remaining subject to United States sovereignty to some degree.[11] To the extent that the proposal would thereby create for Puerto Rico a hybrid status, it runs afoul of the first premise discussed above. The proposal must be assessed against the constitutionally permissible status categories that exist, and the precise nature of the constitutional issues raised by the proposal turns in part on whether it is understood to recognize Puerto Rico as a sovereign nation or to maintain United States sovereignty over Puerto Rico.

First, regardless of whether the New Commonwealth proposal contemplates full Puerto Rican independence or continued United States sovereignty over Puerto Rico, the proposal's mutual consent provisions are constitutionally unenforceable. Article X of the proposal specifies that the New Commonwealth will be implemented pursuant to an "agreement between the people of Puerto Rico and the government of the United States," and provides that the agreement will have the force of a "bilateral covenant . . . based on mutual consent, that cannot be unilaterally renounced or altered."[12] If the proposal is read to maintain United States sovereignty over Puerto Rico, then, since the "enhanced" Commonwealth it contemplates would not be a State, it would necessarily remain subject to congressional power under the Territory Clause. It follows, then, that Congress could later unilaterally alter the terms of the covenant between the United States and Puerto Rico. *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 106 (1953) (explaining that delegations of power from one Congress to the government of a territory are generally subject to revision, alteration, or revocation by a later Congress); *see also* Thornburgh Testimony at 194 (stating that proposed legislation conferring on Puerto Rico "sovereignty, like a State" and making that status irrevocable absent mutual consent was "totally inconsistent with the

---

[10] *See, e.g.*, Preamble (referring to Puerto Rico as a "nation," and describing the "natural right to self government" and "free will" of the people of Puerto Rico as "ultimate sources of their political power"); Article V(B) (referring to Puerto Rico's authority over international matters).

[11] *See, e.g.*, Preamble (describing Puerto Rico as being "in permanent union with the United States"); Article II (providing for continued United States citizenship for persons born in Puerto Rico); Article VIII (providing for federal court jurisdiction over matters arising from "provisions of the Constitution of the United States and of the Federal laws that apply to Puerto Rico consistent with this Covenant and not in violation [of] the laws of the Constitution of Puerto Rico"); Article XIII (providing that the Resident Commissioner of Puerto Rico shall be "considered a Member of the U.S. House of Representatives" for certain purposes).

[12] This mutual consent requirement appears in a number of places throughout the proposal. The Preamble states that Puerto Rico shall remain "in permanent union with the United States under a covenant that cannot be invalidated or altered unilaterally." Article II(A) provides that "[p]eople born in Puerto Rico will continue to be citizens of the United States by birth," and specifies that this rule "will not be unilaterally revokable"). *See also* Article XIII(e) (prohibiting unilateral alteration of the covenant by the United States by providing that "[a]ny change to the terms of this Covenant will have to be approved by the people of Puerto Rico in a special vote conducted consistent with its democratic processes and institutions.").

Constitution").[13]

If Puerto Rico is to become an independent nation under the New Commonwealth proposal, then the relationship between the United States and Puerto Rico would necessarily be subject to subsequent action by Congress or the President, even without Puerto Rico's consent. As a general matter, a treaty cannot, for purposes of domestic constitutional law, irrevocably bind the United States. *See supra* at 7-8. In particular, because the power to make and unmake treaties is "inherently inseparable from the conception" of national sovereignty, *Curtiss-Wright Export Corp.*, 299 U.S. at 318, it can not be contracted away. Thus, if Puerto Rico were to become independent, the New Commonwealth proposal's mutual consent requirements would be constitutionally unenforceable against the United States.[14]

The New Commonwealth proposal also contains certain provisions regarding the retention of United States citizenship. Specifically, it provides that "[p]eople born in Puerto Rico will continue to be citizens of the United States by birth and this citizenship will continue to be protected by the Constitution of the United States and by this Covenant and will not be unilaterally revokable."

___

[13] Under the approach set forth in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810), a different result would be warranted if the covenant called for in the New Commonwealth proposal had the effect of vesting rights in Puerto Rico's status as a commonwealth or in an element of that status, such as the mutual consent requirement. It is true that in 1963, the Office of Legal Counsel concluded that a mutual consent provision would be constitutional because Congress could vest rights in political status. *See Memorandum Re: Power of the United States to Conclude with the Commonwealth of Puerto Rico a Compact which Could be Modified Only by Mutual Consent* (July 23, 1963). But the Justice Department altered its position on that question during the administration of President Bush, *see* Thornburgh Testimony at 194, and the Office of Legal Counsel now adheres to that position. *See* Treanor Testimony at 15-16; Memorandum for the Special Representative for Guam from Teresa Roseborough, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Mutual Consent Provisions in the Guam Commonwealth Legislation* (July 28, 1994).

Two independent grounds support our current position that rights may not be vested in political status. First, after the issuance of the Department's 1963 opinion, the Supreme Court concluded that the Fifth Amendment's guarantee of due process applies only to persons and not to States. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). While *Katzenbach* was concerned with a State, its rationale suggests that a governmental body, including a territory such as Puerto Rico, could not assert rights under the Due Process Clause. Second, the modern Supreme Court case law concerning vested rights is limited in scope. While the Court has recognized that economic rights are protected under the Due Process Clause, *see, e.g., Lynch v. United States*, 292 U.S. 571 (1934), the case law does not support the view that there would be Fifth Amendment vested rights in a political status for a governmental body that is not itself provided for in the Constitution. *Cf. Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55 (1986) ("[T]he contractual right at issue in this case bears little, if any, resemblance to rights held to constitute 'property' within the meaning of the Fifth Amendment. . . . The provision simply cannot be viewed as conferring any sort of 'vested right' in the fact of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation.").

[14] It is a separate question whether, or to what extent, the New Commonwealth proposal's mutual consent requirements would be binding under international law, and we do not address that question here.

9

This provision could be read in two different ways. First, it could be read as concerned only with persons born in Puerto Rico after the New Commonwealth proposal goes into effect. Understood as limited to these individuals, the proposal would confer United States citizenship on them unless and until Puerto Rico and the United States mutually agree to revoke it. Second, the text could be read as addressing the United States citizenship of all persons born in Puerto Rico, whether before or after the New Commonwealth proposal goes into effect.[15] Under this second reading, the proposal would preserve these individuals' citizenship subject to revocation by the mutual consent of Puerto Rico and the United States.

With respect to either reading, the mutual consent stipulation (i.e. that the grant of citizenship cannot be altered except by mutual consent) is, for the reasons discussed above, *see supra* at 8-9, constitutionally unenforceable. If that stipulation is set aside, the provision then reads as a simple grant of citizenship to certain persons born in Puerto Rico – either those born in Puerto Rico after the New Commonwealth proposal goes into effect, or all those born in Puerto Rico before and after such time. We see no constitutional impediment with that provision, regardless of how broadly it is read. However, whether that provision is itself alterable by a subsequent Act of Congress becomes a question of whether the United States citizenship of the persons covered by the provision is constitutionally protected. The answer to that question depends on how the provision is read (that is, whether it is read as addressing those born in Puerto Rico in the future, or as covering those already born in Puerto Rico, or both),[16] and may also depend on whether the New Commonwealth proposal in general is understood as creating an independent nation or as maintaining United States sovereignty over Puerto Rico.

