# EXHIBIT D

[TO BE ARGUED ON FEBRUARY 23, 1988]

No. 87-5398

United States Court of Appeals

FILED JAN 2 2 1988

CONSTANCE L. DUPRÉ
CLERK

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PALESTINE INFORMATION OFFICE, ET AL.,

Plaintiffs-Appellants,

-v.-

GEORGE P. SHULTZ, Secretary of State, ET AL.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLEES

ABRAHAM D. SOFAER
Legal Adviser

PATRICK M. NORTON
Assistant Legal Adviser
For Near Eastern and
South Asian Affairs

JOHN B. REYNOLDS
Attorney Adviser
U.S. Department of State

RICHARD K. WILLARD
Assistant Attorney General

JOSEPH E. DIGENOVA
United States Attorney

DOUGLAS LETTER
Appellate Litigation Counsel
Appellate Staff, Civil Division
Room 3617, Department of Justice
Washington, D.C. 20530
Telephone: (202) 633-3602

BEST AVAILABLE COPY

**TABLE OF CONTENTS**

Page

QUESTIONS PRESENTED ................................. 1

STATUTE INVOLVED ................................... 2

STATEMENT OF THE CASE .............................. 2

    A.   Nature Of The Proceeding ................. 2

    B.   Statement Of The Facts ................... 3

        1.   The Statutory Scheme ................. 3

        2.   The Palestine Information Office and the PLO ......................... 4

        3.   The Designation of the PIO as a Foreign Mission and the Order to Cease Operations .................... 5

        4.   This Litigation and the District Court's Ruling ...................... 7

        5.   The Anti-Terrorism Act of 1987 ....... 9

INTRODUCTION AND SUMMARY OF ARGUMENT ............... 11

ARGUMENT .......................................... 14

    I.   THE EXECUTIVE BRANCH VALIDLY EXERCISED ITS SUBSTANTIAL AUTHORITY IN DESIGNATING THE PIO AS A FOREIGN MISSION OF THE PLO, AND IN ORDERING IT TO CEASE OPERATIONS IN THAT FORM ............................. 14

    A.   The Executive Acted At The Very Height Of His Constitutional Authority In This Matter .................................. 14

    B.   In The Foreign Missions Act Itself, Congress Assigned The Key Functions To The Discretion Of The Secretary, And The Role Of The Courts Here Is Thus Highly Restricted .............................. 17

    C.   The State Department Was Well Within Its Authority In Determining That The PIO Was A Foreign Mission Of The PLO .......... 20

i

                                                              **Page**

II.   THE STATE DEPARTMENT'S ACTION CLOSING
      A MISSION OF THE PLO DID NOT VIOLATE
      ANY FIRST AMENDMENT RIGHTS ................    28

A.    Because The Executive Closed A Mission Of
      A Foreign Entity, No First Amendment
      Rights Are Implicated Here ................    28

B.    Even If First Amendment Rights Are
      Implicated, They Are Overcome By The
      Valid Foreign Policy Actions Of The
      Executive Here ...........................    40

III.  PLAINTIFFS' DUE PROCESS RIGHTS WERE NOT
      INFRINGED ................................    44

A.    A Hearing Here Would Have Served No
      Purpose, And Was Thus Not Required
      Under The Due Process Clause .............    44

B.    Since Plaintiffs' Conduct Fell Within The
      Heart Of The Conduct Covered By The
      Foreign Missions Act, They Cannot Attack
      The Statute As Unconstitutionally Vague ...    45

CONCLUSION ..........................................    48

CERTIFICATE OF SERVICE ..............................    49

## TABLE OF AUTHORITIES

### Cases:

Adams v. Vance, 570 F.2d 950 (D.C. Cir. 1977) .......    15

American Ass'n of Exporters and Importers
      v. United States, 751 F.2d 1239
      (Fed. Cir. 1985) ...............................    19

Aptheker v. Secretary of State,
      378 U.S. 500 (1964) ............................    39

Blum v. Bacon, 457 U.S. 132 (1982) ..................    21

Boutilier v. INS, 387 U.S. 118 (1967) ...............    46

Buckley v. Valeo, 424 U.S. 1 (1976) .................    42

ii

**Cases** (cont'd):                                              **Page**

Bugajewitz v. Adams, 228 U.S. 585 (1913) ............ 34

Butterfield v. Stranahan, 192 U.S. 470 (1904) ....... 31

Chevron U.S.A. v. Natural Resources Defense
    Council, 467 U.S. 837 (1984) ................... 20

Chicago and Southern Air Lines Inc. v. Waterman
    Steamship Corp., 333 U.S. 103 (1948) .......... 15

City of Renton v. Playtime Theatres,
    475 U.S. 41 (1986) ............................ 43

Codd v. Velger, 429 U.S. 624 (1977) ............... 44,45

*Communist Party of the United States v.
    Subversive Activities Control Board,
    367 U.S. 1 (1961) ............................. 17,22,35,
                                                  37,39

*Dames & Moore v. Regan, 453 U.S. 654 (1984) ........ 15

Dupont Circle Citizens' Ass'n v. District of
    Columbia Bd. of Zoning Adjustment,
    530 A.2d 1163 (D.C.App. 1987) ................. 18

Ekiu v. United States, 142 U.S. 651 (1892) ......... 34

Fiallo v. Bell, 430 U.S. 787 (1977) ................ 33,34

Finzer v. Barry, 798 F.2d 1450
    (D.C. Cir. 1986), cert. granted,
    107 S.Ct. 1282 (1987) ........................ 41

First National City Bank v. Banco Para El
    Comercio Exterior de Cuba,
    462 U.S. 611 (1983) ........................... 35

Fong Yue Ting v. United States,
    149 U.S. 698 (1893) ........................... 30,31

Galvan v. Press, 347 U.S. 522 (1954) ............... 33,34

Haig v. Agee, 453 U.S. 280 (1981) .................. 15,41,46

Hanoch Tel-Oren v. Libya, 726 F.2d 774
    (D.C. Cir. 1984) .............................. 28

*Harisiades v. Shaughnessy, 342 U.S. 580 (1952) ...... 16-17,33

**Cases** (cont'd):                                                       **Page**

Hoffman Estates v. The Flipside, Hoffman
    Estates, Inc., 445 U.S. 489 (1982) ............. 47

Hull v. Eaton Corp., 825 F.2d 448
    (D.C. Cir. 1987) ............................... 22,23

Jaffke v. Dunham, 352 U.S. 280 (1957) ............. 22

*Kleindienst v. Mandel, 408 U.S. 753 (1972) ........ passim

Kent v. Dulles, 357 U.S. 116 (1958) ............... 39

Mathews v. Diaz, 426 U.S. 67 (1976) ............... 33

Missouri v. Holland, 252 U.S. 416 (1920) .......... 31

Oceanic Steam Navigation Co. v. Stranahan,
    214 U.S. 320 (1909) ........................... 33

Oetjen v. Central Leather Co.,
    246 U.S. 297 (1918) ........................... 16

Parker v. Levy, 417 U.S. 733 (1974) ............... 46

Penhallow v. Doane, 3 U.S. 54 ..................... 30

Pfizer Inc. v. India, 434 U.S. 308 (1978) ......... 31,32

Principality of Monaco v. Mississippi,
    292 U.S. 313 (1934) ........................... 31

Regan v. Wald, 468 U.S. 222 (1984) ................ 15,39

Russello v. United States, 464 U.S. 16 (1983) ...... 25

Sanchez-Espinoza v. Reagan, 770 F.2d 202
    (D.C. Cir. 1985) .............................. 15

Scales v. United States, 367 U.S. 203 (1961) ....... 33

Schooner Exchange v. McFadden,
    11 U.S. (7 Cranch) 116 (1812) ................. 30,31

South Carolina v. Katzenbach, 383 U.S. 301 (1966) .. 44

Teague v. Regional Commissioner of Customs,
    404 F.2d 441 (2d Cir. 1968),
    cert. denied, 394 U.S. 977 (1969) ............. 43

Udall v. Tallman, 380 U.S. 1 (1965) ............... 20

**Cases** (cont'd):                                                          **Page**

United States v. Belmont, 301 U.S. 324 (1937) ......  16

United States v. Curtiss-Wright Export Corp.,
    299 U.S. 304 (1936) ............................  19,20,30

United States v. Harriss, 347 U.S. 612 (1954) ......  42

United States v. New York Telephone Co.,
    434 U.S. 159 (1977) ............................  27

United States v. O'Brien, 391 U.S. 367 (1968) ......  42,43

United States v. Petrillo, 332 U.S. 1 (1947) .......  46

United States v. Pink, 315 U.S. 203 (1942) .........  16,32

Williams v. Suffolk Insurance Co.,
    38 U.S. (13 Peters) 415 (1839) ................  16

Young v. American Mini Theatres,
    427 U.S. 50 (1976) ............................  46

Youngstown Sheet & Tube Co. v. Sawyer,
    343 U.S. 579 (1922) ...........................  15

*Zemel v. Rusk, 381 U.S. 1 (1965) ..................  19,20,39,47

**Constitutions, Statutes and Regulations:**

**United States Constitution:**

        Article II, Section 3 ..........................  2,15
        First Amendment ................................  passim
        Fifth Amendment ................................  7

v

<u>Constitutions, Statutes and Regulations</u> (cont'd):     <u>Page</u>

Foreign Agents Registration Act,
    22 U.S.C. 611 <u>et seq</u>. .......................... 4,25,27

**Foreign Missions Act:**

    22 U.S.C. 4301 <u>et seq</u>. ......................... 2,3
    22 U.S.C. 4301(a) ............................. 3
    22 U.S.C. 4302(a)(1) .......................... 4
    22 U.S.C. 4302(a)(4) .......................... 3,5,23,25
    22 U.S.C. 4302(b) ............................. 3,17,18
    22 U.S.C. 4304(b) ............................. 4
    22 U.S.C. 4305(b) ............................. 4
    22 U.S.C. 4308(g) ............................. 3,17

