# EXHIBIT J

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 2
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490   Filed 05/06/14   Page 1 of 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

          vs.                                                    No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

**DECLARATION OF KENT A. YALOWITZ IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON
DEFENDANTS' FOURTH AFFIRMATIVE DEFENSE**

KENT A. YALOWITZ hereby declares:

1.      I am a member of the bar of this Court and of the law firm of Arnold & Porter

LLP, counsel for the plaintiffs in the above-captioned action.

2.      Attached to this declaration as Exhibit A are true and correct copies of the

following Plaintiffs' Trial Exhibits:

| **EXHIBIT A**<br>(tabs below correspond to trial exhibit numbers) | **Plaintiffs' Designated Trial Exhibit** |
|---|---|
| A.532 | Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (September 28, 1995). |
| A.1076 | PLO Constitution (amended 1968). |

3.      Attached to this declaration as Exhibit B is a true and correct excerpted copy of

Defendants' Objections and Responses to the [Fifth] Set of Interrogatories From All Plaintiffs

(To The Goldberg Plaintiffs), dated December 21, 2012.

4.     Attached to this declaration as Exhibit C is a true and correct excerpted copy of the Defendants' Objections and Responses to Plaintiffs' First Request for Admissions to Defendants (To The Sokolow Plaintiffs), dated December 21, 2012.

5.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       May 2, 2014

_____
Kent A. Yalowitz

# EXHIBIT A.532

 Israel Ministry of Foreign Affairs

**PLAINTIFF'S EXHIBIT**  532

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V |
ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip
#### Washington, D.C., September 28, 1995

The Government of the State of Israel and the Palestine Liberation
Organization (hereinafter "the PLO"), the representative of the Palestinian
people;

#### PREAMBLE

**WITHIN** the framework of the Middle East peace process initiated at
Madrid in October 1991;

**REAFFIRMING** their determination to put an end to decades of
confrontation and to live in peaceful coexistence, mutual dignity and
security, while recognizing their mutual legitimate and political rights;

**REAFFIRMING** their desire to achieve a just, lasting and comprehensive
peace settlement and historic reconciliation through the agreed political
process;

**RECOGNIZING** that the peace process and the new era that it has
created, as well as the new relationship established between the two
Parties as described above, are irreversible, and the determination of the
two Parties to maintain, sustain and continue the peace process;

**RECOGNIZING** that the aim of the Israeli-Palestinian negotiations within
the current Middle East peace process is, among other things, to establish
a Palestinian Interim Self-Government Authority, i.e. the elected Council
(hereinafter "the Council" or "the Palestinian Council"), and the elected
Ra'ees of the Executive Authority, for the Palestinian people in the West
Bank and the Gaza Strip, for a transitional period not exceeding five years
from the date of signing the Agreement on the Gaza Strip and the Jericho
Area (hereinafter "the Gaza-Jericho Agreement") on May 4, 1994, leading
to a permanent settlement based on Security Council Resolutions 242 and
338;

**REAFFIRMING** their understanding that the interim self-government
arrangements contained in this Agreement are an integral part of the
whole peace process, that the negotiations on the permanent status, that
will start as soon as possible but not later than May 4, 1996, will lead to the
implementation of Security Council Resolutions 242 and 338, and that the
Interim Agreement shall settle all the issues of the interim period and that
no such issues will be deferred to the agenda of the permanent status
negotiations;

**REAFFIRMING** their adherence to the mutual recognition and
commitments expressed in the letters dated September 9, 1993, signed by
and exchanged between the Prime Minister of Israel and the Chairman of
the PLO;

**DESIROUS** of putting into effect the Declaration of Principles on Interim

Self-Government Arrangements signed at Washington, D.C. on September 13, 1993, and the Agreed Minutes thereto (hereinafter "the DOP") and in particular Article III and Annex I concerning the holding of direct, free and general political elections for the Council and the Ra'ees of the Executive Authority in order that the Palestinian people in the West Bank, Jerusalem and the Gaza Strip may democratically elect accountable representatives;

**RECOGNIZING** that these elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions;

**REAFFIRMING** their mutual commitment to act, in accordance with this Agreement, immediately, efficiently and effectively against acts or threats of terrorism, violence or incitement, whether committed by Palestinians or Israelis;

**FOLLOWING** the Gaza-Jericho Agreement; the Agreement on Preparatory Transfer of Powers and Responsibilities signed at Erez on August 29, 1994 (hereinafter "the Preparatory Transfer Agreement"); and the Protocol on Further Transfer of Powers and Responsibilities signed at Cairo on August 27, 1995 (hereinafter "the Further Transfer Protocol"); which three agreements will be superseded by this Agreement;

**HEREBY AGREE** as follows:

### CHAPTER I - THE COUNCIL

### ARTICLE I
**Transfer of Authority**

1. Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli military government and its Civil Administration to the Council in accordance with this Agreement. Israel shall continue to exercise powers and responsibilities not so transferred.

2. Pending the inauguration of the Council, the powers and responsibilities transferred to the Council shall be exercised by the Palestinian Authority established in accordance with the Gaza-Jericho Agreement, which shall also have all the rights, liabilities and obligations to be assumed by the Council in this regard. Accordingly, the term "Council" throughout this Agreement shall, pending the inauguration of the Council, be construed as meaning the Palestinian Authority.

3. The transfer of powers and responsibilities to the police force established by the Palestinian Council in accordance with Article XIV below (hereinafter "the Palestinian Police") shall be accomplished in a phased manner, as detailed in this Agreement and in the Protocol concerning Redeployment and Security Arrangements attached as Annex I to this Agreement (hereinafter "Annex I").

4. As regards the transfer and assumption of authority in civil spheres, powers and responsibilities shall be transferred and assumed as set out in the Protocol Concerning Civil Affairs attached as Annex III to this Agreement (hereinafter "Annex III").

5. After the inauguration of the Council, the Civil Administration in the West Bank will be dissolved, and the Israeli military government shall be withdrawn. The withdrawal of the military government shall not prevent it from exercising the powers and responsibilities not transferred to the Council.

6. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC"), Joint Regional Civil Affairs Subcommittees, one for the Gaza Strip and the other for the West Bank, and District Civil Liaison Offices in the West Bank shall be established in order to provide for coordination and cooperation in civil affairs between the Council and Israel, as detailed in Annex III.

7. The offices of the Council, and the offices of its Ra'ees and its Executive

Authority and other committees, shall be located in areas under
Palestinian territorial jurisdiction in the West Bank and the Gaza Strip.

**ARTICLE II**
**Elections**

1. In order that the Palestinian people of the West Bank and the Gaza Strip
may govern themselves according to democratic principles, direct, free
and general political elections will be held for the Council and the Ra'ees
of the Executive Authority of the Council in accordance with the provisions
set out in the Protocol concerning Elections attached as Annex II to this
Agreement (hereinafter "Annex II").

2. These elections will constitute a significant interim preparatory step
towards the realization of the legitimate rights of the Palestinian people
and their just requirements and will provide a democratic basis for the
establishment of Palestinian institutions.

3. Palestinians of Jerusalem who live there may participate in the election
process in accordance with the provisions contained in this Article and in
Article VI of Annex II (Election Arrangements concerning Jerusalem).

