# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No. 1:21-cv-03043-RM-STV

SHELLEY LEVINE, *et al.*,

                              Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION
and THE PALESTINIAN AUTHORITY (a/k/a "The
Palestinian Interim Self-Government Authority" and/or
"The Palestinian National Authority"),

                              Defendants.

---

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT UNDER RULE 12(b)(6)

---

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this brief in response to the Supplemental Brief filed by Defendants Palestine Liberation Organization (PLO) and Palestinian Authority (PA) in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(6) (ECF 151).

For the reasons set forth below, and in Plaintiffs' original opposition to Defendants' motion to dismiss under Rule 12(b)(6) (ECF 69 at 34-51), Defendants' motion should be denied in toto.

Alternatively, if the Court finds deficiencies in any of Plaintiffs' claims, Plaintiffs request an opportunity to cure any such deficiencies by filing an amended complaint – or at least an opportunity to move for leave to file an amended complaint. Plaintiffs believe all their claims are adequately pleaded, and there is no basis to dismiss any of the claims (much less all of them) under Rule 12(b)(6). Thus, Plaintiffs cannot know what deficiencies, if any, the Court might find, and so

have no way to show **at this stage** that such (unknown) deficiencies can be cured. They should be given a chance to do so, if the Court finds any defects. "Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the opportunity to amend the complaint and cure pleading defects." *Rich v. Polis*, 2025 WL 893375, at *5 (D. Colo. Mar. 20, 2025) (cleaned up).

<u>**THE STRUCTURE OF THIS BRIEF**</u>

Unfortunately, Defendants' Supplemental Brief is systematically pervaded by a battery of blatantly specious arguments that are repeated throughout the entire woof and weave of the Brief. Because this particular subset of specious arguments effectively taints and underpins the entire Supplemental Brief, it is most efficient and logical for Plaintiffs to address these arguments separately, at the outset. Plaintiffs do so in Part I of this brief.

In Part II of this brief, Plaintiffs will respond seriatim to the particular arguments asserted in Defendants' Supplemental Brief in respect to each of Plaintiffs' four ATA liability theories.

**PART I**
<u>**SPECIOUS ARGUMENTS THAT PERVADE DEFENDANTS' BRIEF**</u>

**A.**    <u>**Defendants' Meritless Reliance on Cases involving *Commercial* Defendants**</u>

It is well established that the ATA was enacted in response to the terrorist murder of an American citizen by PLO terrorists. On October 7, 1985, Leon Klinghoffer was a passenger on the cruise ship MS Achille Lauro when it was hijacked by members of a PLO faction known as the Palestine Liberation Front (PLF). The terrorists demanded that Israel release PLO prisoners as a condition of releasing the ship. On October 8, 1985, the terrorists shot Mr. Klinghoffer, "an elderly American Jewish man confined to a wheelchair, and threw his body overboard."[1]

---

[1] Pallardy, Richard. "Achille Lauro hijacking." Encyclopedia Britannica, 30 Sep. 2025, https://www.britannica.com/event/Achille-Lauro-hijacking. Accessed 27 November 2025.

Invoking admiralty jurisdiction, the Klinghoffer family sued the PLO in federal court. Congress then enacted the ATA to enable U.S. citizens to bring actions against those liable for terrorist attacks without regard to admiralty jurisdiction. "The legislative record is replete with references to the then-recent decision in *Klinghoffer v. Palestine Liberation Organization*, 739 F.Supp. 854 (S.D.N.Y. 1990) … The repeated favorable references to *Klinghoffer* indicate a desire on the part of Congress to extend this liability to land-based terrorism that occurred in a foreign country." *Cf. Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002). *Cf. Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 444 (E.D.N.Y. 2008) (The ATA "was first introduced in the wake of *Klinghoffer* … in which heirs of an American national killed in a terrorist attack in the Mediterranean sued the Palestinian Liberation Organization.").

Thus, the instant case, which, like *Klinghoffer*, arises from a terrorist attack carried out for ideological reasons by a PLO faction – there the PLF, here the PFLP – fits squarely within the original, **heartland application of the ATA** envisioned by Congress when it enacted the statute.