We first address whether there would be any constitutional constraints on Congress's authority to provide that persons born in Puerto Rico in the future would not acquire United States citizenship by virtue of their birth in Puerto Rico. If Puerto Rico is to become an independent nation, then, while Congress may well have the power to provide (as the New Commonwealth proposal appears to contemplate) that persons born in Puerto Rico in the future shall acquire United States citizenship, we think Congress could also change that rule and provide that, in the future, birth in Puerto Rico shall no longer be a basis for United States citizenship.[17] If, however, Puerto Rico is to remain subject to United States sovereignty, then the answer is less clear. We are unaware of any case addressing the power of Congress to withhold prospectively non-Fourteenth Amendment citizenship from those born in an area subject to United States

---

[15] One limitation to the scope of the clause should be noted: presumably it is not intended to apply to those residing outside of Puerto Rico at the time the proposal took effect.

[16] The proposal might also be read to refer to people born in Puerto Rico in the future, but before any future action by Congress to cease extending citizenship to persons born in Puerto Rico. Identifying the precise constitutional considerations relevant to that reading of the proposal would require further study.

[17] We do not, however, address whether Congress could also exclude residents of Puerto Rico from other statutory sources of United States citizenship, such as being born abroad to a United States citizen parent or parents.

10

sovereignty, when persons previously born in that area received statutory citizenship by birthright, and we think it is unclear how a court would resolve that issue.

Next, we consider whether the Constitution would permit Congress to revoke the United States citizenship of persons who already have such citizenship because they were born in Puerto Rico. If the New Commonwealth proposal is understood to maintain United States sovereignty over Puerto Rico, then we think Congress could not revoke the United States citizenship of persons who already possess that citizenship by virtue of their birth in Puerto Rico. As the Court explained in *Afroyim*, Congress lacks a "general power . . . to take away an American citizen's citizenship without his assent." 387 U.S. at 257. While not squarely faced with a case of statutory citizenship, the Court in *Afroyim* did not limit its decision to persons whose citizenship is based on the Fourteenth Amendment, and we think it should not be so confined.[18] Accordingly, while we find no constitutional impediment in the New Commonwealth proposal's provision that those born in Puerto Rico will retain their citizenship in the future, we do think that to the extent Puerto Rico is to remain subject to United States sovereignty, the provision is redundant (or at best declaratory) of an underlying constitutional requirement that such citizenship not be revoked once it is granted. If, on the other hand, Puerto Rico were to become an independent nation under the New Commonwealth proposal, then, as we noted in our discussion of the Independence proposal's treatment of citizenship, *see supra* at 4-5, it is unclear whether Congress could revoke the U.S. citizenship of persons already holding such citizenship at the time of independence. There is an argument that the Constitution would ensure that those who possessed United States citizenship at the time of Puerto Rican independence must be able to retain that citizenship after independence, *see Afroyim*, 387 U.S. at 257, but there is also case law supporting the proposition that nationality follows the flag. *See Canter*, 26 U.S. at 542. As noted, it is unclear how a court would resolve this issue.

The New Commonwealth proposal also provides for the election of a Resident Commissioner to "represent Puerto Rico before the Government of the United States and who will be considered a Member of the U.S. House of Representatives for purposes of all legislative matters that have to do with Puerto Rico." The applicable provision of the Constitution – Article

---

[18] A counter-argument might be made based on the Supreme Court's decision in *Rogers v. Bellei*, 401 U.S. 815 (1971), which upheld the loss of citizenship of an individual who was born in Italy and who acquired citizenship under a federal statute because one of his parents was an American citizen. The statute required that persons claiming citizenship on that basis meet certain requirements of residency in the United States prior to their twenty-eighth birthday. The *Rogers* Court upheld the statute's provision for loss of citizenship for those who failed to meet the residency requirement. While the *Rogers* Court criticized *Afroyim*'s language concerning non-Fourteenth Amendment citizenship and based its own holding in part on the fact that Bellei's citizenship was not conferred pursuant to the Fourteenth Amendment, *see* 401 U.S. at 835, *Rogers* is best understood as addressing the legitimacy of pre-established requirements for statutorily conferred citizenship (including conditions subsequent such as the residency by age 28 requirement) when Congress grants citizenship to those who would not otherwise receive it directly by operation of the Fourteenth Amendment. That issue – of the legitimacy of pre-established requirements – is not relevant to Congress's powers to divest citizenship once it has been unconditionally conferred. *Afroyim* thus appears to be the most relevant precedent, and it supports the view that, so long as Puerto Rico remains under United States sovereignty, citizenship that has been granted is constitutionally protected.

I, Section 2, Clause 1 – provides that the House of Representatives "shall be composed of
Members chosen every second Year by the People *of the several States*." (emphasis added).  On
its face, that provision would seem to mean that the Resident Commissioner from Puerto Rico
could not be "considered a Member" of the House because, under the New Commonwealth
proposal, Puerto Rico would not be a "State." While Congress has the ability to permit
participation by representatives of the territories, *see Michel v. Anderson*, 14 F.3d 623, 630-32
(D.C. Cir. 1994) (holding that the House of Representatives had the authority to permit a
territorial delegate (including the Resident Commissioner from Puerto Rico) to vote in the
House's committees, including the Committee of the Whole), there are constitutional limits to the
participation that would be permitted.

The New Commonwealth proposal contains a number of other provisions that may raise
particular constitutional concerns if the proposal contemplates Puerto Rico remaining subject to
United States sovereignty.  The proposal authorizes Puerto Rico to "enter into commercial and
tax agreements, among others, with other countries," and to "enter into international agreements
and belong to regional and international organizations." The Constitution vests the foreign
relations power of the United States, which includes the power to enter into treaties, in the federal
government.  *Curtiss-Wright Export Corp.*, 299 U.S. at 318.  Specifically, Article I, Section 10,
Clause 1 (the "Treaty Clause") prohibits States from entering into "any Treaty, Alliance, or
Confederation." Under Article I, Section 10, Clause 3 (the "Compact Clause"), however, States
are permitted, if authorized by Congress, to "enter into any Agreement or Compact . . . with a
foreign Power." Read against the backdrop of these constitutional provisions, the New
Commonwealth proposal raises several issues.