Anti-Terrrorism Act of 1987 <u>reprinted in</u>
    133 Cong. Rec. H11319
    (daily ed. December 14, 1987): ................ 9

    Sec. 1002(b); H11320 .......................... 10
    Sec. 1003; H11320 ............................. 10
    Sec. 1004; H11320 ............................. 10
    Sec. 1005; H11320 ............................. 11

Emergency Economic Powers Act,
    50 U.S.C. 1701 <u>et seq</u>. ........................ 27

Pub. L. 97-241, Title II, Sec. 202;
    96 Stat. 283 .................................. 26

Pub. L. 99-93, Title I, Sec. 127;
    99 Stat. 418 .................................. 26

Pub. L. 99-569, Title VII, Sec. 701
    100 Stat. 3204 ................................ 26

**Legislative Materials:**

131 Cong. Rec. H2991 (1985) ........................ 26

H.R. Conf. Rep. No. 952, 99th Cong.,
    2d Sess. 28 (1986) ............................ 19

H.R. Rep. No. 102 (Part 1) 97th Cong.,
    1st Sess. 30 (1981) ........................... 18

S. Rep. No. 329, 97th Cong.,
    2d Sess. 8 (1982) ............................. 18,19

**Legislative Materials** (cont'd):

S. Rep. No. 283, 97th Cong.,
    1st Sess. 7 (1981) ............................. 18

S. Rep. No. 307, 99th Cong.,
    2d Sess. 23 (1986) ............................ 19,26


S. Doc. No. 56, 54th Cong., 2d Sess. 19 (1897) ...... 15-16

S. Doc. No. 82, 92d Cong., 2d Sess. 537 (1973) ...... 16

**Miscellaneous:**

Damrosch, Foreign States and the Constitution,
    73 Va. L. Rev. 483 (1987) ..................... 31

Kassim, The Palestine Liberation Organization's
    Claim To Status: A Juridical Analysis Under
    International Law, 9 Den. J. Int'l L &
    Policy 1 (1980) ............................... 29

L. Henkin, Foreign Affairs and the Constitution,
    254 (1972) .................................... 31

The American Heritage Dictionary (2d College Ed.
    1982) ......................................... 25

Webster's Ninth New Collegiate
    Dictionary (1985) ............................. 25

*    Authorities chiefly relied upon are marked with asterisks.

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASF?**

### A.   Parties And Amici

We believe that all parties, intervenors, and <u>amici</u> appearing below have been listed in the Brief of Plaintiffs-Appellants.   We note that the Anti-Defamation League of B'nai B'rith has indicated by letter that it intends to file an <u>amicus</u> brief in this Court.

### B.   Rulings Under Review

Reference to the ruling below appears at page 2 of the Brief of Plaintiffs-Appellants.

### C.   Related Cases

This case was previously before this Court on a request for an emergency stay pending appeal, which was denied on December 4, 1987 by Judges Starr and Buckley.   We are not aware of any related cases pending in this or any other court.

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 87-5398

PALESTINE INFORMATION OFFICE, ET AL.,

Plaintiffs-Appellants,

v.

GEORGE P. SHULTZ, Secretary of State, ET AL.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLEES

### QUESTIONS PRESENTED

1.    Whether the Secretary of State properly designated as a
foreign mission of the Palestine Liberation Organization an
office that is largely funded by the PLO, has direct contact with
that organization, and performs its activities on behalf of that
organization.

2.    Whether the First Amendment prohibits the Executive
from barring an American citizen from operating a mission for a
foreign political entity, when that citizen is left free to
express his ideas on his own behalf.

3.    Whether the Executive violated due process requirements
by defining an organization as a foreign mission without a
hearing, when the facts gleaned from the organization's own
admissions show that it is indeed a foreign mission.

4.    Whether plaintiffs can challenge a statute as
unconstitutionally vague when plaintiffs' status itself plainly
falls within the wording of the statute.

### STATUTE INVOLVED

The relevant portions of the Foreign Missions Act (22 U.S.C.
4301 et seq.) are reprinted in an addendum to this brief.

### STATEMENT OF THE CASE

### A.    Nature Of The Proceeding

This case involves a challenge to an order issued by the
Department of State to the Palestine Information Office
(hereafter "the PIO") on September 15, 1987 to cease operations.
Until that time, the PIO had operated an office in Washington,
D.C. as an agent of the Palestine Liberation Organization
(hereafter "the PLO").   The order to cease operations was issued
pursuant to Article II of the Constitution and the Foreign
Missions Act (hereafter "the Act").

Plaintiffs are the PIO and its director, Hasan Abdel Rahman.
They filed this action in United States District Court against
the Secretary of State and two of his subordinates, attacking the
State Department order as unauthorized under the Act, and in
violation of their First Amendment and Due Process Clause rights.
The district court granted judgment to the Government based on
the facts set out in plaintiffs' papers, and plaintiffs are now
appealing that order.

2

**B.** **Statement Of The Facts**

**1.** **The Statutory Scheme**

The relevant statutory scheme is set out in the Foreign Missions Act. 22 U.S.C. 4301 et seq. In that statute, Congress declared the operation of foreign missions in this country to be a proper subject for statutory-based federal regulation. 22 U.S.C. 4301(a).

The statute defines as a "foreign mission," among other bodies, any "entity in the United States which is involved in the diplomatic, consular, or other activities of, or which is substantially owned or effectively controlled by * * * an organization * * * representing a territory or a political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States or which engages in some aspect of the conduct of the international affairs of such territory or political entity * * *." 22 U.S.C. 4302(a)(4).

Administration of the Foreign Missions Act is assigned to the Secretary of State (hereafter "the Secretary") and determinations of the meaning and applicability of terms contained in the statute (such as "foreign mission") are committed to his discretion. 22 U.S.C. 4302(b). The Act also explicitly states that, unless otherwise provided, determinations required under the Act are committed to the Secretary's discretion. 22 U.S.C. 4308(g).

If an entity is defined as a foreign mission, the Secretary may, in order "to protect the interests of the United States," require that mission to seek to obtain any and all "benefits"

3

through the Office of Foreign Missions, which is part of the State Department. 22 U.S.C. 4304(b). "Benefits" is broadly defined to include virtually everything needed to operate an office, including real estate. 22 U.S.C. 4302(a)(1). The Secretary can require a foreign mission to divest itself of any real property when "necessary to protect the interests of the United States." 22 U.S.C. 4305(b). Thus, a foreign mission can operate under the statute only at the sufferance of the Secretary.

### 2.   The Palestine Information Office and the PLO

Plaintiff-appellant PIO is a registered agent of the PLO under the Foreign Agents Registration Act (22 U.S.C. 611 et seq.), as is its director, plaintiff-appellant Hasan Rahman. App. 30-40, 75. Until last month, the PIO was located in Washington, D.C., and had been operating there since 1978. App. 22. It had, other than Director Rahman, eight full or part-time employees, and all of its employees were either United States citizens (Director Rahman is a naturalized citizen) or legal permanent resident aliens. App. 22.

The PIO's annual budget in 1987 was approximately $350,000. Rahman's salary was paid by an organization called the League of Arab States (of which the PLO is a member), while the self-described "Finance Department" of the PLO -- the Palestine National Fund -- paid the remainder of the PIO's expenses. App. 75-76. PIO funds, apparently provided by the PLO, were used to purchase cars and a house for Director Rahman. App. 76.

Director Rahman has direct contact with the PLO, and the PIO regularly engaged in informational and advocacy activities in the

4

United States on that organization's behalf.  App. 76.  The PLO is the only foreign principal served by the PIO, and the PIO engaged in no activity that benefitted other foreign principals. App. 35.

### 3.   The Designation of the PIO as a Foreign Mission and the Order to Cease Operations

On September 15, 1987, the State Department Office of Foreign Missions sent the PIO a letter from its Director, James Nolan, Jr., enclosing a notice designating the PIO as a foreign mission of the PLO under the Foreign Missions Act.  The designation was executed by Deputy Secretary of State John Whitehead, and was based on several determinations.  He found that: (1) the PIO was an entity "substantially owned and/or effectively controlled by the PLO"; (2) the PIO engaged in "other activities" within the meaning of the Act (22 U.S.C. 4302(a)(4)) because it engages in political activity and political propaganda on behalf of the PLO; (3) the PIO conducted its functions on behalf of the PLO, which is an organization that has received privileges and immunities under American law by virtue of its status as an observer to the United Nations; and (4) the PLO engages in "some aspect of the conduct of international affairs" as evidenced by its membership in the League of Arab States and its status at the United Nations.  App. 16.

At the same time, Deputy Secretary Whitehead issued an order pursuant to both the Executive's general foreign affairs power and specific authority to receive ambassadors under Article II of the Constitution, and the Secretary's authority under the Act. App. 17.  That order stated that "it is reasonably necessary to

5

protect the interests of the United States to require that the Palestine Information Office cease operation as a mission representing the Palestine Liberation Organization." App. 17.

The Deputy Secretary explained that this action was being taken because of "U.S. concern over terrorism committed and supported by individuals and organizations affiliated with the PLO, and as an expression of our overall policy condemning terrorism." App. 17.

More particularly, the Deputy Secretary noted that the PLO recently had retained on its Executive Committee Abu Al-Abbas despite the fact that this individual was implicated in the murder of an American citizen during the Achille Lauro hijacking. App. 17. In addition, at the recent Palestine National Congress, other terrorist groups were reunited with the PLO. App. 17. Deputy Secretary Whitehead explained that "[t]errorism by this minority of Palestinians and their supporters has been a serious obstacle to the realization of a peaceful settlement of the Arab-Israeli conflict, and an accommodation between Israelis and Palestinians." App. 17.