4. The elections shall be called by the Chairman of the Palestinian
Authority immediately following the signing of this Agreement to take place
at the earliest practicable date following the redeployment of Israeli forces
in accordance with Annex I, and consistent with the requirements of the
election timetable as provided in Annex II, the Election Law and the
Election Regulations, as defined in Article I of Annex II.

**ARTICLE III**
**Structure of the Palestinian Council**

1. The Palestinian Council and the Ra'ees of the Executive Authority of the
Council constitute the Palestinian Interim Self-Government Authority,
which will be elected by the Palestinian people of the West Bank,
Jerusalem and the Gaza Strip for the transitional period agreed in Article I
of the DOP.

2. The Council shall possess both legislative power and executive power,
in accordance with Articles VII and IX of the DOP. The Council shall carry
out and be responsible for all the legislative and executive powers and
responsibilities transferred to it under this Agreement. The exercise of
legislative powers shall be in accordance with Article XVIII of this
Agreement (Legislative Powers of the Council).

3. The Council and the Ra'ees of the Executive Authority of the Council
shall be directly and simultaneously elected by the Palestinian people of
the West Bank, Jerusalem and the Gaza Strip, in accordance with the
provisions of this Agreement and the Election Law and Regulations, which
shall not be contrary to the provisions of this Agreement.

4. The Council and the Ra'ees of the Executive Authority of the Council
shall be elected for a transitional period not exceeding five years from the
signing of the Gaza-Jericho Agreement on May 4, 1994.

5. Immediately upon its inauguration, the Council will elect from among its
members a Speaker. The Speaker will preside over the meetings of the
Council, administer the Council and its committees, decide on the agenda
of each meeting, and lay before the Council proposals for voting and
declare their results.

6. The jurisdiction of the Council shall be as determined in Article XVII of
this Agreement (Jurisdiction).

7. The organization, structure and functioning of the Council shall be in
accordance with this Agreement and the Basic Law for the Palestinian
Interim Self-government Authority, which Law shall be adopted by the
Council. The Basic Law and any regulations made under it shall not be
contrary to the provisions of this Agreement.

8. The Council shall be responsible under its executive powers for the
offices, services and departments transferred to it and may establish,

within its jurisdiction, ministries and subordinate bodies, as necessary for the fulfillment of its responsibilities.

9. The Speaker will present for the Council's approval proposed internal procedures that will regulate, among other things, the decision-making processes of the Council.

### ARTICLE IV
### Size of the Council

The Palestinian Council shall be composed of 82 representatives and the Ra'ees of the Executive Authority, who will be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip.

### ARTICLE V
### The Executive Authority of the Council

1. The Council will have a committee that will exercise the executive authority of the Council, formed in accordance with paragraph 4 below (hereinafter "the Executive Authority").

2. The Executive Authority shall be bestowed with the executive authority of the Council and will exercise it on behalf of the Council. It shall determine its own internal procedures and decision making processes.

3. The Council will publish the names of the members of the Executive Authority immediately upon their initial appointment and subsequent to any changes.

4. a. The Ra'ees of the Executive Authority shall be an ex officio member of the Executive Authority.

b. All of the other members of the Executive Authority, except as provided in subparagraph c. below, shall be members of the Council, chosen and proposed to the Council by the Ra'ees of the Executive Authority and approved by the Council.

c. The Ra'ees of the Executive Authority shall have the right to appoint some persons, in number not exceeding twenty percent of the total membership of the Executive Authority, who are not members of the Council, to exercise executive authority and participate in government tasks. Such appointed members may not vote in meetings of the Council.

d. Non-elected members of the Executive Authority must have a valid address in an area under the jurisdiction of the Council.

### ARTICLE VI
### Other Committees of the Council

1. The Council may form small committees to simplify the proceedings of the Council and to assist in controlling the activity of its Executive Authority.

2. Each committee shall establish its own decision-making processes within the general framework of the organization and structure of the Council.

### ARTICLE VII
### Open Government

1. All meetings of the Council and of its committees, other than the Executive Authority, shall be open to the public, except upon a resolution of the Council or the relevant committee on the grounds of security, or commercial or personal confidentiality.

2. Participation in the deliberations of the Council, its committees and the Executive Authority shall be limited to their respective members only. Experts may be invited to such meetings to address specific issues on an ad hoc basis.

### ARTICLE VIII
### Judicial Review

Any person or organization affected by any act or decision of the Ra'ees of the Executive Authority of the Council or of any member of the Executive Authority, who believes that such act or decision exceeds the authority of the Ra'ees or of such member, or is otherwise incorrect in law or procedure, may apply to the relevant Palestinian Court of Justice for a review of such activity or decision.

### ARTICLE IX
#### Powers and Responsibilities of the Council

1. Subject to the provisions of this Agreement, the Council will, within its jurisdiction, have legislative powers as set out in Article XVIII of this Agreement, as well as executive powers.

2. The executive power of the Palestinian Council shall extend to all matters within its jurisdiction under this Agreement or any future agreement that may be reached between the two Parties during the interim period. It shall include the power to formulate and conduct Palestinian policies and to supervise their implementation, to issue any rule or regulation under powers given in approved legislation and administrative decisions necessary for the realization of Palestinian self-government, the power to employ staff, sue and be sued and conclude contracts, and the power to keep and administer registers and records of the population, and issue certificates, licenses and documents.

3. The Palestinian Council's executive decisions and acts shall be consistent with the provisions of this Agreement.

4. The Palestinian Council may adopt all necessary measures in order to enforce the law and any of its decisions, and bring proceedings before the Palestinian courts and tribunals.

5. a. In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

b. Notwithstanding the provisions of this paragraph, the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Council in the following cases only:

(I) economic agreements, as specifically provided in Annex V of this Agreement:

(2) agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council,

(3) agreements for the purpose of implementing the regional development plans detailed in Annex IV of the DOP or in agreements entered into in the framework of the multilateral negotiations, and

(4) cultural, scientific and educational agreements. Dealings between the Council and representatives of foreign states and international organizations, as well as the establishment in the West Bank and the Gaza Strip of representative offices other than those described in subparagraph 5.a above, for the purpose of implementing the agreements referred to in subparagraph 5.b above, shall not be considered foreign relations.

6. Subject to the provisions of this Agreement, the Council shall, within its jurisdiction, have an independent judicial system composed of independent Palestinian courts and tribunals.

### CHAPTER 2 - REDEPLOYMENT AND SECURITY ARRANGEMENTS

#### ARTICLE X
#### Redeployment of Israeli Military Forces

1. The first phase of the Israeli military forces redeployment will cover

populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets - as set out in Annex I, and will be completed prior to the eve of the Palestinian elections, i. e., 22 days before the day of the elections.

2. Further redeployments of Israeli military forces to specified military locations will commence after the inauguration of the Council and will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian Police, to be completed within 18 months from the date of the inauguration of the Council as detailed in Articles XI (Land) and XIII (Security), below and in Annex I.

3. The Palestinian Police shall be deployed and shall assume responsibility for public order and internal security for Palestinians in a phased manner in accordance with XIII (Security) below and Annex I.

4. Israel shall continue to carry the responsibility for external security, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

5. For the purpose of this Agreement, "Israeli military forces" includes Israel Police and other Israeli security forces.