Its origins notwithstanding, the ATA's application has broadened over the years as Americans who were injured, or whose loved ones were murdered, in terrorist attacks abroad, have brought ATA actions against banks, internet and communications companies, and other commercial, non-ideological entities alleged to have provided services to, or acted in collusion with, the terrorist groups responsible. Courts have frequently found ATA actions brought against such commercial defendants to state valid ATA claims. *Cf. Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) (finding plaintiffs had stated a valid ATA claim against a bank); *Moses v. BNP Paribas*, S.A., 2025 WL 2780803 (S.D.N.Y. Sept. 30, 2025) (same); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019) (same); *Finan v. Lafarge S.A.*, 2025 WL 2504317, at *2 (E.D.N.Y. Aug. 29, 2025) (same); *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405

(S.D.N.Y. 2021) (same); *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at \*23 (S.D.N.Y. Feb. 25, 2025) (same regarding cybercurrency platform); *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023) (same regarding telecommunications company).

Some ATA suits brought against such purely commercial actors have been dismissed because the plaintiffs could not show the defendant acted with a sufficiently culpable state of mind, or because its conduct was too far removed from the terrorist group involved. ATA suits against commercial defendants that acted out of mere greed, simple negligence or legitimate ignorance, or had no direct relationship with the terrorist group, have been dismissed for failure to state a claim. The case Defendants rely most heavily on in support of their Rule 12(b)(6) motion, *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), involved exactly such an innocent commercial defendant.

Significantly, **all but four** of the ATA dismissals relied upon by Defendants here involved innocent commercial defendants. This important fact **inherently** distinguishes the instant case from the cases relied upon and cited by Defendants in support of their Rule 12(b)(6) motion.

Furthermore, the allegations and circumstances of the three cases against noncommercial defendants relied upon by Defendants are completely inapposite to the allegations and circumstances of this case:

Defendants rely on *Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322 (S.D.N.Y. May 5, 2014). The *Ahmad* plaintiffs, Palestinian living in the West Bank, alleged they were harmed by unknown persons from among the "over half a million" Israelis living in the West Bank. *Id.* at \*1. The *Ahmad* plaintiffs filed an ATA suit against U.S.-based charities that provided funds to Israeli residents and communities in the West Bank. The court justifiably dismissed the case, highlighting the absurdity of the plaintiffs' theory of liability: "[T]he Amended Complaint alleges no facts suggesting that Defendants were aware—or even deliberately indifferent to the

possibility—that the financial support they provided … would be used to support any violent activity … The Amended Complaint … does not claim that [the defendants] provided money to the specific organizations or individuals that engaged in terrorist activities … Essentially, the Amended Complaint alleges that Defendants transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs." *Id*. at *3-4.

In direct contrast to *Ahmad*, Plaintiffs here allege in detail that Defendants intentionally provided funding and other material support directly to the specific designated terrorist organization (the PFLP) that carried out the attack. *Ahmad* could not be more inapposite.

Defendants also invoke *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace*, 66 F.4th 1007 (D.C. Cir. 2023). The plaintiffs there were Americans alleging harm from incendiary balloons and kites launched into Israel by Hamas, from the Gaza Strip. Their theory of liability was based on what the Court of Appeals described (not complementarily) as "a vast conspiracy." *Id*. at 1012. According to the plaintiffs, the defendant, USCPR, a U.S.-based non-profit corporation, "provides material support and fiscal sponsorship to" an entity known as "the Boycott National Committee," which in turn was somehow affiliated with Hamas. Thus, "by giving money to the Boycott National Committee, USCPR is giving money to Hamas." *Id*. at 1013 (cleaned up).

The D.C. Circuit affirmed the district court's dismissal of the action, finding that the "web of connections alleged in the Complaint falls far short of establishing that the Boycott National Committee is an extension of Hamas or has been taken over by Hamas. Thus, appellants fail to lend factual support to their claim that USCPR provided money to Hamas." *Id*. at 1015. The court also rejected plaintiffs' basis for attributing the attacks to Hamas – namely, the claim that nothing

occurs in Gaza with Hamas' consent – and therefore found that the plaintiffs had failed to adequately plead even Hamas' involvement in the attacks. *Id*.

The facts of *Keren Kayemeth* bear no resemblance to this case. Plaintiffs do not weave a complex "web of connections" – the facts here are simple and straightforward: Defendants **directly** funded and materially supported the PFLP, which in turn **itself** carried out the attack.