First, it is unclear whether either the Treaty Clause or the Compact Clause applies to
Puerto Rico, since both clauses refer only to "State[s]." What little case law there is on this
question is not in agreement.  *Compare Venable v. Thornburgh*, 766 F. Supp. 1012, 1013 (D.
Kan. 1991) (stating in dicta that "the compact clause addresses agreements between the states,
territories and the District of Columbia."), *with Mora v. Torres*, 113 F. Supp. 309, 315 (D.P.R.)
(concluding that "Puerto Rico is not a State, and the compact clause, as such, is not applicable to
it."), *aff'd*, 206 F.2d 377 (1st Cir. 1953).  If the two clauses do apply to Puerto Rico, then
presumably the Compact Clause's provision for congressional authorization to enter into
"Agreement[s] or Compact[s]" applies to Puerto Rico.  Second, even if Congress may consent to
Puerto Rico's entry into "Agreement[s] or Compact[s]," it is not clear that the "commercial and
tax agreements" and "international agreements and . . . regional and international organizations"
referred to in the New Commonwealth proposal would all constitute "Agreement[s] or
Compact[s]" to which Congress may give its consent.  As the Supreme Court has noted, the
constitutional distinction between "Agreement[s] [and] Compact[s]," on the one hand, and
"Treat[ies], Alliance[s], [and] Confederation[s]," on the other, is not easily discerned.  *See U.S.
Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 461-62 (1978) (noting that "the Framers
used the words 'treaty,' 'compact,' and 'agreement' as terms of art, for which no explanation was

required and with which we are unfamiliar.").[19] Some "commercial and tax agreements" would be likely to qualify as "Agreement[s] or Compact[s]" under Article I, Section 10, Clause 3 of the Constitution. If so, then Congress may be able to authorize Puerto Rico to enter into such agreements. The status of the "international agreements and . . . regional and international organizations" referred to in the New Commonwealth proposal, however, is less clear. At least some of the agreements embraced in this phrase might constitute "Treat[ies], Alliance[s], or Confederation[s]" under Article I, Section 10, Clause 1. If so, then Puerto Rico may not constitutionally enter into them, with or without congressional consent. Third, even assuming Congress may authorize Puerto Rico to enter into at least some of the types of international agreements referenced in the New Commonwealth proposal, it is unclear whether Congress could, as apparently contemplated by the proposal, give Puerto Rico prospective blanket authorization to conclude such agreements. Although it is our view that, under the Compact Clause, Congress may consent in advance to a State's entering into certain international agreements,[20] there would still be a question whether advance consent over such a broad and unspecified range of agreements as is contemplated here would be an impermissible use of Congress's power.[21]

---

[19] On one account (which traces back to Justice Story) of the distinction between the Treaty and Compact Clauses, the Treaty Clause's categorical prohibition refers to agreements of a political character such as one Nation would make with another, while the conditional prohibition of the Compact Clause on agreements with foreign countries refers to arrangements regarding the private rights of sovereigns, such as adjusting boundaries, making territorial acquisitions in another State, or harmonizing the internal regulations of bordering States. *See Louisiana v. Texas,* 176 U.S. 1, 16-18 (1900) (outlining Story's theory); *Virginia v. Tennessee,* 148 U.S. 503, 519-20 (1893) (same). Agreements between Puerto Rico and foreign countries regarding taxation and commerce seem unlikely to concern private sovereign rights; *a fortiori,* international agreements and membership in international or regional organizations would seem to be political in character. On this theory, therefore, the Treaty Clause, if applicable to Puerto Rico, could well bar *all* forms of international agreements mentioned in the bill.

[20] *See* Letter for the Hon. Caspar W. Weinberger, Director, Office of Management & Budget, from Ralph E. Erickson, Deputy Attorney General (Sept. 19, 1972); Memorandum for Nicholas deB. Katzenbach, Deputy Attorney General, from Norbert A. Schiei, Assistant Attorney General, Office of Legal Counsel, Re: *Draft bill "To authorize the construction of certain international bridges," the proposed International Bridge Act of 1963* (July 18, 1963). The case law accords with that conclusion. *See Cuyler v. Adams,* 449 U.S. 433, 441 (1981) (advance congressional consent to certain interstate compacts relating to crime prevention and law enforcement); *Seattle Master Builders Ass'n v. Pacific Northwest Power and Conservation Council,* 786 F.2d 1359, 1363 (9th Cir. 1986) (even if advance congressional consent were "unusual," it would not be unconstitutional), *cert. denied,* 479 U.S. 1059 (1987); *see generally Virginia v. Tennessee,* 148 U.S. at 521 ("The Constitution does not state when the consent of congress shall be given, whether it shall precede or may follow the compact made . . . . In many cases the consent will usually precede the compact or agreement.").

[21] We have found little authority addressing the scope of permissible congressional delegation under the Compact Clause, and we note that potential "delegation" problems might arise whether or not the Compact Clause were thought to apply to Puerto Rico. *Compare Milk Industry Found. v. Glickman,* 132 F.3d 1467, 1473-78 (D.C. Cir. 1998) (analyzing issue arising under Compact Clause of delegation of authority to Executive Department), *with Philippine Islands–Postal Service,* 29 Op. Att'y Gen. 380 (1912) (analyzing without reference to Compact Clause whether Congress could delegate to government of Philippine Islands authority to negotiate and enter into international postal conventions). In either case, the breadth of the delegation contemplated here might raise constitutional concerns.

13

Finally, if Puerto Rico remains subject to United States sovereignty, the provision that Puerto Rico would "retain[] all the powers that have not been delegated to the United States" rests on a constitutionally flawed premise. This provision appears to attempt to create for Puerto Rico an analogue to the Tenth Amendment. But the legislative powers of a non-State region under the sovereignty of the United States are entirely vested in Congress. Because territories are created by the Nation, as a matter of constitutional law they can not delegate power to the Nation. As Chief Justice Marshall explained in *Canter*, "[i]n legislating for [the territories], Congress exercises the combined powers of the general, and of a state government." 26 U.S. at 546. And while Congress may delegate some of its powers over a territory to the territory itself, such delegation is, as discussed *supra* at 7-8, always subject to Congress's own plenary power to revise, alter, or revoke that authority. *See Thompson*, 346 U.S. at 106, 109; *United States v. Sharpnack*, 355 U.S. 286, 296 (1958).[22]

We hope this information is helpful to you. Please do not hesitate to contact me if I can be of further assistance.

Sincerely,

Robert Raben

Assistant Attorney General

cc:   The Honorable Jeff Bingaman
      Ranking Minority Member

---

[22] Other provisions of the Commonwealth proposal may present constitutional concerns. Article VIII makes jurisdiction of federal courts subject to the provisions of the Constitution of Puerto Rico, and article XIII concerns the creation of a mechanism by which application of United States laws to Puerto Rico will be subject to the laws of Puerto Rico.