The covering letter from Director Nolan to the PIO emphasized that nothing in the State Department's actions with respect to the PIO "derogates from the constitutionally protected rights of U.S. citizens and permanent residents who are now associated with the Palestine Information Office." App. 77.[1]

---

[1] This cover letter was attached to the original complaint filed here, but was inexplicably not attached to the Amended Complaint, and only the latter is reprinted in the Joint Appendix. Consequently, although this letter is in the district court record and the relevant part of it is quoted in the Joint
(continued...)

6

On October 13, 1987, the State Department granted an extension of the PIO closing date until December 1, 1987.   App. 78.

4.   **This Litigation and the District Court's Ruling**

On November 13, 1987, the PIO and Director Rahman filed this action.   They contended that the Foreign Missions Act does not authorize designation of the PIO as a foreign mission, and that the Act as applied violates their First Amendment speech and association rights, and their Fifth Amendment due process rights. App. 13.   They sought an injunction against the closing of the PIO under the Foreign Missions Act or based on the PIO's "advocacy of unpopular political ideas."   App. 14.

After plaintiffs sought a preliminary injunction, the case was transferred from Judge Sporkin to Judge Richey.[2]   On December 2, 1987, the latter granted judgment to the Government based on the undisputed facts adduced by the parties, and he dismissed the complaint.   App. 105, 115.

The district court first noted that because this matter involves foreign affairs, the court was concerned solely with whether the Secretary's exercise of his discretion was proper, and not the substance of the Secretary's decision.   App. 105-06, 108-09.   Next, the court held that the Secretary had properly

---

[1](...continued)
Appendix, it is not reprinted in full in the Appendix.   It is therefore reprinted in an Addendum to this brief.

[2] The transfer occurred at plaintiffs' request after Deputy Secretary Whitehead explained that, in making the September 15, 1987 determinations, he had "relied upon all the information available to me as Deputy Secretary of State, including classified information."   App. 74.

7

designated the PIO as a foreign mission.  The PIO was found to fit within the plain meaning of the statutory term "entity," and to have conducted "other activities" on behalf of the PLO.  App. 106-08.  The court avoided the question whether the PIO is owned or controlled by the PLO because it found it sufficient for statutory purposes that the PIO engages in "other activities" on behalf of the PLO.  App. 108.

Having found the PIO to be a foreign mission, the district court then rejected plaintiffs' constitutional claims.  App. 110. The court found compelling the fact that neither Rahman nor the PIO were prevented from speaking or disseminating their message; rather they were simply prohibited from doing so as a mission of the PLO.  App. 110.  The narrow scope of the State Department order was found to help it overcome any possible First Amendment rights plaintiffs held.  App. 110-12.

The district court also concluded that, as a mission of a foreign entity, the PIO has no constitutional due process rights. App. 112.  It further ruled that Rahman's individual rights had not been violated because he is free to espouse his personal political views.  App. 113.  Moreover, the court held that there is no due process right to be employed by a foreign entity.  App. 113.  And, Rahman had failed to show how any procedural safeguards would benefit him.  App. 113.

The district court concluded by stating that plaintiffs' various claims were "utterly meritless." App. 113-14.[3] Plaintiffs appealed the judgment against them.

After the district court denied an emergency injunction pending appeal (App. 118), this Court too denied such an injunction on December 4, 1987. The Court held that plaintiffs had failed to make the "extraordinarily strong showing [needed] to succeed" in a request for an injunction against the Secretary in matters of foreign affairs. The Court concluded: "As we read the Department of State's order, the First Amendment activities of individuals in the United States are in no wise infringed."

It is our understanding, that, as of December 5, 1988, the PIO has ceased operations.

## 5. The Anti-Terrorism Act of 1987

After the district court ruled in this case, Congress enacted the Anti-Terrorism Act of 1987.[4] In that statute, Congress found, *inter alia*, that (Sec. 1002; H11319):

(a)  the PLO was directly responsible for the murder of an American citizen during the Achille Lauro hijacking, and that a member of the PLO's Executive Committee had been indicted here for that murder;

---

[3] The district court subsequently amended its opinion to make clear that Director Rahman's rights were not violated because he was left free to express his ideas "provided he complies with all relevant U.S. laws." App. 116.

[4] That statute appears as Title X of the Foreign Relations Authorization Act of 1988-89 (H.R. 1777). Printed copies of the statute do not yet appear to be available. The statute is reprinted in the Congressional Record of December 14, 1987, at H11319-20, and we have cited to that document.

(b)   the head of the PLO has been implicated in the murder of an American ambassador;

(c)   the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens; and

(d)   the PLO covenant states that "armed struggle" is part of the organization's "overall strategy" and not just a "tactical phase," and that the organization recently rededicated itself to a policy of "struggle in all its armed forms."

Congress accordingly concluded that the PLO and its affiliates constitute a terrorist organization and a threat to the interests of the United States, and should not enjoy the benefits of operating in the United States.  Sec. 1002(b); H11320.

As a result of these determinations, Congress made it unlawful, if the purpose is to further the interests of the PLO or its agents, to receive anything of value (except informational material) from the PLO, to expend funds received from the PLO, or to maintain an office in the United States at the behest or direction of the PLO, or with funds provided by the PLO.  Sec. 1003; H11320.  The Attorney General is directed to take the steps necessary to effectuate this statute, and federal district courts are empowered to grant injunctive or other necessary relief, at the request of the Attorney General, in order to enforce it. Sec. 1004; H11320.

The Anti-Terrorism Act is not effective until March 21, 1988, and its provisions lapse if the President subsequently

10

certifies that the PLO no longer practices or supports terrorism. Sec. 1005; H11320.

## INTRODUCTION AND SUMMARY OF ARGUMENT

. A.    Our case here is premised on two basic points, and the second flows from the first.  The initial one is that the State Department acted well within its foreign affairs authority in determining that the PIO operated in the United States as a mission of the PLO.

Our second point is that this proper determination provides the answer to plaintiffs' various constitutional arguments attacking the Executive Branch decision to close the PIO because foreign entities such as the PLO have no right to operate in the United States in any form whatsoever, except as the political branches of the Federal Government allow.  Any argument to the contrary asks this Court to adopt the revolutionary principle that foreign entitites can maintain offices here over the opposition of the political branches of our Government as long as they pay United States citizens or permanent resident aliens to be their representatives.

Plaintiffs' arguments about First Amendment and Due Process Clause rights are flawed because they fail to acknowledge that they depend upon this startling concept.  Moreover, as this Court recognized when it denied the request for an injunction pending appeal, plaintiffs' First Amendment rights have been left untouched; plaintiffs have been barred only from operating as a mission of the PLO, a foreign entity identified by Congress as a terrorist group responsible for murdering American citizens, and not officially recognized by our Government.

11

B.   In our argument, we initially point out that the
Executive Branch acted at the zenith of its power in this matter.
The Executive has inherent constitutional foreign affairs
authority stemming from his power to recognize foreign entities
or to decline to do so.  Additionally, Congress has foreign
policy powers arising in part from its plenary authority to
control entry into this country by foreigners.  In this instance,
Congress delegated its authority to the Executive Branch, and the
State Department therefore acted here under the Executive's
broadest authority.

We next show that, in the Foreign Missions Act, Congress has
explicitly delegated to the Secretary's discretion the
determination of what is a foreign mission.  Consequently, if any
judicial review is appropriate here at all, it should be
extremely limited.  If the Secretary has even plausibly acted
within his substantial discretion, no further judicial review is
appropriate.

We then demonstrate that the uncontroverted facts establish
that the State Department clearly did not abuse its broad
discretion in designating the PIO as a foreign mission of the
PLO.  Those facts reveal that the PIO operated as an agent of the
PLO, and carried out advocacy activities on its behalf.  The PLO
funded the PIO expenses entirely, except for the salary of the
PIO Director, which was paid by an organization of which the PLO
is a member.  The PIO Director consulted with the PLO, and his
house and cars were purchased with funds apparently provided by
the PLO.  Finally, the PIO acted on behalf of no foreign
principal other than the PLO, and undertook no actions on its own

12

behalf benefitting any foreign principal other than the PLO.
These facts fully support the Secretary's finding that the PLO
substantially owned and effectively controlled the PIO.

In the second part of our argument, we show that no First
Amendment rights have been violated by ordering the PIO to cease
its operations as a PLO mission.  The PLO has no right to operate
a mission in the United States, even if it has hired American
citizens and resident aliens in order to do so.

Moreover, plaintiffs Rahman and the PIO are free to express
any views they choose; they simply cannot do so as a PLO mission.
Given this freedom, plaintiffs cannot show any First Amendment
violation; nor can they show that the content of their speech has
been regulated, since they are free to say whatever they please,
including precisely what they have previously been saying.  Only
plaintiffs' ability to serve as a PLO mission has been curtailed.

Indeed, even if First Amendment rights are at stake here, an
assertion with which we disagree, those rights are not absolute
in this context.  Here, they are outweighed by the bona fide, but
narrowly drawn, foreign policy actions taken by the Executive
against the PLO.

In the third part of our argument, we refute plaintiffs'
claim that their due process rights were violated because they
were not given a hearing before being designated as a PLO
mission.  Plaintiffs could possibly have had a right to a hearing
only if they had something apposite to say.  Here, plaintiffs'
own admissions show sufficient grounds for the State Department

to conclude that the PIO was a PLO mission.  Therefore, a hearing would have served no purpose.

Finally, we show that plaintiffs' challenge to the Foreign Missions Act as unconstitutionally vague is unavailing.  This argument is directed at the district court's reading of the Act, which caused it to bypass the issue of the PLO's substantial ownership and/or effective control of the PIO.  In this brief, however, we defend the State Department's action on the rationale it used, based on ownership or control.  Hence, this argument evaporates if the Court accepts our merits argument.