**ARTICLE XI**
**Land**

1. The two sides view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

2. The two sides agree that West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations, will come under the jurisdiction of the Palestinian Council in a phased manner, to be completed within 18 months from the date of the inauguration of the Council, as specified below:

a. Land in populated areas (Areas A and B), including government and Al Waqf land, will come under the jurisdiction of the Council during the first phase of redeployment.

b. All civil powers and responsibilities, including planning and zoning, in Areas A and B, set out in Annex III, will be transferred to and assumed by the Council during the first phase of redeployment.

c. In Area C, during the first phase of redeployment Israel will transfer to the Council civil powers and responsibilities not relating to territory, as set out in Annex III.

d. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

e. During the further redeployment phases to be completed within 18 months from the date of the inauguration of the Council, powers and responsibilities relating to territory will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

f. The specified military locations referred to in Article X, paragraph 2 above will be determined in the further redeployment phases, within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations.

3. For the purpose of this Agreement and until the completion of the first phase of the further redeployments:

a. "Area A" means the populated areas delineated by a red line and

shaded in brown on attached map No. 1;

b. "Area B" means the populated areas delineated by a red line and shaded in yellow on attached map No. 1, and the built-up area of the hamlets listed in Appendix 6 to Annex I, and

c. "Area C" means areas of the West Bank outside Areas A and B, which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in accordance with this Agreement.

## ARTICLE XII
### Arrangements for Security and Public Order

1. In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council shall establish a strong police force as set out in Article XIV below. Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air, as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order, and will have all the powers to take the steps necessary to meet this responsibility.

2. Agreed security arrangements and coordination mechanisms are specified in Annex I.

3. A Joint Coordination and Cooperation Committee for Mutual Security Purposes (hereinafter "the JSC"), as well as Joint Regional Security Committees (hereinafter "RSCs") and Joint District Coordination Offices (hereinafter "DCOs"), are hereby established as provided for in Annex I.

4. The security arrangements provided for in this Agreement and in Annex I may be reviewed at the request of either Party and may be amended by mutual agreement of the Parties. Specific review arrangements are included in Annex I.

5. For the purpose of this Agreement, "the Settlements" means, in the West Bank the settlements in Area C; and in the Gaza Strip - the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as shown on attached map No. 2.

## ARTICLE XIII
### Security

l. The Council will, upon completion of the redeployment of Israeli military forces in each district, as set out in Appendix 1 to Annex I, assume the powers and responsibilities for internal security and public order in Area A in that district.

2. a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(I) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 2 to Annex I and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b(1) above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post.

The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in Annex I.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

## ARTICLE XIV
### The Palestinian Police

1. The Council shall establish a strong police force. The duties, functions, structure, deployment and composition of the Palestinian Police, together with provisions regarding its equipment and operation, as well as rules of conduct, are set out in Annex I.

2. The Palestinian police force established under the Gaza-Jericho Agreement will be fully integrated into the Palestinian Police and will be subject to the provisions of this Agreement.

3. Except for the Palestinian Police and the Israeli military forces, no other armed forces shall be established or operate in the West Bank and the Gaza Strip.

4. Except for the arms, ammunition and equipment of the Palestinian Police described in Annex I, and those of the Israeli military forces, no organization, group or individual in the West Bank and the Gaza Strip shall manufacture, sell, acquire, possess, import or otherwise introduce into the West Bank or the Gaza Strip any firearms, ammunition, weapons, explosives, gunpowder or any related equipment, unless otherwise provided for in Annex I.

## ARTICLE XV
### Prevention of Hostile Acts

1. Both sides shall take all measures necessary in order to prevent acts of

terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property and shall take legal measures against offenders.

2. Specific provisions for the implementation of this Article are set out in Annex I.

### ARTICLE XVI
### Confidence Building Measures

With a view to fostering a positive and supportive public atmosphere to accompany the implementation of this Agreement, to establish a solid basis of mutual trust and good faith, and in order to facilitate the anticipated cooperation and new relations between the two peoples, both Parties agree to carry out confidence building measures as detailed herewith:

1. Israel will release or turn over to the Palestinian side, Palestinian detainees and prisoners, residents of the West Bank and the Gaza Strip. The first stage of release of these prisoners and detainees will take place on the signing of this Agreement and the second stage will take place prior to the date of the elections. There will be a third stage of release of detainees and prisoners. Detainees and prisoners will be released from among categories detailed in Annex VII (Release of Palestinian Prisoners and Detainees). Those released will be free to return to their homes in the West Bank and the Gaza Strip.

2. Palestinians who have maintained contact with the Israeli authorities will not be subjected to acts of harassment, violence, retribution or prosecution. Appropriate ongoing measures will be taken, in coordination with Israel, in order to ensure their protection.

3. Palestinians from abroad whose entry into the West Bank and the Gaza Strip is approved pursuant to this Agreement, and to whom the provisions of this Article are applicable, will not be prosecuted for offenses committed prior to September 13, 1993.

### CHAPTER 3 - LEGAL AFFAIRS

### ARTICLE XVII
### Jurisdiction

1. In accordance with the DOP, the jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single territorial unit, except for:

a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified military locations, Palestinian refugees, borders, foreign relations and Israelis; and

b. powers and responsibilities not transferred to the Council.

2. Accordingly, the authority of the Council encompasses all matters that fall within its territorial, functional and personal jurisdiction, as follows:

a. The territorial jurisdiction of the Council shall encompass Gaza Strip territory, except for the Settlements and the Military Installation Area shown on map No. 2, and West Bank territory, except for Area C which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council. At this time, the jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

Territorial jurisdiction includes land, subsoil and territorial waters, in accordance with the provisions of this Agreement.

b. The functional jurisdiction of the Council extends to all powers and responsibilities transferred to the Council, as specified in this Agreement or

in any future agreements that may be reached between the Parties during the interim period.

c. The territorial and functional jurisdiction of the Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement.

d. Notwithstanding subparagraph a. above, the Council shall have functional jurisdiction in Area C, as detailed in Article IV of Annex III.

3. The Council has, within its authority, legislative, executive and judicial powers and responsibilities, as provided for in this Agreement.

4. a. Israel, through its military government, has the authority over areas that are not under the territorial jurisdiction of the Council, powers and responsibilities not transferred to the Council and Israelis.

b. To this end, the Israeli military government shall retain the necessary legislative, judicial and executive powers and responsibilities, in accordance with international law. This provision shall not derogate from Israel's applicable legislation over Israelis in personam.

5. The exercise of authority with regard to the electromagnetic sphere and air space shall be in accordance with the provisions of this Agreement.

6. Without derogating from the provisions of this Article, legal arrangements detailed in the Protocol Concerning Legal Matters attached as Annex IV to this Agreement (hereinafter "Annex IV") shall be observed. Israel and the Council may negotiate further legal arrangements.

7. Israel and the Council shall cooperate on matters of legal assistance in criminal and civil matters through a legal committee (hereinafter "the Legal Committee"), hereby established.

8. The Council's jurisdiction will extend gradually to cover West Bank and Gaza Strip territory, except for the issues to be negotiated in the permanent status negotiations, through a series of redeployments of the Israeli military forces. The first phase of the redeployment of Israeli military forces will cover populated areas in the West Bank - cities, towns, refugee camps and hamlets, as set out in Annex I - and will be completed prior to the eve of the Palestinian elections, i.e. 22 days before the day of the elections. Further redeployments of Israeli military forces to specified military locations will commence immediately upon the inauguration of the Council and will be effected in three phases, each to take place after an interval of six months, to be concluded no later than eighteen months from the date of the inauguration of the Council.