Defendants also rely heavily on *Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025). The plaintiffs in that case were Americans harmed in Hamas' notorious October 7, 2023, attack on Israel. The defendants were a raft of U.S.-based activist organizations alleged to have engaged in pro-Hamas propaganda and social media messaging in the United States. *Id*. at *3. Unsurprisingly the court found that plaintiffs' theory of liability – i.e., that pro-Hamas preaching in the United States somehow rendered the defendants liable under the ATA for the October 7 attack – failed to state a viable claim.

*Parizer* has nothing to do with the facts and allegations of this case.

Finally, Defendants seek to rely on *Lavi v. UNRWA USA Nat'l Comm., Inc.*, 2025 WL 2300038, at *1 (D. Del. Aug. 8, 2025). There, the plaintiffs alleged that the defendant, a U.S.-based non-profit organization, provided charitable funds to the United Nations Relief and Works Agency (UNRWA) in the Gaza Strip, which in turn allegedly collaborated with Hamas.

Notably, unlike this case, *Lavi* was based on allegations of **indirect and unwitting** support to a terrorist organization. The *Lavi* court dismissed the case after finding that the plaintiffs had failed to adequately allege: (1) that the defendant was aware that its funds might reach Hamas; (2) that UNRWA was involved with Hamas; (3) that any of the funds actually reached Hamas; and (4) that the defendant and Hamas shared common goals or ever interacted. *Id*. at *2-8.

Thus, *Lavi*, too, is wholly inapposite here.

***

In sum: **not one** of the ATA dismissals relied upon by Defendants throughout their Supplemental Brief presented allegations and circumstances even vaguely similar to the allegations and circumstances here. The Court should therefore reject Defendants' attempts to rely on those cases.

## B.   <u>Defendants' "Legitimate Governmental Activities" Argument Is Meritless</u>

Throughout their Supplemental Brief, Defendants repeatedly and systematically characterize their culpable activities – i.e., their provision of material support and resources to the PFLP – as "governmental" in nature. (*Cf.* ECF 151 at 5 (Defendants provide "governmental support to the PFLP"); at 15 (Defendants' payments to convicted PFLP terrorists are "part of a Palestinian government program"); at 16 (referring to Defendants' "governmental support" to the PFLP); at 21-22 (referring to Defendants' "governmental funding provided to the PFLP")).

Building on this "governmental" characterization, Defendants then assert that because their conduct involved "legitimate governmental activities," it is not actionable under the ATA. "Defendants as governmental entities 'invariably maintain legitimate government activities,'" which include their relationship with the PFLP. (ECF 151 at 8). In purported support of this argument, Defendants cite *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 868 (D.C. Cir. 2022), *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018), *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), and *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 678 (D.C. Cir. 2023).

This line of argument fails for two reasons:

<u>**First**</u>, the cases relied on by Defendants – *Bernhardt*, *Owens*, *Rothstein* and *Ofisi* – did **not** hold that government assistance to a terrorist group is "legitimate" or shielded from liability. Those cases all involved allegations that a defendant had provided material support to a foreign state that was known to fund the terrorist group that harmed the plaintiffs. The courts held that because even

7

foreign state sponsors of terrorism fund numerous legitimate activities, a defendant which provides funds to that state is not liable for terrorist attacks carried out by groups funded by the state.

Simply put: giving funds to Iran does not make one liable for terrorist attacks carried out by terrorist groups funded by Iran.

Clearly, then, the holdings in *Bernhardt*, *Owens*, *Rothstein* and *Ofisi* are irrelevant here.

**Second**, no court has ever excused a foreign government that funded a terrorist group from liability on the grounds that such conduct is "legitimate" governmental activity. To the contrary, in a recent ruling in an ATA suit brought by 9/11 victims against Sudan, the court found that plaintiffs had stated a valid claim against Sudan for primary liability under the ATA, because "Sudan provided al Qaeda not only money, but sanctuary, training diplomatic papers, and sovereign protection." *In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4227151, at *21 (S.D.N.Y. May 3, 2022) *report and recommendation adopted in relevant part*, 2023 WL 5132138 (S.D.N.Y. Aug. 10, 2023) at *10, *confirmed in relevant part*, 2024 WL 809887 (S.D.N.Y. Feb. 27, 2024), at *2. Defendants' "legitimate government activities" argument is therefore meritless.