# APPENDIX
# F

# MUTUAL CONSENT PROVISIONS IN THE GUAM COMMONWEALTH LEGISLATION

*Sections of the Guam Commonwealth Bill requiring the mutual consent of the Government of the United States and the Government of Guam raise serious constitutional questions and are legally unenforceable.*

July 28, 1994

## MEMORANDUM OPINION FOR THE SPECIAL REPRESENTATIVE FOR GUAM COMMONWEALTH

The Guam Commonwealth Bill, H.R. 1521, 103d Cong., 1st Sess. (1993) contains two sections requiring the mutual consent of the Government of the United States and the Government of Guam. Section 103 provides that the Commonwealth Act could be amended only with mutual consent of the two governments. Section 202 provides that no Federal laws, rules, and regulations passed after the enactment of the Commonwealth Act would apply to Guam without the mutual consent of the two governments. The Representatives of Guam insist that these two sections are crucial for the autonomy and economy of Guam. The former views of this Office on the validity or efficacy of mutual consent requirements included in legislation governing the relationship between the federal government and non-state areas, *i.e.* areas under the sovereignty of the United States that are not States,[1] have not been consistent.[2] We therefore have carefully reexamined this issue. Our conclusion is that these clauses raise serious constitutional issues and are legally unenforceable.[3]

---

[1] Territories that have developed from the stage of a classical territory to that of a Commonwealth with a constitution of their own adoption and an elective governor, resent being called Territories and claim that that legal term and its implications are not applicable to them. We therefore shall refer to all Territories and Commonwealths as non-state areas under the sovereignty of the United States or briefly as non-state areas.

[2] To our knowledge the first consideration of the validity of mutual consent clauses occurred in 1959 in connection with proposals to amend the Puerto Rico Federal Relations Act. At that time the Department took the position that the answer to this question was doubtful but that such clauses should not be opposed on the ground that they go beyond the constitutional power of Congress. In 1963 the Department of Justice opined that such clauses were legally effective because Congress could create vested rights in the status of a territory that could not be revoked unilaterally. The Department adhered to this position in 1973 in connection with then pending Micronesians status negotiations in a memorandum approved by then Assistant Attorney General Rehnquist. On the basis of this advice, a mutual consent clause was inserted in Section 105 of the Covenant with the Northern Mariana Islands. The Department continued to support the validity of mutual consent clauses in connection with the First 1989 Task Force Report on the Guam Commonwealth Bill. The Department revisited this issue in the early 1990's in connection with the Puerto Rico Status Referendum Bill in light of *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986), and concluded that there could not be an enforceable vested right in a political status; hence that mutual consent clauses were ineffective because they would not bind a subsequent Congress. We took the same position in the Second Guam Task Force Report issued during the last days of the Bush Administration in January 1993.

[3] Mutual consent clauses are not a novel phenomenon; indeed they antedate the Constitution. Section 14 of the Northwest Ordinance contained six "articles of compact, between the original States and the people and States in the said territory, and [shall] forever remain unalterable, unless by common consent." These articles were incorporated either expressly or by reference into many early territorial organic acts. *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 442 (1872). The copious litigation under these "unalterable articles" focussed largely on the question whether the territories' obligations under them were superseded by the Constitution, or when the territory

*Opinions of the Office of Legal Counsel*

In our view, it is important that the text of the Guam Commonwealth Act not create any illusory expectations that might mislead the electorate of Guam about the consequences of the legislation.  We must therefore oppose the inclusion in the Commonwealth Act of any provisions, such as mutual consent clauses, that are legally unenforceable, unless their unenforceability (or precatory nature) is clearly stated in the document itself.

I.

*The Power of Congress to Govern the Non-State*
*Areas under the Sovereignty of the United States*
*is Plenary within Constitutional Limitations*

All territory under the sovereignty of the United States falls into two groups:  the States and the areas that are not States.  The latter, whether called territories, possessions, or commonwealths, are governed by and under the authority of Congress.  As to those areas, Congress exercises the combined powers of the federal and of a state government.  These basic considerations were set out in the leading case of *National Bank v. County of Yankton*, 101 U.S. 129, 132-33 (1880).  There the Court held:

It is certainly now too late to doubt the power of Congress to govern the Territories.  There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded.[4]

* * *

All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress.  The Territories are but political subdivisions of the outlying dominion of the United States.  Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations.  The organic law of a Territory takes the place of a constitution as the fundamental law of the local government.  It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purposes of this department of its governmental authority has all the

---

became a State, as the result of the equal footing doctrine.  We have, however, not found any cases dealing with the question whether the Congress had the power to modify any duty imposed on the United States by those articles.

[4] Some derived that power from the authority of the United States to acquire territory, others from the mere fact of sovereignty, others from the Territory Clause of the Constitution of the United States (Art. IV, Sec. 3, Cl. 2) pursuant to which Congress has "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States".  *See e.g. American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828); *Mormon Church v. United States*, 136 U.S. 1, 42-44 (1890); *Downes v. Bidwell*, 182 U.S. 244, 290 (1901).

At present, the Territory Clause of the Constitution is generally considered to be the source of the power of Congress to govern the non-state areas.  *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673-674 (1945); *Examining Board v. Flores de Otero*, 426 U.S. 572, 586 (1976); *Harris v. Rosario*, 446 U.S. 651 (1980); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1992), *cert. denied* 506 U.S. 1027 (1992).  (Footnote supplied.)

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution.

*Yankton* was anticipated in Chief Justice Marshall's seminal opinion in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542-43, 546 (1828). The Chief Justice explained:

> In the mean time [*i.e.* the interval between acquisition and statehood], Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress "to make all needful rules and regulations, respecting the territory, or other property belonging to the United States."

> Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a state, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States.

> * * *

> In legislating for them [the Territories], Congress exercises the combined powers of the general, and of a state government.

*Id.* at 542-43, 546.

The power of Congress to govern the non-state areas is plenary like every other legislative power of Congress but it is nevertheless subject to the applicable provisions of the Constitution. As Chief Justice Marshall stated in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824), with respect to the Commerce Power:

> This power [the Commerce Power], like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and *acknowledges no limitations, other than are prescribed in the constitution*. (Emphasis added.)

This limitation on the plenary legislative power of Congress is self-evident. It necessarily follows from the supremacy of the Constitution. *See e.g.*, *Hodel v. Virginia Surface Mining and Reclamation Assoc.*, 452 U.S. 264, 276 (1981). That the power of Congress under the Territory Clause is subject to constitutional limitations has been recognized in *County of Yankton*, 101 U.S. at 133; *Downes v. Bidwell*, 182 U.S. 244, 290-91 (1901); *District of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953).

Finally, the power of Congress over the non-state areas persists "so long as they remain in a territorial condition." *Shively v. Bowlby*, 152 U.S. 1, 48 (1894). *See also Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 675 (1945) (recognizing that during the intermediary period between the establishment of the Commonwealth of the Philippine Islands and the final withdrawal of United States sovereignty from those islands "Congress retains plenary power over the territorial government").