Even if the vagueness argument survives, one whose conduct falls squarely within the terms of a statute cannot challenge its application to conduct on the fringes.  Here, the uncontroverted facts show the PIO to be within the heart of the foreign mission definition.

ARGUMENT

I.   **THE EXECUTIVE BRANCH VALIDLY EXERCISED ITS SUBSTANTIAL AUTHORITY IN DESIGNATING THE PIO AS A FOREIGN MISSION OF THE PLO, AND IN ORDERING IT TO CEASE OPERATIONS IN THAT FORM.**

A.   **The Executive Branch Acted At The Very Height Of Its Constitutional Authority In This Matter.**

It is essential in considering this matter to bear in mind that the Executive Branch acted here pursuant to a statutory delegation from Congress in the area of foreign affairs.  In designating the PIO as a mission of a foreign entity and ordering it to cease operations, the State Department therefore acted at the apex of its authority because it wielded the combined authority of the Executive and Legislative Branches to govern the foreign relations of the United States, to regulate a foreign

14

presence in this country, and to recognize foreign entities.   See
<u>Dames & Moore</u> v. <u>Regan</u>, 453 U.S. 654, 668 (1984); <u>Youngstown
Sheet & Tube Co.</u> v. <u>Sawyer</u>, 343 U.S. 5,9, ... ...  (1952) (Jackson,
J. concurring); <u>Chicago and Southern Ai... ... ... </u> v. <u>Waterman
Steamship Corp.</u>, 333 U.S. 103, 111 (1948).   These are areas
entrusted to the political branches of our Government, and are
ones in which the Judicial Branch plays an extremely limited
role.   See <u>Regan</u> v. <u>Wald</u>, 468 U.S. 222, 242-243 (1984); <u>Dames &
Moore</u>, 453 U.S. at 674, 678; <u>Haig</u> v. <u>Agee</u>, 453 U.S. 280, 292
(1981).

This Court too has recognized its restricted authority in
matters involving foreign relations.   See, <u>e.g.</u>, <u>Adams</u> v. <u>Vance</u>,
570 F.2d 950, 954-55 (D.C. Cir. 1977) ("[c]ourts must beware
ignoring the delicacies of diplomatic negotiations, the
inevitable bargaining for the best solution of an international
conflict, and the scope which in foreign affairs must be allowed
to the President"); <u>Sanchez-Espinoza</u> v. <u>Reagan</u>, 770 F.2d 202, 210
(D.C. Cir. 1985) (declining to find a private right of action in
the Neutrality Act because doing so might interfere with the
broad leeway traditionally afforded to the President in foreign
affairs).

Specifically, Article II, Section 3 of the Constitution
provides that the President "shall receive Ambassadors and other
public Ministers."   This is a power granted to the Executive
Branch exclusively.

The President's responsibility to recognize ambassadors
includes the power to determine the identity of a legitimate
foreign delegation.   See S. Doc. No. 56, 54th Cong., 2d Sess. 19

15

(1897); S. Doc. No. 82, 92d Cong., 2d Sess. 537-44 (1973).  For example, when a revolution or a civil war occurs in a foreign state, the President has the authority to decide which group shall be recognized by the United States.  See Oetjen v. Central Leather Co., 246 U.S. 297, 302-03 (1918); United States v. Belmont, 301 U.S. 324, 327-30 (1937); Williams v. Suffolk Insurance Co., 38 U.S. (13 Peters) 415, 420 (1839).  Accord S. Doc. No. 54-56, supra, at 18 ("the President alone is granted power to receive a minister from the Republic of Cuba and a fortiori to recognize its existence"); id. at 15, 19-20.

The power to recognize foreign entities and to accept their emissaries includes the "power to determine the policy which is to govern the question of recognition."  United States v. Pink, 315 U.S. 203, 229 (1942).  Once the Executive makes these determinations, his decisions are binding on the courts.  Pink, 315 U.S. at 222-23, 229-30.

At the same time, Congress possesses significant foreign affairs authority, including the power to enact legislation governing the opening and closing of our borders to aliens and foreign organizations.  See Kleindienst v. Mandel, 408 U.S. 753, 765 (1972); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952) ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

16

This power to regulate foreign encroachments does not apply only to alien individuals.  The Supreme Court has explained that the "[m]eans for effective resistance against foreign incursion -- whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power -- may not be denied to the national legislature." Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 95-96 (1961).

Thus, in this instance, the State Department acted with the inherent foreign affairs authority of the President and the foreign policy and regulatory authority of Congress delegated to the Secretary through the Foreign Missions Act.  For that reason, the Court must be very wary of intruding into the domain of the political branches by overruling the State Department's determinations.

### B.   In The Foreign Missions Act Itself, Congress Assigned The Key Functions To The Discretion Of The Secretary, And The Role Of The Courts Here Is Thus Highly Restricted.

1.  As noted earlier, the Foreign Missions Act states that "[d]eterminations with respect to the meaning and applicability of the terms used [such as "foreign mission"] shall be committed to the discretion of the Secretary." 22 U.S.C. 4302(b).  See also 22 U.S.C. 4308(g) ("[e]xcept as otherwise provided, any determination required under this chapter shall be committed to the discretion of the Secretary").

17

Therefore, assuming that there is to be any judicial review of the Secretary's determinations under this Act, Congress plainly intended that review to be extremely narrow.[5]  See <u>Dupont Circle Citizens' Ass'n</u> v. <u>District of Columbia Bd. of Zoning Adjustment</u>, 530 A.2d 1163, 1168 (D.C. App. 1987) (leaving open question of whether judicial review is available under the Act, but finding no abuse of discretion by the Secretary).  Indeed, the language of the statute appears to provide, at a minimum, that there be no judicial review when the Secretary has even plausibly acted within his authority.

The assignment by Congress to the Secretary's discretion here was quite deliberate.  The legislative history of Section 4302(b) pointedly notes the impact that determinations under the Act may have on the foreign affairs of the United States and the paramount need to avoid conflicting actions.  Thus, the House report explained that Section 4302(b) "is intended to avoid conflicting interpretations by different government agencies <u>and courts</u> and potential litigation that might detract from the efficient implementation of this title or might adversely affect the management of foreign affairs."  H.R. Rep. No. 102 (Part 1), 97th Cong., 1st Sess. 30 (1981) (emphasis added).  Accord S. Rep. No. 283, 97th Cong., 1st Sess. 7 (1981); S. Rep. No. 329, 97th Cong., 2d Sess. 8 (1982).

---

[5] Plaintiffs note (Br. at 16) that the Senate report on the original statute indicated that nothing in the legislation precludes "appropriate judicial review" of matters committed to the Secretary's discretion.  S. Rep. No. 329, 97th Cong., 2d Sess. 8 (1982).  Given the wording of the Act, that "appropriate" review is obviously to be very limited.

18

Moreover, the second amendment to the Act in 1986, further reflects the congressional intent to give full effect to the Secretary's exercise of discretion.  The congressional reports concerning that amendment, which expanded the types of organizations that are included as foreign missions, demonstrate the intent to leave such determinations to the informed discretion of the Secretary.  See S. Rep. No. 307, 99th Cong., 2d Sess. 23 (1986) (amendments do not require the Secretary to act, but "enable the Secretary of State to apply [Foreign Missions Act] controls in appropriate circumstances"); H.R. Conf. Rep. No. 952, 99th Cong., 2d Sess. 28 (1986).

This legislative intent dovetails with the authorities cited in the prior section which establish that the federal courts have a very limited role to play in matters affecting foreign relations.

2.  Even more relevant to this case is the Supreme Court's recognition that, because of the rapidly changing and "explosive nature of contemporary international relations," legislative delegations of authority to the Executive in the area of foreign relations msut often be broader than those in domestic matters, and such broad delegations are to be given full effect.  Zemel v. Rusk, 381 U.S. 1, 17 (1965); United States v. Curtiss-Wright, 299 U.S. 304, 320-22, 324 (1936).  Accord American Ass'n of Exporters and Importers v. United States, 751 F.2d 1239, 1248 (Fed. Cir. 1985) ("[i]n the area of international trade, intimately involved in foreign affairs, Congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, or confined by anxious judicial blinders").

19

Hence, before accepting plaintiffs' arguments here that the Executive has exceeded its statutory authority, this Court must be firmly convinced that the Secretary has acted so cavalierly that he has abused the substantial discretion given him under the Act.[6]  A ruling by the Court contrary to the Secretary's pronouncement would raise the very problem Congress sought to avoid, i.e., conflicting voices speaking for the United States in the international arena.  See Curtiss-Wright Corp., 299 U.S. at 320.

In the next section, we show that not only did the Secretary not abuse his discretion under the Act, he acted fully within it by designating the PIO as a foreign mission of the PLO.

### C. The State Department Was Well Within Its Authority In Determining That The PIO Was A Foreign Mission Of The PLO.

1.  Simply stating the uncontroverted facts here demonstrates the manifest reasonableness of the Secretary's action in designating the PIO as a foreign mission of the PLO.[7]

_____

[6] Even if this case did not involve foreign affairs, the Secretary's implementation of a new statute that he is charged with implementing would be entitled to substantial deference. See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 865-66 (1984); Zemel, 381 U.S. at 11; Udall v. Tallman, 380 U.S. 1, 16 (1965).

[7] Plaintiffs assert (Br. at 46 n.24) that there is a factual dispute as to whether the PLO substantially owned or effectively controlled the PIO.  However, as reflected from our citations, the Executive's finding on this point is supported by facts drawn entirely from plaintiffs' papers.  While there may be a legal dispute as to whether these facts constitute substantial ownership or effective control within the meaning of the Act, there is no dispute as to the material facts themselves at this point because we have thus far chosen to rely on uncontroverted facts rather than on any of the classified material alluded to by Deputy Secretary Whitehead.  App. 74.