## ARTICLE XVIII
### Legislative Powers of the Council

1. For the purposes of this Article, legislation shall mean any primary and secondary legislation, including basic laws, laws, regulations and other legislative acts.

2. The Council has the power, within its jurisdiction as defined in Article XVII of this Agreement, to adopt legislation.

3. While the primary legislative power shall lie in the hands of the Council as a whole, the Ra'ees of the Executive Authority of the Council shall have the following legislative powers

a. the power to initiate legislation or to present proposed legislation to the Council;

b. the power to promulgate legislation adopted by the Council; and

c. the power to issue secondary legislation, including regulations, relating to any matters specified and within the scope laid down in any primary legislation adopted by the Council.

4. a. Legislation, including legislation which amends or abrogates existing laws or military orders, which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this

Agreement, or of any other agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.

b. The Ra'ees of the Executive Authority of the Council shall not promulgate legislation adopted by the Council if such legislation falls under the provisions of this paragraph.

5. All legislation shall be communicated to the Israeli side of the Legal Committee.

6. Without derogating from the provisions of paragraph 4 above, the Israeli side of the Legal Committee may refer for the attention of the Committee any legislation regarding which Israel considers the provisions of paragraph 4 apply, in order to discuss issues arising from such legislation. The Legal Committee will consider the legislation referred to it at the earliest opportunity.

### ARTICLE XIX
#### Human Rights and the Rule of Law

Israel and the Council shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms and principles of human rights and the rule of law.

### ARTICLE XX
#### Rights, Liabilities and Obligations

1. a. The transfer of powers and responsibilities from the Israeli military government and its civil administration to the Council, as detailed in Annex III, includes all related rights, liabilities and obligations arising with regard to acts or omissions which occurred prior to such transfer. Israel will cease to bear any financial responsibility regarding such acts or omissions and the Council will bear all financial responsibility for these and for its own functioning.

b. Any financial claim made in this regard against Israel will be referred to the Council.

c. Israel shall provide the Council with the information it has regarding pending and anticipated claims brought before any court or tribunal against Israel in this regard.

d. Where legal proceedings are brought in respect of such a claim, Israel will notify the Council and enable it to participate in defending the claim and raise any arguments on its behalf.

e. In the event that an award is made against Israel by any court or tribunal in respect of such a claim, the Council shall immediately reimburse Israel the full amount of the award.

f. Without prejudice to the above, where a court or tribunal hearing such a claim finds that liability rests solely with an employee or agent who acted beyond the scope of the powers assigned to him or her, unlawfully or with willful malfeasance, the Council shall not bear financial responsibility.

2. a. Notwithstanding the provisions of paragraphs I.d through I.f above, each side may take the necessary measures, including promulgation of legislation, in order to ensure that such claims by Palestinians including pending claims in which the hearing of evidence has not yet begun, are brought only before Palestinian courts or tribunals in the West Bank and the Gaza Strip, and are not brought before or heard by Israeli courts or tribunals.

b. Where a new claim has been brought before a Palestinian court or tribunal subsequent to the dismissal of the claim pursuant to subparagraph a. above, the Council shall defend it and, in accordance with subparagraph I.a above, in the event that an award is made for the plaintiff, shall pay the amount of the award.

c. The Legal Committee shall agree on arrangements for the transfer of all

materials and information needed to enable the Palestinian courts or tribunals to hear such claims as referred to in subparagraph b. above, and, when necessary, for the provision of legal assistance by Israel to the Council in defending such claims.

3. The transfer of authority in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

4. The Council, upon its inauguration, will assume all the rights, liabilities and obligations of the Palestinian Authority.

5. For the purpose of this Agreement, "Israelis" also includes Israeli statutory agencies and corporations registered in Israel.

## ARTICLE XXI
### Settlement of Differences and Disputes

Any difference relating to the application of this Agreement shall be referred to the appropriate coordination and cooperation mechanism established under this Agreement. The provisions of Article XV of the DOP shall apply to any such difference which is not settled through the appropriate coordination and cooperation mechanism, namely:

1. Disputes arising out of the application or interpretation of this Agreement or any related agreements pertaining to the interim period shall be settled through the Liaison Committee.

2. Disputes which cannot be settled by negotiations may be settled by a mechanism of conciliation to be agreed between the Parties.

3. The Parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both Parties, the Parties will establish an Arbitration Committee.

## CHAPTER 4 - COOPERATION

### ARTICLE XXII
### Relations between Israel and the Council

1. Israel and the Council shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other and, without derogating from the principle of freedom of expression, shall take legal measures to prevent such incitement by any organizations, groups or individuals within their jurisdiction.

2. Israel and the Council will ensure that their respective educational systems contribute to the peace between the Israeli and Palestinian peoples and to peace in the entire region, and will refrain from the introduction of any motifs that could adversely affect the process of reconciliation.

3. Without derogating from the other provisions of this Agreement, Israel and the Council shall cooperate in combating criminal activity which may affect both sides, including offenses related to trafficking in illegal drugs and psychotropic substances, smuggling, and offenses against property, including offenses related to vehicles.

### ARTICLE XXIII
### Cooperation with Regard to Transfer of Powers and Responsibilities

In order to ensure a smooth, peaceful and orderly transfer of powers and responsibilities, the two sides will cooperate with regard to the transfer of security powers and responsibilities in accordance with the provisions of Annex I, and the transfer of civil powers and responsibilities in accordance with the provisions of Annex III.

### ARTICLE XXIV
### Economic Relations

The economic relations between the two sides are set out in the Protocol on Economic Relations signed in Paris on April 29, 1994, and the Appendices thereto, and the Supplement to the Protocol on Economic Relations all attached as Annex V, and will be governed by the relevant provisions of this Agreement and its Annexes.

## ARTICLE XXV
### Cooperation Programs

1. The Parties agree to establish a mechanism to develop programs of cooperation between them. Details of such cooperation are set out in Annex VI.

2. A Standing Cooperation Committee to deal with issues arising in the context of this cooperation is hereby established as provided for in Annex VI.

## ARTICLE XXVI
### The Joint Israeli-Palestinian Liaison Committee

1. The Liaison Committee established pursuant to Article X of the DOP shall ensure the smooth implementation of this Agreement. It shall deal with issues requiring coordination, other issues of common interest and disputes.

2. The Liaison Committee shall be composed of an equal number of members from each Party. It may add other technicians and experts as necessary.

3. The Liaison Committee shall adopt its rules of procedures, including the frequency and place or places of its meetings.

4. The Liaison Committee shall reach its decisions by agreement.

5. The Liaison Committee shall establish a subcommittee that will monitor and steer the implementation of this Agreement (hereinafter "the Monitoring and Steering Committee"). It will function as follows:

a. The Monitoring and Steering Committee will, on an ongoing basis, monitor the implementation of this Agreement, with a view to enhancing the cooperation and fostering the peaceful relations between the two sides.

b. The Monitoring and Steering Committee will steer the activities of the various joint committees established in this Agreement (the JSC, the CAC, the Legal Committee, the Joint Economic Committee and the Standing Cooperation Committee) concerning the ongoing implementation of the Agreement, and will report to the Liaison Committee.

c. The Monitoring and Steering Committee will be composed of the heads of the various committees mentioned above.

d. The two heads of the Monitoring and Steering Committee will establish its rules of procedures, including the frequency and places of its meetings.