Remarkably, at one point in their Supplemental Brief, Defendants even attempt to cloak the PFLP itself in the mantle of "legitimate activities," by quoting a 1997 immigration decision stating the PFLP conducts some lawful activities in addition to its terrorist activities. To the extent that Defendants are arguing that their material support of the PFLP was legitimate because the PFLP conducts some lawful activities, that argument fails for multiple reasons:

**First**, the FAC's allegations against Defendants relate to the period **commencing in 1999**. Whatever the PFLP might have been doing in 1997 or earlier is irrelevant here. [2]

---

[2] Moreover, Defendants cannot factually challenge the allegations of the FAC on a Rule 12(b)(6) motion.

**Second**, and relatedly, the decision cited by Defendants, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 119 F.3d 1367 (9th Cir. 1997), was entered on July 10, 1997. But the PFLP was subsequently designated as a Foreign Terrorist Organization (FTO) on October 8, 1997.[3] What the PFLP was doing before it was designated as FTO is simply not relevant to this case.

**Third**, the Supreme Court has determined that "designated foreign terrorist organizations are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 38 (2010) (cleaned up). Therefore, as a matter of both law and fact, it is impossible to fund an FTO without facilitating terrorism.

**C.     Defendants Seek to Misdirect the Focus from the PFLP to the Individual Perpetrators**

Defendants' Supplemental Brief systematically mischaracterizes Plaintiffs' allegations as based on Defendants' relationship with the individual PFLP operatives who personally carried out the attack (rather than with the PFLP as an organization) and then argues that Plaintiffs failed to adequately allege facts connecting Defendants to the individual killers. By Plaintiffs' count, Defendants repeat this argument at least ten times. But it is completely baseless:

Plaintiffs' FAC clearly and consistently alleges that the attack from which this action arises was carried out by the PFLP **as an organization**, and that Defendants are liable because of their material support and assistance to, and collaboration with, the PFLP **as an organization**.

The FAC does not allege that Defendants had a relationship with the two PFLP operatives who personally executed the attack and were killed at the scene. No such allegations are necessary. In support of their primary liability claim, Plaintiffs assert Defendants violated 18 U.S.C. § 2339B.

---

[3] *See* https://www.state.gov/foreign-terrorist-organizations

That provision criminalizes the provision of material support "to a foreign terrorist organization." A natural person (such as an individual perpetrator) is not a "foreign terrorist organization." Thus, § 2339B applies when the support was provided to an FTO (such as the PFLP), **not an individual**.

Likewise, Plaintiffs' respondeat superior claim is based on the role of the PFLP **as an organization** as an agent of the Defendants. It is well established that an agent need not be a natural person; an organization can be an agent for respondeat superior purposes. *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001) (finding Iran liable under respondeat superior for the terrorist actions of Hizbollah); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007) (member of global accounting firm, which was an umbrella organization for member firms, could be liable under respondeat superior for fraud committed by Italian member firm).

Accordingly, Plaintiffs' claim for respondeat superior liability does not require any relationship between Defendants and the individual perpetrators.

Nor do Plaintiffs' aiding and abetting and conspiracy claims under ATA § 2333(d) require that Defendants aided, abetted, or conspired with the individual PFLP operatives who personally executed the attack. "[A] defendant may be liable under § 2333(d) even if it did not directly conspire with the specific individual representative of the FTO who, for instance, actually planted the [bomb] that injured or killed a plaintiff." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 97 n.38 (E.D.N.Y. 2019) (cleaned up). Indeed, in many and perhaps most ATA actions, the identity of the individual perpetrators is unknown. For example, in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), the plaintiffs were U.S. citizens injured by rockets fired from Lebanon into Israel by Hezbollah terrorists, and the defendant was a bank alleged to have provided financial services to Hezbollah. The Second Circuit found the plaintiffs alleged a valid ATA aiding and abetting claim, even though the identity of the individual Hezbollah terrorists was unknown.

The Court should disregard Defendants' misdirection regarding the attackers.