The plenary Congressional authority over a non-state area thus lasts as long as the area retains that status. It terminates when the area loses that status either by virtue of its admission

– 3 –

*Opinions of the Office of Legal Counsel*

as a State, or by the termination of the sovereignty of the United States over the area by the grant of independence, or by its surrender to the sovereignty of another country.

II.

*The Revocable Nature of Congressional Legislation*
*Relating to the Government of Non-State Areas*

While Congress has the power to govern the non-state areas it need not exercise that power itself.  Congress can delegate to the inhabitants of non-state areas full powers of self-government and an autonomy similar to that of States and has done so since the beginning of the Republic.  Such delegation, however, must be "consistent with the supremacy and supervision of National authority".  *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 441 (1872); *Puerto Rico v. Shell Co.*, 302 U.S. 253, 260, 261-62 (1937).  The requirement that the delegation of governmental authority to the non-state areas be subject to federal supremacy and federal supervision means that such delegation is necessarily subject to the right of Congress to revise, alter, or revoke the authority granted.  *District of Columbia v. Thompson Co.*, 346 U.S. 100, 106, 109 (1953).[5]  *See also United States v. Sharpnack*, 355 U.S. 286, 296 (1958), *Harris v. Boreham*, 233 F.2d 110, 113 (3rd Cir. 1956), *Firemen's Insurance Co. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973).  The power of Congress to delegate governmental powers to non-state areas thus is contingent on the retention by Congress of its power to revise, alter, and revoke that legislation.[6]  Congress therefore cannot subject the amendment or repeal of such legislation to the consent of the non-state area.

This consideration also disposes of the argument that the power of Congress under the Territory Clause to give up its sovereignty over a non-state area includes the power to make a partial disposition of that authority, hence that Congress could give up its power to amend or repeal statutes relating to the governance of non-state areas.  But, as shown above, the retention of the power to amend or repeal legislation delegating governmental powers to a non-state area is an integral element of the delegation power.  Congress therefore has no authority to enact legislation under the Territory Clause that would limit the unfettered exercise of its power to amend or repeal.

The same result flows from the consideration that all non-state areas are subject to the authority of Congress, which, as shown above, is plenary.  This basic rule does not permit the

---

[5] *Thompson* dealt with the District of Columbia's government which is provided for by Art. I, Sec. 8, Cl. 17 of the Constitution, rather than with the non-state areas as to whom the Congressional power is derived from the Territory Clause.  The Court, however, held that in this area the rules relating to the Congressional power to govern the District of Columbia and the non-state areas are identical.  Indeed, the Court relied on cases dealing with non-state areas, *e.g.*, *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1874), and *Christianson v. King County*, 239 U.S. 365 (1915), where it held that Congress can delegate its legislative authority under Art. I, Sec. 8, Cl. 17 of the Constitution to the District, subject to the power of Congress at any time to revise, alter, or revoke that authority.

[6] Congress has exercised this power with respect to the District of Columbia.  The Act of February 21, 1871, 16 Stat. 419, gave the District of Columbia virtual territorial status, with a governor appointed by the President, a legislative assembly that included an elected house of delegates, and a delegate in Congress.  The 1871 Act was repealed by the Act of June 20, 1874, 18 Stat. 116, which abrogated among others the provisions for the legislative assembly and a delegate in Congress, and established a government by a Commission appointed by the President.

– 4 –

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

creation of non-state areas that are only partially subject to Congressional authority.  The plenary power of Congress over a non-state area persists as long as the area remains in that condition and terminates only when the area becomes a State or ceases to be under United States sovereignty.  There is no intermediary status as far as the Congressional power is concerned.

The two mutual consent clauses contained in the proposed Commonwealth Act therefore are subject to Congressional modification and repeal.

III.

*The Rule that Legislation Delegating Governmental Powers to a*
*Non-State Area Must be Subject to Amendment and Repeal is but a*
*Manifestation of the General Rule that one Congress Cannot Bind*
*a Subsequent Congress, Except where it Creates Vested Rights*
*Enforceable under the Due Process Clause of the Fifth Amendment*

The rule that Congress cannot surrender its power to amend or repeal legislation relating to the government of non-state areas is but a specific application of the maxim that one Congress cannot bind a subsequent Congress and the case law developed under it.

The rationale underlying that principle is the consideration that if one Congress could prevent the subsequent amendment or repeal of legislation enacted by it, such legislation would be frozen permanently and would acquire virtually constitutional status.  Justice Brennan expressed this thought in his dissenting opinion in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 45 (1977), a case involving the Impairment of the Obligation of Contracts Clause of the Constitution (Art. I, Sec 10, Cl. 1):

> One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent.  Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days . . . .  The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

Nonetheless, the maxim that one Congress cannot bind a future Congress, like every legal rule, has its limits.  As early as 1810, Chief Justice Marshall explained in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810):

> The principle asserted is that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature.
>
> The correctness of this principle, so far as respects general legislation, can never be controverted.  But, if an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power.  Conveyances have been made, those conveyances have vested legal

– 5 –

*Opinions of the Office of Legal Counsel*

estates, and if those estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact.

When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest [sic] those rights.

The powers of one legislature to repeal or amend the acts of the preceding one are limited in the case of States by the Obligation of Contracts Clause (Art. I, Sec. 10, Cl. 1) of the Constitution and the Due Process Clause of the Fourteenth Amendment, and in the case of Congressional legislation by the Due Process Clause of the Fifth Amendment.  This principle was recognized in the *Sinking-Fund Cases*, 98 U.S. 700, 718-19 (1879):

The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes.  They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States *they are prohibited from depriving persons or corporations of property without due process of law*.  They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad.  Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection.  The United States are as much bound by their contracts as are individuals.  (emphasis supplied.)

*See also Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 54-56 (1986).

IV.

*The Due Process Clause Does Not Preclude Congress from*
*Amending or Repealing the Two Mutual Consent Clauses*

The question therefore is whether the Due Process Clause of the Fifth Amendment precludes a subsequent Congress from repealing legislation for the governance of non-state areas enacted by an earlier Congress under the Territory Clause.  This question must be answered in the negative.

The Due Process Clause of the Fifth Amendment provides:

No *person* shall . . . be deprived of life, liberty, or *property* without due process of law.  (emphasis supplied.)

This Clause is inapplicable to the repeal or amendment of the two mutual consent clauses here involved for two reasons.  First, a non-state area is not a "person" within the meaning of the Fifth Amendment, and, second, such repeal or amendment would not deprive the non-state area of a property right within the meaning of the Fifth Amendment.

A.