The PIO is a registered agent of the PLO, and it represented no other foreign principals. App. 35. The PIO actively and regularly carried out advocacy activities on behalf of the PLO. App. 34-35, 76. The PIO conducted no activities on its own behalf that benefitted any other principal. App. 35.

In carrying out these activities, the salary of the PIO Director was paid by an organization of which the PLO is a member. App. 75-76. The remainder of the PIO's budget was funded entirely by the finance arm of the PLO. App. 75-76. The Director of the PIO had direct contact with the PLO. App. 76. The PIO Director used office funds apparently provided by the PLO to purchase his cars and house. App. 76.[8]

Under these circumstances, no persuasive argument can be made that the Secretary's broad discretion was abused in finding that the PIO was "substantially owned and/or effectively controlled" by the PLO.[9]

---

[8] Moreover, in a recent U.S. television interview on January 8, 1988, PLO chairman Yasir Arafat complained about United States policy involving the Middle East. In answering questions from ABC news reporter Ted Koppel, Arafat stated: "Are you against international legality, Mr. Koppel? It seems that you are not only with closing our offices, but also you are against international legality and international United Nations resolutions." See "Nightline" transcript, "Talking with Yasir Arafat," at 5 (Jan. 8, 1988). Thus, the Chairman of the PLO apparently was complaining about the closing of "our offices" (emphasis added) by the United States.

[9] Plaintiffs state (Br. at 23-24 n.12, 42) that the issue of whether the PIO was substantially owned or effectively controlled by the PLO (and is for that reason a foreign mission of the PLO) is not now before this Court because the district court did not reach it, even though it was the reasoning relied upon by the State Department. App. 16. Plaintiffs' claim is flatly wrong. A judgment can be supported on any ground with support in the record. See Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982); Jaffke v. Dunham, 352 U.S. 280, 281 (1957). And here, as (continued...)

21

Plaintiffs concede (Br. at 24 n.12) the funding of the PIO by the PLO, and describe the relationship between these two groups as that of grantee-grantor. This analogy does not assist them because it is apt only if the grantee is one that receives virtually all of its funds from the grantor, and does nothing other than spend that grantor's funds. In such circumstances, common sense compels that the grantor effectively controls the grantee for the obvious reason that otherwise the funds are likely to be withdrawn.

The State Department's determination of effective control here is also supported by the ruling in Communist Party v. SACB, supra. There, the Supreme Court held that the term "control," as used in a statute relating to or regulating foreign policy interests, should not be given an "arcane, technical meaning." 367 U.S. at 38. The Court noted that "substantial direction, domination, or control of one entity by another may exist without the latter's having power, in the event of non-compliance, effectively to enforce obedience to its will." Id. at 36. The Court then examined the many potential indicia of foreign control over an organization, and found that the existence of foreign control "is largely a matter of the working out of legislative policy in multiform situations of potentially great variety * * *." Id. at 40.[10]

---

[9](...continued)
shown in the text above, there is more than ample support in the record for the Executive's finding that the PLO substantially owned and/or effectively controlled the PIO.

[10] Plaintiffs cite (Br. at 24 n.12) Hull v. Eaton Corp., 825 F.2d 448, 457 (D.C. Cir. 1987), for the proposition that the
(continued...)

22

If this Court holds that the Secretary cannot define an office with the characteristics of the PIO as a foreign mission, there will be little left of the Secretary's power under the Act beyond designating an embassy or a consulate as a foreign mission, a task that hardly would require the type of detailed definition set out in the Foreign Missions Act. 22 U.S.C. 4302(a)(4). Yet, the legislative history of the 1986 amendment to the Act, which broadened the definition of "foreign mission," shows that Congress meant the Secretary to use his expert judgment in designating foreign missions despite efforts to obscure or disguise them. See infra, at 26.

2. Plaintiffs nevertheless contend (Br. at 20) that, even though the State Department obviously meant to designate the PIO as a foreign mission, there was a technical flaw in its designation document. They argue that although the Deputy Secretary described the PLO as an organization that had been given privileges under American law (App. 16), he failed to state that the PLO represents a territory or a political entity, as required by the Act.

This overly technical argument is without merit because the State Department documents make clear that the Executive found the PLO to fall within the meaning of the statute. The State

---

[10](...continued)
determining factor here should be control over the day-to-day operations of an office. Hull, however, concerned the question of a manufacturer's vicarious liability for a seller's negligence. The terms in the Foreign Missions Act are not governed by vicarious liability law, but deal with foreign affairs. Not only do the political branches enjoy plenary power in this area, but Congress has granted the Secretary explicit authority under the Foreign Missions Act to define its terms as appropriate to the proper conduct of the foreign affairs.

Department documents had to be carefully phrased because the United States does not officially recognize the PLO. Nevertheless, the PLO is the type of entity contemplated by the Act since it is obviously an organization that represents a political entity: the PLO itself.

Plaintiffs' assertion (Br. at 21 n.9) that the Act cannot be so read is wrong. The wording of the Act can be read to cover as a foreign mission an entity controlled by an organization that represents a political entity even if that political entity is not one that we recognize as having a constituency. To read the Act otherwise is to defeat the congressional purpose behind the 1985 and 1986 amendments, which was to ensure that the Secretary has the ability to deal with complex and fluid situations as appropriate. See _infra_, at 26.[12]

Plaintiffs' argument on this point asks the Court to take precisely the type of action upsetting delicate foreign affairs matters that both it and the Supreme Court have on numerous occasions instructed against. See _supra_, at 14-15. Given the significant foreign relations concerns at stake here and our non-recognition policy of the PLO, plaintiffs' claim should be rejected.

3.   Plaintiffs also attempt (Br. at 21-23) to escape the coverage of the Act by giving the delegation to the Secretary a narrow reading that conflicts with the statute's plain language. The district court correctly rejected this argument. App. 106-07.

---

[12] Moreover, the PLO claims to represent the Palestinians as a political entity. See _infra_, at 28-29 n.17.

24

Plaintiffs argue that, although the Act does not say so, Congress meant to limit the word "entity" in the Act to commercial establishments.  Besides adding words that Congress did not, this argument collides head-on with the admonitions cited earlier (supra, at 19) that the courts should not read restrictively a legislative delegation to the Executive in the foreign affairs area.

Any "mission to or agency or entity in the United States" which meets the other requirements of Section 4302(a)(4) may be designated by the Secretary as a foreign mission.  Congress did not specifically define the terms "mission to or agency or entity in."  However, given the ordinary meaning of these words,[13] the discretion Congress granted the Secretary to define terms in the statute, and the PIO's status as a registered agent under the Foreign Agents Registration Act (22 U.S.C. 611, et seq.), the State Department properly found that the PIO qualifies for designation as an agency or entity.

The Secretary's conclusion is also consistent with the evolution of the statutory definition of "foreign mission," which has been expanded twice to give the Secretary greater power to regulate foreign missions.

As originally defined, an office that met various other statutory requirements could qualify as a "foreign mission" under the Foreign Missions Act if it was an "official mission."  Pub.

---

[13] When Congress fails to define a term, a reviewing court may look to the ordinary meaning of the words employed.  Russello v. United States, 464 U.S. 16, 21 (1983).  The PIO plainly qualifies under the definitions for "agency" and "entity" given in The American Heritage Dictionary (2d College Ed. 1982), and Webster's Ninth New Collegiate Dictionary (1985).

L. 97-241, Title II, Sec. 202; 96 Stat. 283-84. But, in 1985, Congress expanded the term "official mission" to "mission to or agency in" the United States. Pub. L. 99-93, Title I, Sec. 127; 99 Stat. 418. It again enlarged the scope of the Act in 1986 to include also an "entity." Pub. L. 99-569, Title VII, Sec. 701; 100 Stat. 3204. Nevertheless, plaintiffs urge that even the broad word "entity" as used in the Act really means "commercial enterprise." If Congress meant to reach only certain commercial entities, the amendment could have been so restricted.

Moreover, one of the legislative reports cited by plaintiffs (Br. at 22) supports a broad interpretation of the term "mission to or agency or entity in." The Senate Report explains that Congress twice amended the definition of foreign mission, as set forth above, to make explicit the potential reach of the Act so that foreign missions cannot frustrate congressional intent by use of "covers" that arguably avoid the reach of the Act as originally written, due to Congress's inability to predict the various masks a foreign mission might don. S. Rep. No. 99-307, supra, at 22-23 (1986).[14]

4. Plaintiffs further claim (Br. at 27 n.15) that the explicit coverage of groups like the PIO in the new Anti-Terrorism Act of 1987 (described above at 9-10) suggests that the PIO was not covered by the Foreign Missions Act. This argument is meritless. The new statute governs groups or activities

---

[14] The floor debate on the 1985 amendments also reflected general concern with the ability of "so-called unofficial missions" to use the somewhat restrictive language of the original definition as a "loophole." 131 Cong. Rec. H2991 (1985) (Rep. Mica).

connected with the PLO well beyond those that would constitute foreign missions; thus, it has a different purpose and reach than the Foreign Missions Act.[15]

Moreover, the type of argument raised by plaintiffs has been rejected on numerous occasions by the Supreme Court. The fact that Congress passes new legislation explicitly covering a situation does not mean that the prior statute did not already do so. See, e.g., United States v. New York Telephone Co., 434 U.S. 159, 177 n.25 (1977). Therefore, nothing in the new Anti-Terrorism Act suggests that t' ` State Department abused its discretion in finding the PIO covered by the Foreign Missions Act.