## ARTICLE XXVII
### Liaison and Cooperation with Jordan and Egypt

1. Pursuant to Article XII of the DOP, the two Parties have invited the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives on the one hand, and the Governments of Jordan and Egypt on the other hand, to promote cooperation between them. As part of these arrangements a Continuing Committee has been constituted and has commenced its deliberations.

2. The Continuing Committee shall decide by agreement on the modalities of admission of persons displaced from the West Bank and the Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder.

3. The Continuing Committee shall also deal with other matters of common concern.

Case No. 1:21-cv-03043-GPG-STV Document 69-11 filed 09/19/22 USDC Colorado pg 18
Case 1:04-cv-00397-GBD-RLE Document 490-1 Filed 05/06/14 Page 15 of 17
GxMS Friendly Print

### ARTICLE XXVIII
### Missing Persons

1. Israel and the Council shall cooperate by providing each other with all necessary assistance in the conduct of searches for missing persons and bodies of persons which have not been recovered, as well as by providing information about missing persons.

2. The PLO undertakes to cooperate with Israel and to assist it in its efforts to locate and to return to Israel Israeli soldiers who are missing in action and the bodies of soldiers which have not been recovered.

### CHAPTER 5 - MISCELLANEOUS PROVISIONS

### ARTICLE XXIX
### Safe Passage between the West Bank and the Gaza Strip

Arrangements for safe passage of persons and transportation between the West Bank and the Gaza Strip are set out in Annex I.

### ARTICLE XXX
### Passages

Arrangements for coordination between Israel and the Council regarding passage to and from Egypt and Jordan, as well as any other agreed international crossings, are set out in Annex I.

### ARTICLE XXXI
### Final Clauses

1. This Agreement shall enter into force on the date of its signing.

2. The Gaza-Jericho Agreement, except for Article XX (Confidence-Building Measures), the Preparatory Transfer Agreement and the Further Transfer Protocol will be superseded by this Agreement.

3. The Council, upon its inauguration, shall replace the Palestinian Authority and shall assume all the undertakings and obligations of the Palestinian Authority under the Gaza-Jericho Agreement, the Preparatory Transfer Agreement, and the Further Transfer Protocol.

4. The two sides shall pass all necessary legislation to implement this Agreement.

5. Permanent status negotiations will commence as soon as possible, but not later than May 4, 1996, between the Parties. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbors, and other issues of common interest.

6. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

7. Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations.

8. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

9. The PLO undertakes that, within two months of the date of the inauguration of the Council, the Palestinian National Council will convene and formally approve the necessary changes in regard to the Palestinian Covenant, as undertaken in the letters signed by the Chairman of the PLO and addressed to the Prime Minister of Israel, dated September 9, 1993 and May 4, 1994.

10. Pursuant to Annex I, Article IX of this Agreement, Israel confirms that the permanent checkpoints on the roads leading to and from the Jericho Area (except those related to the access road leading from Mousa Alami to the Allenby Bridge) will be removed upon the completion of the first phase of redeployment.

11. Prisoners who, pursuant to the Gaza-Jericho Agreement, were turned over to the Palestinian Authority on the condition that they remain in the Jericho Area for the remainder of their sentence, will be free to return to their homes in the West Bank and the Gaza Strip upon the completion of the first phase of redeployment.

12. As regards relations between Israel and the PLO, and without derogating from the commitments contained in the letters signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO, dated September 9, 1993 and May 4, 1994, the two sides will apply between them the provisions contained in Article XXII, paragraph 1, with the necessary changes.

13. a. The Preamble to this Agreement, and all Annexes, Appendices and maps attached hereto, shall constitute an integral part hereof.

b. The Parties agree that the maps attached to the Gaza-Jericho Agreement as:

a. map No. 1 (The Gaza Strip), an exact copy of which is attached to this Agreement as map No. (in this Agreement "map No. 2");

b. map No. 4 (Deployment of Palestinian Police in the Gaza Strip), an exact copy of which is attached to this Agreement as map No. 5 (in this Agreement "map No. 5"); and

c. map No. 6 (Maritime Activity Zones), an exact copy of which is attached to this Agreement as map No. 8 (in this Agreement "map No. 8"; are an integral part hereof and will remain in effect for the duration of this Agreement.

14. While the Jeftlik area will come under the functional and personal jurisdiction of the Council in the first phase of redeployment, the area's transfer to the territorial jurisdiction of the Council will be considered by the Israeli side in the first phase of the further redeployment phases.

**Done at Washington DC, this 28th day of September, 1995.**

*For the Government of*
*the State of Israel*

*For the PLO*

**Witnessed by:**

*The United States of America*

*The Russian Federation*

*The Arab Republic of Egypt*

*The Hashemite Kingdom of Jordan*

*The Kingdom of Norway*

*The European Union*

Close

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 21
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490-2   Filed 05/06/14   Page 1 of 7

# EXHIBIT A.1076

PLAINTIFF'S
EXHIBIT
1076
tabbies



JEWISH VIRTUAL LIBRARY
A Division of The American-Israeli Cooperative Enterprise

A.   Constitution of the Palestine
Liberation Organization (PLO)

1.   (July 17, 1968)

---

*Stuart Hersh comments: In addition to amending and ratification of the* Palestine
National Covenant, *the Palestine National Assembly amended and ratified
the* PLO *Constitution, at their Fourth Session in Cairo, from July 10-17, 1968.*

---

2.   Chapter I

## General Principles

Article 1. The Palestinians, in accordance with the provisions of this Constitution,
form themselves into an organization to be known as the Palestine Liberation
Organization.

Article 2. The Palestine Liberation Organization shall exercise its responsibilities in
accordance with the principles of the National Charter, the provisions of this
Constitution, and such rules, provisions and resolutions as may be issued in
conformity with these principles and provisions.

Article 3. Relationships with the Organization shall be based on commitment to
struggle and to national action, the different levels of the Organization, from its base
up to its collective leadership, being closely linked together on a basis of the
following principles: the minority shall defer to the will of the majority, confidence of
the people shall be won through persuasion, the movement of Palestinian struggle
shall be continued, the armed Palestinian struggle shall be supported, and every
possible effort shall be made to ensure that it continues and escalates, so that the
impetus of the masses towards liberation may take its course until victory is achieved.
In implementation of this principle, the Executive Committee shall draft constitutions
for the Organization's subsidiary bodies, due regard being paid to the circumstances of
Palestinians in all places where they are concentrated, to the circumstances of the
Palestinian revolution, and to the realization of the objectives of the Charter and the
Constitution.

Article 4. All Palestinians are natural members of the Palestine Liberation Organization, performing their duty to liberate their country in accordance with their abilities and qualifications. The Palestinian people is the base of this Organization.

3.    Chapter II

**The National Assembly**

Article 5. The members of the National Assembly shall be elected by the Palestinian people by direct ballot, in accordance with a system to be devised for this purpose by the Executive Committee.

Article 6.

(a) Should it be impossible to hold an election to the Assembly, the National Assembly shall continue to sit until circumstances permit of the holding of elections.

(b) If, for some reason, one or more seats in the National Assembly fall vacant, the Assembly shall appoint a member or members to fill the vacant seats.

Article 7.

(a) The National Assembly is the supreme authority of the Liberation Organization. It drafts the policy planning and programmes of the Organization.