**D.**     **Defendants Blatantly Misrepresent the FAC's References to Post-Attack Events**

Another specious argument pervading Defendants' Supplemental Brief is that the FAC "focuses on Defendants' post-Attack conduct" (ECF 151 at 19) rather than their pre-Attack actions. Defendants repeat this "post-Attack focus" theme numerous times in their Supplemental Brief. Defendants assert that Plaintiffs' case is built primarily on post-Attack events, and that post-Attack events are irrelevant to their liability. Both of assertions are entirely meritless:

**First**, the FAC sets forth in extensive detail a broad range of actions taken by Defendants **before** the Attack, continuously since 1999, which render them liable. It is thus risible to claim that Plaintiffs have failed to allege culpable pre-Attack conduct by Defendants.

**Second**, while post-Attack actions obviously cannot **cause** the Attack, they are extremely relevant to proving Defendants' culpable state of mind prior to and at the time of the Attack.

Rule 404(b) of the Federal Rules of Evidence permits the use of subsequent acts to prove Defendants' motive, intent, plan, and knowledge. "A subsequent act, as well as a prior act, can be used to show intent under Rule 404(b)." *United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985). Indeed, "[s]ubsequent acts evidence is particularly relevant when a defendant's intent is at issue." *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006). Likewise, subsequent acts can be used to prove the state of mind elements of a conspiracy. *United States v. Ogunlaja*, 2024 WL 3595535, at *9 (D.N.M. July 30, 2024). Moreover, subsequent acts can be used to prove that a conspiracy existed in the past. *United States v. Bailey*, 133 F. App'x 534, 538 (10th Cir. 2005).

Thus, the FAC's allegations regarding Defendants' post-Attack actions and statements are highly relevant to and probative of their state of mind during the time leading up to the Attack, and in no way detract from the FAC's detailed allegations about Defendants' pre-Attack actions.

**E. Defendants' Self-Serving Modifiers Should Be Disregarded**

Defendants have systematically larded their Supplemental Brief with modifiers designed to self-servingly misrepresent the facts concerning the material support they provided to the PFLP.

For example, Defendants describe their material support to the PFLP as merely "political" seventeen times, as "generalized" twelve times, and as "limited" nine times. Evidently, Defendants believe they can persuade this Court of unsupported factual claims by dint of incessant repetition.

But this is a Rule 12(b)(6) motion, and Defendants cannot challenge the factual allegations of the FAC. Since none of these adjectives has any basis whatsoever in the actual factual allegations of the FAC, the Court should disregard them.

***

In conclusion of this Part: Defendants' Supplemental Brief is systematically interwoven with the raft of unfounded arguments discussed above. With those specious arguments now rebutted, the task of responding to Defendants' remaining arguments has been greatly simplified.

**PART II**
**ALL FOUR OF PLAINTIFFS' ATA CLAIMS ARE ADEQUATELY PLEAD**

**A. The FAC States a Valid Claim for Direct Primary ATA Liability**

Defendants assert that the FAC fails to state a claim for primary ATA liability. As shown presently, Defendants' arguments in this regard are all meritless.

    i.   Proximate Cause

Defendants assert the FAC does not plead sufficient facts showing proximate cause. (ECF 151 at 13-17). This claim is unfounded. In an ATA action, proximate cause requires merely that Defendants' "conduct was a substantial factor in the sequence of responsible causation" and that the "injury was reasonably foreseeable or anticipated as a natural consequence" of that conduct.

Importantly, "[a]llegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA." *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 46 (E.D.N.Y. 2019) (cleaned up).

Notably, a "showing that defendant's conduct was the 'but for' cause of plaintiff's injuries" is **not** required in an ATA case. *Id*. And "plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because money is fungible." *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 418–19 (S.D.N.Y. 2021) (cleaned up).

Plaintiffs' allegations easily meet this standard. The FAC alleges: (1) the PFLP is a designated FTO that for decades carried out numerous deadly terrorist attacks (¶¶ 115, 154-160); (2) for a period of 15 years prior to the Attack, Defendants provided the PFLP with massive funding, as well as other material support and resources, including a geographic base of operations adjacent to Israel, direct financial support for PFLP terrorist operatives, a dedicated radio frequency for the PFLP's radio station, and internet access for the PFLP's websites (¶¶ 126-146); and (3) the material support and resources provided by Defendants greatly enhanced the PFLP's organizational and operational capabilities, and enabled the PFLP to recruit, build, maintain and deploy the human, material, and operational resources and infrastructure that were needed and used by the PFLP to plan, organize and execute acts of terrorism, including the Attack. (¶¶ 126-146, 153-155, 174).