*A non-state area is not a person in the meaning of the Due Process Clause of the Fifth Amendment.*

– 6 –

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Court held that a State is not a person within the meaning of the Due Process Clause of the Fifth Amendment. *See also Alabama v. EPA*, 871 F.2d 1548, 1554 (11th Cir.), *cert. denied*, 493 U.S. 991 (1989) ("The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment"); *State of Oklahoma v. Federal Energy Regulatory Comm.*, 494 F.Supp. 636, 661 (W.D. Okl. 1980), *aff'd*, 661 F.2d 832 (10th Cir. 1981), *cert. denied*, *sub. nom. Texas v. Federal Energy Regulatory Comm.*, 457 U.S. 1105 (1982).

Similarly it has been held that creatures or instrumentalities of a State, such as cities or water improvement districts, are not persons within the meaning of the Due Process Clause of the Fifth Amendment. *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167 (D.D.C. 1980); *El Paso, County Water Improvement District v. IBWC/US*, 701 F. Supp. 121, 123-24 (W.D. Tex 1988).

The non-state areas, concededly, are not States or instrumentalities of States, and we have not found any case holding directly that they are not persons within the meaning of the Due Process Clause of the Fifth Amendment. They are, however, governmental bodies, and the rationale of *South Carolina v. Katzenbach*, 383 U.S. at 301, appears to be that such bodies are not protected by the Due Process Clause of the Fifth Amendment. Moreover, it is well established that the political subdivisions of a State are not considered persons protected as against the State by the provisions of the Fourteenth Amendment. *See, e.g., Newark v. New Jersey*, 262 U.S. 192, 196 (1923); *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40 (1933); *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 505, 507 (6th Cir. 1986), and the authorities there cited. The relationship of the non-state areas to the Federal Government has been analogized to that of a city or county to a State. As stated, *supra*, the Court held in *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1880):

The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States . . . .

More recently, the Court explained that a non-state area is entirely the creation of Congress and compared the relationship between the Nation and a non-state area to that between a State and a city. *United States v. Wheeler*, 435 U.S. 313, 321 (1978). It follows that, since States are not persons within the meaning of the Fifth Amendment and since the political subdivisions of States are not persons within the meaning of the Fourteenth Amendment, the non-state areas are not persons within the meaning of the Due Process Clause of the Fifth Amendment.

B.

*Legislation relating to the governance of non-state areas does not create any rights or status protected by the Due Process Clause against repeal or amendment by subsequent legislation.*

As explained earlier, a subsequent Congress cannot amend or repeal earlier legislation if such repeal or amendment would violate the Due Process Clause of the Fifth Amendment, *i.e.*, if such amending or repealing legislation would deprive a person of property without due process of law. It has been shown in the preceding part of this memorandum, that a non-state area is not a person within the meaning of the Due Process Clause. Here it will be shown that mutual

– 7 –

*Opinions of the Office of Legal Counsel*

consent provisions in legislation, such as the ones envisaged in the Guam Commonwealth Act, would not create property rights within the meaning of that Clause.

Legislation concerning the governance of a non-state area, whether called organic act, federal relations act, or commonwealth act, that does not contain a mutual consent clause is clearly subject to amendment or repeal by subsequent legislation.  A non-state area does not acquire a vested interest in a particular stage of self government that subsequent legislation could not diminish or abrogate.  While such legislation has not been frequent, it has occurred in connection with the District of Columbia.  *See District of Columbia v. Thompson Co.*, 346 U.S. 100, 104-05 (1953); *supra* n.6.  Hence, in the absence of a mutual consent clause, legislation concerning the government of a non-state area is subject to amendment or repeal by subsequent legislation.

This leads to the question whether the addition of a mutual consent clause, *i.e.* of a provision that the legislation shall not be modified or repealed without the consent of the Government of the United States and the Government of the non-state area, has the effect of creating in the non-state areas a specific status amounting to a property right within the meaning of the Due Process Clause.  It is our conclusion that this question must be answered in the negative because (1) sovereign governmental powers cannot be contracted away, and (2) because a specific political relationship does not constitute "property" within the meaning of the Fifth Amendment.

1.  As a body politic the Government of the United States has the general capacity to enter into contracts.  *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 128 (1831).  This power, however, is generally limited to those types of contracts in which private persons or corporations can engage.  By contrast sovereign "governmental powers cannot be contracted away," *North American Coml. Co. v. United States*, 171 U.S. 110, 137 (1898).  More recently the Supreme Court held in connection with legislation arising under the Contract Clause (Art. I, Sec. 10, Cl. 1) of the Constitution that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977).[7]  In a similar context Mr. Justice Holmes stated:

> One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).[8]

Agreements or compacts to the effect that the Congress may not amend legislation relating to the government of a non-state area without the consent of the latter, or that federal legislation shall not apply to Guam unless consented to by the Government of Guam would unquestionably purport to surrender essential powers of the federal government.  They are

---

[7] Cases arising under the Contract Clause holding that a State cannot contract away a sovereign power are also applicable to the contracts made by the federal government because the Contract Clause imposes more rigorous restrictions on the States than the Fifth Amendment imposes on the federal government. *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 733 (1984); *National Railroad Passenger Corp. v. A.T. & S.F. Ry.*., 470 U.S. 451, 472-73 n.25 (1985).  Hence, when state legislation does not violate the Contract Clause, analogous federal legislation is all the more permissible under the Due Process Clause of the Fifth Amendment.

[8] Cited with approval with respect to federal legislation in *Norman v. B. & O.R.*, 294 U.S. 240, 308 (1935).

– 8 –

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

therefore not binding on the United States and cannot confer a property interest protected by the Fifth Amendment.[9]

More generally, the Supreme Court held in *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986), that the contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not arrangements that are part of a regulatory program such as a State's privilege to withdraw its participation in the Social Security system with respect to its employees. Specifically, the Court stated:

> But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, *see Perry v. United States*, *supra*, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch v. United States*, *supra*. The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id.* At 55. Agreements that the Guam Commonwealth Act may not be amended without the consent of the Government of Guam, or that future federal statutes and regulations shall not apply to Guam without the consent of the Government of Guam clearly do not constitute conventional private contracts; they are elements of a regulatory system.

In the past the Department of Justice at times has concluded that a non-State area may have a vested interest in a specific status which would be immune from unilaterial Congressional amendment or repeal.[10] We cannot continue to adhere to that position in view of the rulings of the Supreme Court that legislation concerning the governance of a non-state area is necessarily subject to Congressional amendment and repeal; that governmental bodies are not persons within the meaning of the Due Process Clause; that governmental powers cannot be contracted away, and especially the exposition in the recent *Bowen* case that the property rights protected by the

---

[9] Cases such as *Lynch v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935), are not contrary to this conclusion. Both cases involved commercial agreements (*Lynch*: insurance; *Perry*: Government bonds) In *Lynch* the Court held that Congress could not amend the contract merely to save money "unless, indeed the action falls within the federal police police power or some other paramount power." 292 U.S. at 579. *Perry* involved bonds issued by the United States under the authority of Art. I, Sec. 8, Cl. 2 of the Constitution, to borrow money on the credit of the United States. The Court held that Congress did not have the power to destroy the credit of the United States or to render it illusory by unilaterally abrogating one of the pivotal terms of the bonds to save money. While the Court held that the United States had broken the agreement, it nevertheless held that plaintiff could not recover because, as the result of regulations validly issued by the United States, he had not suffered any monetary damages.