*      *      *      *      *

In sum, the Executive Branch acted well within its very broad authority stemming from the statute and the Constitution in designating the PIO as a foreign mission of the PLO. Therefore, the remainder of this case must be analyzed with the recognition that the Executive's action has been taken against a foreign entity that has no right whatsoever to operate in the United States, except as the political branches of the Government allow.

_____

[15] Plaintiffs also seem to dispute the Executive's ability to close the mission of a foreign entity by asserting (Br. at 25-26, 37) that the President's power is limited by the Foreign Agents Registration Act (22 U.S.C. 611 et seq.) and the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.). The former regulates persons acting on behalf of foreign principals and the latter recognizes the Executive's power to declare economic embargoes. The constitutional and statutory power here is quite distinct; it is the power to control an office operated by a foreign entity, not simply to require disclosures by lobbyists. Nothing in either statute cited by plaintiffs even hints that Congress meant to restrict in any way this separate authority.

II.  **THE STATE DEPARTMENT'S ACTION CLOSING A MISSION OF THE PLO DID NOT VIOLATE ANY FIRST AMENDMENT RIGHTS.**

A.  **Because The Executive Closed A Mission Of A Foreign Entity, No First Amendment Rights Are Implicated Here.**

As described above, the Executive decided to close the PLO mission in Washington, D.C. in order to express its disapproval of the PLO's continued support for terrorists, including the PLO's retention on its Executive Committee of an official allegedly responsible for the recent murder of a United States citizen, Leon Klinghoffer. The congressional findings in the Anti-Terrorism Act of 1987 further detail the ways in which the PLO acts against the interests of the United States and its citizens.[16]

In order to put the First Amendment analysis in this context in its proper perspective, it is essential to focus on who is asserting the First Amendment rights, and the entirely different constitutional status of foreign entities and American citizens. Foreign political entities such as the PLO, which purport to be sovereign entities, have no constitutional rights.[17]  Since the

---

[16] See Hanoch Tel-Oren v. Libya, 726 F.2d 774, 776, 799 (D.C. Cir. 1984) for an example of other PLO terrorist activities.

[17] It is explicit and long-standing U.S. policy not to recognize or negotiate with the PLO so long as it does not recognize Isael's right to exist and does not accept U.N. Security Council Resolutions 242 and 338. Nonetheless, the PLO, which purports to represent the Palestinian people considers itself a "state," or representative of one, entitled to recognition in the international arena, and claims privileges and immunities generally extended only to a sovereign nation and its representatives. The PLO has been accorded observer status at the United Nations (G.A.Res. 3237, 29 U.N. GAOR Supp. (No. 31) at 4 U.N.Doc. A/9631 (1974)). Members of the PLO Observer Mission
(continued...)

28

purpose of the PIO is to act as the "voice" of the PLO, it has only the constitutional non-status of the PLO. In any event, assuming arguendo that the PIO has an existence and legal status separate from the PLO, it is at most a foreign juridical "person" which is present here at the sufferance of the United States Government, a privilege which may be withdrawn at any time for any <u>bona fide</u> foreign policy reason.

It is true, of course, that plaintiff Rahman and other American citizens staffing the PIO have complete First Amendment rights. However, they have no right to speak <u>as</u> a representative of a putative foreign political entity. This is the only disability which has been imposed upon them here. Rahman remains wholly free, individually or in concert with others, to engage in any political speech he desires, including speech in support of, or derived from, the teachings of a foreign organization hostile to the United States. Accordingly, Rahman has suffered no cognizable deprivation of free speech rights he possesses as an individual, but only the right to speak as the alter ego of an entity against which the United States must be able to take adverse action to fulfill its plenary and necessary authority to conduct foreign affairs. We will examine each of these points in turn.

---

17(...continued) have been accorded certain privileges in the United States by virtue of the Headquarters Agreement between the United States and the United Nations (21 U.S.T. 1416). In addition, the PLO is reported to have diplomatic relations with approximately one hundred countries throughout the world. See Kassim, <u>The Palestine Liberation Organization's Claim To Status: A Juridical Analysis Under International Law</u>, 9 Den. J. Int'l L. & Policy 1, 2-3 (1980).

29

1.   There is no question that the PLO is a foreign entity for constitutional purposes and that it interacts with the United States only as a foreign entity.   As such, it has no constitutional rights.   This conclusion flows inexorably from the nature of foreign entities and their interaction with the United States as foreign entities.

The United States, as a nation among nations, is neither subject, nor sovereign, but one among equals.  See Curtiss-Wright Corp., 299 U.S. at 315-18; The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812).

The Framers of the Constitution understood that the United States, as an entity, derived its power to conduct foreign relations not from its domestic instrument of government but from its status in international law as an independent state.  Rather than conferring on the United States the power to wage war and conduct diplomacy, the authors of the Constitution understood that they were only allocating those powers among the branches of the national government and providing sufficient domestic powers to make them effective.  See Curtiss-Wright, 299 U.S. at 315-18.

Consistent with this understanding, the Supreme Court has held from the earliest times to the present that the United States as an entity possesses the full powers of a sovereign nation not by grant under the Constitution but under international law.  See, e.g., Kleindienst v. Mandel, 408 U.S. 753, 762 (1972); Fong Yue Ting v. United States, 149 U.S. 698 (1893); Schooner Exchange, 11 U.S. at 116; Penhallow v. Doane, 3 U.S. (3 Dal.) 54, 80-81 (Patterson, J.).

30

As a direct result of that sovereignty, the United States interacts with foreign entities not within the constitutional system, but as a juridical equal, on the level of international law and diplomacy.  Simply put, the PLO "lies outside the structure of the Union."  Principality of Monaco v. Mississippi, 292 U.S. 313, 330 (1934).

This principle makes sense because foreign entities such as the PLO "[have] undertaken no general obligation to abide by the constitutional norms to which the federal government and the several states are subject, nor are there any effective means to place [them] on a parity with the United States or the states for purposes of enforcement of particular norms."  Damrosch, Foreign States and the Constitution, 73 Va. L. Rev. 483, 522 (1987).  Accord L. Henkin, Foreign Affairs and the Constitution 254 (1972) (foreign governments have no constitutional rights).[18]

A natural attribute of the United States' sovereignty is the oft-mentioned "plenary" authority of the federal political branches over foreign affairs, described earlier (at 15-17).  See, e.g., Butterfield v. Stranahan, 192 U.S. 470, 492-93 (1904); Curtiss-Wright, 299 U.S. at 320.  All matters of international concern fall within federal power.  Missouri v. Holland, 252 U.S. 416, 432-35 (1920) (foreign affairs power allows the Federal

---

[18] This is not to suggest that the courts have not entertained suits by foreign nations.  Several cases of statutory interpretation and occasional dicta support the notion that foreign sovereigns should be treated the same as other juridical persons.  See, e.g., Pfizer Inc. v. India, 434 U.S. 308 (1978) (interpreting "person" in section 4 of the Clayton Act to include foreign states).

Government to regulate by treaty even subjects traditionally falling within state jurisdiction).[19]

Application of these principles here compels the conclusion that the PIO cannot be heard to assert First Amendment rights on behalf of the PLO. Because the PLO purports to be an independent foreign entity, it has no constitutional rights. While the United States does not have diplomatic relations with the PLO, this fact does not affect this basic principle. Certainly, the PLO cannot claim to have greater constitutional rights than foreign entities recognized as such by the United States. Since, the PIO was substantially owned or effectively controlled by the PLO, it has only the constitutional non-status of the PLO. Thus, ordering it to cease operating as a foreign mission does not implicate the First Amendment in any way.[20]

2.  Even assuming that the PIC had an identity separate from the PLO, as a legal and foreign policy matter because it was substantially owned or effectively controlled by the PLO, it may nonetheless be closed pursuant to the political branches' plenary authority to prohibit foreign encroachments.

---

19 Thus, United States courts will not even take cognizance of a constitutional (or other) claim by a foreign political entity unless the Executive recognizes it. United States v. Pink, 315 U.S. 203 (1942). The "established rule" is one of "complete deference to the executive branch" in its determination whether to grant a foreign entity access to United States courts. Pfizer, Inc., 434 U.S. at 319-20. Accordingly, the political branches may deny foreign entities as such all constitutional rights and preclude them from seeking to vindicate those rights in United States courts.

20 Contrary to plaintiffs' rhetoric (Br. at 33), this case does not involve guilt of one party by association with another party. Rather, here, the first party has been found to be the alter ego of the second party.

As described earlier, the Supreme Court has repeatedly emphasized that the power to exclude or to deport foreign nationals is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers -- a power to be exercised exclusively by the political branches of government." <u>Mandel</u>, 408 U.S. at 765. "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of foreigners. <u>Oceanic Steam Navigation Co.</u> v. <u>Stranahan</u>, 214 U.S. 320, 339 (1909). Accord, <u>Fiallo</u> v. <u>Bell</u>, 430 U.S. 787, 792 (1977).

The Supreme Court has noted that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power and maintenance of republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." <u>Harisiades</u>, 342 U.S. at 588-89. See also <u>Galvan</u> v. <u>Press</u>, 347 U.S. 522, 531 (1954) ("that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government").

Pursuant to this sweeping power over entry into the United States, "Congress regularly makes rules that would be unacceptable if applied to citizens." <u>Fiallo</u>, 430 U.S. at 792. Accord <u>Scales</u> v. <u>United States</u>, 367 U.S. 203, 222 (1961); <u>Mathews</u> v. <u>Diaz</u>, 426 U.S. 67, 80 (1976).

33

Specifically, Congress may exclude aliens on the basis of criteria that would clearly be proscribed in the domestic arena, such as political beliefs, sex, and illegitimacy. See, e.g., Kleindeinst v. Mandel, supra; Fiallo v. Bell, supra. At most, courts may review these congressional policy choice to determine whether they are supported by a "facially legitimate and bona fide reason." Fiallo, 430 U.S. at 795. If such a reason exists, "the courts may neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interest of those who seek some communication with the applicant." Mandel, 408 U.S. at 770.