(b) Jerusalem is the seat of the Palestine Liberation Organization.

Article 8. The National Assembly is elected for three years, and it shall be convened in regular session once every six months by its President or, should extraordinary sessions be necessary, by the President at the request of the Executive Committee, or of a quarter of its members. It shall meet in Jerusalem, Gaza, or any other place, depending on circumstances. Should the President not call such a session, the session shall convene automatically in such place and at such time as are designated in the request submitted by its members or by the Executive Committee.

Article 9. The National Assembly shall have a President's Office, consisting of the President, two Vice-Presidents, and a Secretary, elected by the National Assembly when it first meets.

Article 10. The National Assembly in ordinary session shall consider:

(a) The annual report submitted by the Executive Committee on the achievements of the Organization and its subsidiary bodies.

(b) The annual report of the National Fund and budget allocations.

(c) Proposals submitted by the Executive Committee and recommendations of Assembly Committees.

(d) Any other questions submitted to it.

Article 11. The National Assembly shall form such committees as it deems necessary to assist in the performance of its duties.

Article 12. Attendance by two-thirds of the members of the Assembly shall constitute a quorum. Decisions shall be taken by a majority vote of those present.

(b) Supervising the Organization's subsidiary bodies.

(c) Issuing regulations and instructions, and taking decisions on the Organization's activities, provided these are not incompatible with the Charter or the Constitution.

(d) Implementing the Organization's financial policy and drafting its budget.

In General, the Executive Committee shall assume all the responsibilities of the Liberation Organization, in accordance with the general policies and resolutions adopted by the National Assembly.

Article 17. The permanent headquarters of the Executive Committee shall be in Jerusalem. It shall also be entitled to hold its meetings in any other place it sees fit.

Article 18. The Executive Committee shall establish the following Departments:

(a) A Military Department

(b) A Department for Political and Information Affairs.

(c) A Palestine National Fund Department

(d) A Department for Research and Specialized Institutes.

(e) A Department for Administrative Affairs.

(f) Any other department the Committee considers necessary.

Each department shall have a Director-General and the requisite staff. The authority of each department shall be defined by special regulations drawn up by the Executive Committee.

Article 19. The Executive Committee shall establish close relations and coordinate activities between the Organization and all Arab and international Organizations, federations, and institutions which agree with its aims, or which help it in the realization of the Organization's objectives.

4.        Chapter III

**The Executive Committee**

Article 13.

(a) All members of the Executive Committee shall be elected by the National Assembly.

(b) The Chairman of the Executive Committee shall be elected by the Committee itself.

(c) The Executive Committee shall be elected from the National Assembly.

Article 14. The Executive Committee shall consist of eleven members, including the Chairman of the Board of Directors of the Palestine National Fund.

Should vacancies occur on the Executive Committee, for any reason, when the National Assembly is not sitting, they shall be filled as follows:

(a) If the vacancies are less than a third of the total membership, they shall not be filled until the first session of the National Assembly.

(b) If the vacancies amount to a third or more of the total membership of the Executive Committee, the National Assembly shall fill them at a session convened for the purpose in not more than thirty days.

(c) Should it be impossible, for valid reasons, to convene the National Assembly in extraordinary session, vacancies arising in either of the above cases shall be filled by the Executive Committee, the Assembly's Bureau and such members of the Assembly as are able to attend, at a joint assembly formed for this purpose. The new members shall be chosen by majority vote of those present.

Article 15. The Executive Committee is the highest executive authority of the Organization. It shall remain in permanent session, its members devoting themselves exclusively to their work. It shall be responsible for executing the policy, programmes and planning approved by the National Assembly, to which it shall be responsible, collectively and individually.

Article 16. The Executive Committee shall assume responsibility for:

(a) Representing the Palestinian people.

(b) Supervising the Organization's subsidiary bodies.

(c) Issuing regulations and instructions, and taking decisions on the Organization's activities, provided these are not incompatible with the Charter or the Constitution.

(d) Implementing the Organization's financial policy and drafting its budget.

In General, the Executive Committee shall assume all the responsibilities of the Liberation Organization, in accordance with the general policies and resolutions adopted by the National Assembly.

Article 17. The permanent headquarters of the Executive Committee shall be in Jerusalem. It shall also be entitled to hold its meetings in any other place it sees fit.

Article 18. The Executive Committee shall establish the following Departments:

(a) A Military Department

(b) A Department for Political and Information Affairs.

(c) A Palestine National Fund Department

(d) A Department for Research and Specialized Institutes.

(e) A Department for Administrative Affairs.

(f) Any other department the Committee considers necessary.

Each department shall have a Director-General and the requisite staff. The authority of each department shall be defined by special regulations drawn up by the Executive Committee.

Article 19. The Executive Committee shall establish close relations and coordinate activities between the Organization and all Arab and international Organizations, federations, and institutions which agree with its aims, or which help it in the realization of the Organization's objectives.

Article 20. The Executive Committee shall continue to exercise its prerogatives as long as it enjoys the confidence of the National Assembly. The Executive Committee shall submit its resignation to the new National Assembly at its first session. It is subject to re-election.

Article 21. Attendance of two thirds of its members shall constitute a quorum, and its resolutions shall be adopted by a majority vote of those present.

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 26
Case 1:04-cv-00397-GBD-RLE   Document 490-2   Filed 05/06/14   Page 6 of 7
of 38

5.     Chapter IV

**General Rules**

Article 22. The Palestine Liberation Organization shall form an army of Palestinians, to be known as the Palestine Liberation Army, with an independent command which shall operate under the supervision of the Executive Committee, and carry out its instructions and decisions, both general and particular. Its national duty is to become the vanguard in the battle for the liberation of Palestine.

Article 23. The Executive Committee shall make every effort to enroll Palestinians in Arab military colleges and institutes for military training., to mobilize the potentials and resources of the Palestinians, and to prepare them for the battle of liberation.

Article 24. A fund, to be known as the Palestine National Fund, shall be established to finance the activities of the Organization, which fund shall be administered by a board of directors to be formed in accordance with special regulations for the fund issued by the National Assembly.

Article 25. The Funds sources of revenue shall be:

(a) an impost on Palestinians imposed and collected in accordance with a special system.

(b) Financial assistance provided by Arab governments and the Arab nations.

(c) The sale of "liberation stamps" which the Arab states will issue for use in postal and other transactions.

(d) Contributions and donations.

(e) Arab loans and aid from Arab countries and friendly peoples.

(f) Any other sources of revenue approved by the Assembly.

Article 26. Committees to be known as 'Committees for the Support of Palestine' shall be formed in Arab countries to collect contributions and support the organization in its national endeavors.

Article 27. The level at which the Palestinian people is represented in Arab organizations and conferences shall be determined by the Executive Committee. The Executive Committee shall appoint a representative for Palestine to the League of Arab States.

Article 28. The Executive Committee shall be entitled to make such regulations as are necessary for the implementation of the provisions of this constitution.

Article 29. The Organization's National Assembly shall be empowered to amend, alter, or add to this constitution by a two thirds majority of its members.

6.     Chapter V

**Transitional Provisions**

Article 30. On July 10, 1968, the National Assembly convened in Cairo shall replace the former Provisional National Assembly of the Palestine Liberation Organization and exercise all the prerogatives allotted to it by this Constitution.