Clearly then, Defendants' "conduct was a substantial factor in the sequence of responsible causation" and the Attack "was reasonably foreseeable or anticipated as a natural consequence" thereof. Indeed, courts have found proximate cause satisfied in far less egregious circumstances.

For example, in *Schansman*, the court found proximate cause satisfied where the defendant banks had provided money transfer services to a notorious Russian terrorist group, which later shot down a commercial airliner. *Id* at 418-19. Similarly, the *Miller* court held that proximate cause was met because the defendant bank provided banking services for the benefit of various terrorist groups that harmed the plaintiffs. *Id*. at 46-47.

Thus, the FAC adequately pleads proximate cause.

ii.   The "Appear to Be Intended" Requirement

Defendants assert (ECF 151 at 19-20) that the FAC fails to allege that Defendants' activities "appear to be intended" "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." § 2331(1)(B).

This claim is baseless. The "appear to be intended" requirement "depends on whether the consequences of the defendant's activities were reasonably foreseeable. … A knowing donor to an FTO – that is a donor who knew the terroristic aims and activities directed at a particular territory – would know that donations to the entity would enable it to kill more people in the territory. And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination. *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 161 (2d Cir. 2021) (cleaned up). Not only did Defendants foresee the consequences of its provision of support to the PFLP, it affirmatively sought those results, as detailed in the FAC. Additionally, the FAC alleges Defendants intended their conduct to influence the United States government and the American public. (¶¶ 183, 201).

iii.   The "Acts Dangerous to Human Life" Requirement

Defendants assert (ECF 151 at 20) that the FAC fails to adequately allege that their actions were "dangerous to human life." This argument too, is without merit, for the reasons detailed in a decision entered in an ATA action against Sudan's for its provision of material support to Al Qaeda:

> Sudan's acts were … dangerous to human life. **The degree to which giving material support to a terrorist group is dangerous to human life depends on the nature and scale of the support.** Thus, in *Boim v. Holy Land Found. for Relief & Dev.*, the Court of Appeals for the Seventh Circuit found that giving money to Hamas was dangerous to human life because it was like "giving a loaded gun to a child." 549 F.3d 685, 690 (7th Cir. 2008). Conversely, the Court of Appeals for the Second Circuit, found that simply providing routine banking services to a terrorist organization was not a sufficiently dangerous act. *Linde*, 882 F.3d at 327.
>
> Sudan's support is closer to, and indeed beyond the support given in *Boim*, where cash was knowingly provided to a terrorist group, than it is to *Linde*, where a bank provided routine financial services to terrorist leaders. Sudan provided al Qaeda not only money, but sanctuary, training diplomatic papers, and sovereign protection. **Providing such extensive support to an organization bent on [carrying out terrorist attacks] is clearly a dangerous act**. As noted, **Sudan's argument that Plaintiffs must allege that this support is specifically connected to the September 11 Attacks is unsupportable**.

*In re Terrorist Attacks*, 2022 WL 4227151, at *21 (emphasis added).

Here, as in *In re Terrorist Attacks*, Defendants provided a **wide range** of material support to the PFLP, and their conduct was therefore dangerous to human life. Courts have found far less to suffice. *Cf. Miller*, 372 F. Supp. 3d at 45 (mere provision of financial services to a terrorist group is an "act dangerous to human life") and *Schansman*, 565 F. Supp. 3d at 416 (same); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *7 (M.D. Fla. Mar. 31, 2011) ("[A]lthough the provision of money to a terrorist organization such as the FARC may not be violent, it is clearly dangerous to human life."); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 266 (E.D.N.Y. 2019) ("[W]hen banks ... route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing 'acts dangerous to human life.'")

iv.  <u>The Criminal Violation Requirement</u>

Under ATA §§ 2331 and 2333, in order for primary liability to arise the defendant's conduct must constitute "a violation of the criminal laws of the United States or of any State, or … would be a criminal violation if committed within the jurisdiction of the United States or of any State." § 2331(1)(A). In satisfaction of this "criminality" requirements, the FAC alleges that Defendants' conduct violated the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C. (FAC ¶ 181).