[10] *Cf.* n.2.

*Opinions of the Office of Legal Counsel*

Due Process Clause are those arising from private law or commercial contracts and not those arising from governmental relations.[11]

Sections 103 and 202 therefore do not create vested property rights protected by the Due Process Clause of the Fifth Amendment.[12]  Congress thus retains the power to amend the Guam Commonwealth Act unilaterally or to provide that its legislation shall apply to Guam without the consent of the government of the Commonwealth.  The inclusion of such provisions, therefore, in the Commonwealth Act would be misleading.  Honesty and fair dealing forbid the inclusion of such illusory and deceptive provisions in the Guam Commonwealth Act.[13]

Finally, the Department of Justice has indicated that it would honor past commitments with respect to the mutual consent issue, such as Section 105 of the Covenant with the Northern Mariana Islands, in spite of its reevaluation of this problem.  The question whether the 1989 Task Force proposal to amend Section 103 of the Guam Commonwealth Act so as to limit the mutual consent requirement to Sections 101, 103, 201, and 301 constitutes such prior commitment appears to have been rendered moot by the rejection of that proposal by the Guam Commission.

TERESA WYNN ROSEBOROUGH
Deputy Assistant Attorney General
Office of Legal Counsel

---

[11] It is significant that the circumstances in which Congress can effectively agree not to repeal or amend legislation were discussed in the context of *commercial* contracts.  *Bowen*, 477 U.S. at 52.

[12] *Bowen*, it is true, dealt with legislation that expressly reserved the right of Congress to amend, while the proposed Guam Commonwealth Act would expressly preclude the right of Congress to amend without the consent of the Government of Guam.  The underlying agreements, however, are not of a private contractual nature, and, hence, are not property within the meaning of the Due Process Clause.  We cannot perceive how they can be converted into "property" by the addition of a provision that Congress foregoes the right of amendment.

[13] The conclusion that Section 202 of the Guam Commonwealth Act (inapplicability of future federal legislation to Guam without the consent of Guam) would not bind a future Congress obviates the need to examine the constitutionality of Section 202.  In *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939), and *United States v. Rock Royal Co-op.* 307 U.S. 533, 577-78 (1939), the Court upheld legislation that made the effectiveness of regulations dependent on the approval of tobacco farmers or milk producers affected by them.  The Court held that this approval was a legitimate condition for making the legislation applicable.  Similarly, it could be argued that the approval of federal legislation by the Government of Guam is a legitimate condition for making that legislation applicable to Guam.  Since, as stated above, a future Congress would not be bound by Section 202, we need not decide the question whether the requirement of approval by the Government of Guam for *every* future federal statute and regulation is excessive and inconsistent with the federal sovereignty over Guam.

# APPENDIX G

STATEMENT OF C. KEVIN MARSHALL
DEPUTY ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGAL COUNSEL
U.S. DEPARTMENT OF JUSTICE

BEFORE THE COMMITTEE ON RESOURCES,
UNITED STATES HOUSE OF REPRESENTATIVES

HEARING ON THE REPORT BY THE PRESIDENT'S TASK FORCE
ON PUERTO RICO'S STATUS
APRIL 27, 2006

Thank you, Mr. Chairman and Ranking Member Rahall, for inviting me to discuss the work and report of the President's Task Force on Puerto Rico's Status. President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order. The Task Force consists of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs, Ruben Barrales. I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel. As the Attorney General's designee on the Task Force, I serve as its Co-Chair, along with Mr. Barrales.

The status of Puerto Rico, and the options regarding that status, have been issues for many years. In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State." He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option." He charged the Task Force with seeking to implement that policy. We are required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status." Our recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of Puerto Rico's status. That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status. Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority. Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto

Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government.  In October 2000, a few months before President Clinton established the Task Force, this Committee held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal.  William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option.  We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options objectively, without prejudice.  We also attempted to develop a process for realizing one of the options.   We sought input from all interested parties.  The members met with anyone who requested a meeting.  I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report last December and concluded that there were three general options under the Constitution for Puerto Rico's status:  (1) continue its current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status.  Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement.  The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force.  The report is of course not a legal brief.  But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department.  The second of these, a January 2001 letter to the Senate Committee on Energy and Natural Resources, also was sent to this Committee on the same date.  The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as we understand it, is not consistent with the Constitution.  Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding.  Puerto Rico would remain subject to Congress's authority under the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States."  Puerto Rico receives a number of benefits from this status, such as favorable tax treatment.  And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the

Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here. If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause. Puerto Rico's favorable tax treatment would generally no longer be allowed. Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress. Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty. When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations. Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau.

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico. In particular, we sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress." The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely. The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike us as providing much guidance to Congress.

We therefore have recommended a two-step process. The first step is simply to determine whether the people of Puerto Rico wish to remain as they are. We recommend that Congress provide for a federally sanctioned plebiscite in which the choice will be whether to continue territorial status. If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people. If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option. Ultimate authority of course remains with Congress.

Two points about this recommended process merit brief explanation. First, consistent with our presidential mandate, it does not seek to prejudice the outcome, even though it is structured to produce a clear outcome. At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status. They may do so again. But it is critical to be clear about that status. Second, our recommended process does not preclude action by Puerto Rico itself to express its views to Congress. At the first step, we recommend that Congress provide for the plebiscite "to occur on a date certain." We did not, of course, specify that date. But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain." If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite.

3

The Task Force knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole.  We appreciate the Committee's commitment to this matter and the opportunity to share our views.

**STATEMENT OF C. KEVIN MARSHALL**
**DEPUTY ASSISTANT ATTORNEY GENERAL**
**OFFICE OF LEGAL COUNSEL**
**U.S. DEPARTMENT OF JUSTICE**

**BEFORE THE COMMITTEE ON ENERGY AND NATURAL RESOURCES**
**UNITED STATES SENATE**

**HEARING ON THE REPORT BY THE PRESIDENT'S TASK FORCE**
**ON PUERTO RICO'S STATUS**
**NOVEMBER 15, 2006**

Thank you, Mr. Chairman and Ranking Member Bingaman, for inviting me to discuss the work and report of the President's Task Force on Puerto Rico's Status. President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order. The Task Force consists of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs, Ruben Barrales. I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel. As the Attorney General's designee on the Task Force, I serve as its Co-Chair, along with Mr. Barrales.