In short, the basic rationale underlying the Executive action here is that "[i]t is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self preservation, to forbid the entrance of foreigners within its domain, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." Ekiu v. United States, 142 U.S. 651, 659 (1892). Accord Galvan, 347 U.S. at 530-32. Accordingly, deportation is not viewed as "punishment," but merely withdrawal of the privilege of remaining in the United States. See Bugajewitz v. Adams, 228 U.S. 585, 591 (1913).

There is no principled basis for concluding that Congress has less authority with respect to fictional juridical persons, such as the PIO, which was essentially a foreign organization because of its tie to the PLO, than it does over individual aliens. Because physical removal of an entity such as the PIO from the country is obviously impossible, the ability to order

34

cessation of its organizational activities is within the Government's authority.

Here, the Executive has taken action pursuant to the broad power of the political branches over alien encroachments and foreign affairs. Even accepting plaintiff's argument that the PIO was an entity separate from the PLO, the political branches of our Government nevertheless have the authority to stop incursions by such foreign juridical "persons."[21] As a foreign "person" because of its substantial ownership or effective control by the PLO, the PIO was subject to closure for any <u>bona fide</u> foreign policy reason, regardless of whether that reason is premised on ideological disagreement with the foreign entity to which the PIO was allied.

Accordingly, the PIO either as an official representative of the PLO, or an entity substantially owned or effectively controlled by it, may be barred from intruding into this country consistent with the Constitution. The action taken here -- prohibiting the maintenance of an office -- was a permissible way of accomplishing this power.

3.   As a citizen, plaintiff Rahman enjoys the full protection of the First Amendment and other constitutional

---

[21] For obvious reasons, even if the PIO and the PLO denied their alleged link -- which the PIO has not -- such a denial would not be controlling. For example, the Supreme Court accepted Congress's definition of the Communist Party as an organization "substantially directed, dominated or controlled" by a foreign power even though the Party itself vigorously resisted such a designation. See <u>Communist Party</u>, 367 U.S. at 8-9; see also <u>First National City Bank</u> v. <u>Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611 (1983) (Cuban bank, established by Cuban government as separate juridical entity, would not be so treated due to relationship between the bank and the Cuban government).

provisions. But he does not have a constitutional right to act as the agent or representative of a foreign entity such as the PLO. Put simply, there is no First Amendment right to speak as a foreign entity. The political branches, as they have done here pursuant to their extraordinarily broad foreign affairs authority, may forbid Rahman from establishing a formal agency relationship with the PLO -- a hostile foreign entity. Looked at another way, the political branches may forbid Rahman from speaking as the personification of the PLO.

Any contrary conclusion would render the political branches' plenary and necessary authority to preserve national sovereignty largely chimerical. Also, a prohibition such as this one, which extends only to conveying ideas in the name of another but does not otherwise in any way impede the transmittal of those ideas, does no discernible harm to the First Amendment rights of the speaker.

If the political branches were foreclosed from taking any action against a foreign entity because it conducted its operations through American citizens or alter ego domestic organizations, then the Federal Government would be unable to exercise its clear authority to regulate or bar a foreign presence from the United States.

For example, if the Federal Government has severed diplomatic relations with a foreign nation and expelled its diplomats, then that government could not continue its operations by having American citizens hold themselves out as the nation's "embassy." As the Supreme Court explained, "[m]eans for effective resistance against foreign incursion -- whether in the

form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power -- may not be denied to the national legislature." Communist Party, 367 U.S. at 96 (footnote omitted). Indeed, the Court in that case went so far as to say that to find a constitutional bar to registration and disclosure requirements of foreign-dominated groups would "make a travesty of [the First] Amendment and the great ends for the well-being of our democracy that it serves." Id. at 89.

Moreover, it is crucial to recognize that the Executive's action went no further than was necessary to accomplish the legitimate foreign policy objective.  The State Department acted here to deny only the PLO a presence in this country; its order has no effect on the right of plaintiff Rahman to say anything be chooses in support of the PLO.  And, if Rahman wishes to open an office for the purpose of expressing approval of the policies and actions of the PLO, he is free to do so, as long as it is not done in a form owned or controlled by the PLO.[22]

It is difficult to discern how this restriction could significantly affect the content or persuasiveness of the speaker's message.  To be sure, it is conceivable in some circumstances that speaking in the name of a foreign entity would enhance the visibility and audience of the agent.  But this is not an advantage protected by the Constitution, because, by

---

22 Accordingly, plaintiffs' implication (Br. at 31-32) that Rahman has been barred from acting collectively is simply wrong.

definition, it is one derived from the existence of an entity without First Amendment rights. If the reason more people are listening is because the agent is speaking in the name of a foreign principal, then it follows that the prohibition against the agency relationship does not impede the <u>agent's</u> ability to contribute to the marketplace of ideas; it only affects negatively his master's unprotected voice. Simply put, the citizen-agent cannot have it both ways. He may not claim the right to enhance his speech by stepping into the shoes of a foreign entity without accepting the constitutional disabilities that flow from this foreign status.

Because Rahman is free to express views favoring the PLO, and to found an organization to do so in order to reach a wider audience, there is thus no credible argument that the Government has acted here to silence his point of view or to limit domestic debate.[23] The only thing the Government has curbed is the PLO itself; all citizens retain their rights to espouse the same views as the PLO if they wish, and even to band together to do so.

It is important to emphasize that this sort of restriction is not premised on the content of the political beliefs or views espoused by the speaker, but on the speaker's relationship with a

---

[23] For this reason, this case does not involve the principle, cited by plaintiffs (Br. at 35), that our society is strong enough that its citizens can be trusted to determine for themselves which views to reject. As we have repeatedly emphasized, plaintiffs' views can still be heard and considered, and accepted or rejected by the American public as appropriate. The Executive has not acted to stifle debate, but instead to make clear to the PLO that it cannot continue to support terrorism while maintaining an office in Washington, D.C.

foreign entity.  The Supreme Court has recognized and attached significance to this distinction in analogous contexts.  For example, in the <u>Communist Party</u> case, the Court emphatically rejected the assertion that it was permitting the imposition of burdens against "any group which pursues unpopular political objectives or which expresses an unpopular political ideology." 367 U.S. at 104.  As the Court put it:

> Nothing which we decide here remotely carries such an implication.  The Subversive Activities Control Act applies only to <u>foreign-dominated</u> organizations which work primarily to advance the objectives of a world movement controlled by the government of a <u>foreign</u> country * * *.  It applies only to organizations directed, dominated, or controlled by a <u>particular foreign</u> country.

<u>Ibid</u>. (emphasis in original).

Similarly, the Supreme Court upheld restrictions on travel by American citizens to Cuba.  In both cases, the court distinguished prior cases invalidating international travel restrictions on Communist Party members on the ground that the Communist Party restrictions were based on political belief and affiliation, while the restriction on travel to Cuba was based on the current policy of the United States toward Cuba's government. <u>Zemel</u>, 381 U.S. at 13; <u>Wald</u>, 468 U.S. at 241.  Compare <u>Kent</u> v. <u>Dulles</u>, 357 U.S. 116 (1958); <u>Aptheker</u> v. <u>Secretary of State</u>, 378 U.S. 500 (1964).  In short, the fact that ideological differences often motivate the political branches to take adverse action against a foreign political entity does not mean that restrictions on United States citizens vis-a-vis that entity are "content-based" for First Amendment purposes.

39

In addition, plaintiffs' assertion (Br. at 6, 28, 41 n.21) that the PIO acted no differently from normal lobbying activities carried out on behalf of foreign countries is highly misleading. Lobbyists normally are part of law firms or public relations groups that are not owned or controlled by a lone foreign entity; nor do they conduct their activities for the benefit of a sole foreign entity. Thus, lobbyists do not attempt to operate a mission for a foreign entity. Affirmance of the State Department's action here would have no impact on the activities of lobbyists.

Accordingly, both this Court, in denying the injunction pending appeal, and the district court correctly concluded that plaintiffs' First Amendment rights have been preserved. App. 110-11.[24]

### B. Even If First Amendment Rights Are Implicated, They Are Overcome By The Valid Foreign Policy Actions Of The Executive Here.

1. As the Supreme Court has made clear in any event, even if a governmental regulation restricts an individual's freedom of speech, that regulation is not necessarily invalid. Regulations relating to foreign policy interests, for example, have been upheld over claims of First Amendment infringement. See, e.g.,

---

[24] Plaintiffs' contention (Br. at 10, 45-46) that discovery is needed, or that there are factual disputes on this point are puzzling. Plaintiffs' speculation that the State Department wished to silence their political message makes no sense since the State Department has emphasized that plaintiffs are free to speak as they wish, as long as it is not in the form of a mission of the PLO. Furthermore, the State Department has fully explained its foreign policy purpose for taking action against the PLO. App. 17. Plaintiffs have not attempted to attack the reasonableness of this motivation, and the district court correctly recognized that it is not a subject for judicial review. App. 105.

Haig v. Agee, 453 U.S. at 308-09 (passport revoked because speech activities abroad likely to damage foreign policy of the United States); Finzer v. Barry, 798 F.2d 1450 (D.C. Cir. 1986), cert. granted, 107 S.Ct. 1282 (1987) (upholding D.C. statute limiting protests and demonstrations in front of foreign embassies here).