Article 31. The National Assembly shall sit for two years as from July 10, 1968. Should it prove impossible to hold elections for its successor, it shall meet and decide either to extend its term for another period or to form a new Assembly in such a manner as it may approve.

Article 32. The National Assembly alone is entitled to co-opt new members from time to time, as it sees fit, should this be desirable in view of the requirements of the battle for liberation and the need to strengthen national unity, in conformity with the provisions of the National Charter, in accordance with regulations to be drafted by the Executive Committee in the coming session.

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 28
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490-3   Filed 05/06/14   Page 1 of 8

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARK SOKOLOW, *et al.*,

                     Plaintiffs,

           - against -

THE PALESTINE LIBERATION ORGANIZATION,
*et al.*,

                     Defendants.

------------------------------------------------------------------X

Docket No:
04-CV-397 (GBD) (RLE)

### DEFENDANTS' OBJECTIONS AND RESPONSES TO THE [FIFTH][1] SET OF INTERROGATORIES FROM ALL PLAINTIFFS
### (TO THE GOLDBERG PLAINTIFFS)

       Defendants The Palestine Liberation Organization ("PLO") and The Palestinian

Authority ("PA") (collectively "Defendants"), by counsel, and pursuant to Rules 26(e) and 33 of

the Federal Rules of Civil Procedure, hereby respectfully submit their Objections and Responses

to the [Fifth] Set of Interrogatories from All Plaintiffs and state as follows:

### PRELIMINARY STATEMENT

       1.       The objections and responses by Defendants to the Interrogatories are based only

upon such information and documents as are currently known to Defendants.  These objections

and responses are made subject to, without prejudice to, and are not in waiver of, Defendants'

right to rely on other facts or documents at trial or to supplement their objections hereto.

       2.       The exact wording of any objections or answers contained herein may be that of

Defendants' counsel and does not necessarily purport to be that of Defendants.

---

[1] Plaintiffs entitled the interrogatories served on November 21, 2012 as the "Fourth Set of Interrogatories from All Plaintiffs."  However, Plaintiffs had previously served Defendants with a Fourth Set of Interrogatories from All Plaintiffs on September 19, 2011.  Therefore, this request is Plaintiffs' Fifth Set of Interrogatories from All Plaintiffs.

1292690.2

including all discrete subparts, permitted by that Rule as modified by Paragraph 7 of the

Scheduling Order issued by the Court on June 24, 2011 (DE 131).

14.    Defendants incorporate by reference every general objection set forth above into

the specific responses set forth below.  The failure to include any general objection in any

specific answer does not waive any general objection to the Interrogatory.

## SPECIFIC OBJECTIONS AND ANSWERS

### PLAINTIFFS' SPECIFIC DEFINITIONS:

1.    "PA" means and refers to defendant The Palestinian Authority and any ministry, agency, division, bureau, department or instrumentality thereof.

2.    "PLO" means and refers to defendant The Palestine Liberation Organization and any agency, division, bureau, department or instrumentality thereof.

3.    "Defendants" means and refers collectively to Defendants PA and PLO and any ministry, agency, division, bureau, department or instrumentality thereof.

### INTERROGATORY NO. 6(a)[2]:

Describe in full (i) the process, procedure and manner through which a person can become a "member" of the PA (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951)) and (ii) the process, procedure and manner through which a person can cease to be a "member" of the PA.

### OBJECTIONS TO INTERROGATORY NO. 6(a):

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing

General Objections.  In addition, Defendants specifically object to Interrogatory No. 6(a) on the

grounds that:  (a) the Interrogatory is overly broad and unduly burdensome particularly with

respect to its lack of a timeframe and the lack of any reasonable restrictions as to the scope of

information it requests (*e.g.*, its request to "[d]escribe in full" "the process, procedure, and

---

[2] Plaintiffs previously served Defendants with Interrogatory No. 6 on September 19, 2011.  Therefore, Defendants will refer to the interrogatory labeled "Interrogatory No. 6" in the set of interrogatories served on Defendants on November 21, 2012 as "Interrogatory No. 6(a)."

1292690.2

manner through which a person can become a 'member' of the PA"); (b) the Interrogatory seeks disclosure of information that is irrelevant to any party's claim or defense, and the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence; (c) as potentially construed, the words "full," "process," "procedure," "manner," and "member" are vague and ambiguous; (d) the Interrogatory, while styled as single interrogatory, is composed of multiple discrete subparts that count as separate interrogatories, and (e) the Interrogatory exceeds the 25-interrogatory limit set by Federal Rule of Civil Procedure 33(a)(1) as modified by Paragraph 7 of the Scheduling Order issued by the Court on June 24, 2011 (DE 131).

## ANSWER TO INTERROGATORY NO. 6(a):

Subject to, and without waiving the foregoing General and Specific Objections, Defendants hereby answer this Interrogatory as follows:

The PA is not a labor union like the unincorporated association at issue in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951), but the PA does have members in the sense that elected and appointed officials assume and cease their positions with the PA in accordance with the pertinent legislation and regulations governing within the Occupied Palestinian Territory.  The PA also has members in the sense that it has employees who assume and cease their positions with the PA in accordance with the pertinent legislation and regulations governing within the Occupied Palestinian Territory, and in accordance with individual employment decisions made by officials within the PA.

## INTERROGATORY NO. 7:

Describe in full (i) the process, procedure and manner through which a person can become a "member" of the PLO (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951)) and (ii) the process, procedure and manner through which a person can cease to be a "member" of the PLO.

6

1292690.2

**OBJECTIONS TO INTERROGATORY NO. 7:**

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections. In addition, Defendants specifically object to Interrogatory No. 7 on the grounds that: (a) the Interrogatory is overly broad and unduly burdensome particularly with respect to its lack of a timeframe and the lack of any reasonable restrictions as to the scope of information it requests (*e.g.*, its request to "[d]escribe in full" "the process, procedure, and manner through which a person can become a 'member' of the PLO"); (b) the Interrogatory seeks disclosure of information that is irrelevant to party's claim or defense, and the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence; (c) as potentially construed, the words "full," "process," "procedure," "manner," and "member" are vague and ambiguous; (d) the Interrogatory, while styled as single interrogatory, is composed of multiple discrete subparts that count as separate interrogatories, and (e) the Interrogatory exceeds the 25-interrogatory limit set by Federal Rule of Civil Procedure 33(a)(1) as modified by Paragraph 7 of the Scheduling Order issued by the Court on June 24, 2011 (DE 131).

**ANSWER TO INTERROGATORY NO. 7:**

Subject to, and without waiving the foregoing General and Specific Objections, Defendants hereby answer this Interrogatory as follows:

The PLO is not a labor union like the unincorporated association at issue in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951), but the PLO does have members in the sense that elected and appointed officials assume and cease their positions with the PLO in accordance with the Organization's governing policies and procedures. The PLO also has members in the sense that it has employees who assume and cease their positions with the PLO in accordance with the

1292690.2

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 33
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490-3   Filed 05/06/14   Page 6 of 8

Organization's governing policies and procedures, and in accordance with individual

employment decisions made by officials within the PLO.

In addition, the PLO is made up of constituent political organizations which have their

own individual members.

In addition, the PLO is the internationally recognized representative of the Palestinian

people and, as such, all Palestinian persons may be viewed as represented by the PLO from the

time of birth until the time of death.