Defendants assert that the FAC fails to plead a violation of § 2339B "because Plaintiffs allege, at most, that Defendants provided *de minimis* support—not 'material support,' as the statute requires—to the PFLP." (ECF 151 at 22). This argument fails for two reasons:

**<u>First</u>**, Defendants have misunderstood the term "material" in this provision:

> [T]he district court seems to have **inadvertently redefined** the term "material" in the context of sections 2339A and 2339B **as meaning substantial or considerable**. The statute itself defines "material support or resources" as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b). Thus, **the term relates to the type of aid provided rather than whether it is substantial or considerable**.

*Boim v. Quranic Literacy Inst., et al.*, 291 F.3d 1000, 1015 (7th Cir. 2002) (emphases added).

Defendants do not (and cannot) dispute that the types of assistance they gave the PFLP are included in the statutory definition of "material support and resources."

**<u>Second</u>**, the scope and substance of the material support provided by Defendants to the PFLP, as detailed in the FAC, is anything but *de minimis*.

Thus, there is no question whatsoever that Defendants' conduct violated 18 U.S.C. § 2339B, and the ATA's criminality requirement is therefore fully satisfied here. And since the

criminality prong has been met, it is unnecessary for Plaintiffs, or the Court, to address Defendants' arguments that Plaintiffs have failed to plead violations of §§ 2339A or 2339C.

In sum: the FAC pleads a valid ATA claim for primary liability, and Defendants' arguments to the contrary are meritless.

**B.**     **The FAC States a Valid Claim for ATA Liability on the Basis of Respondeat Superior**

Plaintiffs also allege that Defendants are primarily liable under the ATA under respondeat superior, because the Attack was an "act of international terrorism" under § 2333(a), and the PFLP—as an organization—executed the Attack as Defendants' agent. (FAC ¶¶ 200-204).

In their opposition to Defendants' motion to dismiss, Plaintiffs showed that *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242 (10th Cir. 2020), which clarified the elements of respondeat superior liability in tort where, as here, the agent is not the employee of the principal, governs their respondeat superior claim. (ECF 69 at 42-46).

Defendants' Supplemental Brief contains a jumble of arguments purporting to challenge Plaintiffs' respondeat superior claims. (ECF 151 at 22-25). Because the defense of Plaintiffs' respondeat superior claims contained in their opposition to the motion dismiss (ECF 69 at 42-46) is detailed and thorough, and because the Supplemental Brief says nothing significant about the topic, Plaintiffs will rest on their original papers (ECF 69 at 42-46), subject to the comments below:

*First*, Defendants ignore *Alfaro-Huitron* and cite to inapposite case law concerning employees; *second*, Defendants' stylistic complaint that the FAC pleads respondeat superior under a separate heading, rather than including it as a theory of liability within their direct primary liability claim, is meaningless; *third*, Defendants' assertion that the FAC fails to allege any underlying tort is untrue: the FAC alleges in specific detail that the PFLP—Defendants' agent—has primary ATA liability for the attack. (ECF 50 at ¶¶ 201-203); *fourth*, Defendants invoke bad law, citing *Parsons*

*v. Palestinian Authority*, 715 F. Supp. 2d 27, 33-34 (D.D.C. 2010) as finding "no basis on which to assign vicarious liability to the PA for the alleged criminal acts of a few employees." But Defendants neglect to mention that this ruling was **rejected** on appeal. "The district court stated without explanation that 'we have no basis on which to assign vicarious liability to the PA for the alleged criminal acts of a few employees.' We have never so held." *Parsons v. Palestinian Authority*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, Circuit Judge, concurring).

**C.**     **The FAC States a Valid Aiding and Abetting Claim**

Defendants vigorously insist in their Supplemental Brief that *Twitter v. Taamneh*, 598 U.S. 471 (2023) dooms Plaintiffs' aiding-and-abetting claim here. In support of this assertion, Defendants argue at length that the FAC fails to show a specific "nexus" between Defendants' aiding and abetting and the specific Attack from which this action arises.

But Defendants ignore the fact that *Twitter* does not require a "nexus" where, as here, a defendant "systemically and pervasively assisted" the terrorist organization. *Id*. at 501. Simply put, "a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Id*. at 496.

Defendants are ideological entities which for 15 years prior to the Attack systematically provided a wide range of material support and resources directly to the PFLP—for the specific purpose of enabling exactly such attacks. They are therefore liable for **all** PFLP attacks.