The status of Puerto Rico, and the options regarding that status, have been issues for many years. In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State." He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option." He charged the Task Force with seeking to implement that policy. We are required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status." Our recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of Puerto Rico's status. That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status. Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority. Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto

Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government.  In October 2000, a few months before President Clinton established the Task Force, the House Committee on Resources held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal.  William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option. We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options, including the current status and the New Commonwealth option, objectively and without prejudice.  We also attempted to develop a process for Congress to ascertain which of the constitutional options the people of Puerto Rico prefer.  We sought input from all interested parties, including Governor Acevedo-Vilá.  The members met with anyone who requested a meeting.  I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report last December and concluded that there were three general options under the Constitution for Puerto Rico's status:  (1) continue Puerto Rico's current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status.  Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement.  The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force.  The report is of course not a legal brief.  But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department.  The second of these is a January 2001 letter to this Committee, a copy of which was sent to the House Committee on Resources on the same date.  The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as we understand it, is not consistent with the Constitution.  Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding.  Puerto Rico would remain subject to Congress's authority under the Territory Clause of the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to

the United States." Puerto Rico receives a number of benefits from this status, such as favorable tax treatment. And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here. If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause. Puerto Rico's favorable tax treatment would generally no longer be allowed. Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress. Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty. When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations. Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau. The report explains, with a few qualifications, that, "[a]mong the constitutionally available options, freely associated status may come closest to providing for the relationship between Puerto Rico and the United States that advocates for 'New Commonwealth' status appear to desire."

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico. In particular, we sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress." The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely. The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike us as providing clear guidance to Congress.

We therefore have recommended a two-step process. The first step is simply to determine whether the people of Puerto Rico wish to remain as they are. We recommend that Congress provide for a federally sanctioned plebiscite in which the choice will be whether to continue territorial status. If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people. If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option. Ultimate authority of course remains with Congress.

Two points about this recommended process merit brief explanation. First, consistent with our presidential mandate, it does not seek to prejudice the outcome; it is structured to produce a clear outcome. At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status. They may do so again. But it is critical to be clear about that status. Second, our recommended process does not preclude action by Puerto Rico itself to

3

express its views to Congress.  At the first step, we recommend that Congress provide for the plebiscite "to occur on a date certain."  We did not, of course, specify that date.  But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain." If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite.

The Task Force knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole.  We appreciate the Committee's commitment to this matter and the opportunity to share our views.

**STATEMENT OF C. KEVIN MARSHALL**
**DEPUTY ASSISTANT ATTORNEY GENERAL**
**OFFICE OF LEGAL COUNSEL**
**U.S. DEPARTMENT OF JUSTICE**

**BEFORE THE SUBCOMMITTEE ON INSULAR AFFAIRS**
**OF THE COMMITTEE ON NATURAL RESOURCES**
**UNITED STATES HOUSE OF REPRESENTATIVES**

**HEARING ON H.R. 900, THE "PUERTO RICO DEMOCRACY ACT OF 2007," AND**
**H.R. 1230, THE "PUERTO RICO SELF DETERMINATION ACT OF 2007 "**
**APRIL 25, 2007**

Thank you, Madame Chairman and Ranking Member Fortuno, for inviting the Administration to discuss pending legislation concerning the future political status of Puerto Rico.  The work and report of the President's Task Force on Puerto Rico's Status have contributed to renewed attention to this question in the last few years, including a hearing in April 2006 before the full Committee, in which I participated.  President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order.  The Executive Order as amended provides for the Task Force to consist of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs.  I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel.  As the Attorney General's designee on the Task Force, I have served as its Co-Chair.  Today I appear because of that work but also as a representative of the Administration.

The status of Puerto Rico, and the options regarding that status, have been issues for many years.  In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State."  He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option."  He charged the Task Force with seeking to implement that policy.  The Task Force was required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status."  Its recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of

Puerto Rico's status.  That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status.  Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority.  Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government.  In October 2000, a few months before President Clinton established the Task Force, the House Committee on Resources held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal.  William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option. We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options, including the current status and the New Commonwealth option, objectively and without prejudice.  It also attempted to develop a process for Congress to ascertain which of the constitutional options the people of Puerto Rico prefer.  It sought input from all interested parties, including Governor Acevedo-Vilá.  The members met with anyone who requested a meeting.  I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report in December 2005 and concluded that there were three general options under the Constitution for Puerto Rico's status:  (1) continue Puerto Rico's current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status.  Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement.  The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force.  The report is of course not a legal brief.  But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department.  The second of these is a

January 2001 letter to the Senate Committee on Energy and Natural Resources, a copy of which was sent to the House Committee on Resources on the same date.  The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as the Task Force understood it, is not consistent with the Constitution.  Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding.  Puerto Rico would remain subject to Congress's authority under the Territory Clause of the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States."  Puerto Rico receives a number of benefits from this status, such as favorable tax treatment.  And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here.  If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause.  Puerto Rico's favorable tax treatment would generally no longer be allowed.  Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress.  Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty.  When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations.  Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau.  The report explains, with a few qualifications, that, "[a]mong the constitutionally available options, freely associated status may come closest to providing for the relationship between Puerto Rico and the United States that advocates for 'New Commonwealth' status appear to desire."

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico.  In particular, it sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress."  The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely.  The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike the Task Force as providing much guidance to Congress.

The Task Force therefore recommended a two-step process.  The first step is simply to determine whether the people of Puerto Rico wish to remain as they are.  The Task Force recommended that Congress provide for a federally sanctioned plebiscite in which the choice

3

will be whether to continue territorial status.  If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people.  If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option.  Ultimate authority of course remains with Congress.

Three points about this recommended process merit specific explanation in connection with the two bills the Subcommittee is considering.  First, consistent with the presidential mandate to the Task Force, its recommended process does not seek to prejudice the outcome, even though it is structured to produce a clear outcome.  At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status.  They may do so again.  But it is critical to be clear about that status.  H.R. 1230, in referring to "a new or modified Commonwealth status" as among the status options that are "not subject to the plenary powers of the territorial clause of the Constitution of the United States," does not further the necessary clarity.

Second, the Task Force's recommended process does not preclude action by Puerto Rico itself to express its views to Congress.  At the first step, the report recommended that Congress provide for the plebiscite "to occur on a date certain."  The Task Force did not, of course, specify that date.  But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain."  If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite.  H.R. 900 adopts a similar approach in leaving the Puerto Rico Elections Commission discretion to set the date of the first plebiscite but requiring that it occur by December 31, 2009.

Finally, I am authorized to state that the Administration supports the Task Force report.  The report correctly identifies the limited options available under the U.S. Constitution for permanent status and sets out a process so Puerto Ricans are heard on the critical question of Puerto Rico's status.  The Administration therefore also supports legislation consistent with the report and recognizes that H.R. 900 sets out a process closely resembling that which the report recommends.  We will work with Congress to be sure that any process to solicit the views of the people of Puerto Rico is transparent, understandable, and fair.

The Administration knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole.  We appreciate the Subcommittee's commitment to this matter and the opportunity to share our views.

4