Indeed, in Mandel, 408 U.S. 753, the Supreme Court held that First Amendment cases are no exception to the doctrine of judicial deference to government decisions potentially affecting the Government's foreign policy interests. In Mandel, the plaintiffs had claimed infringement of their First Amendment rights due to the Attorney General's refusal to grant a temporary non-immigrant visa to a Belgian Marxist whom plaintiffs had invited to this country. The Supreme Court acknowledged that the Attorney General's action implicated First Amendment concerns (id. at 765), but held that, when the Government states a "facially legitimate and bona fide" reason for a decision made pursuant to the plenary power of the Government over exclusion of aliens, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." Id. at 769-70.

The identical principle should be applied here. Plaintiffs argue that their First Amendment rights allow them to override the Executive's plenary power to regulate the activities of foreign missions in this country. As in Mandel, the Executive has stated a facially legitimate and bona fide reason for its action.

41

Thus, even if this Court reads the State Department's order as affecting plaintiffs' associational rights, the closure order is permissible because it furthers a <u>bona fide</u> foreign policy objective, and does not materially affect the potential for debate on any issues that plaintiffs wish to discuss publicly or privately.  See also <u>United States</u> v. <u>Harriss</u>, 347 U.S. 612, 626 (1954) (legitimate governmental interests overcome First Amendment attack on Federal Regulation of Lobbying Act even if some deterrent effect on speech is assumed); <u>Buckley</u> v. <u>Valeo</u>, 424 U.S. 1, 29-30 (1976) (limits on political campaign contributions outweigh associational interests even if only to preserve the <u>appearance</u> of the integrity of the electoral system).

2.   The State Department's action is valid even if the Court uses a test for governmental measures that affect First Amendment rights outside the context of foreign relations.

In <u>United States</u> v. <u>O'Brien</u>, 391 U.S. 367, 377 (1968), the Supreme Court stated the following test to determine the constitutionality of government regulations that "incidentally" burden speech:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[25]

---

25 The Supreme Court has apparently also added the criterion of whether there are alternative means of communication

(continued...)

As our prior discussion demonstrates, all of these factors have been met in this case. First, plaintiffs do not attempt to dispute that it is within the constitutional power of the political branches of our Government to bar operation of a mission of a foreign entity. Second, closing the PLO mission here further a substantial foreign policy interest of reinforcing our opposition to PLO-supported terrorism. Third, the State Department action is unrelated to suppression of free expression since Rahman and others are left open to advocate the views held by the PLO; the purpose of the Executive action, as explained by the State Department (App. 17) is to discourage terrorism. Fourth, in leaving Rahman free to advocate, the Government has taken the most limited means possible of shutting down the PLO mission while minimally affecting First Amendment freedoms.[26]

Finally, in assessing the available alternative means of communication, it is important to note what the restriction on a relationship with a foreign political entity does not do. In the case of the closure at issue, it does not prevent anyone in the United States from engaging in independent advocacy of the Palestinian cause, raising money from the public, or using personal funds in any amount for this purpose.

---

[25](...continued)
available. See City of Renton v. Playtime Theatres, 475 U.S. 41, 53-54 (1986).

[26] We note that the O'Brien standards have been used in upholding restrictions on the importation of publications from foreign countries under the Trading with the Enemy Act. See, e.g., Teague v. Regional Commissioner of Customs, 404 F.2d 441, 445 (2d Cir. 1968), cert. denied, 394 U.S. 977 (1969).

To summarize, the State Department order to the PIO to cease operations does not burden plaintiffs' individual rights to free speech and association; it prohibits only their practice of acting as a mission for the PLO. Nevertheless, even if the closure order is read to implicate plaintiffs' ability to distribute information or associate without restriction, it is justified as an incidental effect of the Government's power to preclude foreign encroachments and conduct foreign policy.

### III. PLAINTIFFS' DUE PROCESS RIGHTS WERE NOT INFRINGED.

### A. A Hearing Here Would Have Served No Purpose, And Was Thus Not Required Under The Due Process Clause.

Foreign entities such as the PLO obviously do not have due process rights since they are not part of our constitutional scheme. See supra, at 31. Cf. South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966) (states are not covered by the Due Process Clause). Plaintiffs nevertheless contend (Br. at 42-44) that they were entitled to a hearing before the PIO was designated as a mission of the PLO. This contention is incorrect.

The Supreme Court has applied the common sense notion that an individual is ordinarily entitled to a hearing if there is a purpose to be served by such a hearing. See Codd v. Velger, 429 U.S. 624 (1977). There, a police officer sought a hearing to contest his dismissal and to answer a stigmatizing part of his record, but he did not dispute the critical fact that he had attempted suicide, which was the reason given for his dismissal.

44

The case at bar is nearly identical.  Plaintiffs seek a hearing; yet, their own papers reveal ample facts to support the State Department's conclusion under the Foreign Missions Act that the PIO operated as a mission of the PLO.  Thus, plaintiffs do not contest the facts that justify the agency's finding and designation.

As in Codd v. Velger, no hearing was necessary here since the key facts, rather than the legal or foreign policy conclusions to be drawn from them, are not disputed.  Plaintiffs merely wished to argue that a different legal conclusion should be drawn from those uncontroverted facts.[27]  But the Due Process Clause does not mandate a hearing for that purpose.

**B.   Since Plaintiffs' Conduct Fell Within The Heart Of The Conduct Covered By The Foreign Missions Act, They Cannot Attack The Statute As Unconstitutionally Vague.**

Plaintiffs argue (Br. at 39-42) that the Foreign Missions Act is unconstitutionally vague as applied by the district court. They base their claim on the district court's decision not to reach the "substantial ownership or effective control" issue because of its finding that the PIO was covered by the Act in light of its "other activities" on behalf of the PLO.  App. 108.

---

[27] Plaintiffs have given no indication that they wish to show that Rahman disregarded orders or directions from the PLO, or otherwise took actions that would demonstrate independence despite the outward compelling signs of PLO substantial ownership or effective control.  We note that Rahman submitted a somewhat lengthy declaration in the district court (App. 22-28), but provided no details or specifics regarding his dealings with the PLO leadership over the past several years.  In light of the apparent absence of any desire by Rahman to reveal more to the Government than is already shown by the public papers in this case, the call for a hearing rings rather hollow.

45

However, the State Department ordered the closing of the PIO because it was substantially owned or effectively controlled by the PLO (App. 16-17), and, as this brief shows, we are defending the Executive's action on the grounds stated by the State Department.  Consequently, if the Court accepts our argument that the PIO was validly found to be a mission of the PLO, because of its substantial ownership or effective control, this vagueness allegation disappears.

If the vagueness argument nonetheless survives, it is unavailing in any event.  If the PIO is substantially owned or effectively controlled by the PLO, as we contend, it is not affected by any alleged vagueness in the statute.  Therefore, the Court should not consider plaintiffs' vagueness claim, which is in essence raised on behalf of some other hypothetical litigant. See Haig v. Agee, 453 U.S. at 309 n. 61 ("since Agee's conduct falls within the core of the regulation, he lacks standing to contend that the regulation is vague and overbroad");  Young v. American Mini Theatres, 427 U.S. 50, 58-59 (1976); Parker v. Levy, 417 U.S. 733, 755 (1974); Harriss, 347 U.S. at 618.

Even if the vagueness doctrine were held to apply to this case, it would not affect the validity of the Secretary's order because the doctrine does not require impossible standards of specificity.  See United States v. Petrillo, 332 U.S. 1, 7 (1947).  The purpose of the "void for vagueness" doctrine is to assure that individuals have adequate notice of the conduct that will bring them within the reach of a statutory provision or regulation.  See Boutilier v. INS, 387 U.S. 118, 124 (1967).

46

The degree of vagueness that the Constitution tolerates depends in part upon the nature of the enactment.  Thus, economic regulations and statutes with civil rather than criminal penalties are subject to a more lenient test.  See, e.g., Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, (1982).  As discussed already (at 19), the need for flexibility in regulations affecting foreign policy interests is even more compelling.  See Zemel, 381 U.S. at 17; Curtiss-Wright, 299 U.S. at 321-22.  Thus, to prevail on a vagueness claim here, plaintiffs must present an especially strong case, which they have failed to do.

Applying these, or even the strictest standards, the Foreign Missions Act provides sufficient guidance to enable a reasonable person to avoid operating a foreign mission.  As we have already pointed out (at 40), the nature of the operation of the PIO stands in marked contrast to that of a law or public relations firm doing lobbying work on behalf of foreign entities.  There is thus very little danger of lobbyists becoming concerned about their ability to operate in light of the Secretary's application of the Foreign Missions Act to the PIO.[28]

---

[28] Plaintiffs incorrectly state (Br. at 39) that the Government itself does not know the bounds of the Act.  This claim is apparently based on the fact that the State Department has not told plaintiffs precisely how they may reorganize in order to operate.  The State Department has informed plaintiffs that they are free to operate as long as they are not substantially owned or effectively controlled by the PLO; there is no obligation of which we are aware that the Government give more detailed advice on how to avoid coming within the terms of a statute.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

ABRAHAM D. SOFAER
  Legal Adviser

PATRICK M. NORTON
  Assistant Legal Adviser
  for Near Eastern and
  South Asian Affairs

JOHN B. REYNOLDS
  Attorney Adviser
  U.S. Department of State

RICHARD K. WILLARD
  Assistant Attorney General

JOSEPH E. DIGENOVA
  United States Attorney

DOUGLAS LETTER
  Appellate Litigation Counsel
  Appellate Staff, Civil Division
  Room 3617, Department of Justice
  Washington, D.C.  20530
  Telephone:  (202) 633-3602

JANUARY 22, 1988

48

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 1988, I served the foregoing Brief for the Appellees by causing two copies to be hand delivered to:

Steven Shapiro
American Civil Liberties Foundation
132 West 43d St.
New York, NY   10036

Arthur Spitzer
ACLU
1400 20th St., N.W.
Washington, D.C.   20036

DOUGLAS LETTER
Attorney

49