## INTERROGATORY NO. 8:

List all "members" of the PA (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683
(N.Y. 1951)) between January 8, 2001 and the present day, and for each such "member" specify
(i) the person's full name and (ii) the date on which that person became a "member" of the PA.

## OBJECTIONS TO INTERROGATORY NO. 8:

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing

General Objections.  In addition, Defendants specifically object to Interrogatory No. 8 on the

grounds that:  (a) the Interrogatory is overly broad and unduly burdensome particularly with

respect to its more than 10-year timeframe and the lack of any reasonable restrictions as to the

scope of information it requests (*e.g.*, its request for a list of "all 'members' of the PA," "the

person's full name," and "the date on which that person became a 'member' of the PA"); (b) the

Interrogatory seeks disclosure of information that is irrelevant to any party's claim or defense,

and the Interrogatory is not reasonably calculated to lead to the discovery of admissible

evidence; (c) as potentially construed, the words "members" and "member" are vague and

ambiguous; (d) the Interrogatory, while styled as single interrogatory, is composed of multiple

discrete subparts that count as separate interrogatories, and (e) the Interrogatory exceeds the 25-

1292690.2

interrogatory limit set by Federal Rule of Civil Procedure 33(a)(1) as modified by Paragraph 7 of the Scheduling Order issued by the Court on June 24, 2011 (DE 131).

**ANSWER TO INTERROGATORY NO. 8:**

Subject to, and without waiving the foregoing General and Specific Objections, Defendants hereby answer this Interrogatory as follows:

It would be unduly burdensome for Defendants to list the requested information for all the persons described as "members" of the PA in Interrogatory Answer No. 6(a) during the time period specified in Interrogatory No. 8, but the names of certain elected, appointed, and employed officials of the PA during that period do appear in the documents Bates labeled 04:000030-04:000106 and 02:008806-02:008938, which, although they were not complied or published by either Defendant, and have not been independently verified by either Defendant, are believed to be generally accurate as to the information requested by this interrogatory.

**INTERROGATORY NO. 9:**

List all "members" of the PLO (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951)) between January 8, 2001 and the present day, and for each such "member" specify (i) the person's full name; (ii) the date on which that person became a "member" of the PLO.

**OBJECTIONS TO INTERROGATORY NO. 9:**

Defendants hereby incorporate by reference, as if fully set forth herein, the foregoing General Objections.  In addition, Defendants specifically object to Interrogatory No. 9 on the grounds that:  (a) the Interrogatory is overly broad and unduly burdensome particularly with respect to its more than 10-year timeframe and the lack of any reasonable restrictions as to the scope of information it requests (*e.g.*, its request for a list of "all 'members' of the PLO," "the person's full name," and "the date on which that person became a 'member' of the PLO); (b) the Interrogatory seeks disclosure of information that is irrelevant to any party's claim or defense,

1292690.2

and the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence; (c) as potentially construed, the words "members" and "member" are vague and ambiguous; (d) the Interrogatory, while styled as single interrogatory, is composed of multiple discrete subparts that count as separate interrogatories, and (e) the Interrogatory exceeds the 25-interrogatory limit set by Federal Rule of Civil Procedure 33(a)(1) as modified by Paragraph 7 of the Scheduling Order issued by the Court on June 24, 2011 (DE 131).

## ANSWER TO INTERROGATORY NO. 9:

Subject to, and without waiving the foregoing General and Specific Objections, Defendants hereby answer this Interrogatory as follows:

It would be unduly burdensome for Defendants to list the requested information for all the persons described as "members" of the PLO in Interrogatory Answer No. 7 during the time period specified in Interrogatory No. 9, but the names of certain elected, appointed, and employed officials of the PLO during that period do appear in the documents Bates labeled 04:000030-04:000106 and 02:008806-02:008938, which, although they were not complied or published by either Defendant, and have not been independently verified by either Defendant, are believed to be generally accurate as to the information requested by this interrogatory.

## INTERROGATORY NO. 10:

State the full factual basis for the contention (DE 92 at 2) that "Defendants lack the capacity to be sued in this Court with respect to the Second Count (Wrongful Death), Third Count (Pain and Suffering), Fourth Count (Battery), Fifth Count (Assault), Sixth Count (Loss of Consortium and Solatium), Seventh Count (Negligence), Eighth Count (Intentional Infliction of Emotional Distress), Ninth Count (Negligent Infliction of Emotional Distress), Tenth Count (Civil Conspiracy), Eleventh Count (Aiding and Abetting), Twelfth Count (Vicarious Liability/Respondeat Superior) and Thirteenth Count (Inducement)."

1292690.2

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 36
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490-4   Filed 05/06/14   Page 1 of 3

# EXHIBIT C

Case No. 1:21-cv-03043-GPG-STV   Document 69-11   filed 09/19/22   USDC Colorado   pg 37
of 38
Case 1:04-cv-00397-GBD-RLE   Document 490-4   Filed 05/06/14   Page 2 of 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARK SOKOLOW, *et al.*,

                                     Plaintiffs,

                   - against -

THE PALESTINE LIBERATION ORGANIZATION,
*et al.*,

                                    Defendants.

-----------------------------------------------------------------X

Docket No:
04-CV-397 (GBD) (RLE)

## DEFENDANTS' OBJECTIONS AND RESPONSES TO
## PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS TO DEFENDANTS
## <u>(TO THE SOKOLOW PLAINTIFFS)</u>

Defendants The Palestinian Authority ("PA") and the Palestine Liberation Organization

("PLO") (collectively "Defendants"), by their counsel, and pursuant to Rules 26 and 36 of the

Federal Rules of Civil Procedure, hereby respectfully submit their Objections and, where

applicable, Responses to "Plaintiffs' First Request for Admissions to Defendants," dated

November 21, 2012 ("Request" or "Requests"), and state as follows:

## <u>GENERAL OBJECTIONS</u>

      1.     Defendants object to the Requests to the extent that the definitions or instructions

set forth therein seek to impose requirements beyond those contained in the Federal Rules of

Civil Procedure and the Local Rules of this Court.

      2.     Defendants object to the Requests to the extent that they seek admissions

concerning matters that are "in dispute." *See* Fed. R. Civ. P. 36, cmts.

      3.     Defendants object to the Requests to the extent that they refer to documents that

were not created by Defendants or cannot be authenticated by Defendants through a reasonable

97.     The PA does not have membership dues.

**OBJECTIONS:**

Defendants incorporate herein by reference the foregoing General Objections.  In addition, Defendants object to Request No. 97 on the grounds that, as potentially construed, the use of the words and phrase "membership dues" is vague and ambiguous.

**RESPONSE:**

Defendants incorporate herein by reference the foregoing General and Specific Objections to Request No. 97.  Subject to, and without waiving those Objections, Defendants respond based on their understanding and interpretation of the terms contained in the Request as follows:

Defendants admit this Request.

**REQUEST:**

98.     The PA holds assets in its own name.

**OBJECTIONS:**

Defendants incorporate herein by reference the foregoing General Objections.  In addition, Defendants object to Request No. 98 on the grounds that, as potentially construed, the use of the words and phrase "holds assets in its own name" is vague and ambiguous.

**RESPONSE:**

Defendants incorporate herein by reference the foregoing General and Specific Objections to Request No. 98.  Subject to, and without waiving those Objections, Defendants respond based on their understanding and interpretation of the terms contained in the Request as follows:

Defendants admit this Request.