Indeed, numerous post-*Twitter* decisions have denied Rule 12(b)(6) motions even in suits against commercial defendants who were accused of conduct infinitely less direct and egregious than that of Defendants here. *See e.g. Moses v. BNP Paribas, S.A.*, 2025 WL 2780803 (S.D.N.Y. Sept. 30, 2025) (finding U.S. victims of Iranian-sponsored terror attacks stated a valid ATA aiding and abetting claim under *Twitter* against a commercial bank alleged to have provided banking

services to Iranian-linked petroleum companies); *Hakimyar v. Habib Bank Ltd.*, 2025 WL 605575 (S.D.N.Y. Feb. 25, 2025) (finding U.S. victims of Al Qaeda attacks stated valid ATA aiding and abetting claim against commercial bank alleged to have provided banking services to Al Qaeda-related customers, and rejecting argument that *Twitter* precluded the aiding and abetting claim); *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at *18-24 (S.D.N.Y. Feb. 25, 2025) (finding victims of Hamas attacks stated valid ATA aiding and abetting claim under TRIA against crypto-currency company alleged to have provided services to Hamas-related customers); *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023) (same, in suit against telecommunications companies that provided funding, technology, and logistical support to terrorist proxies of Iran).

Thus, *Twitter* provides no succor to Defendants.

Therefore, and for the reasons detailed in Plaintiffs' opposition to the motion to dismiss (ECF 69 at 46-49) Defendants' motion to dismiss the aiding and abetting claims should be denied.

**D.**    **The FAC States a Valid Conspiracy Claim**

Defendants' Supplemental Brief challenges Plaintiffs' ATA conspiracy claim on the ground that the FAC fails to an allege an agreement between Defendants and the PFLP. This assertion is completely baseless: the FAC alleges in extensive detail how the Defendants and the PFLP worked "hand-in-glove" for decades, carrying out their respective complementary roles, utilizing terrorism, and the threat of terrorism, to achieve their shared goals. (FAC ¶¶ 147-154).

Defendants also rely on stale and inapposite caselaw, involving commercial defendants alleged to have conspired with terrorist groups. Tellingly, however, Defendants fail to address two recent decisions denying Rule 12(b)(6) motions to dismiss ATA conspiracy claims—even though the defendants were commercial actors:

In *Hakimyar*, 2025 WL 605575, the court concluded that the plaintiffs stated a valid ATA

conspiracy claim against a commercial bank providing services to Al Qaeda-related customers, because the bank and Al Qaeda "shared a common object: to force the U.S. military to leave Afghanistan." *Id*. at *10. So too here, as extensively detailed in the FAC, Defendants and the PFLP shared the common goal of using of terrorism to cause Israel to leave territories claimed by them.

And in *Finan v. Lafarge S.A.*, 2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025), the court held that the plaintiffs had stated a valid ATA conspiracy claim against French companies that paid ISIS to allow the continued operation of their cement plant in Syria. The court found that though the defendants did not share ISIS' ideology, their "interest in maintaining their cement operations in Syria […] converged with ISIS's purpose of building and maintaining a geographic strong-hold […] these conspiracies advanced Defendants' economic motives while simultaneously advancing ISIS and ANF's political motives by maintaining their foothold in the region." *Id*. at *22.

*Finan* applies here *a fortiori*, since Defendants and the PFLP __*do*__ share the same ideology.

## CONCLUSION

Defendants' motion to dismiss under Rule 12(b)(6) should be denied in its entirety.

Alternatively, if the Court finds any of Plaintiffs' claims deficient, it should grant Plaintiffs an opportunity to cure any deficiencies by filing an amended complaint, or at least to move for leave to file an amended complaint.

DATED this 27th day of November, 2025

Respectfully submitted,

*s/ Daniel K. Calisher*
Daniel K. Calisher
Foster Graham Milstein & Calisher, LLP

360 South Garfield Street, 6th Floor
Denver, Colorado 80209
Telephone: 303-333-9810
Email: calisher@fostergraham.com
*Attorneys for Plaintiffs*


s/ Asher Perlin
Asher Perlin, Esq.
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: 786-233-7164
Email: asher@asherperlin.com
*Attorneys for Plaintiffs*